# JUDGE SWAIN

## 06 CV 5724

James T. Shirley, Jr. (JTS 6114)
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

Attorneys for Plaintiffs Michael Williamson, The Estate of Don C. Craft, Kirk O'Donnell, John Lettow, Timothy McGinnis, Fred Newton, William Watson, Chris Hancock, Dale Schoeneman and International Deep Sea Survey, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
2 8 2006
U.S.D.C. S.D. N.Y.
CASHIERS

| | |
|---|---|
| MICHAEL WILLIAMSON, THE ESTATE OF DON C. CRAFT, KIRK O'DONNELL, JOHN LETTOW, TIMOTHY MCGINNIS, FRED NEWTON, WILLIAM WATSON, CHRIS HANCOCK, DALE SCHOENEMAN, and INTERNATIONAL DEEP SEA SURVEY, INC., <br><br> Plaintiffs, <br><br> v. <br><br> RECOVERY LIMITED PARTNERSHIP, COLUMBUS EXPLORATION, LLC, COLUMBUS-AMERICA DISCOVERY GROUP, INC. COLUMBUS EXPLORATION LIMITED PARTNERSHIP, OMNI ENGINEERING, INC., OMNI ENGINEERING OF OHIO, INC., ECONOMIC ZONE RESOURCE ASSOCIATES, ECONOMIC ZONE RESOURCE ASSOCIATES, LTD., EZRA, INC., EZRA OF OHIO, INC., ECON ENGINEERING ASSOCIATES, INC., DOE.E, INC., THOMAS G. THOMPSON, GILMAN D. KIRK, JAMES F. TURNER, MICHAEL J. FORD, and W. ARTHUR CULLMAN, JR., <br><br> Defendants. | 06 Civ. <br><br> **VERIFIED COMPLAINT** |

Plaintiffs, Michael Williamson, The Estate Of Don C. Craft, Kirk O'Donnell, John

Lettow, Timothy Mcginnis, Fred Newton, William Watson, Chris Hancock, Dale Schoeneman

(the "Individual Plaintiffs"), and International Deep Sea Survey, Inc. ("IDSS") (collectively "Plaintiffs"), by and through their attorneys, Holland & Knight LLP, for their verified complaint against defendants Recovery Limited Partnership ("RLP"), Columbus Exploration, LLC ("CXLLC"), Columbus-America Discovery Group, Inc. ("CADG"), Columbus Exploration Limited Partnership ("CXLP"), Omni Engineering, Inc. ("Omni"), Omni Engineering of Ohio, Inc. ("Omni Ohio"), Economic Zone Resource Associates, Economic Zone Resource Associates, Ltd., EZRA, Inc., EZRA of Ohio, Inc., Econ Engineering Associates, Inc. ("Econ"), DOE.E, Inc., Thomas G. Thompson ("Thompson"), Gilman D. Kirk ("Kirk"), James F. Turner ("Turner"), Michael J. Ford ("Ford"), and W. Arthur Cullman, Jr. ("Cullman") (collectively "Defendants"), allege, upon information and belief, as follows:

## JURISDICTION AND PARTIES

1.      This is a case of admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333 as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.      Plaintiffs are persons or entities to which some or all of the Defendants herein promised remuneration based on the gross value of gold, silver and valuable artifacts recovered from the shipwreck of the *S.S. Central America*, a United States Mail Steamship that sank off the coast of South Carolina in 1857. Specifically, Plaintiffs were promised a percentage of the gross value of the recovered treasure as consideration for executing non-disclosure and non-compete agreements. The Individual Plaintiffs all are members of Defendant Thomas G. Thompson's team, which first imaged the *S.S. Central America* in 1986 and which confirmed that it was the *Central America* in 1988, and which subsequently recovered gold, silver and other artifacts from the sunken ship. Despite there being unquestionable proof that literally tons of gold and other

valuables were recovered from the *S.S. Central America*, Defendants never have paid Plaintiffs as promised and have refused to provide Plaintiffs with any information as to what happened to the treasure (or the proceeds from the treasure). Defendants' failure to pay Plaintiffs and to provide the requested information constitutes a breach of contract.

3.      Plaintiffs have commenced a proceeding in Ohio against many of the Defendants herein, with the exception of CADG, CXLP, Omni, Omni Ohio, Economic Zone Resource Associates, Ltd., EZRA, Inc., EZRA of Ohio, Inc., and DOE.E, Inc. That proceeding is an admiralty proceeding pending in the United States District Court for the Southern District of Ohio, Eastern Division, before the Honorable Edmund A. Sargus, Jr., entitled *Michael Williamson et al. v. Recovery Limited Partnership et al., No. C2-06-292* (the "Ohio Proceeding"). Plaintiffs originally thought that CADG was either a trade name or other representative name of some of the other Defendants herein or is an alter-ego of those Defendants. Plaintiffs learned only recently of the actual corporate existence of, or ongoing existence of, the remainder of the additional defendants. Plaintiffs are in the process of preparing a motion to amend their complaint in the Ohio Proceeding to include CADG, CXLP, Omni, Omni Ohio, Economic Zone Resource Associates, Ltd., EZRA, Inc., EZRA of Ohio, Inc., and DOE.E, Inc. as defendants.

4.      At all times material herein, Plaintiffs were individuals that resided, or were companies incorporated and with principal places of business, in states of the United States.

5.      The Individual Plaintiffs all are persons who provided technical expertise to one or more of the Defendants in the course of the search for and/or recovery of the gold, silver and other artifacts from the *S.S. Central America*.

6.    Plaintiff IDSS rented deep sea survey equipment to one or more of the Defendants in the course of the search for and/or recovery of the gold, silver and other artifacts from the *S.S. Central America.*

7.    Upon information and belief, Defendant RLP is a limited partnership organized under the laws of the State of Ohio, with its principal place of business in Columbus, Ohio.

8.    Upon information and belief, Defendant CXLLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Fernandina Beach, Florida.

9.    Upon information and belief, Defendant CADG is a corporation organized under the laws of the State of Ohio, with its principal place of business in Columbus, Ohio.

10.    Upon information and belief, Defendant CXLP is a limited partnership organized under the laws of the State of Ohio, with its principal place of business in Fernandina Beach, Florida.

11.    Upon information and belief, Defendant Omni is a corporation organized under the laws of the State of Delaware, with its principal place of business in Fernandina Beach, Florida.    Upon information and belief, Defendant Omni is the general partner of Defendant CXLP.

12.    Upon information and belief, Defendant Omni Ohio is another registered name for Defendant Omni.

13.    Upon information and belief, Defendant Thompson is the president of Defendant Econ and is a resident of Ohio or Florida.    He also is a member of Defendant CXLLC and serves as the chairman of the company's board of directors ("Chairman").    Thompson also was formerly the general partner of Defendant RLP.

4

14.     Upon information and belief, Defendant Econ is a corporation organized under the laws of the State of Ohio, with its principal place of business in Columbus, Ohio.  Econ is the current general partner of Defendant RLP.

15.     Upon information and belief, Defendant Economic Zone Resource Associates is or was a corporation organized under the laws of the State of Ohio, with its principal place of business in Columbus, Ohio.   Economic Zone Resource Associates, Ltd. is the corporate predecessor and/or alter-ego of some or all of the other Defendants herein, and Thompson was an officer of or the general partner of EZRA.

16.     Upon information and belief, Defendant Economic Zone Resource Associates, Ltd. is or was a partnership organized under the laws of the State of Ohio, with its principal place of business in Fernandina Beach, Florida.   Economic Zone Resource Associates, Ltd. is the corporate predecessor and/or alter-ego of some or all of the other Defendants herein, and Thompson was an officer of or the general partner of Economic Zone Resource Associates, Ltd.

17.     Upon information and belief, Defendant EZRA, Inc. is or was a corporation organized under the laws of the State of Ohio, with its principal place of business in Columbus, Ohio.  EZRA, Inc. is the corporate predecessor and/or alter-ego of some or all of the other Defendants herein, and Thompson is the president of EZRA, Inc.

18.     Upon information and belief, Defendant EZRA of Ohio, Inc. is another registered name for Defendant EZRA, Inc.

19.     Upon information and belief, Defendant DOE.E, Inc. is a corporation organized under the laws of the State of Florida, with its principal place of business in Fernandina Beach, Florida.   Upon information and belief, Defendant Thompson is the president of Defendant DOE.E, Inc.

20.    At all material times, Defendant Kirk is and was a director of CXLLC and resident of Ohio. Mr. Kirk owes or owed fiduciary duties to Plaintiffs.

21.    At all material times, Defendant Turner is and was a director of CXLLC and a resident of Ohio. Mr. Turner owes or owed fiduciary duties to Plaintiffs.

22.    At all material times, Defendant Ford is and was a director of CXLLC and a resident of Ohio. Mr. Ford owes or owed fiduciary duties to Plaintiffs.

23.    At all material times, Defendant Cullman is and was a director of CXLLC and resident of Ohio. Mr. Cullman owes or owed fiduciary duties to Plaintiffs.

### BACKGROUND FACTS

24.    In 1977, Thompson began researching deep-ocean shipwrecks and the methods and technologies for locating them. Thompson became particularly interested in the United States Mail Steamship *Central America* ("*S.S. Central America*"), which sank off the coast of South Carolina during a hurricane on September 12, 1857. The *S.S. Central America* was carrying several tons of gold when it sank.

25.    Thompson put together a team to conduct a search-and-recovery project for the *S.S. Central America*, and in 1985 he organized RLP as an Ohio limited partnership to finance the project. Thompson then began soliciting leaders from the Central Ohio business community to invest in RLP.

26.    Upon information and belief, in May 1985, the limited partnership agreement for RLP was executed. Under the terms of the agreement, Thompson was to act as general partner of RLP. Thompson has directly or indirectly managed the finances and operations of RLP since its inception.

27.     Thompson's team went to sea in the summer of 1986 to begin their search for the *S.S. Central America*. The Individual Plaintiffs all were members of Thompson's team, and RLP contracted with IDSS for the rental of IDSS equipment that was critical to Thompson's team succeeding in finding the *S.S. Central America*.

28.     The Individual Plaintiffs all were paid in part or in full for their service and labor pursuant to oral or written agreements. In addition to their employment agreements, the Individual Plaintiffs were required to execute separate, distinct, non-disclosure and non-compete agreements with Thompson (the "Non-Disclosure Agreements"), in consideration for which each of the Individual Plaintiffs was promised remuneration not in definite sum, but rather based on a percentage of the value of the total treasure recovered from the wreck of the *S.S. Central America*, without deduction for competing claims or recovery, marketing or other expenses. As part of its compensation package, IDSS similarly was promised additional compensation based on a percentage of the value of the total treasure recovered from the wreck of the *S.S. Central America*, without deduction for competing claims or recovery, marketing or other expenses. An exemplary copy of the Individual Plaintiffs' Non-Disclosure Agreements is annexed as Exhibit 1, and the IDSS Agreement is annexed as Exhibit 2.

29.     In the case of Don C. Craft, he also negotiated a reduction of his daily hire rate from $450.00 to $300.00 in exchange for an additional .15% interest in the total treasure recovered from the wreck of the *S.S. Central America*, without deduction for competing claims or recovery, marketing or other expenses. Copies of Don C. Craft's Non-Disclosure Agreement and a letter from RLP confirming Mr. Craft's daily hire rate as $450.00 are annexed as Exhibits 3 and 4, respectively.

30.    In September 1988, during the third year of the search effort, Thompson and his team (including some or all of the Plaintiffs) discovered the wreck of the *S.S. Central America* approximately 160 miles off the coast of South Carolina, in approximately 8,000 feet of water. Thompson and his team (including some or all of the Plaintiffs) were successful in recovering *S.S. Central America's* bronze bell, a gold bar, and certain artifacts before they had to come ashore for the winter.    Ultimately, Thompson and his team (including some or all of the Plaintiffs) were able to recover more than a ton of gold and silver as well as numerous artifacts from the *S.S. Central America.*

31.    Upon discovering the *S.S. Central America*, CADG – for itself and/or on behalf of the other Defendants – initiated an admiralty action in federal court in the Eastern District of Virginia to establish ownership of the shipwreck and all of its contents (the "Admiralty Litigation").    During certain of the proceedings, members of the Individual Plaintiffs provided testimony in support of CADG's claims.    The Admiralty Litigation's first trial was held in April 1990, during which a multitude of insurance companies (the "Underwriters") claimed either a direct or descendant subrogated interest in the treasure recovered from the *S.S. Central America* resulting from insurance claims paid resulting from the loss of the *S.S. Central America.*    In a decision dated August 14, 1990, the district court held that the Underwriters had abandoned any claim that they might have to the treasure and dismissed the Underwriters' claims in their entirety.    The Underwriters appealed the district court's decision.

32.    Shortly after the conclusion of the first trial in the Admiralty Litigation, in response to inquiries made by the Plaintiffs and their attorneys as to when the Plaintiffs would be paid under their respective Non-Disclosure Agreements, Thompson wrote each of the Plaintiffs a letter (the "1990 letter") and promised that payment would be forthcoming after resolution of the

Admiralty Litigation and marketing of the treasure had been effected. An exemplary copy of Thompson's 1990 letter is annexed as Exhibit 5.

33.     On information and belief, during the several months following distribution of the 1990 letter, Thompson spoke to several of the Individual Plaintiffs and asked them "to call off the lawyers" (i.e., for the Plaintiffs to instruct their attorneys to hold off filing suit or otherwise pressuring Defendants regarding payment of the Plaintiffs' claims under the Non-Disclosure Agreements). On information and belief, when speaking with those members of the Plaintiffs, Thompson confirmed that the amounts to be paid Plaintiffs under the Non-Disclosure Agreements was to be based on the gross amount received from the sale of the gold, silver and other artifacts recovered from the *S.S. Central America*, without deduction for search expenses, recovery expenses, legal expenses, marketing expenses, salaries, competing claims or other costs.

34.     Having received these written and oral assurances, Plaintiffs consented to Thompson's request and instructed their attorneys to desist in pressing their requests for payment.

35.     The following year, on August 26, 1992, the United States Court of Appeals for the Fourth Circuit reversed the district court's decision dismissing the Underwriters' claim as abandoned and its decision to not afford intervening parties an opportunity to conduct discovery. The Fourth Circuit remanded the case to the district court for further proceedings.

36.     After a second trial, on November 18, 1993 the district court awarded CADG 90% of the insured treasure and 100% of the uninsured treasure, which decision again was appealed by the Underwriters. On appeal, by decision dated June 14, 1995, the Fourth Circuit affirmed the district court's decision.

37.    After the Fourth Circuit affirmed the second trial decision, the matter was remanded to the district court for further proceedings, including resolution of the process by which the treasure would be marketed and sold.  The district court issued orders in 1996 that provided certain terms and conditions under which CADG was to proceed with marketing the entire treasure, of which the Underwriters would receive their awarded percentage.

38.    Although Thompson's companies had been given control of the marketing and sales process, the process became contentious and resulted in further litigation.  Eventually, in May 1998, the Underwriters and Thompson's companies settled the marketing and sales dispute by agreeing to divide up the treasure into the parties' respective portions, which was effected on or about June 17, 1998 and which resulted in CADG (on behalf of some or all of the Defendants) obtaining 92.4% of the treasure.

39.    Upon information and belief, in November 1998, Thompson organized CXLLC to take over from RLP the recovery, marketing and sale efforts regarding the *S.S. Central America* treasure.  RLP's partners were granted ownership interests in CXLLC based on their respective ownership interests in RLP.  Thus, RLP's partners became members of CXLLC.  The members of CXLLC entered into an Operating Agreement, under which Thompson was named Chairman of CXLLC's board of directors.

40.    Upon information and belief, CXLLC entered into a Management and Recovery Services Agreement ("Management Agreement") with RLP, whereby RLP transferred its salvage rights to the treasure that already had been recovered from the *S.S. Central America* (the "Up Treasure") as well as the treasure from the shipwreck that Thompson believed was still on the ocean floor (the "Down Treasure") in exchange for an additional ownership interest in CXLLC for RLP and its partners and certain other consideration.  Also, under the Management

Agreement, CXLLC took over from RLP the management of operations to market the Up Treasure and also the financing, recovery and marketing efforts regarding the Down Treasure (furthermore, upon information and belief, in May 2004, RLP amended its limited partnership agreement to name Econ as its new general partner to replace Mr. Thompson, which change did not affect the management of RLP, inasmuch as Thompson is the president of Econ).

41.    In January 1999, the Plaintiffs once again instructed their attorneys to contact Defendants' attorneys to obtain information regarding the status of the marketing and sale of the treasure.  Defendants' attorney, Richard T. Robol, Esq., visited Plaintiffs' attorney, James T. Shirley, Jr., Esq., to assure Plaintiffs that they would be paid at the same time that Defendants' investors would be paid.  Plaintiffs' attorney and several attorneys representing Defendants corresponded over the course of the next year concerning Plaintiffs' inquiries regarding the status of the marketing and sale of the treasure.

42.    Upon information and belief, after recovering the Up Treasure from the *S.S. Central America*, Thompson and/or one or more of the other Defendants initially engaged Christie's Galleries, Inc. auction house to market and sell the treasure.  However, while the Up Treasure was tied up in the Admiralty Litigation, disputes arose between Thompson and Christie's, causing Thompson to engage another company, California Gold Marketing Group, LLC ("California Gold"), to market and sell the Up Treasure.  Upon information and belief, California Gold was retained in or about December 1999 and began marketing the gold for sale in or about February 2000.

43.    By letter dated March 2, 2000, Richard T. Robol, Esq. wrote Plaintiffs (on CADG letterhead) to report status of marketing and sale of the treasure.  In that letter, CADG advised

that "[o]n the marketing front, retail sales have been very robust to date."  A copy of CADG's March 2, 2000 letter is annexed as Exhibit 6.

44.     According to media reports, as of November 2003, California Gold had sold virtually all of the Up Treasure.  However, to date, despite the promises to the Plaintiffs in the Non-Disclosure Agreements that each of the Plaintiffs would be paid a share of the value of the treasure, and despite the repeated assertions by Defendants' attorneys and Thompson himself that payment was forthcoming, Defendants have not paid any of the Plaintiffs.  Upon information and belief, Thompson likewise has not made any cash distributions to his investors, or otherwise provided them with any return on their investment.

45.     According to Defendant Thompson's statements in an interview on Dateline NBC in 1998, he estimated that the Up Treasure might be valued at as much as $400,000,000.00.  He has professed in federal court to secret marketing techniques which will enable him to achieve this value, which is several multiples of the believed bullion value of the recovered treasure.

46.     Furthermore, upon information and belief, since at least 2000, Thompson has refused to provide the partners of RLP and the members of CXLLC with any meaningful information regarding the finances and operations of those entities.  Indeed, because of this failure to communicate, some of the Defendants' investors commenced the Ohio lawsuits against Defendants last year to determine what had become of their investments, into which proceedings Plaintiffs herein intervened with their claims.

47.     As described above and as further set forth below, Defendants have breached their obligations under the Non-Disclosure Agreements by failing to pay Plaintiffs the consideration promised despite Plaintiffs' having performed fully under those agreements.

48.     As a result of all the foregoing, and as described below, Defendants are liable to Plaintiffs in the principal amount of $7,800,000.00, exclusive of interest and costs.

49.     In addition to the principal amount owed, Plaintiffs also are entitled to recover reasonable prejudgment interest on their claim, which amount is estimated to be $3,120,000.00, calculated as interest at 5% per annum since the division of the treasure by settlement between the Underwriters and CADG in July 1998.

50.     Defendants cannot be found within the Southern District of New York, but have assets, goods or chattels within the jurisdiction, to wit: funds or accounts held in the name (or names) of Recovery Limited Partnership, Columbus Exploration, LLC, Columbus-America Discovery Group, Inc., Columbus Exploration Limited Partnership, Omni Engineering, Inc., Omni Engineering of Ohio, Inc., Economic Zone Resource Associates, Economic Zone Resource Associates, Ltd., EZRA, Inc., EZRA of Ohio, Inc., Econ Engineering Associates, Inc., DOE.E, Inc., Thomas G. Thompson, Gilman D. Kirk, James F. Turner, Michael J. Ford, and/or W. Arthur Cullman, Jr. with one or more of the following financial institutions:

Bank of America, N.A.

The Bank of New York

Citibank, N.A.

Deutsche Bank Trust Company Americas

HSBC Bank USA, N.A.

JPMorgan Chase Bank, N.A.

LaSalle Bank, N.A.

UBS AG

U.S. Bank, N.A.

Wachovia Bank, N.A.

Wells Fargo Bank, N.A.

Société Générale

Standard Chartered Bank

BNP Paribas

Calyon Investment Bank

American Express Bank

Commerce Bank

ABN Amro Bank

Bank Leumi USA

Credit Suisse

Fortis Financial Groups

Banco Popular

51.     In accordance with the Non-Disclosure Agreements forum selection clauses, all disputes arising out of those agreements are to be litigated in Ohio.  However, the action herein, submitted in accordance with Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, is not and cannot be considered a waiver of the forum selection clauses in the Non-Disclosure Agreements.

## COUNT I

### INDIVIDUAL PLAINTIFFS' BREACH OF CONTRACT CLAIM

52. Plaintiffs incorporate by reference Paragraphs 1 through 51 above.

53. Each of the Individual Plaintiffs' Non-Disclosure Agreements provides that it is an agreement:

> [B]y and between Thomas G. (Harvey) Thompson, a research scientist in the field of ocean engineering with principal offices in Columbus, Ohio (herein called "Thompson"), who represents interests, in addition to his own, of certain other science professionals and individuals, including one or more entities, and [the Individual Plaintiffs].

54. In executing each of the Individual Plaintiffs' Non-Disclosure Agreements, Thompson was acting for each of the Defendants herein.

55. Each of the Individual Plaintiffs' Non-Disclosure Agreements provides that, in consideration for the Individual Plaintiffs' promise to not disclose information regarding the *S.S. Central America* project and to not compete with that project, Defendants would remunerate each of the Individual Plaintiffs in an amount to be based on the value of the treasure recovered from the *S.S. Central America*.

56. Each of the Individual Plaintiffs has complied with his obligations under his respective Non-Disclosure Agreement.

57. Each of the Individual Plaintiffs, having complied with his obligations under his respective Non-Disclosure Agreement, is entitled to compensation in accordance with the terms of the Non-Disclosure Agreements. The respective percentages owed each of the Individual Plaintiffs is as follows:

Michael Williamson:    .45%  (45/100 of 1%)

15

| | | |
|---|---|---|
| Don C. Craft: | .35% | (35/100 of 1%) |
| Kirk O'Donnell: | .025% | (2.5/100 of 1%) |
| John Lettow: | .05% | (5/100 of 1%) |
| Timothy McGinnis: | .025% | (2.5/100 of 1%) |
| Fred Newton: | .025% | (2.5/100 of 1%) |
| Chris Hancock | .05% | (5/10 of 1%) |
| Dale Schoeneman | .025% | (2.5/100 of 1%) |
| William Watson: | .05% | (5/100 of 1%) |

58.    Despite being entitled to payment under the Non-Disclosure Agreements of their consideration for honoring those agreements (which consideration was measured by percentages of the total treasure recovered off the *S.S. Central America*), and despite numerous demands to Thompson and Defendants' attorneys for payment under the Non-Disclosure Agreements having been made, the Individual Plaintiffs have not been paid their consideration under the Non-Disclosure Agreements.

59.    Defendants' failure to pay the Individual Plaintiffs their consideration due under the Non-Disclosure Agreements constitutes a breach of contract, as a result of which each of the Individual Plaintiffs has been damaged and is entitled to bring his claim herein.

60.    As a result of all the foregoing, and as described below, Defendants are liable to Plaintiffs in the principal amount of $4,200,000.00, exclusive of interest and costs.

61.    In addition to the principal amount owed, Plaintiffs also are entitled to recover reasonable prejudgment interest on their claim, which amount is estimated to be $1,680,000.00, calculated as interest at 5% per annum since the division of the treasure by settlement between the Underwriters and CADG in July 1998.

## COUNT II

## IDSS' BREACH OF CONTRACT CLAIM

62.    Plaintiffs incorporate by reference Paragraphs 1 through 61 above.

63.    IDSS and Defendant RLP entered into the IDSS Agreement.

64.    In addition to certain rental fees and expenses provided in the IDSS Agreement, Defendant RLP promised to give IDSS .9% of the total treasure recovered off the *S.S. Central America*.

65.    IDSS has complied with its obligations under the IDSS Agreement.

66.    Having complied with its obligations under the IDSS Agreement, IDSS was paid by Defendant RLP, or by one of the other Defendants on behalf of RLP, the rental fees and expenses promised IDSS as consideration for its performance.

67.    IDSS, having complied with its obligations under the IDSS Agreement, also is entitled to its percentage of the total treasure recovered from the *S.S. Central America* as promised in the IDSS Agreement.

68.    Despite being entitled the additional consideration in the form of a percentage of the total treasure recovered off the *S.S. Central America*, and despite numerous demands to Thompson and Defendants' attorneys for payment under the IDSS Agreement having been made, IDSS has not been paid its additional consideration under the IDSS Agreement.

69.    RLP's failure to pay IDSS its percentage of the total treasure recovered off the *S.S. Central America* constitutes a breach of the IDSS Agreement, as a result of which IDSS has been damaged and is entitled to bring this claim herein.

70.    As a result of all the foregoing, and as described below, Defendants are liable to IDSS in the principal amount of $3,600,000.00, exclusive of interest and costs.

71.    In addition to the principal amount owed, Plaintiffs also are entitled to recover reasonable prejudgment interest on their claim, which amount is estimated to be $1,440,000.00, calculated as interest at 5% per annum since the division of the treasure by settlement between the Underwriters and CADG in July 1998.

72.    Some or all of the other Defendants are alter egos and/or successors to RLP and, accordingly, likewise are liable to IDSS for its claim. Alternatively, RLP and the other corporate defendants are so dominated by the individual defendants that this Court should disregard the corporate defendants' corporate veils.

73.    As but one example of the domination of the corporate defendants by the individual defendants, upon information and belief the individual defendants were appointed as directors of Columbus Exploration, LLC to serve two year terms. Despite the individual directors being appointed in or about 1998 or 1999, none of those directors has stood for re-election because Defendant Thompson has refused to allow corporate meetings or allow corporate elections.

74.    Moreover, many of the Defendants have allowed their corporate status to lapse under the laws of their respective states, thereby failing to observe corporate formalities.

## COUNT III

## PLAINTIFFS' CONVERSION CLAIM

75.    Plaintiffs incorporate by reference Paragraphs 1 through 74 above.

76.    Some or all of the Defendants have been, and still are, exercising dominion and/or control over the treasure recovered off the *S.S. Central America* and/or the proceeds from the sale of that treasure.

77.    Plaintiffs each are entitled to a share of the treasure recovered off the *S.S. Central America* and/or the proceeds from the sale of that treasure.

78.    Although Plaintiffs have repeatedly demanded that Defendants release to Plaintiffs that portion of the proceeds of the sale of the treasure recovered off the *S.S. Central America* that is Plaintiffs', Defendants have refused to comply with Plaintiffs' demand, which refusal is inconsistent with the Plaintiffs' rights to that treasure and/or the proceeds therefrom.

79.    As a result of Defendants' conversion of the treasure recovered off the *S.S. Central America* and/or the proceeds therefrom, Plaintiffs have been damaged collectively in the principal amount of $7,800,000.00, exclusive of interest and costs.

80.    In addition to the principal amount owed, Plaintiffs also are entitled to recover reasonable prejudgment interest on their claim, which amount is estimated to be $3,120,000.00, calculated as interest at 5% per annum since the division of the treasure by settlement between the Underwriters and CADG in July 1998.

## COUNT IV

### PLAINTIFF DON C. CRAFT'S PENALTY WAGE CLAIM

81.    Plaintiffs incorporate by reference Paragraphs 1 through 80 above.

82.    By the terms of his Non-Disclosure Agreement, Plaintiff Don C. Craft chose to take one-third of his daily hire rate of $450.00 in the form an additional .15% percentage of the recovered treasure. As such, a portion of Don C. Craft's claim herein is for outstanding unpaid wages.

83.    Some or all of the Defendants, including but not limited to Defendant Kirk, were the owners of the vessel on which Don C. Craft was employed.

84.     Under the penalty wage provisions of the U.S. Wage Statute, 46 U.S.C. § 10504, Don C. Craft is entitled to two days wages for every day since June 17, 1998, the date that Defendants entered the settlement agreement with the Underwriters, up to the date he is paid.

85.     As a result of Defendants' failure to pay the specified wages, Defendant Kirk and some or all of the remaining Defendants are liable in the amount of $888,600.00 to date, which amount continues to accrue at the rate of $300.00 per day.

WHEREFORE, Plaintiffs Michael Williamson, The Estate of Don C. Craft, Kirk O'Donnell, John Lettow, Timothy McGinnis, Fred Newton, William Watson, Chris Hancock, Dale Schoeneman, and International Deep Sea Survey, Inc. request judgment as follows:

1.     That process in due form of law according to the practice of this Court in the form of a writ of maritime attachment and garnishment be issued against bank accounts and other property of Defendants with the financial institutions listed in PARAGRAPH FIFTY of this Verified Complaint;

2.     That Defendants and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3.     That judgment be entered in favor of Plaintiffs and against Defendants in the amount of US$10,920,000.00 (including estimated interest);

4.     That judgment be entered in favor of Plaintiff Don C. Craft and against Defendants for his penalty wage claim in the additional amount of at least US$888,600.00, which total amount is to be determined by the Court; and,

5.    That this Court grant Plaintiffs such other and further relief which it may deem
just and proper.

Dated: New York, New York
       July 28, 2006

HOLLAND & KNIGHT LLP

By: _____
    James T. Shirley, Jr. (JTS 6114)
    195 Broadway
    New York, NY 10007-3189
    Tel:    (212) 513-3200
    Fax:    (212) 385-9010

*Attorneys for Plaintiffs*

## VERIFICATION

STATE OF NEW YORK              )
                               :ss.:
COUNTY OF NEW YORK             )

JAMES T. SHIRLEY, JR., being duly sworn, deposes and says:

I am a member of the firm of Holland & Knight LLP, counsel for Plaintiffs Michael Williamson, The Estate of Don C. Craft, Kirk O'Donnell, John Lettow, Timothy McGinnis, Fred Newton, William Watson, Chris Hancock, Dale Schoeneman, and International Deep Sea Survey, Inc. ("Plaintiffs") in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Plaintiffs and discussed the matter by telephone with Plaintiffs. I am authorized by Plaintiffs to make this verification, and the reason for my making it is that none of the Plaintiffs are within the jurisdiction of this Honorable Court.

James T. Shirley, Jr. (JTS 6114)

Sworn to before me this
28th day of July, 2006

Notary Public

ELVIN RAMOS
NOTARY PUBLIC, State of New York
No. 41-4870243
Qualified in Queens County
Certificate Filed in New York County
Commission Expires September, 2, 200_

# Exhibit 1

## NON-DISCLOSURE AGREEMENT

THIS AGREEMENT is entered into this 6ᵗʰ day of March, 1986, by and between Thomas G. (Harvey) Thompson, a research scientist in the field of ocean engineering with principal offices in Columbus, Ohio (herein called "Thompson"), who represents interests, in addition to his own, of certain other science professionals and individuals, including one or more entities, and Timothy M. McGinnis (herein called "McGinnis"), an ocean engineer with Williamson & Associates, Inc. ("Williamson") and a corporate officer of International Deep Sea Survey, Inc. ("IDSS").

### RECITALS

A.   Thompson is engaged in the costly implementation and testing of various theories and innovations resulting from years of extensive research, which was undertaken at considerable out-of-pocket expense and investment of time by Thompson and others. Thompson is currently engaged in the development of procedures and applications for high technology equipment to be used in locating, verifying, surveying and recovering certain lost deep-water cultural sites of significant historical importance (defined as shipwrecks and other man-made sites being neither natural nor mineral). In the course of this undertaking, Thompson's projects have fostered valuable cooperative relationships among professional colleagues and unique multi-disciplinary innovations with regard to research and exploration of deep-ocean cultural sites. Thompson and his colleagues recognize that strict secrecy is essential with regard to the research data, its development, and the proprietary nature of their projects if they are to realize success in their cooperative efforts.

B.   McGinnis is engaged in the business of providing consulting services for at-sea search and survey operations through his employers, Williamson and IDSS.

C.   Thompson has engaged Williamson and IDSS in connection with a Project to locate and verify the remains of a certain historic Shipwreck(s). It is anticipated that McGinnis, as a member of the professional team at Williamson and IDSS assigned to work on Thompson's Project, will contribute consulting work that will become a constituent part of the multi-disciplinary approach to deep-water historic shipwreck recovery developed by Thompson in connection with the current Project effort. As such, McGinnis's contributions will entitle him to receive a percentage of the recovery profits.

D.   While McGinnis does not intend to pursue the search and recovery of historic shipwrecks as a line of business, his tasks involve the actual search operations and require that he review certain highly confidential and proprietary information developed by Thompson. In addition, they may require that McGinnis consult with certain other research consultants and

(Page 1 of 4 pages)

technical operations personnel for the purpose of completing the selection and design of equipment to be used in the search operation to locate the particular target Shipwreck site(s).

E.    Thompson desires McGinnis to participate in the Project effort through Williamson and IDSS, but only to the extent that Thompson is sure that the information developed by Thompson, including the existence of the Project being directed by Thompson, remains confidential between Thompson and McGinnis.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, Thompson and McGinnis agree as follows:

1. (a)    For the purposes of this Agreement, "Confidential Information" shall mean all information concerning the deep-water cultural site(s) and/or object(s) of search, including the location, the procedures and applications to be used to confirm the location(s) of or to engage in archaeological work on the site(s), and all other information or material proprietary to Thompson or designated as Confidential Information by Thompson, of or to which McGinnis may obtain knowledge or access through or as a result of McGinnis's relationship with Thompson, Williamson, and IDSS.

(b)    Confidential Information includes, but is not limited to, the following types of information and other information of a similar nature (whether or not reduced to writing): discoveries, ideas, concepts, computer programs, designs, drawings, specifications, techniques, models, data, documentation, diagrams, research, development, processes, procedures, expertise ("know-how"), marketing and development plans, names and other information related to sources of funding and supplies, and financial information.

(c)    Confidential Information also includes any information described above which Thompson treats as proprietary or designates as Confidential Information, whether or not owned or developed by Thompson individually or by other individuals, colleagues, or entities to whom Thompson may be confidentially obligated.

(d)    Confidential Information also includes knowledge of the existence of the Project being directed by Thompson, including, but not limited to, the names of any ship or shipwreck associated with the Project.

2.    McGinnis agrees that the recitals above are true and that the Confidential Information, as defined in paragraphs 1. (a), (b), (c), and (d), above are in the nature of trade secrets and that they are owned by and/or under Thompson's fiduciary protection. McGinnis further agrees that the Confidential Information is not readily available and cannot be easily obtained. McGinnis acknowledges that but for his executing this Agreement, Thompson would not permit McGinnis to review the Confidential Information

developed by Thompson.

3.    McGinnis agrees that he will not remove, copy, or make any notes concerning any Confidential Information provided him by Thompson through Williamson and/or IDSS without obtaining Thompson's prior consent. Further, McGinnis agrees to hold in confidence and not directly or indirectly reveal, report, publish, disclose or transfer any Confidential Information to any person or entity. For the purpose of performing his assigned tasks, McGinnis may consult as necessary with other research consultants and technical personnel on the basis of the "need-to-know" criteria and the Project's formal security structure, as discussed in a meeting between Thompson and Williamson in Seattle, Washington on 18 January 1986 and in other communications between Thompson and Williamson. In view of the relationship between Thompson, Williamson, IDSS, and McGinnis, McGinnis agrees that he will contact Michael E. Williamson, Thompson's principal contact at Williamson and IDSS, for decisions if questions arise concerning the use of the Project's security structure.

4.    McGinnis agrees that he will not at any time for a period of ten (10) years after the execution of this Agreement become involved in any effort regarding search, verification, survey and/or recovery of the target Shipwreck site(s) that is the object of the Project's search operations, unless such efforts are being sponsored by Thompson.

5.    Because of the unique nature of the Confidential Information, McGinnis understands and agrees that Thompson will suffer irreparable harm in the event that McGinnis fails to comply with any of his obligations under this Agreement, and that monetary damages will be inadequate to compensate Thompson for such breach. Accordingly, McGinnis agrees that Thompson will, in addition to any other remedies available to him at law or in equity, be entitled to injunctive relief to enforce the terms of this Agreement.

6.    McGinnis acknowledges that the damages suffered by Thompson as a result of McGinnis's breach of this Agreement will be incapable of exact measurement and therefore agrees that in the event he breaches this Agreement in any manner whatsoever, or sponsors or participates in a venture to recover the target Shipwreck site(s), in addition to the remedies available to Thompson under paragraph 5 above, or otherwise, Thompson will be entitled to liquidated damages equal to the greater of: (a) Fifty percent (50%) of all profits obtained by any venture recovering the target Shipwreck site(s) with which McGinnis is in any way associated; or (b) Ten Thousand Dollars ($10,000).

7.    Thompson agrees to give McGinnis One-Fortieth (1/40) of One Percent (1%) of the recovery profits, provided the target Shipwreck site(s) is located in June-July of 1986 regardless of when the recovery operation is performed and provided that McGinnis employs his best efforts to complete his assigned tasks in connection with the search operations.

8.    Thompson and McGinnis agree that if any term, paragraph or

(Page 3 of 4 pages)

section of this Agreement is unenforceable, a court of competent jurisdiction may construe this Agreement without including the specific term, paragraph, or section found to be unenforceable.

9.    This Agreement shall be governed by Ohio law applicable to contracts between residents of Ohio wholly executed and performed in Ohio. Further, this Agreement contains the full and complete understanding of the parties with respect to the subject matter hereof and supersedes all prior representations and understandings, whether oral or written. This Agreement may be modified only in a writing signed by both parties.

10.    In the event that disputes, differences, or controversies arise in connection with this Agreement, McGinnis agrees that the United States District Court for the Southern District of Ohio, Eastern Division, shall have exclusive jurisdiction. Accordingly, McGinnis irrevocably submits his person to the jurisdiction of such court for purposes of such litigation.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year written above.

THOMPSON:                                MCGINNIS:

_____          _____
Thomas J. (Harvey) Thompson        Timothy M. McGinnis

Date: __2/27/86__                  Date: __3/6/86__

(Page 4 of 4 pages)

# Exhibit 2

363-0500

Octavo

## EQUIPMENT LEASE AND SERVICES AGREEMENT

THIS AGREEMENT is made as of the 22nd day of April, 1986 by and among International Deep Sea Survey, Inc., a Washington Corporation with principal offices located at 1219 Westlake Ave. N., Suite 111, Seattle, Washington 98109 (hereinafter "IDSS") and Recovery Limited Partnership, an Ohio Limited Partnership, with principal offices located at 867 Neil Avenue, Columbus, Ohio 43215 (herinafter "Lessee").

### Recitals

A.    IDSS is engaged in the business of leasing deep sea search and survey equipment and providing associated technical services.

B.    Lessee is engaged in the business of conducting a search and recovery project involving a deep sea shipwreck (the "Project"), and wishes to engage the equipment and services of IDSS in connection with the Project.

### Agreement

In consideration of the foregoing, and of their mutual promises contained herein, the parties agree as follows:

1.    Lease of Equipment. IDSS agrees to lease to Lessee, and Lessee agrees to lease from IDSS, the SeaMARC IA sidescan sonar system and associated equipment specified on Exhibit A attached to this Agreement, including all replacement parts, additions and accessories incorporated therein and/or affixed thereto (the "Equipment").

2.    Technical Services. In addition to and in connection with the Equipment leased pursuant to this Agreement, IDSS agrees to provide to Lessee technical services to include operation, maintenance and repair of the Equipment, provision of sonar images of the seafloor for the purposes of survey, target location, and target verification, analysis and interpretation of sonar images, on-board sidescan sonar image processing, photographic target verification, and other services incident thereto (the "Services"), which shall be provided by qualified personnel as identified on Exhibit B.

3.    Term of Lease and Services. The term of the lease of the Equipment and the provision of the Services pursuant to this Agreement shall be for a period of not less that 30, nor more than 40 consecutive days, unless extended by the parties, beginning on or before June 1, 1986, commencing on the first day of Operation and ending on the last day of Operations, as defined in Section 4.1 below.

4.    Rent and Compensation for Services.

4.1    For purposes of this agreement, "Mobilization" shall

1

consist of travel of IDSS personnel and delivery of the Equipment to the port of embarkation, installation of the Equipment on the vessel, software development, and preparations for sailing. "Operations" shall begin on the date that the vessel leaves port, and shall end on the date the vessel returns to port, which dates shall be determined in Lessee's sole discretion. "Demobilization" shall consist of removal of the Equipment from the vessel, return travel and freight, and the completion of IDSS's analysis and report.

4.2  As rent for the lease of the Equipment pursuant to this Agreement, Lessee shall pay IDSS during the period of Operations at a daily rate of $6632 for the first 30 days. After the first 30 days the daily rate will be $4796. In the event that search and survey activities are delayed for a period greater than 24 consecutive hours due to a malfunction of the Equipment, the per diem lease rate for the Equipment will be reduced by 39 percent, beginning on the hour of the malfunction, and ending on the hour that search and survey activities resume.

4.3  As compensation for the Services rendered pursuant to this Agreement, Lessee shall reimburse IDSS for out-of-pocket costs of compensation for the personnel performing the Services during the period of Operations and Mobilization/Demobilization, but no to exceed a daily charge for Services of $7800.

4.4  In addition to the foregoing charges, Lessee shall reimburse IDSS for out-of-pocket costs for Mobilization and Demobilization activities. A description of Mobilization and Demobilization activities and an estimated cost is attached as Schedule C.

4.5  In the event that Lessee is successful in locating and verifying the target sought by Lessee through the Equipment and Services provided by IDSS, in addition to the compensation to IDSS as provided in this Agreement, Lessee agrees to pay IDSS 0.9% of the net recovery of any salvage operation conducted by Lessee on the target.

4.6  IDSS's charges under Sections 4.1 to 4.4 above shall be invoiced to Lessee promptly upon the completion of Demobilization, and will be accompanied by paid invoices or other substantiation of charges for the items of cost for which Lessee has agreed to reimburse IDSS. Lessee shall pay IDSS within thirty (30) days of receipt of the invoice and other documentation required by this Section.

5.0  Deposit.  Lessee will provide IDSS with a deposit of $317573.00 by May 1, 1986, the receipt of which will be acknowledged by IDSS, which shall be applied to charges incurred under Sections 4.1 to 4.4 above.

6.0  Warranty.  IDSS warrants that it and its personnel will make their best effort to maintain and operate the Equipment to maximize the production of sea floor images and the

2

identification of sea floor targets. Schedule I is a part
performance history of SeaMARC IA operations.  IDSS warrants that
it either owns or has the right to use the Equipment and to lease
it to the Lessee, and that neither the lease of the Equipment nor
the provision of the Services will conflict with or infringe upon
the ownership or intellectual property rights of any person.

7.0  Delivery; Mobilization.  Lessee shall provide IDSS
written instructions for the delivery of the Equipment by May 15,
1986,  such instructions to include the port of embarkation,  the
identity of Lessee's vessel, and the wharf, pier or dock to which
the Equipment is to be delivered.  IDSS shall deliver the
Equipment to Lessee's vessel in good condition and repair.  IDSS
agrees to deliver the Equipment and complete Mobilization prior
to June 1, 1986.

8.  Maintenance and Repairs.  IDSS shall, at its expense,
maintain and repair each item of Equipment and shall keep it in
good mechanical and electronic condition and working order.

9.0  Risk of Loss.  All risk of loss, damage, theft or
destruction to each item of Equipment, or of injury or death to
IDSS personnel, shall be borne by IDSS.

10.  Indemnification; Insurance.  IDSS agrees to indemnify
and hold Lessee harmless from any and all loss, liability,
damage, claims, demands, and actions for injury or death to
persons, or damage to or loss of property caused by the acts or
omissions of IDSS, IDSS personnel, or defects in the Equipment,
and waives any rights of subrogation against Lessee in such
event.  IDSS shall, at its own cost and expense, procure and
maintain during the term of this Agreement, policies of insurance
for comprehnsive public and property damage liability in adequate
amounts, including provisions insuring Lessee against all
liabilities described in this Section.

11.  Independent Contractor.  In the performance of services
under this Agreement, it is mutually understood and agreed that
IDSS and its employees, agents or representatives shall at all
times be acting as independent contractors of Lessee, and not as
Lessee's employees or agents, and shall have no authority to
enter into agreements on behalf of or otherwise bind Lessee.

12.  IDSS Personnel.  IDSS shall be exclusively responsible
for the payment of all wages and salaries to the personnel who
perform services for Lessee pursuant to this Agreement,  and IDSS
shall pay all taxes, withholding payments, social security taxes,
group insurance premiums, pension contributions, medical plan
contributions, and other fringe benefits for such personnel.
IDSS shall indemnify and hold Lessee harmless against any and all
loss, Liability, damage, calims, demands, and actions relating to
such wages, taxes and fringe benefits.  IDSS shall, at its own
cost and expense, procure and maintain during the term of this
Agreement in amount and forms, and with an insurance company
satisfactory to Lessee, policies of workers' compensation and

employer's liability insurance in accordance with, and as required by, all applicable laws, with respect to the personnel that IDSS may furnish pursuant to this Agreement.

13. Confidential Information

13.1    For purposes of this Agreement, "Confidential Information" shall mean information or material proprietary to Lessee or designated as Confidential Information by Lessee and not generally known by persons unaffiliated with Lessee, which IDSS or its personnel develop or of which IDSS or its personnel may obtain knowledge or access through or as a result of IDSS's relationship with Lessee. Confidential Information shall include, but is not limited to, the following types of information and other information of a similar nature (whether or not reduced to writing): discoveries, ideas, concepts, software in various stages of development, designs, drawings, specifications, techniques, models, data source code, object code, documentation, diagrams, research, processes, "know-how," marketing and development plans, investor information, and financial information. Confidential Information also includes any information described above which Lessee obtains from another party and which Lessee treats as proprietary or designates as Confidential Information, whether or not developed by Lessee. Information publicly known that is generally employed by the trade at or after the time that IDSS or its personnel first learns of such information, or generic information or knowledge which IDSS or its personnel would have learned in the course of similar employment or work elsewhere in the trade, shall not be deemed to be part of the Confidential Information.

13.2    All notes, data reference materials, sketches, drawings, memoranda, documentation, and records in any way incorporating or reflecting any of the Confidential Information, and all proprietary rights therein, including copyrights, shall belong exclusively to Lessee, and IDSS and its personnel shall trun over all copies of such materials in their control to Lessee upon request or upon termination of this Agreement.

13.3    IDSS agrees during the term of this Agreement and thereafter to hold in confidence and not to directly or indirectly reveal, report, publish, disclose or transfer any of the Confidential Information to any person or entity, or utilize any of the Confidential Information for any purpose, except in the course of performance under this Agreement.

13.4    IDSS agrees that any inventions, ideas or original works of authorship in whole or in part conceived or made by IDSS or its personnel during or after the term of this agreement which are made through the use of any of the Confidential Information or any of Lessee's equipment, facilities, supplies, or trade secrets, or which relate to the Project, Lessee's business, or its actual or demonstrably anticipated research and development, shall belong exclusively to Lessee and shall be deemed part of the Confidential Information for purposes of this Agreement

4

whether or not fixed in a tangible medium of expression. Without limiting the foregoing, IDSS agrees that any such original works of authorship shall be deemed to be "works made for hire" and that Lessee shall be deemed the author thereof under the U.S. Copyright Act, provided that in the event and to the extent such works are determined not to constitute "works made for hire" as a matter of law, IDSS hereby irrevocably assigns and transfers to Lessee all right, title, and interest in such works, including but not limited to copyrights. IDSS understands and agrees that Lessee may film, videotape, photograph or otherwise record the activities of the Project, and that Lessee shall have the sole right to use, copyright, and publish the same.

13.5   Because of the unique nature of the Confidential Information, IDSS understands and agrees that Lessee will suffer irreparable harm in the event that IDSS fails to comply with any of its obligations under Sections 13.2, 13.3 or 13.4 above, and that monetary damages will be inadequate to compensate Lessee for such breach. Accordingly, IDSS agrees that Lessee will, in addition to any other remedies available to it at law or in equity, be entitled to injunctive relief to enforce the terms of Sections 13.2, 13.3 and 13.4 above.

13.6   IDSS agrees to take such action, whether by instruction, agreement, or otherwise, to insure that its personnel adhere to the obligations imposed upon IDSS under Sections 13.1 to 13.5 of this Agreement.

14.   Miscellaneous.

14.1   Entire Agreement.   This Agreement constitutes the entire agreement between the parties and no party shall be liable or bound to any other party in any manner by any warranties, representations, or conenants except as specifically set forth herein.

14.2   Assignment and Benefit.   This Agreement may not be assigned by either party without the written consent of the other. This agreement shall be binding upon and shall inure to the benefit of the parties, their successors, heirs and assigns.

14.3   Governing Law.   This Agreement shall be governed by and construed under the laws of the State of Ohio. Any action or proceeding involving or arising out of this Agreement shall be brought in the Court of Common Pleas, Franklin County, Ohio. The parties agree that venue in such court is proper.

14.4   Counterparts.   This Agreement may be executed in two or more counterparts, each of which shall be deemed and original, but all of which together shall constitute on and the same instrument.

14.5   Titles and Subtitles.   The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

5.

14.6  Notices.  Any notice required or permitted under this Agreement shall be given in writing and shall be deemed to be effectively given upon personal or courier delivery, or three days after deposit with the United States Post Office, by registered or certified mail, postage prepaid, addressed as first indicated above, or at such other address as any party may designate by ten (10) days advance written notice to the other party.

14.7  Amendments and Waivers.  Any therm of this Agreement may be amended only in writing signed by authorized representatives of the parties.  The observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the party claimed ot have given the same.

14.8  Incorporation by Reference.  All Exhibits attached hereto are hereby incorporated herein by this reference.

14.9  Time.  Time is of the essence of this Agreement.


IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

INTERNATIONAL DEEP SEA SURVEY, INC.

By: _____

Title: _President_____


RECOVERY LIMITED PARTNERSHIP

By: _____

Title: _General Partner_____

6

# Exhibit 3

Economic
Zone
Resource
Associates        1046 Neil Ave. Columbus, Ohio 43201 (614) 299-6000

## NON-DISCLOSURE AGREEMENT

THIS AGREEMENT is entered into this _23rd_ day of _JUNE_,
1986, by and between Thomas G. (Harvey) Thompson, a research scientist in
the field of ocean engineering with principal offices in Columbus, Ohio
(herein called "Thompson"), who represents interests, in addition to his
own, of certain other science professionals and individuals, including one
or more entities, and ___Don O. Craft___ (herein called
"Confidant").

### RECITALS

A.    Thompson is engaged in the costly implementation and testing of
various theories and innovations resulting from years of extensive
research, which was undertaken at considerable out-of-pocket expense and
investment of time by Thompson and others. Thompson is currently engaged in
the development of procedures and applications for high technology
equipment to be used in locating, verifying, surveying and recovering
certain lost deep-ocean cultural sites (defined as shipwrecks and other
man-made sites being neither natural nor mineral) of significant historical
importance. In the course of this undertaking, Thompson's projects have
fostered valuable cooperative relationships among professional colleagues
and unique multi-disciplinary innovations with regard to research and
exploration of deep-ocean cultural sites. Thompson and his colleagues
recognize that strict secrecy is essential with regard to the research
data, its development, and the proprietary nature of their projects if they
are to realize success in their cooperative efforts.

B.    Confidant is being paid to perform work in one of the following
areas in connection with the search operations effort: operations, data
interpretation, equipment repair and maintenance, image processing, and
logistics.

C.    Thompson, through one of his agents, has accepted Confidant to
work as a member of the search operations team involved in locating and
verifying the remains of a certain historic Shipwreck(s). Thompson desires
that Confidant, as a member of the search operations team, share in the
proceeds of the net recovery, provided that the target Shipwreck(s) is
found as a result of Confidant having lent his best efforts to the search
operations effort and providing that subsequent recovery operations are
successful.

D.    While Confidant does not intend to pursue the search and recovery
of historic shipwrecks as a line of business, his tasks involve the actual
search operations and may also require that he review certain highly
confidential and proprietary information developed by Thompson. In
addition, they may require that Confidant consult with certain other search
operations personnel for the purpose of carrying out his assigned tasks.

(Page 1 of 4 pages)

E.    Thompson desires Confidant to participate in the search operations, but only to the extent that Thompson is sure that the information developed by Thompson, including the existence of the Project being directed by Thompson and the location(s) of any Shipwreck target(s) found, remains confidential between Thompson and Confidant.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises hereinafter set forth, Thompson and Confidant agree as follows:

1. (a)    For the purposes of this Agreement, "Confidential Information" shall mean all information concerning the deep-water cultural site(s) and/or object(s) of search, including the location, the procedures and applications to be used to confirm the location(s) of or to engage in archaeological work on the site(s), and all other information or material proprietary to Thompson or designated as Confidential Information by Thompson, of or to which Confidant may obtain knowledge or access through or as a result of Confidant's relationship with Thompson.

(b)    Confidential Information includes, but is not limited to, the following types of information and other information of a similar nature (whether or not reduced to writing): discoveries, ideas, concepts, computer programs, designs, drawings, specifications, techniques, models, data, documentation, diagrams, research, development, processes, procedures, expertise ("know-how"), marketing and development plans, names and other information related to sources of funding and supplies, and financial information.

(c)    Confidential Information also includes any information described above which Thompson treats as proprietary or designates as Confidential Information, whether or not owned or developed by Thompson individually or by other individuals, colleagues, or entities to whom Thompson may be confidentially obligated.

(d)    Confidential Information also includes knowledge of the existence of the Project being directed by Thompson, including, but not limited to, the names of any ship or shipwreck associated with the Project.

2.    Confidant agrees that the recitals above are true and that the Confidential Information, as defined in paragraphs 1. (a), (b), (c), and (d), above are in the nature of trade secrets and that they are owned by and/or under Thompson's fiduciary protection. Confidant further agrees that the Confidential Information is not readily available and cannot be easily obtained. Confidant acknowledges that but for his executing this Agreement, Thompson would not permit Confidant to review the Confidential Information developed by Thompson.

3.    Confidant agrees that he will not remove, copy, or make any notes

(Page 2 of 4 pages)

concerning any Confidential Information provided him, either directly or indirectly, through Thompson without obtaining Thompson's prior consent. Further, Confidant agrees to hold in confidence and not directly or indirectly reveal, report, publish, disclose or transfer any Confidential Information to any person or entity. For the purpose of performing his assigned tasks, Confidant may consult as necessary with other operations personnel on the basis of the "need-to-know" criteria.

4.    Confidant agrees that he will not at any time for a period of ten (10) years after the execution of this Agreement become involved in any effort regarding search, verification, survey and/or recovery of the target Shipwreck site(s) that is the object of the Project's search operations, unless such efforts are being sponsored by Thompson.

5.    Because of the unique nature of the Confidential Information, Confidant understands and agrees that Thompson will suffer irreparable harm in the event that Confidant fails to comply with any of his obligations under this Agreement, and that monetary damages will be inadequate to compensate Thompson for such breach. Accordingly, Confidant agrees that Thompson will, in addition to any other remedies available to him at law or in equity, be entitled to injunctive relief to enforce the terms of this Agreement.

6.    Confidant acknowledges that the damages suffered by Thompson as a result of Confidant's breach of this Agreement will be incapable of exact measurement and therefore agrees that in the event he breaches this Agreement in any manner whatsoever, or sponsors or participates in a venture to recover the target Shipwreck site(s), in addition to the remedies available to Thompson under paragraph 5 above, or otherwise, Thompson will be entitled to liquidated damages equal to the greater of: (a) Fifty percent (50%) of any interest of Confidant in a competing venture, or of any sums that Confidant might receive as a result of participating in such a venture; or (b) One Hundred Fifty Thousand Dollars ($150,000).

7.    Thompson agrees to give Confidant One-Twentieth (1/20) of One Percent (1%) of the net recovery, provided the target Shipwreck site(s) is found as a result of Confidant having participated in the search operations effort and providing that subsequent recovery operations are successful, regardless of when the recovery operation is performed and provided that Confidant employs his best efforts to complete his assigned tasks in connection with the search operations.

8.    The limitations and obligations imposed on Confidant by this Agreement shall extend to any corporation, partnership, joint venture, association or other entity in which Confidant is a shareholder, partner, or member.

9.    Confidant may not assign or transfer his obligations under this Agreement, without the prior written consent of Thompson, but Thompson may assign this Agreement to Economic Zone Resource Associates or others who

7.a. Confidant shall be entitled to his percentage of the net recovery based on the following breakdown: .15% for Confidant's advise and participation early on in the Project; .15% in exchange for a one-third reduction in Confidant's normal day rate during Vessel mobilization, demobilization, and at-sea operations.

(Page 3 of 4 pages)

may be beneficiaries of this Agreement and therefore entitled to enforce its terms.

10.    Thompson and Confidant agree that if any term, paragraph or section of this Agreement is unenforceable, a court of competent jurisdiction may construe this Agreement without including the specific term, paragraph, or section found to be unenforceable.

11.    This Agreement shall be governed by Ohio law applicable to contracts between residents of Ohio wholly executed and performed in Ohio. Further, this Agreement contains the full and complete understanding of the parties with respect to the subject matter hereof and supersedes all prior representations and understandings, whether oral or written. This Agreement may be modified only in a writing signed by both parties.

12.    In the event that disputes, differences, or controversies arise in connection with this Agreement, Confidant agrees that the United States District Court for the Southern District of Ohio, Eastern Division, shall have exclusive jurisidiction. Accordingly, Confidant irrevocably submits his person to the jurisdiction of such court for purposes of such litigation.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year written above.

THOMPSON:

Thomas G. (Harvey) Thompson

Date: 6/23/86

CONFIDANT:

Confidant's Signature

DON C CRAFT
Print Name

Date: 6/23/86

(Page 4 of 4 pages)

*9.a. Confidant agrees that this Agreement supercedes all previous Non-Disclosure agreements between Confidant and Thompson.*

# Exhibit 4

**RECOVERY** 1046 Neil Ave. Columbus, Ohio 43201 (614) 299-6000

20 February 1986

Don C. Craft, President
Craft Marine Associates, Inc.
P. O. Box 125
Satsuma, FL 32089

Dear Don:

This letter represents the Agreement between Recovery, Ltd. (the "Partnership") and Craft Marine Associates, Inc. ("Craft") for the performance of certain work in connection with vessel mobilization and search operations to locate a historic shipwreck site(s), whose confidentiality and proprietary nature has been communicated to you in prior discussions and correspondence.

You agree to manage the selection of a search vessel, to mobilize the vessel, and to select and train a crew in accordance with the timeline established for going to sea by June 1, 1986. In addition, you agree to collaborate with Williamson & Associates, Inc. on the logistical management of search operations. You agree that the three documents enclosed with this letter represent your basic responsibilities within the context of the timeline established by Fred Newton's Program Plan for going to sea.

In return for your services in connection with pre-mobilization, the Partnership agrees to pay you $350.00 per day plus standard expenses for related travel, subsistence, and operational expenses as incurred. A day's work shall be defined as at least eight hours for pre-mobilization services. You agree that this work will require approximately nine days to complete. If more time is required, you agree to get my verbal consent prior to proceeding.

Upon commencement of vessel mobilization, the Partnership agrees to pay you at a rate of $450.00 per day, unless you and I subsequently agree to substitute your day rate with a fixed at-sea fee and/or a percentage of the interest in the recovery. Your at-sea work day shall be defined as the time necessary to assure both the efficient and safe execution of round-the-clock search operations.

In exchange for the Partnership hiring your services for the at-sea search operations, you agree to forego any broker's commissions in connection with leasing the vessel.

(Page 1 of 3 pages) *DCC*

The Partnership agrees to pay you monthly on the basis of 30 days net upon receipt of invoices for services and expenses.

You acknowledge being in receipt of an advance payment in the amount of $1050.00 for your services in connection with this Agreement, which advance is explained in my letter to you dated 9 October 1985.

In the event a candidate vessel's operator will not accept you as master of the vessel, you agree to obtain consent of the operator that Craft will have the sole customer responsibility for directing the search operations and all other matters of vessel operation that do not infringe upon the master's ultimate responsibility for the safety of the vessel and the personnel embarked.

You acknowledge that all historical, location, cargo, technological, and other information about the Partnership and the target shipwreck site(s) are proprietary. Further, you acknowledge that all of this information has been developed by the Partnership's General Partner over a period of years and that such information is not publicly available. Accordingly, you agree not to disclose any proprietary information concerning the Partnership, including the existence of the target shipwreck site(s) and its project to locate and recover the shipwreck target(s), without first obtaining the written consent of the General Partner.

You agree that for a period of five years from the date of this Agreement you will not compete with the Partnership in any other search, verification, or recovery operation whose purpose involves the target shipwreck site(s). You further agree not to work for any person or other entity during this five-year period that intends to locate and/or recover the target shipwreck site(s).

You and I agree that this Agreement shall be governed by Ohio law applicable to contracts between residents of Ohio wholly executed and performed in Ohio.

In the event that serious disputes, differences, or controversies arise in connection with this Agreement, you and I agree that the United States District Court for the Southern District of Ohio, Eastern Division, shall have exclusive jurisdiction over the matter. Accordingly, you agree to irrevocably submit your person to the jurisdiction of such court for purposes of litigation.

You and I agree that if any term, paragraph or section of this Agreement is unenforceable, a court of competent jurisdiction may construe this Agreement without including the specific term, paragraph, or section found to be unenforceable.

If the foregoing provisions are acceptable, kindly sign the

Agreement and return a photocopy to me in the self-addressed, stamped envelope provided.

My signature below reflects the Partnership's agreement to the terms of this letter.

Very truly yours,
for RECOVERY, LTD.

Thomas G. (Harvey) Thompson
General Partner

Accepted for
CRAFT MARINE ASSOCIATES, INC.

Capt. Don C. Craft, President

Date: 3/1/86

Enclosures: Newton's Project Plan for Hardware Selection Phase, dated
1/30/86;
Suggested Schedule of Don Craft, dated 10/4/85 (2 pages);
Page of correspondence from Craft listing Project
responsibilities, dated 2/7/86.

(Page 3 of 3 pages)

# Exhibit 5

JAN- 6-99 WED 16:40 D.C. CRAFT                                    P.03

# EZRA
Economic Zone Resource Associates
433 West Sixth Avenue, Columbus, Ohio 43201
(614) 299-6008

April 28, 1990

Mr. Don Craft
P.O. Box 125
Satsuma, FL 32189

Dear Don:

Thank you for your participation and prior support in the project. I hope you have enjoyed the many positive articles on our project in the media. Even before we had brought in a little over a ton of gold into Norfolk last October 5th, approximately 3000 stories about us as a result of our discoveries. We are planning on this amount of positive press to be very helpful when it comes time to market the gold. In the meantime, as you may have read in the newspapers, the extent of ownership interest which our project will have in the recoveries made to date, will be determined by the United States District Court for the Eastern District of Virginia in an admiralty proceeding which is currently pending before that court.

Should the Court decide in our favor, we will implement a marketing program for our recoveries. I expect that the earliest by which we will be able to convert some of our recoveries to cash will be late 1991 or 1992. Because of its nature as rare gold, it will be difficult to effectively market until the entire treasure is recovered. Once recovered, there will be only one *Central America* treasure - a potentially very exclusive item. Of course, if the Court rejects our ownership claim and we are required to await a salvage award, the disposition of recoveries could be delayed a year or more. In either case, it is possible that the claimants could appeal the judgment of the District Court and obtain an injunction against our disposition of any recoveries pending the appeal. This event might delay the disposition of any recoveries by a a year or more.

Jack Grimm, Harry John and Columbia University intervening claims, which first appeared at outset of the insurance company trial, were viewed by most observers as a circus rather than a trial. We do not expect these claims to amount to much.

As noted, if things go our way, we hope to begin making cash distributions to our investors, perhaps as early as 1991. Any cash distributions to which you are entitled by virtue of your Non-Disclosure agreement will be made at the same time as distributions to investors and me, on a pro rata basis. In other words, we plan for you to be paid at the same time, and following the same procedures, as other participants in this project.

I appreciate everyone's support for our project. I'll try to keep you posted of significant developments as time and circumstances permit.

Very truly yours,

Thomas G. Thompson

TGT:jv

# Exhibit 6



# COLUMBUS·AMERICA
## D I S C O V E R Y   G R O U P

433 West Sixth Avenue
Columbus, Ohio 43201
USA
(614) 299-6000
Fax (614) 299-1314
Telex 9102506022 (RSVP UQ)

March 2, 2000

James Shirley, Esq.
Haight, Gardner, Holland & Knight
195 Broadway
New York, N.Y.
~~Via Telefax 212/385-9010~~

**Columbus-America v. The Unidentified, Wrecked and Abandoned Sailing Vessel, etc. et al.**

**<u>Confidential</u>**

Dear Jim:

Thank you for your letter of February 7.

The day after your letter, the U.S. Court Appeals for the Fourth Circuit issued an Opinion that bears directly on some of your questions. The Court ruled in Columbus-America's favor on all issues except abandonment.

As to abandonment, the Court recognized that the U.S. Courts of Appeals are in conflict, but stated that overturning the 1992 split decision (which had reversed the district court's award of 100% in Columbus-America's favor) would require an en banc hearing.

Columbus-America has petitioned for rehearing en banc. In a tit-for-tat move, the Underwriters have asked for sanctions against Columbus-America based on the issuance of the injunction stopping the Sotheby's sale. We expect to hear something from

Letter to James Shirley, Esq.
March 2, 2000
Page 2

the Court within the next 1-2 months.  (A copy of the Opinion, which is public record, is enclosed.)

Let me assure you that Columbus-America will continue to exert its best efforts to obtain the 7.6% awarded to the insurance companies, as you requested.  Even if this requires filing a petition for a writ of certiorari, Columbus-America will pursue this matter vigorously.

On the marketing front, retail sales have been very robust to date.  Three of the largest numismatic dealers in the world are involved, and progress has been encouraging. (*Coin World* and *Numismatic News* have been carrying information about the gold tours, and should be a good source for announcements by the California Gold Group).

I have read the press reports you mentioned concerning "donations."  I am not aware of any such donations to date.  If such donations are made, however, we would expect they would be done so out of the California Gold Group's share, at least unless there were some imperative marketing reason that somehow substantially enhanced the value of the gold.

The California Gold Group's purchase of the 92.4% of the treasure awarded to Columbus-America has resulted in settlements with Christie's and the Bank of California. The end result appears essentially to be the elimination of those claims, with a pay-off of approximately $43 million.  (The newspaper reports on payments of $50 million and $100 million, respectively, are inaccurate).

While the terms of the agreement are confidential, essentially it provides, in addition to the sums paid Christie's and the Bank of California, for a split of profits between Columbus-America and the California Gold Group, with the percentages varying depending on who procures the buyer's and the amount of sales made.

To date, there has been no net profit to Columbus-America.  The Group is very hopeful that profits may be obtained within the next 6-12 months, as sales progress.

It has been, and remains, Tommy's intention to make payment to Don Craft and others of like standing their *pro rata* portion of the profits due to them under the Non-Disclosure Agreements simultaneously with his receipt of any net profits.  Tommy is grateful for the work done and is as anxious for net profits as anyone.

Letter to James Shirley, Esq.
March 2, 2000
Page 3


     We should have a much better idea of the nature and size of those net profits as sales progress over the next several months.

     I hope this is helpful.

Very truly yours,


Richard T. Robol


Encl.