James T. Shirley, Jr. (JTS 6114)
Michael J. Frevola (MJF 8359)
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200
Attorneys for Plaintiffs Michael Williamson, The Estate of Don C. Craft, Kirk O'Donnell, John
Lettow, Timothy McGinnis, Fred Newton, William Watson, Chris Hancock, Dale Schoeneman,
and International Deep Sea Survey, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL WILLIAMSON, THE ESTATE OF DON C. CRAFT, KIRK O'DONNELL, JOHN LETTOW, TIMOTHY MCGINNIS, FRED NEWTON, WILLIAM WATSON, CHRIS HANCOCK, DALE SCHOENEMAN, and INTERNATIONAL DEEP SEA SURVEY, INC., <br><br> Plaintiffs, <br><br> v. <br><br> RECOVERY LIMITED PARTNERSHIP, COLUMBUS EXPLORATION, LLC, COLUMBUS-AMERICA DISCOVERY GROUP, INC. COLUMBUS EXPLORATION LIMITED PARTNERSHIP, OMNI ENGINEERING, INC., OMNI ENGINEERING OF OHIO, INC., ECONOMIC ZONE RESOURCE ASSOCIATES, ECONOMIC ZONE RESOURCE ASSOCIATES, LTD., EZRA, INC., EZRA OF OHIO, INC., ECON ENGINEERING ASSOCIATES, INC., DOE.E, INC., THOMAS G. THOMPSON, GILMAN D. KIRK, JAMES F. TURNER, MICHAEL J. FORD, and W. ARTHUR CULLMAN, JR., <br><br> Defendants. | 06 Civ. 5724 (LTS) <br><br> **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION BY ORDER TO SHOW CAUSE TO VACATE <u>MARITIME ATTACHMENT</u>** |

## TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT** .......................................................................................1

**STATEMENT OF FACTS**...........................................................................................2

**ARGUMENT**..............................................................................................................4

**POINT I**

    **PLAINTIFF'S CLAIMS ARE MARITIME CLAIMS** ......................................5

        A.    The IDSS Agreement.................................................................................8

        B.    The Penalty Wage Claim ........................................................................11

        C.    The Non-Disclosure Agreement Claims...................................................14

**POINT II**

    **THE ATTACHMENTS SHOULD NOT BE VACATED AS PLAINTIFFS HAVE SHOWN "REASONABLE GROUNDS" FOR THEIR MAINTENANCE** ....................16

**POINT III**

    **DEFENDANTS' NOTICE AND EQUITY ARGUMENTS SHOULD NOT UNDO THE PLAINTIFFS' PROPER ATTACHMENT OF DEFENDANTS' ASSETS** ....................21

**CONCLUSION** .........................................................................................................25

## PRELIMINARY STATEMENT

Plaintiffs submit this memorandum in opposition to Defendants' motion to vacate the maritime attachments in this matter. Defendants' three arguments made in their moving papers both misapprehend Supplemental Admiralty Rule B and misrepresent the equities of this matter to this Honorable Court. As stated in Plaintiffs' Verified Complaint and as will be further shown below, Plaintiffs are individuals (and one company) who were integral to the Defendants' finding and recovering literally tons of gold and other treasure from the wreck of the *S.S. Central America* (the "Treasure") nearly twenty years ago. Plaintiffs are persons of modest means. In contrast, the individual Defendants who filed affidavits in this proceeding (Messrs. Kirk, Ford, Turner and Cullman) (collectively the "Director Defendants") are amongst the most affluent persons in the community of Columbus, Ohio, persons who, with others, invested literally millions of dollars in the highly speculative attempt to find and recover the Treasure. Defendants have admitted in the primary proceeding pending before United States District Judge Edmund A. Sargus, Jr. in the United States District Court for the Southern District of Ohio (the "Ohio Proceedings") that the Treasure sold for at least "tens of millions of dollars." Nonetheless, Defendants have neither paid Plaintiffs the consideration promised as set forth in the Verified Complaint, nor given a valid reason why Plaintiffs should not be paid.

Now that Plaintiffs have exercised their clear right under Supplemental Rule B to secure the claims which they patiently have waited for Defendants to honor, the Director Defendants have the temerity to represent to the Court that they have been financially disadvantaged by the Plaintiffs' attachments. Plaintiffs have been disadvantaged by the Defendants' conduct – including that of the Director Defendants – for years! Indeed, one of the original Plaintiffs (Don C. Craft) ***has died*** while waiting for the Defendants to honor their commitments.

1

Defendants neither advise the Court of these facts, nor do they wish the Court to know them. The Director Defendants likewise insinuate that they have no control over the failure of payment. At best, this is a misrepresentation. At worst, it is sanctionable mendacity. Although they fail to advise the Court of this critical fact, ***the Director Defendants all are directors of the company which manages the Defendant companies awarded the Treasure and which manages the sales and proceeds received from the Treasure***. Indeed, ***<u>investors in the Defendants' management company have sued the Director Defendants for breaches of their fiduciary obligations</u>*** asserting, *inter alia*, that these Director Defendants were appointed as directors with terms that expired years ago, but which positions the directors never have relinquished nor have been re-elected. Thus, the Director Defendants are not only proper defendants rather than innocent bystanders, they well may be the most appropriate defendants of all.

## STATEMENT OF FACTS

Plaintiffs' claims are largely set forth in the Verified Complaint. Where certain facts are referenced from the Verified Complaint, Plaintiffs will cite them accordingly.

The Director Defendants all have been directors of Columbus Exploration, LLC ("CXLLC") during the relevant times of this dispute.[1] Affidavit of James T. Shirley, Esq. dated October 23, 2006 ("Shirley Aff."), ¶ 16 & Exs. B, C & D. CXLLC entered into a management agreement with Recovery Limited Partnership ("RLP") dated December 18, 1999 (the "Management Agreement"). *Id.* ¶ 18 & Ex. E. By that Management Agreement, Recovery Limited Partnership gave CXLLC exclusive managerial authority of RLP. *See id.* Ex. E, at p. 3, numbered para. 2. RLP is the entity that defendant Thomas G. Thompson organized to search

---

[1]    Individual Defendant Cullman purportedly recently resigned from his position as a director of Columbus Exploration, LLC. Even assuming that this is true, the events alleged which would establish his liability relate to events prior to the time that he resigned. *See* Shirley Aff., ¶ 18 (regarding award of the Treasure to Defendants and the Defendants' subsequent sale of the Treasure to the California Gold Marketing Group, LLC).

2

for and recover the Treasure (and which did recover the Treasure), and it was a party to the contracts for the sale of the Treasure to a third-party (the California Gold Marketing Group, LLC). Shirley Aff., ¶ 16 & Exs. C & D.

A number of the individual Plaintiffs' Non-Disclosure Agreements ("NDAs") that are sued upon herein are printed on RLP letterhead. They each provide that it is an agreement:

> [B]y and between Thomas G. (Harvey) Thompson, a research scientist in the field of ocean engineering with principal offices in Columbus, Ohio (herein called "Thompson"), who represents interests, in addition to his own, of certain other science professionals and individuals, including one or more entities, and [the Individual Plaintiffs].

*See* Verified Complaint, Ex. 1.

Plaintiffs' Verified Complaint alleges that, in executing each of the individual Plaintiffs' NDAs, Thompson was acting for each of the Defendants herein, including the Director Defendants. *Id.* ¶ 54. The Director Defendants do not deny that they were investors at the time that Thompson executed these Non-Disclosure Agreements. This is important because each Non-Disclosure Agreement makes clear that Thompson "***represent[ed] interests . . . of certain other*** science professionals and ***individuals*** . . . ." Thompson specifically stated that he was acting as the representative of "other individuals," and the Defendant Directors were such individuals at the time that these agreements were executed. Thompson confirmed this fact to be true in December 1999. Shirley Aff., ¶¶ 9-13. But there is more.

As Defendants themselves have admitted, it is quite clear that tens of millions, if not hundreds of millions of dollars, were obtained in sales proceeds from third party purchasers of the Treasure after the Treasure was recovered. *Id.* ¶ 16-17 & Exs. B, C & D (recounting Dateline NBC interview of Defendant Thompson in which he estimated sale value to be between $100 million and $400 million); Affidavit of Michael J. Frevola dated October 23, 2006 ("Frevola Aff."), ¶ 4 & Ex. A (attaching Defendants' filing in the Ohio Proceedings stating that the

3

Treasure sold for "tens of millions of dollars"). All of the Director Defendants were directors of CXLLC from and since the time of when the Management Agreement gave CXLLC the exclusive right to market and sell the Treasure and to collect the sales proceeds therefrom. *See* Shirley Aff. ¶ 18 & Ex. E. They were directors of CXLLC when the sale of the Treasure was completed and all ownership interest of RLP was extinguished in June 2001. *Id.* ¶ 18.

In the Ohio Proceedings, investors of the Defendants have filed claims against the Director Defendants on grounds that they have breached their fiduciary responsibilities by, among other things, failing to step down as directors when their terms expired. *Id.* ¶ 19 & Ex. F (Ohio complaint of investor plaintiffs claiming that Director Defendants have violated fiduciary duties and refused to stand for re-election despite their terms having expired). Instead they have remained in place continuously for years, dominating the management of the Defendant companies by usurping the role of traditional corporate governance. Nevertheless, the Director Defendants claim that there is some inequity in the fact that their funds are being frozen and they are being somehow prejudiced when they have failed to pay on the contracts that were entered into almost twenty years ago and despite the proceeds from which the Plaintiffs were supposed to be paid – having begun to be received in December 1999 and completely received in June 2001 – all were received over five years ago.

## ARGUMENT

Maritime attachment is centuries old and "has prevailed during a period extending as far back as the authentic history of those tribunals can be traced." *Atkins v. Fibre Disintegrating Co.*, 85 U.S. (18 Wall.) 272, 303 (1873). As nearly two centuries of admiralty precedent make clear, the property attached need not have a direct connection to the claim sued upon, since Rule B(1)(a), broadly phrased, allows attachment of "the defendant's tangible or intangible personal

property," limited only by "the amount sued for." *Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d

263, 268 (2d Cir. 2002), *cert. denied*, 539 U.S. 927 (2003). The proper questions to be asked at

this stage are these: (1) are Plaintiffs' claims maritime claims and, if so, (2) have Plaintiffs shown

"reasonable grounds" to sustain their attachment of the assets? If the answer to these questions

are "yes," then Plaintiffs have satisfied their burden and the attachments must be maintained.

## POINT I

### PLAINTIFFS' CLAIMS ARE MARITIME CLAIMS

Similar to the Director Defendants' objection to financial inconvenience now that it

impacts *them*, it is ironic how Defendants now contest the maritime nature of the Plaintiffs'

claims now that it impacts them adversely! Defendants refer to the issue peripherally in their

motion, but Plaintiffs wish to make the matter clear for this Court: ***Defendants removed the***

***Ohio Proceedings from Ohio state court to the United States District Court for the Southern***

***District of Ohio on grounds that the Plaintiffs' claims were subject to maritime jurisdiction***

***under 28 U.S.C. § 1333***. *See* Frevola Aff., ¶ 5 & Ex. B (Defendants' Notice of Removal in Ohio

Proceedings on basis that Plaintiffs' claims were subject to admiralty jurisdiction). ***It is***

***Defendants who first invoked federal maritime jurisdiction.*** Only now, when it is inconvenient,

do Defendants seek to avoid the correct application of maritime law.

Defendants have stated that they removed because they thought that Plaintiffs were

asserting a salvage claim. They claim that they have now changed their mind because Plaintiffs

have "disclaimed" a salvage claim. Defendants' actions here, however, are inconsistent with

their filings in the Ohio Proceedings. When Defendants filed their motion to vacate attachment

before this Court, they still had (and have) pending in the Ohio Proceedings a motion to transfer

venue to the Eastern District of Virginia on ***admiralty*** grounds! They have neither withdrawn

that motion, nor have they advised District Judge Sargus of their argument here that Plaintiffs claims are not maritime (which would cause their pending motion to transfer venue to fail).

Contrary to Defendants' contentions, none of the Plaintiffs' pleadings in the Ohio Proceedings (or elsewhere) *ever* have stated a claim for salvage. If Plaintiffs had intended to state a salvage claim, they clearly knew how to do so. Quite simply, Defendants now find the waters of federal admiralty jurisdiction to be uncomfortable, and they retroactively seek to avoid them. Turning to the governing precedent, Plaintiffs respectfully submit that their claims all should be deemed to be maritime claims.

It is well settled that contracts that have an effect on maritime commerce are considered maritime contracts subject to admiralty jurisdiction. Indeed, in the recent landmark case of *Norfolk Southern Railway Co. v. James N. Kirby Pty Ltd.*, 543 U.S. 14 (2004), in which the Supreme Court defined and expanded the boundaries of admiralty jurisdiction over contracts, Justice O'Connor commenced her opinion with the following statement: "This is a maritime case about a train wreck." *Id.* at 18. In *Kirby*, the respondents argued that the case was a diversity jurisdiction dispute "involving tort and contract claims arising out of a rail accident somewhere between Savannah and Huntsville[, Alabama]." *Id.* at 22. The Court disagreed, stating:

> We think, however, borrowing from Justice Harlan, that "the situation presented here has a more genuinely salty flavor than that" . . . . When a contract is a maritime one, and the dispute is not inherently local, federal law controls the contract interpretation.

*Id.* at 22-23 (quoting *Kossick v. United Fruit Co.*, 365 U.S. 731, 742 (1961)). Notably, all the cases cited by the defendants are prior to the decision of *Kirby* and the Defendants do not cite *Kirby* whatsoever. In the *Kirby* decision, the Supreme Court guided a court's future inquiry by determining whether the principal objective of the contract is maritime commerce. *Id.* at 25. If the contract has an impact on maritime commerce, the contract is considered maritime.

6

Furthermore, although Defendants suggest otherwise, the *Kirby* decision makes clear that maritime contracts are not limited solely to ship operations, management and navigation:

> To ascertain whether a contract is a maritime one, *we cannot look to whether a ship or other vessel was involved in the dispute, as we would in a putative maritime tort case*. [citations omitted].  Nor can we simply look to the place of the contract's formation or performance.  Instead, the answer "depends upon . . . the nature and character of the contract," and the true criterion is whether it has "reference to maritime service or maritime transactions."

*Id.* at 23-24 (citations omitted) (emphasis added).

The limitations suggested by Defendants exist not in the maritime contract domain, but rather in that of maritime *tort*.  This subtle distinction is one of many that are lost throughout Defendants' moving papers, which reveals the questionable basis for their application.

Yet another of Defendants' misconceptions of the law is revealed in their reference to how maritime contracts only exist where the "subject-matter of the contract is 'purely' or 'wholly' maritime in nature."  Defendants' Memo, at 10 (citing *Hartford Fire Ins. Co. v. Orient Overseas Container Lines*, 230 F.3d 549, 555 (2d Cir. 2000)).  Defendants fail to advise this Court that *Hartford Fire Insurance Co. specifically was criticized by the Supreme Court in Kirby as an incorrect application of the "conceptual" approach required under the Supreme Court's Kossick decision*.  The Supreme Court questioned the "spatial" approach taken by *Hartford Fire Insurance Co.* and made clear that the primary focus of the inquiry is whether the contract has *insubstantial sea components*, rather than the "purely or wholly maritime" inquiry incorrectly used in cases such as *Hartford Fire Insurance Co.*:

> Some lower federal courts appear to have taken a spatial approach when deciding whether intermodal transportation contracts for intercontinental shipping are maritime in nature.  They have held that admiralty jurisdiction does not extend to contracts which require maritime and nonmaritime transportation, unless the nonmaritime transportation is merely incidental – and that long-distance land travel is not incidental.  *See,.e.g., Hartford Fire Ins. Co. v. Orient Overseas Container Lines*, 230 F.3d 549, 555-556 (2d Cir. 2000) . . . .

> *[T]o the extent that these lower court decisions fashion a rule for identifying maritime contracts that depends solely on geography, they are inconsistent with the conceptual approach our precedent requires. See Kossick*, 365 U.S. at 735, 81 S. Ct. 886.  Conceptually, so long as a [contract] requires substantial carriage of goods at sea, its purpose is to effectuate maritime commerce – and thus is a maritime contract.  Its character as a maritime contract is not defeated simply because it also provides for some land carriage.  Geography, then, is useful in a conceptual inquiry only in a limited sense: if a [contract]'s ***sea*** components are insubstantial, then the [contract] is not a maritime contract.

*Id.* at 26, 27 (final emphasis in original).    Thus, after *Kirby*, it is clear that only when the ***sea*** components of a contract are ***insubstantial*** that the court should find that the contract is not maritime. *Id.* at 27.  This is the correct and current statement of the maritime law, rather than the outdated statements of the law set forth in Defendants' Memorandum, which have been discredited by no less an authority than the Supreme Court of the United States.

Turning to Plaintiffs' claims, they can be divided into three separate classifications: (1) the IDSS claim for lease of its side-scan sonar for use to map the ocean floor in the vicinity of the wreck site; (2) the claim of the Estate of Don C. Craft for penalty wages under the U.S. Wage Statute; and (3) the remainder of the Individual Plaintiffs' claims under their respective Non-Disclosure Agreements.  Plaintiffs will address each of these classifications in turn.

## A.    The IDSS Agreement

The IDSS Agreement is a contract by which the Defendant RLP leased a side scan sonar from IDSS for use while Defendants' vessel was sailing more than one hundred miles offshore in the Atlantic Ocean searching for the wreck of the *S.S. Central America*.[2]  A side scan sonar is a device that is trailed behind a vessel while at sea, deep in the water, and is used to map the ocean floor and to locate objects on the ocean floor.  In fact, in this case the side scan sonar leased from IDSS marked the wreck that later was confirmed to be the *S.S. Central America*. Side scan sonar

---

[2]    Gary Kinder's book regarding the *S.S. Central America* search, *Ship of Gold in the Deep Blue Sea* ("*Ship of Gold*"), discusses side-scan sonar at pp. 150-52. *See* Frevola Aff., ¶ 6 & Ex. C.  Defendants cite *Ship of Gold* extensively in the Ohio Proceedings and here as well, and Plaintiffs do not believe that Defendants will contest the general description of side-scan sonar.

has no use on land.  Unquestionably, the IDSS Agreement is a maritime contract subject to this court's admiralty jurisdiction.  Borrowing Justice Harlan's expression, nothing could have a more "genuinely salty flavor" than this type of a contract, *see Kossick*, 365 U.S. at 742, as it relates to equipment that cannot be used anywhere but in a maritime environment.

Under *Kirby*, no other consideration is necessary once it has been determined that the sea component of a contract is not insubstantial.  Nonetheless, Defendants rely on a Sixth Circuit case, *National Enterprises v. Smith*, 114 F.3d 561 (6th Cir. 1997), that predates *Kirby* and posits an intent of the parties test which conflicts with *Kirby*.  On this ground alone, *National Enterprises* should have no bearing on this Court's determination of whether admiralty jurisdiction is proper because it has been superseded by more recent Supreme Court precedent.

Moreover, state law concepts may play a role in maritime contract interpretation without affecting the court's admiralty jurisdiction: "[e]ven under maritime law, . . . 'a maritime contract's interpretation may so implicate local interests as to beckon interpretation by state law.'" *Littlefield v. Acadia Ins. Co.*, 392 F.3d 1, 6 (1st Cir. 2004) (quoting *Kirby*, 543 U.S. at 28). Federal courts sitting in admiralty regularly apply state law to modify or augment federal maritime law so long as the state law does not contradict it or deprive a party of a substantive federal right. 1 *Benedicts on Admiralty*, § 112 at 7-30, 31.

Within this District, courts flatly have rejected the *National Enterprises* consideration of a choice of law clause to determine whether admiralty jurisdiction is proper.  In *McNamara v. Tug DIANA L. MORAN*, No. 87 Civ. 3096, 1989 WL 106522, at *2 (S.D.N.Y. Sept. 6, 1989), Judge Mukasey construed an indemnity provision in a oil transport contract that contained a Connecticut choice of law clause.  He ***initially*** determined whether the agreement was a

9

maritime contract within the Court's admiralty jurisdiction. *Id*. Only ***then*** did Judge Makasey consider which law should apply to the indemnification issue.

Judge Mukasey first stated the general proposition that "interpretation of a maritime contract is 'governed by federal maritime law, not state law.'" *Id*. (quoting *Navieros Oceanikos, S.A. v. S.T. Mobil Trader*, 554 F.2d 43, 47 (2d Cir. 1977)). He noted, however, the purchase order contained a Connecticut state law clause. After reviewing Second Circuit precedent, he recognized that it remains an open question whether "a choice of law provision in a maritime contract ought to be given effect." *Id*. In the end, Judge Mukasey applied general notions of contract law, as opposed to Connecticut law, because the two sets of laws were similar and the application of the homogenized law is favored under those circumstances. *Id*.

Importantly, Magistrate Judge Dolinger undertook the same analysis with respect to another maritime contract involving stevedores where the agreement was subject to the laws of Virginia. *See U.S. Fire Ins. Co. v. S.S. LIONS GATE BRIDGE*, No. 88 Civ. 9188, 1997 WL 10923, at *5 (S.D.N.Y. Jan. 10, 1997). In determining to apply federal admiralty law as opposed to Virginia state law, Magistrate Judge Dolinger stated that both were similar for the subjects in the case and, in that case, the court should apply admiralty law. *Id*.

In both *McNamara* and *S.S. LIONS GATE BRIDGE*, the courts only considered the choice of law clauses when determining the law to apply to the issues in the cases; the choice of law provisions had no bearing whatsoever ***on the Court's underlying jurisdiction***. Here, once it is established that the IDSS Agreement is a maritime contract under the strictures of *Kirby* and thus admiralty jurisdiction is proper, the Ohio state choice of law provision may only be an issue in determining what substantive law should apply to the interpretation of the IDSS Agreement.

Finally, the terms of the NDAs – prepared 20 years ago by Defendants' own attorneys – belie Defendants' freshly-minted argument that the NDAs are not maritime contracts. The NDAs recite that they are to be construed in accordance with the law "applicable to contracts between residents of Ohio wholly executed and performed in Ohio." *See, e.g.,* Verified Complaint, Ex. 1, para. 11. Nevertheless, the NDAs all contain a forum selection clauses that specify the U.S. District Court for the Southern District of Ohio as the forum in which disputes will be heard. *See, e.g., id.,* para. 12. If the contract is recited to be between non-diverse parties, the only manner in which the NDAs could be resolved in federal court would be if the dispute was subject to admiralty jurisdiction! Thus, Defendants' own attorneys recognized the NDAs to be subject to admiralty jurisdiction 20 years ago, and they continued to act on that position as recently as several weeks ago in (i) removing these disputes to federal court in Ohio and (ii) in seeking to transfer the Ohio Proceedings to the Eastern District of Virginia on admiralty grounds. Defendants' revisionist argument that the Plaintiffs' claims are not maritime claims, therefore, must be viewed with skepticism and ultimately rejected.

**B.    The Penalty Wage Claim**

Similarly, the penalty wage claim asserted by the estate of Don C. Craft likewise qualifies as a maritime claim. As stated by the Supreme Court in *Kossick,* "[w]ithout doubt a contract for hire either of a ship or of the sailors and officers to man her is within the admiralty jurisdiction." 365 U.S. at 735 (citing 1 Benedict, Admiralty, 366). The claim is asserted under Title 46, of the United States Code ("Shipping"), and relates to Defendants' failure to timely pay the wages to Mr. Craft after the completion of the voyage of the Defendants' vessel, the *Artic Discoverer.*

It is a matter of hornbook law that seamen have historically received favored treatment from Congress and the admiralty courts:

11

> Seamen have always been regarded as wards of the admiralty, and their rights, wrongs and injuries a special subject of the admiralty jurisdiction. *Benedict's Admiralty*, 4th ed., §§ 182, 603. The policy of Congress, as evidenced by its legislation, has to deal with them as a favored class. *Robertson v. Baldwin*, 165 U.S. 275, 287 [(1897)]. In the light of and to effectuate that policy, statutes and enacted for their benefit should be liberally construed."

*Bainbridge v. Merchants & Miners Transp. Co.*, 287 U.S. 278, 282 (1932).

Title 46 of the United States Code governs the maritime industry in the United States. The specific provisions sued upon in this case pertain to the protection of a seaman. As the Supreme Court stated in *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982):

> [T]he "evident purpose" of the [penalty wage] statute is "to secure prompt payment of seamen's wages . . . and thus to protect them from the harsh consequences of arbitrary and unscrupulous action of their employers, to which, as a class, they are peculiarly exposed." This was to be accomplished "by the imposition of a liability which is not exclusively compensatory, but designed to prevent, by its coercive effect, arbitrary refusals to pay wages, and to induce prompt payment when payment is possible." Thus, although the sure purpose of the statute is remedial, Congress has chosen to secure that purpose through the use of potentially punitive sanctions designed to deter negligent or arbitrary delays in payment.

*Id.* at 572 (quoting *Collie v. Ferguson*, 281 U.S. 52, 55-56 (1930)) (internal citations omitted).

In *Griffin*, the Supreme Court strictly construed the penalty wage statute and ruled that a seaman who was denied $412.50 in compensation for repatriation expenses was entitled to over $300,000 under the clear terms of the statute. *Id.* at 575. In holding that this result was the proper interpretation, the Supreme Court referred to legislative history which indicated that "Congress intended the statute to mean exactly what its plain language says." *Id.* at 574.

Here, Defendants' first question whether the Estate of Don C. Craft has standing to assert the penalty wage claim. They cite no basis for why the claim should not survive Mr. Craft's death. The penalty wage statute has no provision for the cessation or the extinction of the seaman's claim in these circumstances, and both Congress' and the federal courts' historic treatment of seamen cannot be harmonized with such a result. The penalty wage statute is

designed to prevent arbitrary or unscrupulous conduct. Extinguishing such a claim when the seaman's widow is bringing the claim, because that seaman has not been paid for services rendered years before, cannot be a result which Congress or the Supreme Court would endorse. Indeed, allowing Mr. Craft's claim to be extinguished would *reward* a shipowner for refusing to pay for all of the accrued years. This cannot be the correct interpretation of a statute designed to protect seamen from arbitrary and unscrupulous shipowners.

Defendant contend that the choice of law provision in Mr. Craft's NDA likewise would somehow defeat maritime jurisdiction over a seaman's wage claim. As *Kossick* makes clear, a seaman's employment contract cannot be taken out of maritime jurisdiction, especially in light of the protections enacted by Congress over the last two centuries to protect seamen.

Defendants also contend that the general provisions of the wage statute override the specific provisions of the penalty wage statute. Specifically, they refer to the "share in the profit or result of the voyage" general provisions of the wage statute at 46 U.S.C. § 10501(b) rather than the specific provisions of the penalty wage provision at 46 U.S.C. § 10504. The specific provisions of the penalty wage provision identify fishing and whaling voyages as voyages to which the penalty wage two days' pay for each day of delay does not apply. *See* 46 U.S.C. § 10504(c), (d). Fishing and whaling voyages pay crewmembers in "lays" – percentages of the catch for the voyage. The "share in the profit" general provision refers to these specifically enunciated voyages in the penalty wage section of the Wage Statute.

Because payment by lays is not calculated on a daily hire rate, there is no basis on which to calculate two days wages for each day the wages remain unpaid. Here, of course, a specific quantity exists – the $150.00 per day that Mr. Craft was not paid. Because the maritime adventure in this case was not a traditional fishing or whaling "lay" share arrangement, because a

definite, daily hire rate subject to calculation exists in this instance, and because the seamen's protection statutes are to be liberally construed in favor of seamen, the penalty wage statute applied to the claims asserted by the Estate of Don C. Craft.

**C.    The Non-Disclosure Agreement Claims**

Turning to the NDAs, their "sea element" is anything but insubstantial. A significant, and perhaps the most important, portion of consideration that was provided by the Plaintiffs to the Defendants in the NDAs was to ***not compete with the Defendants*** during their search and recovery operations for the *S.S. Central America*. Indeed, this element of consideration was of supreme importance to these Defendants because there were competing salvors attempting to find and recover the Treasure and the Defendants had to obtain injunctions from the Eastern District of Virginia to prevent such interlopers. A brief review of the papers filed by Defendants in the Ohio Proceedings recite some of the multitude of problems they have had in this regard. *See* Frevola Aff., ¶ 7 & Ex. D.

This consideration given by the Plaintiffs, their agreement to not conduct maritime search operations over one hundred miles off the coast of the Carolinas in the Atlantic Ocean, obviously has an impact on maritime commerce because the promise entails not engaging in a maritime adventure on the high seas. Accordingly, under *Kirby*, the NDAs on this ground alone should be considered maritime contracts. But there is more.

Supreme Court jurisprudence over the last half century shows that the NDAs must be considered subject to admiralty jurisdiction. The one Supreme Court case cited by Defendants, *Kossick v. United Fruit Co.*, 365 U.S. 731 (1961), involves a remarkably similar agreement. In *Kossick*, the agreement at hand was an oral agreement by a shipowner to assume responsibility for all consequences of an injured crewman being treated in a local Public Health Service

14

Hospital. *Id.* at 732. The agreement was reached because the seaman wanted private care rather than public health care, and the shipowner persuaded the seaman to accept public health care by the additional promise to pay for any damages resulting from the public care facility. *Id.* at 738.

Obviously, a shipowner's agreement to compensate a seaman for any negligence committed by hospital personnel, on land, after the seaman had been discharged from the service of the ship, has a significant land-based nexus. On its face, the *Kossick* case presented virtually no maritime element. This is what was argued by the shipowner in *Kossick*, but to no avail. *See, e.g., id.* at 736-38. Rather, in looking at the nature of the agreement at issue, the Supreme Court held that the shipowner's undertaking essentially was a part of the terms and conditions of the seaman's employment contract. *See id.* at 736. For of this reason, even though the contract involved a ***separate, new agreement*** entered into between the shipowner and the seaman ***after the seaman had been injured and discharged from the ship*** and which related solely to events occurring solely on shore, the Supreme Court ruled that it was a maritime contract. *Id.* at 738.

Here, the agreements at issue likewise must be considered indispensable portions of the contracts for maritime employment. Indeed, by their very terms, these agreements were an integral part of the employment between the shipowner and the Plaintiffs, in that the Plaintiffs clearly would have been refused participation in the maritime adventure but for their execution of these agreements. Shirley Aff., ¶¶ 4. The Recitals in the NDAs states clearly:

> Thompson desires Confidant to participate in the search operations, but only to the extent that Thompson is sure that the information developed by Thompson, including the existence of the Project being directed by Thompson and the location(s) of any Shipwreck target(s) found, remains confidential between Thompson and Confidant.

*See, e.g.*, Verified Complaint, Ex. 1.

Perhaps the Defendants here created a separate and distinct contract regarding the non-compete and non-disclosure obligations in attempt to avoid maritime jurisdiction. In *Kossick*,

however, the oral undertaking of the shipowner was a separate and distinct agreement with the crewmember, but that agreement nevertheless was construed to form part of the maritime contract of employment. A shipowner's creation of a separate document for a crewmember to execute cannot destroy the essential nature of the agreement which is indisputably maritime in nature. Additionally, in light of the clear intent of both Congress and the federal courts to protect the "wards of the admiralty," the protections afforded seamen such as Plaintiffs should be construed liberally.

Accordingly, under *Kossick* and its progeny, and under the admiralty jurisdiction principles clearly enunciated by the Supreme Court's recent *Kirby* decision, it is unquestionable that the NDAs are indeed maritime contracts and subject to this Court's admiralty jurisdiction.

## POINT II

### THE ATTACHMENTS SHOULD NOT BE VACATED AS PLAINTIFFS HAVE SHOWN "REASONABLE GROUNDS" FOR THEIR MAINTENANCE

Having shown above that the claims asserted herein all should be considered maritime claims, Plaintiffs now address the Defendants' argument that no maritime claims exist against the Director Defendants. In resolving this argument, a critical aspect of the post-attachment hearing under Supplemental Rule E(4)(f) is that ***it is not intended to resolve the underlying merits of the parties' dispute***. *See, e.g., Linea Naviera de Cabotage, C.A. v. Mar Caribe de Navegacion, C.A.*, 169 F. Supp. 2d 1341, 1358 (M.D. Fla. 2001) (emphasis added) (citing *North of England Prot. & Indem. Ass'n, Ltd. v. M/V NARA*, No. 99-0464, 1999 WL 33116416, 1999 U.S. Dist. LEXIS 22375, at *4 (E.D. La. 1999)). Rather, the hearing is only for the purpose of determining whether there were ***reasonable grounds*** for the issuance of the *ex parte* order for the process of maritime attachment and garnishment. *Salazar v. The ATLANTIC SUN*, 881 F.2d 73, 79-80 (3d Cir. 1989); *Maersk, Inc. v. Neewra, Inc.*, No. 05 Civ. 4356 (RCC), 2006 WL 2168452, at *10

16

(S.D.N.Y. Aug. 1, 2006); *Ullises Shipping Corp. v. Fal Shipping Co.*, 415 F. Supp. 2d 318, 326

(S.D.N.Y. 2006); *Thypin Steel Co. v. Certain Bills of Lading Issued for a Cargo*, No. 96 Civ. 266

(RPP), 1996 WL 223896, at *4 (S.D.N.Y. 1996), *aff'd*, 215 F.3d 273 (2d Cir. 2000).

Furthermore, this Court is not limited to reviewing the Verified Complaint in deciding

whether such reasonable grounds for the attachment exist. For example, as stated a few weeks

ago by Judge Casey:

> The current motion to vacate, however, is not a motion to dismiss; it is a
> specialized maritime proceeding with the singular purpose of determining the
> ongoing propriety of a maritime attachment. *See* Supp. R. Fed.R.Civ.P. E(4)(f).
> Accordingly, the Court's review of whether reasonable grounds exist for the
> attachment is not limited to allegations in the Complaint. *See Linea Naviera*, 169
> F. Supp. 2d at 1358.

*Maersk*, 2006 WL 2168452, at *10.

Courts frequently characterize the "reasonable grounds" burden as a requirement to make

a *prima facie* showing that plaintiff is entitled to the damages sought and secured by the arrest

and attachment. *See, e.g., Parkroad Corp. v. China Worldwide Shipping Co.*, No. 05 Civ. 5085

(GBD), 2005 U.S. Dist. LEXIS 11122, at *3 (S.D.N.Y. June 6, 2005); *see also Blake Maritime,*

*Inc. v. Petrom S.A.*, No. 05 Civ. 8033 (PAC), 2005 U.S. Dist. LEXIS 26310, at *12 (S.D.N.Y.

Oct. 31, 2005); *M/V NARA*, 1999 U.S. Dist. LEXIS 22375, at *5 (E.D. La. 1999); *Caspar*

*Marine, Inc. v. Seatrans Shipping Corp.*, 969 F. Supp. 395, 396 (E.D. La. 1997). Courts

inquiring further merely review the limited evidence present – taking into account the short turn

around time involved with a Rule E(4)(f) hearing – and determine whether plaintiff ***may be able***

***to prove its contentions***. *Maersk*, 2006 WL 2168452, at *10; *Linea Naviera*, 169 F. Supp. 2d at

1359-60; *A. Coker & Co. v. Nat'l Shipping Agency Corp.*, No. CIV. A. 99-1440, 1999 WL

311941, at *2 (E.D. La. May 17, 1999). With the standard of review now adequately set forth,

Plaintiffs turn to the facts of the case at bar.

As related above, the IDSS Agreement was executed between RLP and IDSS. Under the management agreement between RLP and CXLLC, CXLLC has taken exclusive control of RLP until RLP is wound up. The claims filed in the Ohio Proceedings by insiders – investors in the Defendants' companies – allege that the Director Defendants have held over as directors of CXLLC, the management company that controls the sales and proceeds of the entire Treasure, and that they have co-opted CXLLC to their own designs by refusing to hold meetings, refusing to hold elections for the appointment of new directors although the Director Defendants' initial terms expired years ago, and by refusing to provide financial information to the investors of the Defendant companies as to the millions of dollars that have been invested in these companies and the tens of millions of dollars obtained from the sale of the Treasure. CXLLC's failure (as manager of RLP) to pay IDSS, therefore, may be imputed to the Director Defendants who have dominated and controlled RLP for years. These are allegations that have been made in court papers filed in the Ohio Proceedings *by investors* of CXLLC.

As for the penalty wage claims asserted by the Estate of Don C. Craft, *Ship of Gold* relates that Director Defendant Gilman Kirk was the owner of the vessel *Artic Discoverer* at the time that the wages that have not been paid were earned. *See* Frevola Aff., ¶ 8 & Ex. E. Indeed, Defendants do not dispute this. *See* Defendants' Memo, at 15 n.14. Under U.S. law, the "master or owner" of the vessel clearly is liable for penalty wages. 46 U.S.C. § 10504(c).

As for the claims under the NDAs, each of the Director Defendants has been an investor in the Defendant companies since before the NDAs were executed. The NDAs specifically state that Thompson was acting not merely for himself, but also for ***other individuals***. On this ground alone, Plaintiffs have met their reasonable grounds burden, because discovery well may show that Thompson's execution of the NDAs was done with the full blessing of the Director

Defendants, just as Defendant Thompson said it was. Shirley Aff., ¶¶ 9-11. Over and above that ground, however, exists the Director Defendants' domination of RLP's manager CXLLC. Many of the NDAs were signed on RLP stationary. Defendants fail to draw the Court's attention to this, instead filing pro forma affidavits which deny involvement in any of the Defendant companies' operations. Vacating an attachment, however, cannot be achieved so simply.

Turning to other cases where courts allowed attachments to be maintained against alleged *alter egos*, the facts of this case easily surpass those found to support reasonable grounds in other cases and reveal that the mere fact that the Director Defendants deny they are bound by the NDAs cannot serve to vacate Plaintiffs' attachment. For example, in *Maersk*, Judge Casey noted that courts may take into account the alleged factual background to determine whether to maintain the attachment over the attached assets and require the maintenance of the attachment pending further factual investigation in appropriate instances. *Maersk*, 2006 WL 2168452, at *10 (upholding the attachment of funds of an asserted garnishee, stating that "the Court will not permit [the garnishee] to employ [tacit alliances and shifting identities] to escape the attachment presently in dispute."). In *Maersk*, similar to the Director Defendants here, the garnishee also contended that the fraud and similar claims against him were not maritime claims. Judge Casey properly rejected the movant's argument, noting that (as here) the garnishee might be liable under the maritime contract and, in any event, the alleged fraudulent activities of the garnishee might serve to also subject the garnishee to jurisdiction under a maritime tort theory. *Id.* at *10-11.

In *Ullises Shipping*, Judge Scheindlin held that the payment of a debt of the principal defendant by an alleged alter-ego was sufficient grounds to maintain the attachment over the alleged alter-ego, despite both defendants having shown hundreds of millions of dollars of capitalization, separate corporate filings, affidavits supporting corporate separateness, and

similar evidence.  In upholding the multi-million dollar attachment over the alleged alter-ego

because of the payment made on behalf of the corporate affiliate, Judge Scheindlin ruled:

> ***Although this is not conclusive evidence, [plaintiff] has met its burden of
> showing reasonable grounds for attaching the assets [of the alter ego
> defendant].***

*Ullises Shipping Corp. v. Fal Shipping Co.*, 415 F. Supp. 2d 318, 326 (S.D.N.Y. 2006)

(emphasis added).  District courts of other districts likewise have used similar reasoning to

maintain maritime attachments in cases similar to the case at bar:

> Based on the *Sabine* factors [to determine alter-ego relationships], ***this Court
> finds that [plaintiff] has met its probable cause burden***.  Specifically, [plaintiff]
> produced a financial document listing Summit Marine as an affiliate of NSAC.
> [Plaintiff] also submitted evidence showing that Summit Marine has insufficient
> capital to perform its obligations under the time charter.  This evidence, combined
> with the fact that NSAC guaranteed Summit Marine's performance of the time
> charter, suggests that Summit Marine ***may*** be acting as a conduit for NSAC.
>
> Finally, although Mr. Wu testified that Summit Marine is located in Houston,
> Texas, the fax acknowledging its purchase of the bunkers is addressed to "Summit
> Marine Management, Taipei."  NSAC does business in Taipei.  At a minimum,
> this suggests that the companies ***may*** share a corporate office, and it ***may*** indicate
> that NSAC exercises some degree of control over Summit Marine – contrary to
> the assertions of Mr. Wu.
>
> ***[Plaintiff] has not definitively established that Summit Marine and NSAC
> are alter egos. At this preliminary stage, however, [plaintiff] need only show
> probable cause. [Plaintiff] has met this burden.***

*A. Coker*, 1999 WL 311941, at *2 (emphasis added).

> While characterizing [plaintiff's] evidence as ***not conclusive***, and recognizing that
> the decision to continue the attachments was not a final determination of
> commonality and control between the three entities, ***Judge Corrigan [properly]
> concluded that the attachment was supported by probable cause***.

*Linea Naviera*, 169 F. Supp. 2d at 1359-60 (emphasis added).  Plaintiffs respectfully submit that

the foregoing shows that the Director Defendants may be liable for Plaintiffs' claims either

directly or derivatively as alter-egos.  In either case, as shown by the foregoing precedent, the

claims against the Director Defendants would fall within maritime claims.  Unquestionably, this

Court should hold that Plaintiffs have sustained their burden of showing reasonable grounds for the maintenance of the attachment of the Director Defendants' assets.

## POINT III

### DEFENDANTS' NOTICE AND EQUITY ARGUMENTS SHOULD NOT UNDO THE PLAINTIFFS' PROPER ATTACHMENT OF DEFENDANTS' ASSETS

Defendants contend that some or all of the frozen assets should be unfrozen because several days have passed since their assets were frozen without notice from Plaintiffs. Plaintiffs routinely have given notice to Defendants when Plaintiffs have been advised that they have attached an asset of the Defendants. For example, Plaintiffs have given Defendants notice previously of the attachment of gold coins and ingots in connection with the Los Angeles Rule B proceeding, and have given Defendant Gilman Kirk notice of the attachment of approximately $11,600 here in New York related to two separate wire transfers through garnishee Deutsche Bank. Copies of these notices, which have been served on counsel for Defendants in the Ohio Proceedings and have been filed in the Ohio Proceedings, are attached to the Frevola Affidavit. *See* Frevola Aff., ¶ 9 & Exs. F & G.

Of course, Plaintiffs only can give notice when it knows that property has been attached. The only attachments of assets which have been confirmed by a garnishee in New York are the two Deutsche Bank attachments. *Id.* ¶ 9-10 & Ex. G. Defendants claim that a broad spectrum of assets have been attached, but they fail to identify what has been attached and the identity of the garnishee. The notice requirements of Rule B do not require speculation; nor do they require the Plaintiffs to play "blind man's bluff." As the Advisory Committee's Notes state:

> Modern conceptions of fairness, however, dictate that actual notice be given to persons known to claim an interest in the property that is subject to the action ***where that is reasonably practicable***.

1966 Advisory Committee Notes, Fed. R. Civ. P. Supp. R. B (emphasis supplied).

21

How can notice to the Defendants be "reasonably practicable" where Plaintiffs have not been advised of the freezing of the alleged property, and where Defendants themselves fail to specify in their court papers the property to which they refer?

Defendants' contentions regarding a several day delay in notice justifying vacating an attachment, which delays occur because the garnishee does not advise the Plaintiffs of the attachment, does not reflect the delays that occur with the huge amount of Rule B writs being processed on a daily basis.[3]  Furthermore, Defendants' notice argument fails to apprise the court that Defendants all have been aware of this proceeding since at least September 2, 2006.  This argument similarly pays short shrift to the whole reason why such notice is required:  to prevent a non-present defendant from being defaulted without notice.  *See id.*

On September 2, 2006, Defendants filed a notice in the Ohio Proceedings advising Judge Sargus of the commencement of this proceeding and of the writs issued in conjunction with this proceeding.  Frevola Aff., ¶ 12 & Ex. H.  That notice specifically identified the concern of having assets attached.  *See id.*  Thus, no unfair surprise or lack of notice is present here.  Indeed, these Defendants have received much more notice than recent Rule B foreign defendants having EFT's attached here in New York.

Here, Defendants state they received immediate notice of the freezing through their lending institutions.  Defendants already knew of the filing of this proceeding.  Furthermore, the primary purposes of such notice, to provide the Defendant with prompt notice so as to oppose the

---

[3]    For example, the Deutsche Bank letter advising of the Kirk attachments was dated and received on October 11, 2006, although the attachments occurred on September 28 and October 4, 2006,  respectively.  *See* Frevola Aff., ¶¶ 9-10 & Ex. G.  As a further example, Plaintiffs' counsel are before Judge Berman in *Bertling Logistics (Peru) S.A.C. v. Martrade Shipping & Transport GmbH*, No. 06 Civ. 6543.  There, plaintiff attached assets sufficient to obtain full security and issued a "cease and desist" notice to garnishee banks.  Nevertheless, garnishee banks continued to report funds restrained a week and more earlier subsequently were received by plaintiff's counsel because of processing delays with the garnishees.  *See id.* ¶ 11.  Under Defendants' notice argument, such delays – not attributable to the plaintiffs – somehow would invalidate a proper Rule B attachment.  This is simply not the law.

attachment and to prevent an absent defendant from inadvertently defaulting, do not apply in this case. Thus, Defendants have received adequate notice and their contentions should be rejected.

Defendants also seem to argue at the conclusion of their brief that the attachments should be vacated because of the primary proceeding pending in Ohio or the fact that a now-dismissed supplemental security proceeding was filed in Los Angeles. In light of the plethora of Rule B supplemental proceedings which this district has seen since the Second Circuit's decision in *Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263 (2d Cir. 2002), and in light of the Second Circuit's reaffirmance of these principles in *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434 (2d Cir. 2006), Defendants' argument disregards well-settled law in this Circuit. It is hornbook law that a plaintiff with an admiralty cause of action may commence a supplemental maritime attachment proceeding in a jurisdiction other than that in which the primary lawsuit (or other legal proceeding) is pending to secure its claim. *See, e.g., id.* at 436; *Winter Storm Shipping*, 310 F.3d at 265.[4] This principle has been applied both in cases in which the plaintiff's claims are being litigated in another forum due to the presence of a forum selection clause or the presence of jurisdiction over the defendants elsewhere, *see, e.g., Polar Shipping*, 680 F.2d at 633; *Western Bulk Carriers (Australia), Pty. Ltd. v. P.S. Int'l, Ltd.*, 762 F. Supp. 1302, 1309 (S.D. Ohio 1991); *Staronset Shipping Ltd. v. North Star Navigation Inc.*, 659 F. Supp. 189, 190-91 (S.D.N.Y. 1987), and also in the context of arbitration where an arbitration clause requires that the parties arbitrate the dispute as oppose to litigate it. *See, e.g., Winter Storm Shipping*, 310 F.3d at 265 (involving supplemental maritime attachment lawsuit filed pursuant to Rule B in Southern District of New York in connection with London arbitration).

---

[4] *See also Polar Shipping Ltd. v. Oriental Shipping Corp.*, 680 F.2d 627, 631-33 (9th Cir. 1982); *The West of England Ship Owners Mut. Ins. Ass'n (Luxembourg) v. McAllister Bros., Inc.*, 1993 A.M.C. 2559, 2564-66 (E.D. Pa. 1993). The Plaintiffs could string cite literally dozens of other decisions for this proposition, but in the interest of space and brevity have listed the cited cases as a representative sample.

In *Polar Shipping*, the district court vacated a maritime attachment on grounds that a forum selection clause required the parties' dispute to be resolved by London arbitration or in the High Court of London. *Polar Shipping*, 680 F.2d at 630. The plaintiff appealed, contending that it was entitled to commence and maintain its lawsuit to obtain security pursuant to Rule B despite the governing forum selection clause. The Ninth Circuit agreed, reversing the district court and reinstating the plaintiff's attachment. In so holding, the Ninth Circuit stated:

> We hold that ***in an admiralty action***, absent express intent to the contrary, ***a forum selection clause*** providing that all disputes under the [contract] will be determined by a selected foreign court ***neither precludes a plaintiff from commencing an action in the district court to obtain security by maritime attachment, nor prohibits the district court from ensuring the availability of security adequate to satisfy a favorable judgment by the selected forum***.

*Polar Shipping*, 680 F.2d at 633 (emphasis added). Quite simply, courts have held for decades that a plaintiff in an admiralty proceeding may bring a Rule B maritime attachment claim for the sole purpose of gaining security in another jurisdiction so long as the prerequisites for Rule B are met in the jurisdiction in which the plaintiff's Rule B action has been commenced. The Second Circuit's *Aqua Stoli Shipping* decision emphatically reinforced this principle several weeks ago.

The Director Defendants also seek vacatur of the attachment based on the purported difficulties created by the freezing of their assets. This should play no factor in whether the attachments should be lifted. As the *Aqua Stoli Shipping* panel stated, an otherwise valid attachment may be vacated at the court's discretion in very limited circumstances, which circumstances the Defendants – not Plaintiffs as Defendants claim – have the burden of proving:

> [W]e believe that a district court may vacate the attachment ***if the defendant shows*** at the Rule E hearing that 1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise.

*Aqua Stoli Shipping*, 460 F.3d at 445. Defendants have failed to show the existence of any of these equitable grounds for vacatur, because none exist. None of the Defendants is located locally. Frevola Aff., ¶ 13. The Plaintiffs are residents of a multitude of states, and none are residents of Ohio. *Id.* Plaintiffs have not obtained any security of any amount. *Id.* In regard to the purported hardships created by the attachments, they are irrelevant. *See, e.g., Aqua Stoli Shipping*, 460 F.3d at 437, 447 (reversing vacatur and reinstating attachment despite the attachment having "substantially impaired [defendant]'s ability to move money internationally" on grounds that the defendant's arguments were "legally irrelevant").[5]

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants motion to vacate the Plaintiffs attachments of Defendants assets and deny Defendants' motion to dismiss Plaintiffs' Verified Complaint.

Dated: New York, New York
      October 23, 2006

                           HOLLAND & KNIGHT LLP

By: _____
                James T. Shirley, Jr. (JTS 6114)
                Michael J. Frevola (MJF 8359)
                195 Broadway
                New York, NY 10007-3189
                Tel:   (212) 513-3200
                Fax:  (212) 385-9010

                *Attorneys for Plaintiffs*

---

[5] As the Court may well be aware, many defendants have been threatened with, or sustained, various forms of financial difficulties as a result of Rule B attachments. As but one example, in *Sea Transport Contractors v. Industries Chimiques du Senegal*, 05 Civ. 10271, Judge Batts ordered a writ of attachment issued against the defendant in the amount of $75 million, which employed over 2,500 employees in Senegal and which was driven into receivership by the Rule B writs filed in New York. Frevola Aff., ¶ 14 Ex. I.

TO:   **By Hand**
      Landman Corsi Ballian & Ford P.C.
      Attorneys for Defendants
      120 Broadway, 27th Floor
      New York, New York 10271
      Attn: David S. Moretti, Esq.
      Tel: (212) 238-4835
      Fax: (212) 238-4848

# 4125659_v1

## ATTORNEY'S AFFIRMATION OF PERSONAL DELIVERY SERVICE VIA MESSENGER

STATE OF NEW YORK        )
                         ) SS.:
COUNTY OF NEW YORK       )

RUDY D. GREEN, an attorney admitted to practice in the Courts of the State of New York, affirms under penalty of perjury:

That on October 23, 2006, I caused a true copy of the attached Memo of Law, to be served personally by same day messenger delivery upon the following:

Landman Corsi Ballaine & Ford P.C.
120 Broadway
27th Floor
New York, New York 10271

_____
                    RUDY D. GREEN

Dated:  October 23, 2006