James T. Shirley, Jr. (JS 6114)
Michael J. Frevola (MJF 8359)
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

Attorneys for Plaintiffs Michael Williamson, The Estate of Don C. Craft, Kirk O'Donnell, John
Lettow, Timothy McGinnis, Fred Newton, William Watson, Chris Hancock, Dale Schoeneman,
and International Deep Sea Survey, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL WILLIAMSON, THE ESTATE OF
DON C. CRAFT, KIRK O'DONNELL,
JOHN LETTOW, TIMOTHY MCGINNIS,
FRED NEWTON, WILLIAM WATSON, CHRIS
HANCOCK, DALE SCHOENEMAN, and
INTERNATIONAL DEEP SEA SURVEY, INC.,

                Plaintiffs,

      v.

RECOVERY LIMITED PARTNERSHIP,
COLUMBUS EXPLORATION, LLC,
COLUMBUS-AMERICA DISCOVERY GROUP, INC.
COLUMBUS EXPLORATION LIMITED
PARTNERSHIP, OMNI ENGINEERING, INC.,
OMNI ENGINEERING OF OHIO, INC.,
ECONOMIC ZONE RESOURCE ASSOCIATES,
ECONOMIC ZONE RESOURCE ASSOCIATES,
LTD., EZRA, INC., EZRA OF OHIO, INC., ECON
ENGINEERING ASSOCIATES, INC., DOE.E, INC.,
THOMAS G. THOMPSON, GILMAN D. KIRK,
JAMES F. TURNER, MICHAEL J. FORD, and
W. ARTHUR CULLMAN, JR.,

                Defendants.

---

06 Civ. 5724 (LTS)

**AFFIDAVIT OF
JAMES T. SHIRLEY, JR. IN
OPPOSITION TO DEFENDANTS'
MOTION TO VACATE RULE B
ATTACHMENT**

STATE OF NEW YORK        )
                         ) ss:
COUNTY OF NEW YORK       )

     JAMES T. SHIRLEY, JR., being duly sworn, deposes and says:

     1.    I am a member of the law firm Holland & Knight LLP, attorneys for Plaintiffs, and I am fully familiar with the facts in this case.

     2.    This Affidavit is made in opposition to the Defendants' Motion By Order to Show Cause to Vacate Rule B Attachments in this district. The statements made in this affidavit are based upon my personal knowledge except where I state them to be based upon information and belief and in those cases I believe them to be true. In this Affidavit I refer to "the Defendants" collectively even with respect to matters and issues which may not relate to all of them because we have so far been unable to ascertain the precise interplay amongst some of them and they in any event give the appearance of being alter-egos of each other.

     3.    As has been set forth in other pleadings before this court, the Plaintiffs in this litigation are individuals and one corporate entity, all of whom provided valuable services on board a ship at sea, enabling the successful search and location of the shipwreck of the *S.S. Central America* and the eventual salvage of gold and other treasure and artifacts from that shipwreck (the "Treasure"). On information and belief, the Treasure included approximately three (3) tons of gold consisting of gold coins, gold bars, and other items.

     4.    On information and belief, as a condition for being employed in this operation on the Defendants' vessel(s), our clients were required to agree not to compete with the Defendants in their search and recovery operations with respect to the *S.S. Central America* and other

targeted shipwrecks for 10 years, not to disclose certain information about the whereabouts of the shipwreck of the *S.S. Central America* or the technology required to recover the Treasure, and not to disclose certain other information to which they had access by virtue of their employment in this search and deep ocean salvage operation.

5.    In consideration for these undertakings, which are memorialized in documents referred to as "Non-Disclosure Agreements" (the "NDAs"), a sample of which is provided herewith as Exhibit A, our clients were promised certain fractional percentages of the value realized from the recovered Treasure. The individual percentages are stated in the Verified Complaint. When I first met Richard T. Robol in his Norfolk, Virginia offices he told me the NDA's had been prepared by Defendant Thompson's "Ohio lawyers", whom he identified as Messrs. Porter, Wright, Morris & Arthur.

6.    With the exception of Don C. Craft, insofar as we presently know the plaintiffs have received the compensation to which they are entitled for their service on board the Defendants' vessel(s), *__except__* for the amounts which would become due upon award and valuation of the Treasure pursuant to the NDAs. Mr. Craft is an exception because he exchanged $150 of his regular daily pay (originally $450) for an increase of .15% in his NDA recovery.

7.    In the case of International Deep Sea Survey, Inc. ("IDSS"), the percentage to which it is entitled is actually spelled out in its service contract. That amount, like the percentages for the individual plaintiffs, would still become due only after the Treasure was recovered and sold.

8.    On information and belief, the gold Treasure was recovered during the late 1980s and early 1990s. In June 1998, the United States District Court for the Eastern District of

3

Virginia awarded the Defendants approximately 92.2% of the gold component of the Treasure, and 100% of the remaining Treasure and artifacts, that had been recovered. *See* Declaration of Richard T. Robol, Esq. in Central District of California Proceeding, Exhibit B hereinafter. At that time the Defendants were entirely free to market the Treasure.

9.    On December 21, 1999, Don Craft and I engaged in a 1-1/2 hour telephone call with Thomas G. Thompson and his lawyer, Richard T. Robol, in order to obtain responses to questions about why our clients had not yet been paid, and when they would be paid. I shall relate in this Affidavit only the points in that conversation which are relevant to issues before this Court in this proceeding.

10.    In the course of that conversation, Thompson assured us that he at all times had authority to speak for all of the investors, partners and other interests in the Treasure, and that they were fully aware of the Defendants' obligations to our clients. My note of that telephone conversation with respect to that point states, "Had authority to speak for all the investors, partners and other interests in the gold". In my confirmation letter to Mr. Robol dated January 3, 2000, I stated: "Tommy confirmed that at the time the non-disclosure agreements were executed by Craft and the members of his group, and subsequently when he responded to their questions regarding interpretation of those agreements, he had authority to speak for all the investors, partners, and other interests in the treasure."

11.    Thompson also confirmed that our clients had fully performed their obligations pursuant to the NDAs, he had no dispute with them over that, and they would be paid accordingly. My telephone notes on this point state "The percentages are good and going to be paid," and "Yes – believes all the Non disclosure Parties earned their shares." In my January 3,

4

2000 letter to Mr. Robol confirming that telephone conversation I stated: "Tommy confirmed, however, that all the non-disclosure agreement holders had earned their fractional shares, i.e. had not defaulted by some condition precedent or circumstance provided for in their non-disclosure agreement(s) not having been met," and "We were assured that the non-disclosure agreement holders will get paid at the same time Thompson, the initial investors, the partners, etc. get paid . . . . "

12.    Thompson put emphasis on this, particularly with respect to Don Craft because he was the one who led the "Craft Group" (now known as the "Williamson Plaintiffs"). He referred to the importance of trust, and gave assurances to Mr. Craft.    My telephone notes read "Thompson – wants to assure Don his contract is valid and will be respected," and "Thompson – Craft did a lot to make the project successful – described what Craft did to get the vessel to sea – with barely enough money to find the ship," and "Craft was a key link in the chain – if that link was broken the project would fail".

13.    This is important because of what is now being said in the affidavits of the individual defendants Gilman Kirk, Michael Ford, Richard Turner, and W. Arthur Cullman (the "Director Defendants"). They are claiming they are not bound by Thompson's statements in the NDAs, as the general partner, to be representing them all when he signed the NDAs, and when he later confirmed they were fully aware of their continuing obligations to our clients.

14.    That conversation covered many more issues, but those are the ones most relevant to this proceeding, except perhaps the fact we were told during that conversation that all of the Treasure was as of that time the property of Recovery Limited Partnership, the Defendants were

putting together a marketing plan for the Treasure designed to maximize the value of the recovery, and that was expected to be in place in early 2000.

15.     In an early 2000 conversation, I was told by Mr. Robol (and also perhaps by Mr. Thompson) that title, but not ownership, to the Treasure transferred to the California Gold Marketing Group, LLC, which would execute the marketing plan, pay off certain debts of the Defendants based on amounts previously borrowed from lenders, and would return to the Defendants substantial percentages of the amounts that would be realized from sale of the Treasure.

16.     Despite a number of telephone conversations with Mr. Robol and others representing the Defendants over the years subsequent to the December 1999 telephone conversation, it was not until we received the Declaration of Mr. Robol, which is Exhibit B, as well as documents from California Gold Marketing Group, LLC, (Exhibits C and D, hereto) in a recent Los Angeles, California Rule B proceeding that we learned that all the gold Treasure had been sold to California Gold Marketing Group, LLC in 1999, and that the Defendants' reversionary interest in proceeds to be realized from sales (referred to paragraph 15 above) had been completely extinguished by an Amendment to that agreement executed on June 25, 2001, whereafter the Defendants would have no further income flow from or interest in the gold Treasure.

17.     The Defendants have refused to produce information to us showing the total amounts realized from sales of the Treasure. Mr. Thompson stated in an interview with Stone Phillips on Dateline NBC that the expected sale value of the Treasure would be between $100 Million and $400 Million. That is substantially less than the $500 Million and $1 Billion that

6

Mr. Thompson had earlier projected, but I am aware of no lesser projection by him or others of the Defendants, even now, more than five years after the gold Treasure has been sold (as we found out only last week!). That interview was rebroadcast by NBC in the Spring of 2006 with no retraction by Thompson or anyone, so we must accept until shown otherwise that between $100 Million and $400 Million has been realized from the sale of the treasure.

18.    All the management responsibilities of Recovery Limited Partnership, which was a key player in the initial efforts and in the recovery and sale of the Treasure, and which Thompson and Robol told us in 1999 then owned the Treasure, were taken over by Columbus Exploration, LLC by a contract dated December 18, 1998 (*see* Exhibit E hereto), and Columbus Exploration, LLC also is one of the defendants in this proceeding.  Each of the Director Defendants in this action are, according to their own affidavits filed in this proceeding, directors of Columbus Exploration, LLC.

19.    In pleadings filed in the primary lawsuit in Columbus, Ohio, other plaintiffs who are investors and shareholders in Columbus Exploration, LLC have stated that these Director Defendants have co-opted full control of the Defendant companies for themselves, refused to allow directors' meetings or the election of new or different directors, and therefore control the books, including income to and payments by the Defendants, including the individual defendants, i.e. Thompson, Kirk, Turner, Ford and Cullman, (Exhibit F hereto) and they are therefore the ones refusing to pay amounts owed to our clients, despite having sold the gold Treasure more than five years ago for as much as $400 Million.

20.    Furthermore, on information and belief, each of the Director Defendants is amongst the group of wealthy investors in the Defendants' Columbus America project who

provided Thompson with some $20 Million to finance the search and recovery effort (although in an affidavit recently submitted in a related proceeding before Judge Sweet, Defendants' counsel Mr. Rex Elliot accounted for only $14 Million of that amount having been spent), and the same investors provided another $10 Million to Mr. Thompson to engage in another project.

21.    Despite having this enormous investment outstanding for nearly 20 years, and despite sale of the Treasure more than five years ago for as much as $400 Million, according to filings in the Columbus, Ohio proceeding the investors, possibly including these four Director Defendants, have not been repaid their shares or any other amount due them pursuant to their agreements to provide the financing.

22.    Despite the above, these Director Defendants are continuing to support the other Defendants, including Thomas G. Thompson, by paying lawyers all over the country to fend off those, like our clients, who just want to be paid, and the Plaintiff investors who just want an accounting.  They should not therefore be heard to now complain that the attachment of modest amounts of their considerable assets is working a hardship on them, when they so easily and readily ignore the $30 Million they laid out many years ago to finance this project without realizing any return despite sale of the gold more than five years ago for as much as $400 Million.

23.    To the extent it is the inconvenience of the attachments which troubles them, they may of course provide a bond or other form of substitute security to ensure payment of our clients' eventual judgment in the primary Ohio proceeding.

WHEREFORE, it is respectfully requested that this Court deny the Defendants' motion to vacate the Rule B attachments herein, and grant such other and further relief to the Plaintiffs as may be appropriate.

James T. Shirley, Jr. (JTS 6114)

Sworn to before me this
23rd day of October, 2006

Notary Public

# 4126239_v1

**RUDY D. GREEN**
**Notary Public, State of New York**
**No. 02GR4952723**
**Qualified in Queens County**
**Certificate Filed in New York County**
**Commission Expires February 26, 2010**

9

**ATTORNEY'S AFFIRMATION OF PERSONAL DELIVERY SERVICE VIA MESSENGER**

STATE OF NEW YORK          )
                           ) SS.:
COUNTY OF NEW YORK         )

RUDY D. GREEN, an attorney admitted to practice in the Courts of the State of New York, affirms under penalty of perjury:

That on October 23, 2006, I caused a true copy of the attached Affidavit of James T. Shirley, Esq., to be served personally by same day messenger delivery upon the following:

Landman Corsi Ballaine & Ford P.C.
120 Broadway
27th Floor
New York, New York 10271

_____
RUDY D. GREEN

Dated:  October 23, 2006

Economic
Zone
Resource
Associates        1046 Neil Ave. Columbus, Ohio 43201 (614) 299-6000

NON-DISCLOSURE AGREEMENT

THIS AGREEMENT is entered into this _23d_ day of _JUNE_,
1986, by and between Thomas G. (Harvey) Thompson, a research scientist in
the field of ocean engineering with principal offices in Columbus, Ohio
(herein called "Thompson"), who represents interests, in addition to his
own, of certain other science professionals and individuals, including one
or more entities, and _Don C Craft_ (herein called
"Confidant").

### RECITALS

A.      Thompson is engaged in the costly implementation and testing of
various theories and innovations resulting from years of extensive
research, which was undertaken at considerable out-of-pocket expense and
investment of time by Thompson and others. Thompson is currently engaged in
the development of procedures and applications for high technology
equipment to be used in locating, verifying, surveying and recovering
certain lost deep-ocean cultural sites (defined as shipwrecks and other
man-made sites being neither natural nor mineral) of significant historical
importance. In the course of this undertaking, Thompson's projects have
fostered valuable cooperative relationships among professional colleagues
and unique multi-disciplinary innovations with regard to research and
exploration of deep-ocean cultural sites. Thompson and his colleagues
recognize that strict secrecy is essential with regard to the research
data, its development, and the proprietary nature of their projects if they
are to realize success in their cooperative efforts.

B.      Confidant is being paid to perform work in one of the following
areas in connection with the search operations effort: operations, data
interpretation, equipment repair and maintenance, image processing, and
logistics.

C.      Thompson, through one of his agents, has accepted Confidant to
work as a member of the search operations team involved in locating and
verifying the remains of a certain historic Shipwreck(s). Thompson desires
that Confidant, as a member of the search operations team, share in the
proceeds of the net recovery, provided that the target Shipwreck(s) is
found as a result of Confidant having lent his best efforts to the search
operations effort and providing that subsequent recovery operations are
successful.

D.      While Confidant does not intend to pursue the search and recovery
of historic shipwrecks as a line of business, his tasks involve the actual
search operations and may also require that he review certain highly
confidential and proprietary information developed by Thompson. In
addition, they may require that Confidant consult with certain other search
operations personnel for the purpose of carrying out his assigned tasks.

(Page 1 of 4 pages)

exhibit 3

E.    Thompson desires Confidant to participate in the search operations, but only to the extent that Thompson is sure that the information developed by Thompson, including the existence of the Project being directed by Thompson and the location(s) of any Shipwreck target(s) found, remains confidential between Thompson and Confidant.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises hereinafter set forth, Thompson and Confidant agree as follows:

1. (a)    For the purposes of this Agreement, "Confidential Information" shall mean all information concerning the deep-water cultural site(s) and/or object(s) of search, including the location, the procedures and applications to be used to confirm the location(s) of or to engage in archaeological work on the site(s), and all other information or material proprietary to Thompson or designated as Confidential Information by Thompson, of or to which Confidant may obtain knowledge or access through or as a result of Confidant's relationship with Thompson.

(b)    Confidential Information includes, but is not limited to, the following types of information and other information of a similar nature (whether or not reduced to writing): discoveries, ideas, concepts, computer programs, designs, drawings, specifications, techniques, models, data, documentation, diagrams, research, development, processes, procedures, expertise ("know-how"), marketing and development plans, names and other information related to sources of funding and supplies, and financial information.

(c)    Confidential Information also includes any information described above which Thompson treats as proprietary or designates as Confidential Information, whether or not owned or developed by Thompson individually or by other individuals, colleagues, or entities to whom Thompson may be confidentially obligated.

(d)    Confidential Information also includes knowledge of the existence of the Project being directed by Thompson, including, but not limited to, the names of any ship or shipwreck associated with the Project.

2.    Confidant agrees that the recitals above are true and that the Confidential Information, as defined in paragraphs 1. (a), (b), (c), and (d), above are in the nature of trade secrets and that they are owned by and/or under Thompson's fiduciary protection. Confidant further agrees that the Confidential Information is not readily available and cannot be easily obtained. Confidant acknowledges that but for his executing this Agreement, Thompson would not permit Confidant to review the Confidential Information developed by Thompson.

3.    Confidant agrees that he will not remove, copy, or make any notes

concerning any Confidential Information provided him, either directly or indirectly, through Thompson without obtaining Thompson's prior consent. Further, Confidant agrees to hold in confidence and not directly or indirectly reveal, report, publish, disclose or transfer any Confidential Information to any person or entity. For the purpose of performing his assigned tasks, Confidant may consult as necessary with other operations personnel on the basis of the "need-to-know" criteria.

4. Confidant agrees that he will not at any time for a period of ten (10) years after the execution of this Agreement become involved in any effort regarding search, verification, survey and/or recovery of the target Shipwreck site(s) that is the object of the Project's search operations, unless such efforts are being sponsored by Thompson.

5. Because of the unique nature of the Confidential Information, Confidant understands and agrees that Thompson will suffer irreparable harm in the event that Confidant fails to comply with any of his obligations under this Agreement, and that monetary damages will be inadequate to compensate Thompson for such breach. Accordingly, Confidant agrees that Thompson will, in addition to any other remedies available to him at law or in equity, be entitled to injunctive relief to enforce the terms of this Agreement.

6. Confidant acknowledges that the damages suffered by Thompson as a result of Confidant's breach of this Agreement will be incapable of exact measurement and therefore agrees that in the event he breaches this Agreement in any manner whatsoever, or sponsors or participates in a venture to recover the target Shipwreck site(s), in addition to the remedies available to Thompson under paragraph 5 above, or otherwise, Thompson will be entitled to liquidated damages equal to the greater of: (a) Fifty percent (50%) of any interest of Confidant in a competing venture, or of any sums that Confidant might receive as a result of participating in such a venture; or (b) One Hundred Fifty Thousand Dollars ($150,000).

7. Thompson agrees to give Confidant One-Twentieth (1/20) of One Percent (1%) of the net recovery, provided the target Shipwreck site(s) is found as a result of Confidant having participated in the search operations effort and providing that subsequent recovery operations are successful, regardless of when the recovery operation is performed and provided that Confidant employs his best efforts to complete his assigned tasks in connection with the search operations.

8. The limitations and obligations imposed on Confidant by this Agreement shall extend to any corporation, partnership, joint venture, association or other entity in which Confidant is a shareholder, partner, or member.

9. Confidant may not assign or transfer his obligations under this Agreement, without the prior written consent of Thompson, but Thompson may assign this Agreement to Economic Zone Resource Associates or others who

7.a. Confidant shall be entitled to his percentage of the net recovery based on the following breakdown: 15% for Confidant's advise and participation early on in the Project; 15% in exchange for a one-third reduction in Confidant's normal day rate during Vessel mobilization, demobilization, and at-sea operations.

(Page 3 of 4 pages)

may be beneficiaries of this Agreement and therefore entitled to enforce its terms.

10. Thompson and Confidant agree that if any term, paragraph or section of this Agreement is unenforceable, a court of competent jurisdiction may construe this Agreement without including the specific term, paragraph, or section found to be unenforceable.

11. This Agreement shall be governed by Ohio law applicable to contracts between residents of Ohio wholly executed and performed in Ohio. Further, this Agreement contains the full and complete understanding of the parties with respect to the subject matter hereof and supersedes all prior representations and understandings, whether oral or written. This Agreement may be modified only in a writing signed by both parties.

12. In the event that disputes, differences, or controversies arise in connection with this Agreement, Confidant agrees that the United States District Court for the Southern District of Ohio, Eastern Division, shall have exclusive jurisdiction. Accordingly, Confidant irrevocably submits his person to the jurisdiction of such court for purposes of such litigation.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year written above.

THOMPSON:

Thomas G. (Harvey) Thompson

Date: 6/23/86

CONFIDANT:

Confidant's Signature

DON C CRAFT
Print Name

Date: 6/23/86

(Page 4 of 4 pages)

*Handwritten margin note:* 9.a. Confidant agrees that this Agreement supercedes all previous Non-Disclosure agreements between Confidant and Thompson.

OCT-12-2006 10:35P FROM:

TO:17145469035     P.2

1 | Richard K. Howell (State Bar No. 144241)
Heather N. Herd (State Bar No. 217521)
2 | RUTAN & TUCKER, LLP
611 Anton Boulevard, Fourteenth Floor
3 | Costa Mesa, California 92626-1931
Telephone:  714-641-5100
4 | Facsimile:   714-546-9035

5 | Attorneys for Garnishee
MONACO FINANCIAL, LLC

6

7 | UNITED STATES DISTRICT COURT

8 | CENTRAL DISTRICT OF CALIFORNIA

9

10 | MICHAEL WILLIAMSON, THE          Case No. CV-06-5689 (JTLx)
ESTATE OF DONE C. CRAFT, KIRK
11 | O'DONNELL, JOHN LETTOW,          **DECLARATION OF RICHARD
TIMOTHY MCGINNIS, FRED            ROBOL IN SUPPORT OF MONACO
12 | NEWTON, WILLIAM WATSON,          FINANCIAL, LLC'S REPLY TO
CHRIS HANCOCK, DALE              PLAINTIFFS' OPPOSITION TO
13 | SCHOENEMAN, and                  MONACO FINANCIAL LLC'S
INTERNATIONAL DEEP SEA           MOTION TO QUASH PLAINTIFFS'
14 | SURVEY, INC.,                    WRIT OF MARITIME
                                  ATTACHMENT AND
15 |          Plaintiffs,            GARNISHMENT**

16 |     vs.

17 | RECOVERY LIMITED                 Date:         October 16, 2006
PARTNERSHIP, COLUMBUS            Time:         1:30 p.m.
18 | EXPLORATION, LLC, COLUMBUS-      Courtroom: 827-B
AMERICA DISCOVERY GROUP,
19 | INC., COLUMBUS EXPLORATION       Date Action Filed:   September 11, 2006
LIMITED PARTNERSHIP, OMNI        Trial Date:      None set
20 | ENGINEERING, INC., OMNI
ENGINEERING OF OHIO, INC.,
21 | ECONOMIC ZONE RESOURCE
ASSOCIATES, ECONOMIC ZONE
22 | RESOURCE ASSOCIATES, LTD.,
EZRA, INC., EZRA OF OHIO, INC.,
23 | ECON ENGINEERING ASSOCIATES,
INC. DOE.E, INC., THOMAS G.
24 | THOMPSON, GILMAN D. KIRK,
JAMES F. TURNER, MICHAEL J.
25 | FORD, and W. ARTHUR CULLMAN,
JR.,
26
              Defendants.
27

28

Rutan & Tucker, LLP
attorneys at law

2239/025519-0001
753238.01 a10/12/06

## DECLARATION OF RICHARD T. ROBOL

I, Richard T. Robol, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am one of the Ohio counsel for the Defendants in the current proceeding with the exception of Thomas G. Thompson in his individual capacity. Mr. Thompson is represented in this proceeding by Rex Elliott, Esq.

2. I have personal knowledge of the facts set forth in this declaration. I make this Declaration to the best of my knowledge and belief, including based upon my involvement in legal proceedings pertaining to the shipwreck SS *Central America* since approximately 1987, including service, for a number of years, as General Counsel Discovery Group, Inc. If called as a witness, I could and would testify competently to the facts set forth herein under oath.

3. To the best of my knowledge and belief, none of the Defendants has any direct or indirect ownership or other beneficiary interest in any of the property attached pursuant to Plaintiffs' Writ of Maritime Attachment and Garnishment (the "Attachment").

4. 92.2% of the treasure recovered from the SS *Central America* was originally awarded to Columbus-America Discovery Group, Inc. ("COLUMBUS-AMERICA") in the 1990s.

5. In addition, COLUMBUS-AMERICA was awarded 100% of the "down", or unrecovered, treasure, together with 100% of the recovered and unrecovered non-gold artifacts from the shipwreck.

6. To the best of my knowledge and belief, COLUMBUS-AMERICA sold its entire interest in the recovered treasure subject to the Attachment a number of years ago.

7. COLUMBUS-AMERICA and the other Defendants have been, and remain, interested in the success of the marketing of the recovered treasure. To the best of my knowledge and belief, the reason for this interest is that the marketing of

1  the recovered treasure will inevitably have an effect on the marketing and value of

2  future recoveries, such as the marketing of the down treasure.  In addition, as the

3  explorer who found the shipwreck and recovered it, COLUMBUS-AMERICA is

4  interested in the trust and confidence that both collectors and the public have in the

5  treasure.

6        8.    For this and related reasons, COLUMBUS-AMERICA, as an

7  organization, is committed to the long-term value of the treasure, both in the original

8  sales, and after-sales, market.

9        9.    Defendants are also interested in the methodologies and techniques

10  used in marketing the treasure, insofar as these have been developed by

11  COLUMBUS-AMERICA or other Defendants, as such knowledge and know-how

12  constitute important and valuable intellectual property and trade secrets.

13        10.   None of Defendants' positions in the proceedings referred to by

14  Plaintiffs' in filings connected with the Attachment should be read to suggest that

15  any of the Defendants has retained any ownership interest, direct or indirect, in any

16  of the property that has been attached.

17        11.   To the best of my recollection, I have never stated or suggested

18  anything to James Shirley, Esq. that is inconsistent with any of these facts.   Several

19  years ago I discussed with Mr. Shirley the fact that COLUMBUS-AMERICA had

20  an interest in the treasure at that time, and Mr. Shirley appeared to be independently

21  aware of this fact.  In recent years, I have not spoken with Mr. Shirley about such an

22  interest.

23        12.   To the best of my knowledge and belief, the interest referred to in

24  Paragraph 11, above, which I previously discussed with Mr. Shirley, was

25  extinguished in its entirety by the terms of the June, 2001 Amendment to Asset

26  Purchase Agreement between COLUMBUS-AMERICA and California Gold and

27  has not ever been revived.

28        13.   I am currently unaware of any basis on which Plaintiffs believe that, as

Nixon & Vanderhye, LLP
attorneys at law

2259/025510-0001

OCT-12-2006 10:36P FROM:                               TO:17145469035          P.5

1  of July, August or September, 2006, any of the Defendants had an ownership

2  interest, direct or indirect, in any of the property at issue in the Attachment.

3

4      I declare under penalty of perjury under the laws of the United States of

5  America that the foregoing is true and correct to the best of my knowledge and

6  belief.

7      Executed on October 12, 2006, at Columbus, Ohio.

8

9

10                          RICHARD T. ROBOL

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2259/025519-0001

**PROOF OF SERVICE BY FEDEX**

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

I am employed by the law office of Rutan & Tucker, LLP in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is 611 Anton Boulevard, Fourteenth Floor, Costa Mesa, California 92626-1931.

On October 12, 2006, I served on the interested parties in said action the within:

**DECLARATION OF RICHARD ROBOL IN SUPPORT OF MONACO FINANCIAL, LLC'S REPLY TO PLAINTIFFS' OPPOSITION TO MONACO FINANCIAL LLC'S MOTION TO QUASH PLAINTIFFS' WRIT OF MARITIME ATTACHMENT AND GARNISHMENT**

by depositing in a box or other facility regularly maintained by FedEx, an express service carrier, or delivering to a courier or driver authorized by said express service carrier to receive documents, a true copy of the foregoing document in sealed envelopes or packages designated by the express service carrier, addressed as stated below, with fees for overnight delivery provided for or paid.

Mark S. Shipow
Holland & Knight
633 West 5th, 21st Floor
Los Angeles, CA 90071

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 12, 2006, at Costa Mesa, California.

_____
KATIE MCGINN
(Type or print name)

_____
(Signature)

382/025519-0001
748243.01 a09/22/06

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made and entered into on _____, 1999 by and among COLUMBUS-AMERICA DISCOVERY GROUP, INC., an Ohio corporation ("CADG") and RECOVERY LIMITED PARTNERSHIP, an Ohio limited partnership ("RLP") (collectively, CADG and RLP may be referred to herein as the "Seller"), and CALIFORNIA GOLD MARKETING GROUP, LLC, a California limited liability company (the "Purchaser").

RECITALS

A.    Certain of the Members of Purchaser previously entered into an agreement in November 1998 with CADG for the purchase and/or marketing of certain gold and silver coins, gold bars, and other numismatic items (hereafter the "Treasure") that CADG has recovered, and intends to recover, from the *SS Central America*.

B.    The November 1998 Agreement with CADG had been amended by Amendment No. 1 dated February 24, 1999, Amendment No. 2 dated in February 1999, and Amendment No. 3 dated August 1999, all of the foregoing documents are collectively hereafter referred to as the "Columbus Agreement" and is attached hereto, in its entirety, and as amended, as Exhibit 0.1 and has expired. While the Columbus Agreement concerned Recovered Gold Collectibles and Other Gold Collectibles (each as defined in the Columbus Agreement), this Agreement concerns only the Recovered Gold Collectibles and supercedes all prior agreements concerning the Recovered Gold Collectibles. Those provisions of the Columbus Agreement which concern solely the Other Gold Collectibles shall continue to survive and are, by this reference, made a part of this Agreement.

C.    Purchaser recognizes Seller's interest in and desire for marketing of the Treasure in a diligent, professional and dignified manner consist with the scientific and historical significance of the Central America project, its public identification with innovation, scientific discovery, entrepreneurship and historic preservation and maximization of the cultural value of its recoveries. Notwithstanding the foregoing nonbinding statement of desire set forth above in this paragraph, Purchaser or any assignee, or successor thereof, shall have the power to manage the marketing of the Treasure in its sole and absolute discretion and without any liability or obligation to the Seller or any other person.





F.    The Seller desires to sell to the Purchaser, and the Purchaser desires to purchase from the Seller, all of the assets, properties and rights concerning those certain Recovered Gold Collectibles as specifically set forth on <u>Schedule A</u> attached hereto (collectively, the "<u>Assets</u>").

NOW, THEREFORE, for and in consideration of the premises and mutual covenants and agreements contained herein, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

## ARTICLE 1
### PURCHASE AND SALE OF ASSETS AND PURCHASE PRICE

1.1    <u>Purchase and Sale of Assets</u>.    Subject to the terms and conditions of this Agreement, on the Closing Date (as defined in Section 2.1) the Seller shall sell, transfer, convey, assign and deliver ("Transfer") to the Purchaser, and the Purchaser shall purchase, acquire and accept from the Seller, all of the Seller's right, title and interest in and to all of the Assets set forth on Schedule 1.1, wherever located, free and clear of all Liens (as defined in Section 3.5(c)).

1.2    <u>Exclusion of All Liabilities</u>.

(a)    Except as expressly provided herein, the Purchaser shall not assume, and shall have no liability for, any debts, liabilities, obligations, expenses, taxes, contracts or commitments of the Seller or concerning the Assets of any kind, character or description, whether accrued, absolute, contingent or otherwise, arising out of any act or omission occurring or state of facts existing prior to or on the Closing Date (the "<u>Excluded Liabilities</u>").

(b)    The Seller shall remain fully liable for the Excluded Liabilities to the extent it was so liable prior to the Closing.  Purchaser shall have no liability for the Excluded Liabilities.

1.3    <u>Purchase Consideration and Certain Rights</u>.    The aggregate consideration (the "<u>Purchase Consideration</u>") to be paid for the Assets shall be as follows:



(c)    The following additional payments and rights:

EXHIBIT __A__, PAGE __4__

(i)    Gross Revenue attributable to Assets sales by Purchaser up to ██████████ Net Profits are to be split ███ to Purchaser and ███ to Seller. For Gross Revenue attributable to Assets sales over ████████ Net Profits are to be split ███ to Purchaser and ███ to Seller. However, the first ████ plus ██ interest per annum from the date of this Agreement of Seller's profits otherwise due to Seller shall, instead, be owed to and paid to Purchaser. Notwithstanding the preceding, the parties agree that if Seller finds a buyer for all or part of the Assets as a collection, and if the Purchaser approves such sale, Purchaser will pay to ████████████████ of the net profits (the "Percentage") from any such sale of Assets.

(ii)    "Net Profits" means any and all revenues or other value received by the owner or maketing agent of the Assets arising from its ownership of the Assets, including revenues from sale and/or promotion of the Assets, and any reproduction, merchandise or other thing or value made, manufactured or created that is derived from the Assets (collectively, the "Gross Revenues")

███████████████████████████████████████████████

(iii) Purchaser shall be solely responsible for and shall control all additional marketing and curating costs relating to the Assets, and the Purchaser shall be entitled to all revenue received from the sale of the Assets, or any tangible merchandise produced from or reproduction of the Assets except as otherwise provided herein. Notwithstanding the foregoing sentence, Seller will retain all trade secrets, intangibles and intellectual property relating to or arising out the project to obtain the Assets, including, without limitation, all copyrights, patents, trade secrets, photographs, video tapes, laser images, sound recordings,

EXHIBIT ___A___, PAGE _5_

information and any other derivative or subsidiary rights. Seller hereby agrees to provide (and where appropriate, grant a non-exclusive, non-assignable license), free of charge, to the, Purchaser for the use of its books, articles videotapes, photographs and information relating to the history of the SS Central America and the story of the recovery of the shipwreck as appropriate for the promotional and marketing efforts envisioned by this Agreement for such period as appropriate to carry out such effort. For purposes and during the period of curating the coins of the Assets, Seller hereby agrees to provide a non-exclusive, non-assignable license to the Purchaser of any of the proprietary curating processes Seller has relating to curating techniques used to curate the Assets, and to provide cooperation and know-how in connection with the Purchaser's curation of the Assets. Seller agrees to provide Bob Evans' assistance to the curating of the coins provided Mr. Evans is paid ███ per day for his services, plus his actual and reasonable travel, hotel and food costs by the Purchaser and Milt Butterworth for photography.

1.4    Allocation of Purchase Price. As soon as practicable after the Closing Date, the Purchaser shall prepare an allocation of the Purchase Price among the Assets in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended (the "Code"). Neither the Purchaser nor the Seller shall take any position for purposes of federal or state income taxes respecting the allocation of the Purchase Price which is inconsistent with the allocation so agreed upon by the parties.

## ARTICLE 2
## CLOSING

2.1    Closing.

(a)    The closing (the "Closing") of the transactions contemplated by this Agreement will be held on _____, 1999 (the "Closing Date") at 10:00 a.m. at the offices of Purchaser's counsel, or at such other time, date or location as the parties hereto may mutually agree upon.

(b)    At the Closing, the Purchaser shall deliver the Purchase Consideration as set forth in Section 1.3.

2.2    Instruments of Conveyance and Transfer.

(a)    At the Closing, the Seller shall deliver to the Purchaser:

(i)    such bills of sale, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to the Purchaser, as shall be effective to vest in the Purchaser all of the Seller's right, title and interest in and to the Assets;

EXHIBIT _A_, PAGE _6_

(ii)    copies of all of the Seller's books, records and records relating to the Assets purchased hereunder;

(iii)    all Permits, filings and consents from federal, state and local governmental agencies and regulatory bodies as are required by applicable law for the Purchaser to acquire the Assets;

(iv)    copies of all authorizations or approvals required to enable Seller to consummate the transactions contemplated hereby and incident hereto;

(v)    an opinion of Fisher & Douglas, counsel to the Seller, dated the Closing Date, in substantially the form attached hereto as Exhibit 2.2 (a)(v);

(vi)    CADG's Certificate of Incorporation, as amended, and the Certificate of Organization (or its equivalent), each certified by the Secretary of State of the State of Ohio; dated not earlier than thirty (30) days prior to the Closing Date; and

(vii)    a copy of the resolutions adopted by the Board of Directors of CADG and the partners of RLP authorizing this Agreement and the transactions contemplated hereby, certified, in the case of CADG, by a Secretary or Assistant Secretary of CADG and, in the case of RLP, by the general partner of RLP.

(b)    Simultaneously with such deliveries, the Seller shall take such steps as may be necessary to put the Purchaser in actual possession and control of the Assets with appropriate security measures (e.g. Brinks documentary transfer) to insure the safe transfer of the Assets to Purchaser's ultimate destination, all as set forth in the Brinks Custodial Agreement attached hereto as Exhibit 2.2(b).

2.3    Further Assurances.  From time to time after the Closing, and without further consideration, the Seller shall execute and deliver such other instruments of conveyance, assignment, transfer and delivery, and take such other actions as the Purchaser may reasonably request in order more effectively to Transfer to the Purchaser, and to place the Purchaser in actual possession or control of, all of the rights intended to be Transferred hereunder, to reasonably assist in the collection of any and all such rights, and to enable the Purchaser to exercise and enjoy all of the rights and benefits of the Seller with respect thereto.

2.4    Transfer Taxes.  The Seller shall pay all sales, use, excise and other taxes, if any, incurred in connection with the transactions contemplated by this Agreement.  With respect to any item that is exempt from any such tax on any basis. the Seller shall deliver to the Purchaser an appropriate certificate establishing the basis for such exemption.  Seller shall pay all other taxes and registration and transfer fees, if any, payable by reason of the Transfer of the Transferred Assets pursuant to this Agreement.  Each party hereto will cooperate to the extent practicable in minimizing all taxes (other than income taxes) and fees levied by reason of the Transfer of the Transferred Assets.

EXHIBIT _A_, PAGE _7_

## ARTICLE 3
### REPRESENTATIONS AND WARRANTIES OF THE SELLER

Each of CADG and RLP hereby jointly and severally represents and warrants to the Purchaser that the following representations and warranties are true and correct at the Closing Date:

3.1    Corporate and Limited Partnership Existence.    CADG is a corporation duly organized, validly existing and in good standing under the laws of the State of Ohio and has full corporate power and authority to conduct its business as it is now being conducted and to own or lease all of its properties and assets. CADG has previously delivered to the Purchaser true and complete copies of its Certificate of Incorporation and Bylaws as in effect on the date hereof. RLP is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Ohio and has full partnership power and authority to conduct its business as it is now being conducted and to own or lease all of its properties and assets. RLP has previously delivered to the Purchaser true and complete copies of its Limited Partnership Agreement as in effect on the date hereof.

3.2    Corporate and Limited Partnership Power and Authority.    CADG has full corporate power and authority to enter into this Agreement, perform its obligations hereunder, Transfer the Transferred Assets and carry out the transactions contemplated hereby.    The execution and delivery of this Agreement, the performance by CADG of its obligations hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all corporate, shareholder and other actions on the part of CADG required by applicable law, its [Certificate] of Incorporation or Bylaws, or otherwise.    This Agreement constitutes the legal, valid and binding obligation of CADG, enforceable against it in accordance with its terms, except (i) as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally and (ii) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought. RLP has full partnership power and authority to enter into this Agreement, perform its obligations hereunder, Transfer the Transferred Assets and carry out the transactions contemplated hereby. The execution and delivery of this Agreement, the performance by RLP of its obligations hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all partnership and other actions on the part of RLP required by applicable law, its Limited Partnership Agreement, or otherwise.    This Agreement constitutes the legal, valid and binding obligation of RLP, enforceable against it in accordance with its terms, except (i) as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally and (ii) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

3.3    No Violation.    Neither the execution and delivery of this Agreement nor the performance by each of CADG and RLP of its respective obligations hereunder nor the consummation of the transactions contemplated hereby will (a) contravene any provision of (i) the

EXHIBIT __A__, PAGE __8__

)                                    )

Certificate of Incorporation or Bylaws of the CADG or (ii) contravene any provision of the Limited Partnership Agreement of RLP; (b) violate. be in conflict with, constitute a default under, permit the termination of, cause the acceleration of the maturity of any debt or obligation of either CADG or RLP under, require the consent of any other party to, constitute a breach of, create a loss of a material benefit under, or result in the creation or imposition of any Lien (as defined in Section 3.5(c)), upon any of the Assets under, any mortgage, indenture, lease, contract, agreement, instrument or commitment to which either CADG or RLP is a party or by which it, any of its assets or properties, may be bound; (c) violate any statute or law or any judgment, decree, order, regulation or rule of any court or governmental authority; or (d) violate any contract, agreement or commitment to which any of (i) CADG's directors or officers or any shareholder of CADG on the date hereof, or (ii) the general and limited partners of RLP is bound, or create a claim of diversion of corporate or partnership opportunity against any such person.

3.4    Consents and Approvals of Governmental Authorities. No consent, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority is required to be made or obtained by the Seller in connection with the execution, delivery or performance of this Agreement by the Seller.

3.5    Title to Properties: Encumbrances.

(a)    The Seller has good and marketable title to all of the Assets. Upon release of the claims of Christie's and Union Bank of California, none of the Assets are subject to any Lien (as defined in subsection (c) below).

(b)    The Seller does not own or hold, and is not obligated under or a party to, any option, right of first refusal or other contractual right to acquire any of the Assets.

(c)    When used in this Agreement, "Lien" or "Liens" shall mean any mortgage, pledge, security interest, conditional sale or other title retention agreement, encumbrance, lien, easement, claim, right, covenant, restriction, right of way, warrant, option or charge of any kind.

3.6    Litigation. Schedule 3.6 sets forth a true and complete list and description of all actions, claims and proceedings and, investigations to which the Seller is a party (individually, an "Action" and, collectively, "Actions"), concerning CADG, RLP or the Assets before any court, arbitrator or administrative or governmental body. There is no Action pending, or, threatened against CADG, RLP or the Assets, or any of their respective , properties or rights, before any court, arbitrator or administrative or governmental body, which questions or challenges the validity of this Agreement or any Action taken or proposed to be taken by CADG or RLP pursuant to this Agreement or in connection with the transactions contemplated hereby or would, in anyway, alter Purchaser's receipt of title to the Assets free of any Lien. No state of facts exists or has existed which would constitute grounds for the institution of any Action against CADG, RLP or the Assets. Neither CADG nor RLP is subject to any judgment, order or decree entered in any lawsuit or proceeding which has affected, or which can reasonably be expected to affect, the Assets in any way.

EXHIBIT _A_, PAGE _9_

3.7    Compliance with Laws.  Neither CADG nor RLP has been charged with and is not threatened with or under any investigation with respect to, any charge concerning any violation of any provision of any federal, state, local or foreign law, regulation, ordinance, order or administrative ruling affecting the Assets, and the neither CADG nor RLP is in default with respect to any order, writ, injunction or decree of any court, agency or instrumentality affecting the Assets.  Neither CADG nor RLP (a) is in violation of any federal, state, local or foreign law, ordinance or regulation or any other requirement of any governmental or regulatory body, court or arbitrator, or (b) would not in violation of any such law, ordinance, regulation or other requirement that has been enacted or adopted but is not yet effective if it were effective at the date hereof.

3.8    Licenses, Permits and Authorizations.  Each of CADG and RLP has all licenses, permits, authorizations, approvals, consents, franchises and orders required for the conduct and operation of its business (individually, a "Permit" and, collectively, the "Permits"), the ownership and Transfer of the Assets.  All of the Permits are valid, in full force and effect and in good standing.  No violations have been recorded in respect of any such Permit.  There is no claim or Action pending, or, after due inquiry and diligent investigation, threatened, which disputes the validity of any such Permit or threatens to revoke, cancel, suspend or limit any such Permit.

3.9    Asset Condition.  The Assets are in good and merchantable condition and are suitable and usable or saleable as specified on Schedule A.

3.10   Affiliate.  When used in this Agreement, "Affiliate" or "Affiliates" shall mean, with respect to any individual, partnership, corporation, association, business trust, joint venture, governmental entity or other entity of any nature ("Person"), any Person that controls, is controlled by, or is under common control with, such Person.

3.11   Tax Returns and Payments.  All of the tax returns and reports of each of CADG and RLP required by law to be filed have been duly filed and all taxes shown as due thereon have been paid.  No liability for any federal, state, local or foreign income, sales, use, withholding, payroll, franchise, real property or personal property taxes is pending in connection with the Assets, and there is no proposed liability for any such taxes to be imposed upon the Assets at any time for any reason.

3.12   Broker's and Finder's Fees.  Neither CADG nor RLP is a party to, nor in any way obligated to make any payment relating to, any contract or outstanding claim for the payment of any broker's or finder's fee in connection with the origin, negotiation, execution or performance of this Agreement or the consummation of the transactions contemplated hereby.

3.13   Disclosure.  No representation or warranty by either CADG or RLP the Seller in this Agreement (including, without limitation, the Schedules hereto) contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the statements herein or therein not misleading  There is no fact known to either CADG or RLP which adversely affects, or which might in the future adversely affect, the Assets, which has not been set forth in this Agreement or on the Schedules hereto.

EXHIBIT  A , PAGE  10

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Seller as follows:

4.1    Existence.  The Purchaser is a limited liability company, validly existing and in good standing under the laws of the State of California.

4.2    Power and Authority.  The Purchaser has full power and authority to enter into this Agreement, perform its obligations hereunder, acquire and own the Assets, and carry out the transactions contemplated hereby.    The execution and delivery of this Agreement, the performance by the Purchaser of its obligations hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all company, member and other actions on the part of the Purchaser required by applicable law, its Operating Agreement, or otherwise.  This Agreement constitutes the legal, valid and binding obligation of the Purchaser, enforceable against it in accordance with its terms, except (i) as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally and (ii) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought.

## ARTICLE 5
## CERTAIN POST-CLOSING COVENANTS

5.1    Books and Records; Access.  Unless otherwise consented to in writing by the Purchaser, the Seller shall not destroy, alter or otherwise dispose of any original books or records of the Seller pertaining to the Assets without first offering to surrender such books and records to the Purchaser and shall maintain such books and records in good condition in a reasonably accessible location.  For a period of five (5) years, the Seller shall allow the Purchaser and its advisors reasonable access during normal business hours to examine and copy such books and records.

5.2    Confidentiality.

(a)    The Seller shall not use or disclose, or induce the use or disclosure of, and shall otherwise keep confidential all matters concerning the sale of the Assets hereunder ("Confidential Matters").

(b)    If any party commits a breach, or threatens to commit a breach, of any of the provisions of this Section 5.2, the other party shall have the right and remedy (in addition to any others) to have the provisions of this Section 5.2 specifically enforced by any court having equity jurisdiction, together with an accounting therefor, it being acknowledged and understood by the parties that any such breach or threatened breach will cause irreparable injury to the other party and that money damages will not provide an adequate remedy therefor.

091/015679-0009
28975.01 PM/99

9

EXHIBIT  A , PAGE  11

(c)    Neither Seller nor Purchaser shall disclose the specific terms of this Agreement without the written consent of all parties to this Agreement which shall not be unreasonably withheld.

5.3    Sales Tax Receipt.    Seller covenants and agrees that it will, at the earliest practicable date, pay any and all sales tax due and owing to governmental and other authorities on account of the Transfer of the Assets to Purchaser hereunder or otherwise.

### ARTICLE 6
### SURVIVAL OF REPRESENTATIONS
### AND WARRANTIES; INDEMNIFICATION

6.1    Survival of Representations and Warranties.    Notwithstanding (a) the making of this Agreement, (b) any examination made by or on behalf of the parties hereto and (c) the Closing hereunder, the representations and warranties of the Seller and the Purchaser contained in this Agreement, or in any document delivered pursuant to the provisions of this Agreement, shall survive the Closing.

6.2    Indemnification.

(a)    Subject to Section 6.1 above, from and after the Closing, the Seller shall indemnify and save harmless the Purchaser and its officers, directors, partners, shareholders, successors and assigns (collectively, the "Indemnified Party") from and against any loss, claim, liability, damage (including consequential damages), punitive damages, remedial costs, civil and criminal penalties or expenses or other damages of any kind or nature, including Purchaser's reasonable attorneys' fees incurred in connection with any of the foregoing (collectively, the "Damages"), caused to Purchaser by or arising out of (i) the failure by the Seller to perform any covenant or agreement required to be performed by it in this Agreement, after the Closing, (ii) the failure of the Seller to pay, perform or satisfy any Excluded Liability, (iii) any judgments, orders or decrees entered in any lawsuit or proceeding or Actions against Seller or concerning the Assets arising out of activities undertaken by the Seller or concerning the Assets prior to the Closing Date and arising out of activities undertaken by the Seller on or after the Closing Date, (iv) the failure of the Seller to pay promptly any federal, state, local or foreign taxes of the Seller or concerning the sale of the Assets, (v) any Actions, claims, demands, grievances or disputes brought or initiated by third parties against the Purchaser or any of its Affiliates, or (vi) any breach of warranty or misrepresentation in this Agreement (including the Schedules hereto) made by or on behalf of the Seller.

(b)    The Indemnified Party shall notify the Seller within a reasonable period of time after becoming aware of, and shall provide to the Seller as soon as practicable thereafter all information and documentation necessary to support and verify, any Damages which the Indemnified Party shall have determined has given or could give rise to a claim for indemnification hereunder, and the Seller shall be given access to all books and records in the possession or under the control of the Indemnified Party which the Seller reasonably determines to be related to such claim.

EXHIBIT __A__, PAGE __12__

(c)    All claims for indemnity under this Article 6 shall be paid by the Seller on demand in immediately available funds in U.S Dollars. At the Purchaser's option, in lieu of payment in cash, Purchaser shall have the absolute right in Purchaser's sole discretion to setoff, in part or in full, against amounts owing to Seller, the full amount of any claim for indemnity pursuant to this Article 6.

(d)    The Indemnified Party shall notify the Seller with reasonable promptness of its discovery of any matter giving rise to a claim of indemnity or setoff pursuant to this Agreement. With respect to any third party claim or action that could give rise to indemnity under this Agreement, the Seller shall be entitled to assume the defense thereof with counsel satisfactory to the Indemnified Party, provided, that upon the request of the Indemnified Party, the Seller provides reasonable evidence of its ability to perform its obligations under this Section 6.2; and after notice from the Seller to the Indemnified Party of its election so to assume the defense thereof, the Seller shall not be liable to the Indemnified Party under the foregoing indemnity agreement for any legal or other expenses subsequently incurred by the Indemnified Party in connection with the defense thereof other than (i) those relating to investigation or the furnishing of documents or witnesses and (ii) all reasonable fees and expenses of separate counsel retained by such Indemnified Party if (A) the Seller and the Indemnified Party shall have agreed to the retention of such counsel or (B) counsel to the Indemnified Party shall have concluded reasonably that the representation of the Seller and the Indemnified Party by the same counsel would be inappropriate due to actual or potential differing interests between them in the conduct of the defense of such action. Promptly after receipt by an Indemnified Party of notice of the commencement of any action to which the Seller is not a party, such Indemnified Party shall, if such claim in respect thereof is to be made against the Seller pursuant to this Agreement, notify the Seller in writing of the commencement thereof, but the failure or delay in so notifying the Seller shall not relieve the Seller of its obligations to indemnify pursuant to the terms of this Agreement. The Indemnified Party shall keep the Seller informed of the progress of any such action and shall not enter into any settlement of any such action without the prior written consent of the Seller, which consent shall not be unreasonably withheld.

6.3    Additional Indemnification.

(a)    Subject to Section 6 above, from and after the Closing, the Purchaser shall indemnify and save harmless the Seller and its officers, directors, partners, shareholders, successors and assigns (collectively, the "Additional Indemnified Party") from and against any loss, claim, liability, damage (including consequential damages), punitive damages, remedial costs, civil and criminal penalties or expenses or other damages of any kind or nature, including Purchaser's reasonable attorneys fees incurred in connection with any of the foregoing (collectively, the "Damages"), caused to Seller by or arising out of (i) the failure by the Purchaser to perform any covenant or agreement required to be performed by it in this Agreement, after the Closing, (ii) any judgments, orders or decrees entered in any lawsuit or proceeding of Actions against Seller or concerning the Assets arising out of activities undertaken by the Purchaser or concerning the Assets prior to the Closing Date

EXHIBIT __A__, PAGE __13__

and arising out of activities undertaken by the Purchaser on or after the Closing Date, (iii) any Actions, claims, demands, grievances or disputes brought or initiated by third parties against the Seller or any of its Affiliates arising out of any breach of duty under this Agreement by the Purchaser, or (iv) any breach of warranty or misrepresentation in this Agreement made by or on behalf of the Purchaser.

(b)    The Additional Indemnified Party shall notify the Purchaser within a reasonable period of time after becoming aware of, and shall provide to the Purchaser as soon as practicable thereafter all information and documentation necessary to support and verify, any Damages which the Additional Indemnified Party shall have determined has given or could give rise to a claim for indemnification hereunder, and the Purchaser shall be given access to all books and records in the possession or under the control of the Additional Indemnified Party which the Purchaser reasonably determines to be related to such claim.

(d)    The Additional Indemnified Party shall notify the Purchaser with reasonable promptness of its discovery of any matter giving rise to a claim of indemnity or setoff pursuant to this Agreement. With respect to any third party claim or action that could give rise to indemnity under this Agreement, the Purchaser shall be entitled to assume the defense thereof with counsel satisfactory to the Indemnified Party, provided, that upon the request of the Additional Indemnified Party, the Purchaser provides reasonable evidence of its ability to perform its obligations under this Section 6.2; and after notice from the Purchaser to the Additional Indemnified Party of its ejection so to assume the defense thereof, the Purchaser shall not be liable to the Additional Indemnified Party under the foregoing indemnity agreement for any legal or other expenses subsequently incurred by the Additional Indemnified Party in connection with the defense thereof other than (i) those relating to investigation or the furnishing of documents or witnesses and (ii) all reasonable fees and expenses of separate counsel retained by such Additional Indemnified Party if (A) the Purchaser and the Additional Indemnified Party shall have agreed to the retention of such counsel or (B) counsel to the Additional Indemnified Party shall have concluded reasonably that the representation of the Purchaser and the Additional Indemnified Party by the same counsel would be inappropriate due to actual or potential differing interests between them in the conduct of the defense of such action. Promptly after receipt by an Additional Indemnified Party of notice of the commencement of any action to which the Purchaser is not a party, such Additional Indemnified Party shall, if such claim in respect thereof is to be made against the Purchaser pursuant to this Agreement, notify the Purchaser in writing of the commencement thereof, but the failure or delay in so notifying the Purchaser shall not relieve the Purchaser of its obligations to indemnify pursuant to the terms of this Agreement. The Additional Indemnified Party shall keep the Purchaser informed of the progress of any such action and shall not enter into any settlement of any such action without the prior written consent of the Purchaser, which consent shall not be unreasonably withheld.

EXHIBIT  A , PAGE  14

ARTICLE 7
MISCELLANEOUS PROVISIONS

7.1    Public Announcements. Except as required by law Seller shall not, and shall cause its respective officers, partners, directors, employees. Affiliates and Advisors not to, disclose any matter or matters relating to this transaction to any Person not an officer, director, employee, Affiliate or Advisor of such party without the prior consent of the Purchaser.

7.2    Amendment; Waiver. Neither this Agreement, nor any of the terms or provisions hereof, may be amended, modified, supplemented or waived, except by a written instrument signed by the parties hereto (or, in the case of a waiver, by the party granting such waiver). No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver. No failure of either party hereto to insist upon strict compliance by the other party with any obligation, covenant, agreement or condition contained in this Agreement shall operate as a waiver of, or estoppel with respect to, any subsequent or other failure. Whenever this Agreement requires or permits consent by or on behalf of any party hereto, such consent shall be given in a manner consistent with the requirements for a waiver of compliance as set forth in this Section 7.2.

7.3    Fees and Expenses. Except as otherwise provided in this Agreement, each of the parties hereto shall bear and pay its own costs and expenses incurred in connection with the origin, preparation, negotiation, execution and delivery of this Agreement and the agreements, instruments, documents and transactions referred to in or contemplated by this Agreement (whether or not such transactions are consummated) including, without limitation, any fees, expenses or commissions of any of its Advisors, attorneys, agents, finders or brokers. The Purchaser shall indemnify the Seller against any claims of third parties for any brokerage, finder's, agent's or similar fees or commissions in connection with the transactions contemplated hereby. insofar as such claims are alleged to be based on arrangements or contacts made by, to or with the Purchaser or its Advisors or representatives. The Seller shall indemnify the Purchaser against all such claims insofar as they are alleged to be based on arrangements or contacts made by, to or with the Seller or its Advisors or representatives.

7.4    Bulk Sales Law Waiver. The Purchaser and the Seller each agrees to waive compliance by the other with the provisions of any bulk sales law of any jurisdiction to the extent that the same may be applicable to the transactions contemplated by this Agreement. In addition to any other indemnities provided in this Agreement, the Seller agrees to indemnify and hold harmless the Purchaser from and against any and all claims that may be asserted against the Purchaser or liens claimed against any of the Assets by the creditors of the Seller or other third parties under such bulk sales law of any jurisdiction.

7.5    Notices.

(a)    All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (including telefax, telegraphic, telex or cable communication) and mailed, telefaxed, telegraphed, telexed, cabled or delivered:

091/015679-0009
28975.01 PM/99

13

EXHIBIT A, PAGE 15

)                                           )

(i)     If to the Seller, to:

Columbus-America Discovery Group, Inc.
433 West Sixth Avenue
Columbus, Ohio 43201
Attn: Thomas Thompson

and

Recovery Limited Partnership
433 West Sixth Avenue
Columbus, Ohio 43201
Attn: Thomas Thompson

with a copy to:

David Douglas
Fisher & Douglas
122 East Main Street
Columbus, Ohio 43215

and to:

Richard T. Robol
60 Kenyon Brook Drive
Worthington, Ohio 43089

(ii)    If to the Purchaser, to:

California Gold Marketing Group, LLC
24 Corporate Place, Suite 100
Newport Beach, California 92660
Attn: Dwight Manley

with a copy to:

Rutan & Tucker, LLP
611 Anton Boulevard, 14th Floor
Costa Mesa, CA 92626
Attn: Richard K. Howell, Esq.

(b)     All notices and other communications required or permitted under this Agreement which are addressed as provided in this Section 7.5 (i) if delivered personally against proper receipt or by confirmed telefax or telex, shall be effective upon delivery and (ii) if delivered (A) by certified or registered mail with postage prepaid, (B) by Federal

‾‾ _A_ , PAGE 16

)                                        )

Express or similar courier service with courier fees paid by the sender or (C) by telegraph or cable, shall be effective two (2) business days following the date when mailed, couriered, telegraphed or cabled, as the case may be. Either party may from time to time change its address for the purpose of notices to that party by a similar notice specifying a new address, but no such change shall be deemed to have been given until it is actually received by the party sought to be charged with its contents.

7.6    Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by the parties hereto without the prior written consent of the other party; provided, however, that the Purchaser may assign its rights and obligations under this Agreement to (a) any of its Affiliates, or (b) any entity who by merger, consolidation, purchase or sale subsequently becomes an Affiliate, without the prior consent of the Seller. Any assignment which contravenes this Section 7.6 shall be void ab initio.

7.7    Governing Law; Consent to Jurisdiction. This Agreement and the legal relations between the parties hereto shall be governed by and construed in accordance with the internal laws of the State of California, without giving effect to the conflicts of laws principles thereof. Any matter concerning this Agreement which is the subject of litigation shall be adjudicated in the state and federal courts located in Denver, Colorado.

7.8    Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

7.9    Headings. The headings contained in this Agreement are for convenience of reference only and shall not constitute a part hereof or define, limit or otherwise affect the meaning of any of the terms or provisions hereof.

7.10    Entire Agreement. This Agreement (which defined term includes the Schedules and Exhibits to this Agreement) embodies the entire agreement and understanding among the parties hereto with respect to the subject matter of this Agreement and supersedes all prior agreements, commitments, arrangements, negotiations or understandings, whether oral or written, between the parties with respect thereto. There are no agreements, covenants, undertakings, representations or warranties with respect to the subject matter of this Agreement other than those expressly set forth or referred to herein.

7.11    Severability. Each term and provision of this Agreement constitutes a separate and distinct undertaking, covenant, term and/or provision hereof. In the event that any term or provision of this Agreement shall be determined to be unenforceable, invalid or illegal in any respect, such unenforceability, invalidity or illegality shall not affect any other term or provision of this Agreement, but this Agreement shall be construed as if such unenforceable, invalid or illegal term or provision had never been contained herein. Moreover, if any term or provision of this Agreement shall for any reason be held to be excessively broad as to time, duration, activity or

subject, it shall be construed, by limiting and reducing it, so as to be enforceable to the extent permitted under applicable law as it shall then exist.

 7.12 <u>No Third Party Beneficiaries</u>. Nothing in this Agreement is intended, nor shall anything in this Agreement be construed, to confer any rights, legal or equitable, in any Person (other than the parties hereto and their respective heirs, distributees, beneficiaries, executors, successors and assigns), including, without limitation, any employee of the Seller or any beneficiary of such employee.

 7.13 <u>Miscellaneous</u>. The persons executing this Agreement in behalf of the parties hereto are duly authorized to execute, acknowledge and deliver this Agreement.

**[SIGNATURES ON FOLLOWING PAGE]**

EXHIBIT _A_, PAGE_18_

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

"SELLER".

COLUMBUS-AMERICA DISCOVERY GROUP, INC

By _____

Its _____

RECOVERY LIMITED PARTNERSHIP

By _____

Its _____

"PURCHASER"

CALIFORNIA GOLD MARKETING GROUP, LLC

By _____

Dwight Manley, Managing Member

Received   Dec-07-99   08:11am    From-2126384847              To-RUTAN & TUCKER LLP,    Page 03

EXHIBIT _A_, PAGE _19_

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

"SELLER":                          COLUMBUS-AMERICA DISCOVERY
                                   GROUP, INC.

                                   By: _____

                                      Its President

                                   RECOVERY LIMITED PARTNERSHIP

                                   By: _____

                                      President, Econ Engineering, Inc.,
                                      Its General Partner

"PURCHASER":                       CALIFORNIA GOLD MARKETING
                                   GROUP, LLC


                                   By: _____
                                          Dwight Manley, Managing Member

091/015679-0009

EXHIBIT __A__, PAGE __20__

## AMENDMENT TO ASSET PURCHASE AGREEMENT

This Amendment to Agreement ("Amendment") is entered into as of this ___ day of June, 2001 (the "Effective Date"), by and among California Gold Marketing Group, LLC, a California limited liability company ("California"), on the one hand, and Columbus-America Discovery Group, Inc., an Ohio corporation ("Columbus"), and Recovery Limited Partnership, a limited partnership formed under the laws of the state of Ohio ("Recovery"), on the other hand. California, Columbus and Recovery are sometimes referred to herein individually as a "Party" and collectively as the "Parties." Columbus and Recovery are sometimes referred to herein collectively as the "Sellers." Columbus and Recovery, and each of them, expressly acknowledge and agree that any reference to "Sellers" in this Amendment shall refer to both of them, jointly and severally, and each of them.

### RECITALS

WHEREAS, this Amendment is intended to amend, modify and change that certain Asset Purchase Agreement entered into in December 1999 by the Parties or their respective predecessors-in-interest ("Master Agreement"). The Master Agreement was preceded by a certain related agreement entered in November, 1998, and three amendments thereto (collectively the "Prior Agreements."). The Master Agreement superceded the Prior Agreements insofar as these documents pertained to the Recovered Gold Collectibles. The Prior Agreements remain full force and effect insofar as they pertain to the Other Gold Collectibles.

WHEREAS, the Parties have as of the Effective Date performed their respective duties and obligations set forth in the Master Agreement in accordance with their terms; and

WHEREAS, Sellers wish to liquidate and California desires to acquire from Sellers, all of the rights, title and interest of Sellers, and each of them, in, to or in any way originating from the Deleted Paragraph (as that term is defined hereinbelow) in the Master Agreement and the Previous Amendments as more particularly provided for below.

NOW, THEREFORE, for and in consideration of the promises and mutual covenants and agreements contained herein, and intending to be legally bound hereby, the Parties hereto hereby agree as follows:

### ARTICLE 1
### TRANSFERRED INTEREST

1.1    As of the Effective Date, California and Sellers, and each of them, agree that Paragraph 1.3(r)(i) of the Master Agreement (the "Deleted Paragraph") shall be deleted in its entirety from the Master Agreement. In lieu of Sellers' rights to receive both the ▓▓ of the net profits from the gross sales of Recovered Collectibles up to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and the ▓▓ of the net profits from the gross sales of Recovered Gold Collectibles in excess of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ set forth in the Deleted Paragraph, Sellers shall receive from California and California shall deliver to Sellers the acquisition price (the "Acquisition Price") as follows:

-1-



1.2    Sellers jointly acknowledge and agree that the Acquisition Price set forth in Section 1.1 hereinabove represents the aggregate sums to be delivered by California to Sellers as consideration for the removal of the Deleted Paragraph and Sellers' joint waiver of all of their rights thereunder and that no further payments shall be due to Sellers or either of them. Sellers may divide the Acquisition Price between them at their discretion.

1.3    Sellers, and each of them, jointly and severally, represents and warrants to California that their rights, title and interests in the Master Agreement are free and clear of all Liens and that Sellers, and each of them, have good and marketable title to all of said rights, title

EXHIBIT _B_, PAGE_22_

and interests. For purposes of this Amendment, the terms "Lien" or "Liens" shall mean any mortgage, pledge, security interest, conditional sale or other title retention agreement, encumbrance, lien, easement, claim, right, covenant, restriction, right-of-way, warrant, option or charge of any kind.

1.4     The Parties hereto expressly acknowledge and agree that each Party's rights, title and interest in all aspects and provisions of the Master Agreement, except for those in the Deleted Paragraph remain unchanged by this Amendment.

1.5     Thomas Q. Thompson, as the designated representative of Sellers, will have in his sole discretion, the right to rescind this Agreement on or before August 1, 2001, in which event this Agreement shall be null, void and of no effect, and the Parties shall thereupon return to their positions ▓▓▓▓▓▓▓▓▓▓▓

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES OF SELLERS

2.1     Sellers, and each of them, jointly and severally, represents and warrants as to themselves as follows:

(a)     Each has full power and authority to enter into this Amendment, perform its obligations hereunder and carry out the transactions contemplated hereby.

(b)     The execution and delivery of this Amendment, the performance of their obligations hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all corporate, shareholder, member, partnership or other actions on their part, required by applicable law, their Articles of Incorporation or Bylaws, their Partnership Agreements, their Operating Agreements or otherwise.

(c)     Neither the execution and delivery of this Amendment nor the consummation of their obligations hereunder nor the consummation of the transactions contemplated hereby will (i) contravene any provision of the Articles of Incorporation or Bylaws, Partnership Agreement, or Operating Agreement, as the case may be, (ii) violate, be in conflict with, constitute a default under, permit the termination of, cause the acceleration of the maturity of any debt or obligation under, require the consent of any other Party to, constitute a breach of, create a loss of a benefit under, or result in the creation or imposition of any Lien upon any of the property or assets under any mortgage, indenture, lease, contract, agreement, instrument or commitment to which they, or either of them, are a party or by which it, any of their assets or properties may be bound, (iii) violate any statute or law or any judgment, decree, order, regulation or rule of any court or governmental authority to which they are subject or by which they or any of their assets or properties are bound.

EXHIBIT __B__, PAGE 23

## ARTICLE 3
## MISCELLANEOUS PROVISIONS

3.1    As a courtesy to Sellers, California will in attempt in good faith to provide Sellers with timely copies of promotional materials (e.g., brochures, books, videos, etc.), information about upcoming events (e.g., product release, exhibits, coin shows, etc.) and other general marketing information.

3.2.    It is the intent of the parties that they will create a Memorandum Agreement reflecting the core terms and conditions of this Agreement, provided that such Memorandum will have no legal effect of altering, amending, or in any way affecting this Agreement.

California:

CALIFORNIA GOLD MARKETING GROUP,
LLC, a California limited liability company

By: _____
Dwight Manley, Manager

Sellers:

COLUMBUS-AMERICA DISCOVERY GROUP,
INC., an Ohio corporation

By: _____
Thomas G. Thompson, President

RECOVERY LIMITED PARTNERSHIP, an Ohio
limited partnership

By:   ECON ENGINEERING, INC., an Ohio
corporation, its General Partner

By: _____
Thomas G. Thompson, President

EXHIBIT _B_, PAGE _24_

# MANAGEMENT AND RECOVERY
# SERVICES AGREEMENT

This Management and Recovery Services Agreement ("Agreement") is entered as of December 18, 1998, by and between Recovery Limited Partnership, an Ohio limited partnership ("RLP") and Columbus Exploration, LLC, a Delaware limited liability company ("CX").

## Background and Recitals

Whereas, RLP was organized in 1985 for, and has engaged in the business of, locating, verifying and recovering the contents of the shipwreck of the ███████████ S.S. *Central America*, which sank in 1857 (the "Shipwreck");

Whereas, RLP has conducted successful recovery operations at the Shipwreck site, having recovered substantial amounts of gold coins, gold bars, and other artifacts;

Whereas, CX was organized in 1990 for, and has engaged in the business of, developing certain technology, equipment and methods to locate, verify and recover the contents of deep ocean historic shipwrecks, and providing deep ocean technology products and services ██████ ████████████████████████████;

Whereas, RLP has various rights, including the rights of first salvor with respect to the Shipwreck, which rights have been recognized by the United States District Court for the Eastern District of Virginia;

███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

Whereas, the parties believe that CX has, or is in a better position to obtain, the necessary resources to accomplish this task, as well as to complete the marketing and other activities related to RLP's realization of its rights with respect to recoveries from the Shipwreck;

Whereas, the parties have agreed that it is the best interests of both for CX to assume the responsibility for management, financing ████████████████████ and marketing activities with respect to the Shipwreck.

1

## Statement of Agreement

Now therefore, in consideration of the foregoing recitals, which the parties agree to be true to the best of their knowledge and belief, and of their mutual promises contained herein, the parties agree as follows:

1.    *Definitions.*  As used in this Agreement, the following terms will have the meanings ascribed to them in this Section:

"Admiralty Litigation" means the proceedings before the United States District Court for the Eastern District of Virginia known as *Columbus America Discovery Group, Inc. v. the Unidentified, Wrecked and Abandoned Sailing Vessel, etc., (believed to be the S.S. CENTRAL AMERICA)*, Civil Action No. 87-363-N, including any related judicial proceedings, and appeals from judgments and orders entered in such proceedings.



2



2.    *Engagement and Appointment of Managing Agent.*  On the terms and subject to the conditions set forth in this Agreement, RLP, by and through its General Partner, hereby engages CX, and CX hereby accepts such engagement, to manage and supervise the business of RLP as provided in this Agreement.  RLP retains and irrevocably appoints CX as its agent with full power and authority to manage the business, assets and liabilities of RLP, and hereby ratifies all acts of CX taken pursuant to such appointment.  The term of this appointment shall commence on the date of this Agreement and terminate upon the completion of the dissolution and winding up of RLP.

3.    *Management Authority and Duties of CX.*  Without limiting the generality of the foregoing appointment, CX shall have the authority to:

(a)    evaluate and make recommendations regarding arrangements for the marketing and sale of the ▮▮▮▮▮▮▮▮Treasure, including any agreements relating thereto, collect any proceeds of such marketing and sales activities, pay any costs and expenses incurred in the course of such activities, and apply the Net Proceeds as provided in this Agreement;

(b)    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(c)    cause the Obligations of RLP to be paid and discharged as they become due;

(d)    commence, prosecute and settle any litigation (including the Admiralty Litigation) in the name and on behalf of RLP;

(e)    establish and maintain management and business systems, books, contracts, computer systems, forms and administration procedures;

(f)    select and retain consultants and technical advisors (including, without limitation, accountants, attorneys, banks, contractors, custodians, depositories, agents for collection, and insurers) or persons acting in any other capacity, in connection with the business of RLP, and determine the terms of engagement of such persons, including, without limitation, compensation, expense reimbursement and waiver of conflicts of interest, actual and potential;

(g)    advise the General Partner of RLP with regard to management and direction of the business of RLP and as to any further actions as may be necessary or desirable to further the interests of RLP;

(h)    provide for the maintenance of the books and records of RLP, and the preparation of tax returns and schedules on behalf of RLP and its partners;

(i)    compile and provide information for reports to the partners of RLP, and appropriate governmental authorities, with respect to the business, operations, and financial condition of RLP; and

(j)    perform such other services for RLP as in the best judgment of CX and the General Partner of RLP are necessary or advisable in the best interests of RLP.

3



4.



5

. . CX agrees that such compensation shall be the only compensation to which it is entitled . for performing the recovery services, and waives any right to assert a claim against RLP for a salvage award or claim of ownership



12.  *Force Majeure; Consequential Damages.* Neither party will be responsible for failure to meet its obligations under this Agreement if the failure arises from causes beyond the control and without the fault or negligence of the non-performing party. Examples of causes beyond a party's control include (i) acts of God or of the public enemy, (ii) acts of the Government in either its sovereign or contractual capacity, (iii) fires, (iv) floods, (v) epidemics, (vi) quarantine restrictions, (vii) strikes, (viii) freight embargoes, and (ix) unusually severe weather. In no event will either party be liable to the other for any consequential damages (including lost profits or anticipated savings), even if the party has been advised of the possibility of such damages or loss.







14.  *No Conflict Statement.*  The parties to this Agreement acknowledge that, in addition to his position as CEO for CX, the current Chairman of CX has also served as the general partner for RLP and was the president of the general partner for CX Limited Partnership. Similarly, members of the Board of Directors of CX may hold positions not only as members of the Board, but also as partners in RLP or the successor to CX, or in other capacities.  To avoid any claim of conflict, the parties agree that the Chairman, members of the Board of Directors of CX, and counsel selected by the Chairman must be able to act freely and unhindered by any such claim of conflict that may be made.  This may involve an interplay of their own personal interests as well as the potential interest of both CX and RLP as they participate in the Joint Management and Recovery Services Agreement.  The Chairman and/or members of the Board may also be placed in a position where operations may be enhanced by the use of their life rights or other type of personal endorsements, resulting in additional compensation to them. The parties hereby agree that Chairman's and Directors' holding of these positions and actions resulting from these positions do not create a conflict of interest.  The parties further agree that under no circumstances shall the Chairman or Directors be liable for any claim of conflict by any limited partner of CX or RLP, or any member of CX as it relates to Chairman's or Directors' holding of multiple positions in CX, RLP, and CX.  Inasmuch as the Chairman's retention of legal counsel creates similar potential conflicts, the parties further agree that this "no conflict" paragraph applies to counsel as well as the Chairman and Directors.  Chairman shall have the right to employ counsel of his choosing.  CX agrees to pay reasonable attorneys fees to said counsel related to CX matters.

15.  *Counsel.*  The parties acknowledge that for efficiency it is important that the Chairman have the benefit of timely advice of counsel.  Inasmuch as the Chairman's retention of legal counsel creates potential conflicts similar to those identified in Paragraph 15 of this Agreement, the parties further agree that the "no conflict" statement in Paragraph 15 applies to

counsel as well as the Chairman. The parties hereto agree that counsel may be employed by the Chairman to represent CX, RLP, CX and/or the Chairman in any capacity designated by the Chairman, and the parties waive any potential or actual conflict of interest or other such claim that that may arise from such representation. The parties further agree that the Chairman may (i) direct counsel as to the goals, methods and interests of the entities, and (ii) waive any potential or actual conflict on behalf of the partnerships and all partners of RLP, CX, and the members of CX, and counsel shall be entitled to accept and rely upon such waivers and such instruction and direction of the Chairman as to any legal or business matter, without requiring or seeking further authorization or taking any further action, with respect to any of the foregoing. It is the intent of the parties that such counsel be third party beneficiaries of this Paragraph.

16.   *Term and Termination.*   The Term of this Agreement shall continue until the recovery and marketing of the ███████ Treasure are completed and the net proceeds, if any therefrom, are distributed according to this Agreement.



9



21.  *Severability.*  The intention of the Parties is to comply fully with all laws and public policies, and this agreement shall be construed consistently with all laws and public policies to the extent possible.  If any court of competent jurisdiction determines it is impossible to construe any provision of this agreement consistently with any law or public policy and consequently holds that provision to be invalid, such holding shall in no way affect the validity of the other provisions of this agreement, which shall remain in full force and effect, provided that such result would not frustrate the intent of the Parties in entering into this agreement.

22.  *Governing Law, Jurisdiction and Venue.*  All questions concerning the validity or meaning of this agreement or relating to the rights and obligations of the parties with respect to performance under this agreement shall be construed and resolved under the laws of Ohio.  The parties to this agreement hereby designate the U.S. District Court for the Northern District of Florida, Jacksonville Division as the court of proper jurisdiction and venue for any actions or proceedings relating to this agreement; hereby irrevocably consent to such designation, jurisdiction or venue with respect to any action or proceeding initiated in such court; and hereby waive all defenses to jurisdiction and venue.



25.  *Complete Agreement.*  This document contains the entire agreement between the Parties and supersedes all prior or contemporaneous discussions, negotiations, representations or

10



agreements relating to the subject matter of this agreement. No changes to this agreement shall be made or be binding on either Party unless made in writing and signed by each Party.

EXHIBIT

4

ALL-STATE LEGAL

IN THE COURT OF COMMON PLEAS OF FRANKLIN COUNTY, OHIO

THE DISPATCH PRINTING COMPANY      :
34 South Third Street
Columbus, Ohio 43215               :

                                   :
DONALD C. FANTA                    :
726 City Park Avenue
Columbus, Ohio 43206               :

                    Plaintiffs,    :

                                   :
         -vs-                      :

                                   :
GILMAN D. KIRK                     :
3239 Mann Road
Blacklick, Ohio 43004              :

                                   :
JAMES F. TURNER                    :
2156 Partlow Drive                 :
Columbus, Ohio 43220               :

                                   :
MICHAEL J. FORD                    :
7650 Rivers Edge Drive             :
Columbus, Ohio 43235               :

                                   :
W. ARTHUR CULLMAN, JR.             :
2164 Elgin Road                    :
Columbus, Ohio 43221               :

                                   :
JOHN DOE NOS. 1-10                 :

                                   :
                    Defendants.    :

*File stamps / markings:*

50 8860 - 1
FILE COPY
KOHAK
SERVED BY MAIL HAND
SUBMITTED/FILED
RECEIVED BY MAIL HAND
POST MARKED
5-19-06
BY: _____  ENTERED

05CVH10   11795

COMPLAINT (Jury Demand
Endorsed Hereon)

CLERK OF COURTS-CV
'05 OCT 25 PM 2:34
FILED COMMON PLEAS COURT
FRANKLIN CO. OHIO

### Introduction

1.      Perhaps the most fundamental fiduciary duty owed by corporate directors to their

investors is the duty to keep the investors informed of what happened to the investment monies

that the investors entrusted to the directors.  In stark contrast to this most basic fiduciary duty,

this case is about directors who believe they can take millions from their investors but then refuse to tell the investors what happened to their money.

2.      Plaintiffs The Dispatch Printing Company and Donald C. Fanta are investors in Columbus Exploration, LLC ("Columbus Exploration"). Defendants are directors of Columbus Exploration and, as such, are charged with the fiduciary obligation to keep the company's investors, including Plaintiffs, apprised of the company's operations and financial affairs. But, in abject disregard of their fiduciary responsibilities, Defendants have unlawfully refused to provide Plaintiffs with any information regarding the finances and operations of Columbus Exploration, presumably to hide mismanagement and waste by Defendants and the company's other managers. Defendants' refusal to provide Plaintiffs with any information about what happened to Plaintiffs' investment has left Plaintiffs with no choice but to prosecute this action to remedy Defendants' blatant violations of their fiduciary duties.

<u>The Parties</u>

3.      Plaintiff The Dispatch Printing Company ("The Dispatch") is an Ohio corporation with its principal place of business in Columbus, Ohio. The Dispatch is an investor in, and a member of, Columbus Exploration.

4.      Plaintiff Donald C. Fanta ("Mr. Fanta") is an individual who resides in Columbus, Ohio. Mr. Fanta is an investor in, and a member of, Columbus Exploration.

5.      Defendant Gilman D. Kirk ("Mr. Kirk") is an individual who resides in Blacklick, Ohio. Mr. Kirk is a director of Columbus Exploration, and, as such, he owes fiduciary duties to Plaintiffs.

2

6.    Defendant James F. Turner ("Mr. Turner") is an individual who resides in Columbus, Ohio. Mr. Turner is a director of Columbus Exploration, and, as such, he owes fiduciary duties to Plaintiffs.

7.    Defendant Michael J. Ford ("Mr. Ford") is an individual who resides in Columbus, Ohio. Mr. Ford is a director of Columbus Exploration, and, as such, he owes fiduciary duties to Plaintiffs.

8.    Defendant W. Arthur Cullman, Jr. ("Mr. Cullman") is an individual who resides in Columbus, Ohio. Mr. Cullman is a director of Columbus Exploration, and, as such, he owes fiduciary duties to Plaintiffs.

9.    The John Doe defendants are additional, unknown directors, officers, managers or agents of Columbus Exploration, both current and former, who were involved in or otherwise were a part of the fiduciary violations and other unlawful acts and omissions giving rise to this action.

Facts

10.    Columbus Exploration is a Delaware limited liability company with its principal place of business in Columbus, Ohio.

11.    Columbus Exploration maintains an office in Ohio, owns property in Ohio, and conducts business activities in Ohio.

12.    Columbus Exploration is managed by its board of directors, which includes Defendants and Thomas G. Thompson ("Mr. Thompson"), who serves as chairman of Columbus Exploration's board of directors.

13.    In the mid-1980s, Thompson and Defendants organized an Ohio limited partnership known as Recovery L.P. ("RLP") to finance a search-and-recovery project for the

3

shipwreck of the *S.S. Central America,* a United States Mail Steamship which sank off the coast of South Carolina during a hurricane on September 12, 1857 carrying several tons of gold, silver and other treasures.

14.    Thompson and Defendants solicited leaders from the Columbus business community to invest in RLP.

15.    The Dispatch invested $1,000,000 and Mr. Fanta invested $250,000 in RLP.

16.    In September 1988, RLP discovered the wreck of the *S.S. Central America* approximately 160 miles off the coast of South Carolina. RLP was able to recover more than a ton of gold, silver and other valuable artifacts from the shipwreck.

17.    In November 1998, Defendants and Thompson organized Columbus Exploration to take over from RLP the recovery, marketing and sale efforts for the treasure from the *S.S. Central America.* RLP's partners, including The Dispatch and Mr. Fanta, were granted ownership interests in Columbus Exploration based on their respective ownership interests in RLP, thus making them members of Columbus Exploration.

18.    The members of Columbus Exploration, including Plaintiffs, entered into an Operating Agreement, under which Defendants were named directors of Columbus Exploration and Thompson was named chairman of the board of directors. A copy of Columbus Exploration's Operating Agreement is attached as Exhibit 1. This Operating Agreement is the principal source and definition of the fiduciary duties owed by Columbus Exploration's directors, including Defendants, to Plaintiffs and the company's other members.

19.    At Defendants' direction, RLP transferred its salvage rights to Columbus Exploration for the treasure that already had been recovered from the *S.S. Central America* (the "Up Treasure") as well as the treasure from the shipwreck that was still on the ocean floor (the

4

"Down Treasure") in exchange for an additional ownership interest in Columbus Exploration for RLP and its partners and certain other consideration. Thereafter, at Defendants' direction, Columbus Exploration took over from RLP the management of operations to market the Up Treasure and also the financing, recovery and marketing efforts regarding the Down Treasure.

20.    At Defendants' direction, Columbus Exploration engaged a California company known as California Gold Marketing Group, LLC ("California Gold") to market and sell the Up Treasure.

21.    Defendants retained California Gold in or about December 1998 and began marketing the gold for sale in 2000. According to media reports, as of November 2003, California Gold had sold virtually all of the Up Treasure. However, to date, Defendants have not made any cash distributions to Columbus Exploration's members or otherwise provided them with any return on their investment as a result of the sale of the Up Treasure.

22.    Moreover, since approximately 2000, Defendants have refused to provide the members of Columbus Exploration, including Plaintiffs, with any meaningful information regarding the company's finances and operations or what happened to Plaintiffs' investment. The Dispatch and Mr. Fanta have been provided no information regarding Columbus Exploration's business expenses, revenues from the sale of the Up Treasure or whether any profit has been realized. Additionally, Defendants have refused to provide The Dispatch, Mr. Fanta and other members of Columbus Exploration with any information as to whether there is any remaining Down Treasure, and if so, what efforts have been made to recover it.

23.    The Dispatch and Mr. Fanta sent letters to Columbus Exploration and its directors on September 22, 2004, December 1, 2004, and March 18, 2005, requesting records and information regarding Columbus Exploration's finances and operations. When Defendants

5

refused to respond, The Dispatch and Mr. Fanta brought an action against Columbus Exploration, RLP and Thompson to obtain the information to which Plaintiffs are entitled. Defendants, however, intentionally blocked discovery in that action, and Defendants authorized Columbus Exploration's counsel to engage in baseless and dilatory tactics to prevent Plaintiffs from obtaining any information as to the status of their investments.

24.    Upon information and belief, Defendants, as directors of Columbus Exploration, met at some point in time during the past three years and unanimously voted to preclude Plaintiffs and the other members of Columbus Exploration from accessing the company's books and records and to withhold from the members any information regarding the company's finances and operations, despite the fact that Defendants have a fiduciary obligation to disclose this information to the members. Thereafter, Defendants and the other directors and managers of Columbus Exploration wrongfully and fraudulently concealed this decision from the members of Columbus Exploration in order to prevent the members, including Plaintiffs, from discovering that Defendants had consciously decided to disregard their fiduciary duty to keep the members apprised of the company's financial affairs. Defendants did not disclose their wrongful decision to conceal all financial information from the members until the present dispute arose between Plaintiffs and Defendants in early 2005.

<u>Count I</u>

<u>(Breach of Fiduciary Duty)</u>

25.    Plaintiffs incorporate by reference Paragraphs 1 through 24 above.

26.    Plaintiffs are members of Columbus Exploration and, as members, are owed fiduciary duties and obligations by the company's directors, including Defendants.

27.    By operation of law and, specifically, under Columbus Exploration's Operating Agreement, Defendants, as directors, owe a fiduciary duty to the company's members, including Plaintiffs, to provide the company's members with access to various records, including financial records and tax returns. Section 9.02 of Columbus Exploration's Operating Agreement provides:

> (a)  The Directors shall direct the officers to keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The records shall include, but not be limited to, financial statements of the Company for the three most recent fiscal years, a copy of the Certificate and Operating Agreement, together with any relevant powers of attorney, information regarding the amount of cash or agreed value of property or services contributed or agreed to be contributed in the future by each Member, the respective rights of the Company and each Member regarding the return of contributions, and the Company's federal, state or local tax returns.

> (b)  The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member at any and all reasonable times during normal business hours. Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

28.    Defendants, as directors of Columbus Exploration, also owe a fiduciary duty under the Operating Agreement to provide each member, including Plaintiffs, with the company's certified year-end financial statements. Section 9.04 of Columbus Exploration's Operating Agreement provides:

> 9.04.   Reports.   Within ninety (90) days after the end of each taxable year of the Company, the Directors shall cause to be sent to each Person who was a Member at any time during such year the financial statements of the Company for such year, accompanied by a certificate of the chief financial officer of the Company that such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows for the Company at year end and for the year then ended, in conformity with generally accepted accounting principles. In lieu of such

7

certification, if the financial statements have been reported upon by the Company's independent auditors, a copy of such auditors' report shall be furnished to the Members. . . .

29.   On September 22, 2004, December 1, 2004, and March 18, 2005, Plaintiffs sent letters via certified mail to Columbus Exploration, asking that Plaintiffs be provided with copies of Columbus Exploration's financial statements and other financial records for the past four years as well as other information contained in the company's books and records.    Copies of these letters are attached as Exhibit 2(A) through 2(D).

30.   Defendants received or otherwise are aware of Plaintiffs' several requests for copies of Columbus Exploration's financial statements and other financial books and records.

31.   Defendants have refused to provide Plaintiffs with copies of the records they requested and also have not provided Plaintiffs with copies of Columbus Exploration's financial statements as required by Section 9.04 of the company's Operating Agreement.

32.   By failing to provide Plaintiffs with copies of the records and information requested in their letters and by making the affirmative decision to withhold the company's financial information from the members, Defendants breached Columbus Exploration's Operating Agreement and violated their fiduciary duties to Plaintiffs and the other members.

33.   Defendants' violation of fiduciary duties has caused, and will continue to cause, harm and damage to Plaintiffs, including irreparable harm for which Plaintiffs have no adequate remedy at law, as well as monetary harm in the form of loss of Plaintiffs' investment interest in Columbus Exploration.

34.   As directors of Columbus Exploration, Defendants owe fiduciary duties to each of the members, including a duty to provide the members with timely and accurate reporting regarding the operations and finances of the company.

35.     Plaintiffs are informed and believe that within the past three years, the exact date being unknown to Plaintiffs, the directors of Columbus Exploration, including Defendants, met and unanimously decided to repudiate and disregard their fiduciary obligations by agreeing to withhold from the company's members any information regarding the company's finances and operations.   Since making that decision, Defendants have not provided Plaintiffs with any material information regarding Columbus Exploration's financial situation or its operations.

36.     Defendants' decision to withhold all material information regarding Columbus Exploration's finances and operations and their actions in withholding that information constitute a willful breach of Defendants' fiduciary duties to Plaintiffs.

37.     Upon information and belief, Defendants have refused to disclose information regarding Columbus Exploration's finances and operations in order to conceal mismanagement by the directors and managers of the company, including Thompson and the John Doe defendants.  Upon information and belief, this mismanagement has risen to the level of corporate waste and violation of the duty of care, and constitutes a further breach of Defendants' fiduciary duties to Plaintiffs.

38.     As a result of the directors' breaches of their fiduciary duties, Plaintiffs have suffered damages in an amount to be determined at trial.

39.     Section 11.09 of Columbus Exploration's Operating Agreement provides that any member of the company is entitled to specific performance in the event of a breach:

> Specific Performance. The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any remedies that may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act that would constitute a

9

breach, or (ii) compelling the performance of any obligation that, if not performed, would constitute a breach.

40.    Plaintiffs hereby request injunctive relief in the form of an order for specific performance requiring Defendants, on behalf of Columbus Exploration, to immediately provide Plaintiffs with copies of all of the company's records, reports and financial information requested by Plaintiffs in their September 22, 2004, December 1, 2004, and March 18, 2005 letters, including the company's financial reports as required under Section 9.04 of the Operating Agreement.

41.    Without injunctive relief, Plaintiffs will suffer irreparable harm for which there is no adequate remedy at law.

WHEREFORE, Plaintiffs The Dispatch Printing Company and Donald C. Fanta request judgment as follows:

(A)    An injunction compelling Defendants to immediately provide Plaintiffs will all records and information relating to Columbus Exploration, LLC that Plaintiffs have requested in writing as well as all records and information to which Plaintiffs are entitled under Columbus Exploration's Operating Agreement;

(B)    An award of money damages in an amount to be determined at trial, but not less than $25,000;

(C)    An award of costs, expenses, attorney fees, and any other relief the Court deems appropriate.

John W. Zeiger (0010707)
Steven W. Tigges (0019288)
Bradley T. Ferrell (0070965)
ZEIGER, TIGGES & LITTLE LLP
3500 Huntington Center, 41 South High Street
Columbus, Ohio 43215
Telephone: (614) 365-9900
Facsimile: (614) 365-7900

Attorneys for Plaintiffs.

## JURY DEMAND

Plaintiffs hereby demand trial by jury on all issues triable as of right by a jury.

John W. Zeiger (0010707)
Steven W. Tigges (0019288)
Bradley T. Ferrell (0070965)
ZEIGER, TIGGES & LITTLE LLP
3500 Huntington Center
41 South High Street
Columbus, Ohio 43215
Telephone:  (614) 365-9900
Facsimile:  (614) 365-7900

Attorneys for Plaintiffs.

157-169:165235

11