UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
MICHAEL WILLIAMSON, THE ESTATE OF
DON C. CRAFT, KIRK O'DONNEL, JOHN
LETTOW, TIMOTHY MCGINNIS, FRED NEWTON,
WILLIAM WATSON, CHRIS HANCOCK, DALE            06-CV-5724 (LTS)
SCHONEMAN and INTERNATIONAL DEEP SEA
SURVEY, INC.,

         Plaintiffs,

   - against -

RECOVERY LIMITED PARTNERSHIP,
COLUMBUS EXPLORATION, LLC,
COLUMBUS-AMERICA DISCOVERY GROUP,
INC., COLUMBUS EXPLORATION LIMITED
PARTNERSHIP, OMNI ENGINEERING, INC., OMNI
ENGINEERING OF OHIO, INC., ECONOMIC ZONE
RESOURCE ASSOCIATES, ECONOMIC ZONE
RESOURCE ASSOCIATES, LTD., EZRA, INC.,
EZRA OF OHIO, INC., ECON ENGINEERING
ASSOCIATES, INC. DOE.E, INC., THOMAS G.
THOMPSON, GILMAN D. KIRK, JR., JAMES F.
TURNER, MICHAEL J. FORD, JR. and W. ARTHUR
CULLMAN, JR.,

         Defendants.
-----------------------------------------------------------------X

## DEFENDANTS' REPLY IN SUPPORT OF MOTION BY ORDER TO SHOW CAUSE TO VACATE MARITIME ATTACHMENT

### PRELIMINARY STATEMENT

    Plaintiffs do not contest that they had the burden of strict compliance with the procedures for

a prejudgment attachment, and that they failed to meet that burden. They do not dispute that they

fail to state a cognizable maritime claim as to each Defendant whose property they improperly

attached. Instead, Plaintiffs assert that, despite their failure to satisfy the requirements for a Rule

B attachment, they are entitled to maintain their *ex parte* attachment because: (1) Plaintiffs are poor

and Defendants are rich; (2) although Plaintiffs violated Local Admiralty Rule Rule B.2 and did not

provide prompt written notice of the attachment, Defendants became aware of the attachment  a

month or so after it was procured; (3) the Defendant Board members are somehow personally liable for contracts which they neither authorized nor entered, and which were entered 12 years before the Delaware limited liability company of which they were advisory board members was even created; (4) authorities and precedents decided prior to *Norfolk Southern Railway Co. v. James N. Kirby Pty Ltd.*, 543 U.S. 14 (2004), have no value, save those precedents that Plaintiffs believe are convenient to their position; (5) the Court should disregard the clear, unambiguous language of the Wage Penalty Statute making it inapplicable to seaman who claim to have a contractual right to profits; and (6) the Court should also disregard Plaintiffs' unclean hands in procuring this attachment and the other facts and considerations.

As discussed below, each of Plaintiffs' arguments is without merit, and Plaintiffs have failed to carry their burden of proof.

## ARGUMENT

**1.    Seven Months After Filing Suit In Ohio and Three Months After Filing This Attachment, Plaintiffs' Claims Continue to Be Devoid of Competent Evidentiary Foundation, and Instead Rest on Hearsay, Speculation, Innuendo and Worse.**

This case represents the second time Plaintiffs have asked a Court to maintain improper *ex parte* attachments.

The first time was a week ago in the U.S. District Court for the Central District of California before the Magistrate Judge Jennifer T. Lum. Following testimony over three separate days, it became apparent to everyone in the courtroom that the *ex parte* attachment had been procured based on hearsay, speculation, innuendo and grasping at straws by Plaintiffs' counsel.

In that proceeding, Plaintiffs had convinced the U.S. District Court, *ex parte*, to seize gold bars and coins in the middle of one of the largest numismatic conventions in the country. The Court there heard live testimony over three separate days. During the course of the proceeding, Plaintiffs' counsel were given full access, *in camera*, to the agreements that they said "might" support their claims. Nothing could have been further from the truth. It became apparent to all during the hearing that Plaintiffs had no competent evidentiary basis for their claims, and that they were facing Rule

2

11 sanctions and a separate action for abuse of process.

Plaintiffs took a voluntary dismissal, conditioned on the garnishees' agreement that Plaintiffs' counsel, Holland & Knight, and their clients, would be spared sanctions for their misconduct in procuring the attachment.[1]

It requires little but to read the filings of Plaintiffs to determine the lack of a competent evidentiary basis for the present attachment. Plaintiffs do not even attach a single affidavit of a single competent witness; the only declarations offered are those of Plaintiffs' two local counsel.[2] And those two declarations rely upon unsworn and incompetent statements—newspaper reports, magazine articles, and the like.

As for Plaintiffs' claim that they are all poor and the Defendants are all rich, little need be said. Even if such claim were true, the comparative wealth of Plaintiffs and Defendants has nothing to do with this case. Parties are to be judged on their rights and duties under the law under the principle of the rule of law, including the ancillary precept of equal justice under law. It would serve little purpose, therefore, to respond further to Plaintiffs' assertion in this regard.

2.    **Plaintiffs Failed to Give Prompt Written Notice of the Attachment Required For a Rule B Attachment By Local Admiralty Rule B.2.**

Plaintiffs do not dispute that they were required to give prompt written notice to Defendants under Local Admiralty Rule B.2. Nor do Plaintiffs' dispute that failure strictly to comply with the requirement is grounds for vacating the attachment.

But Plaintiffs assert that they are excused from complying with Local Admiralty Rule B.2 because Defendants, themselves, filed notice of this attachment on September 22, 2006. See Pl Memo 10-23-06 at 22. Plaintiffs omit to mention that Defendants filed the notice after they learned of the attachment not from notice of Plaintiffs—notice that was not given—but after the company's

---

[1] During the course of that proceeding, Magistrate-Judge Lum had the opportunity to observe the utter lack of evidence to support Plaintiffs.

[2] *Cf.* Fed. R. Civ. P. 56 (e) (affidavits to show competence of affiant). Counsel for the parties are not competent witnesses. The Southern District of New York has adopted the New York State Lawyer's Code of Professional Responsibility. See Local Civil 1.5(b)(5). See DR 5-102 (lawyers as witnesses).

checks began to bounce, including checks to pay their three single female employees to cover their respective monthly rents, mortgages, etc. Defendants received no notice from Plaintiffs of the attachment—not even so much as a courtesy call from counsel for Plaintiffs. See Declaration of Gilman D. Kirk.

Plaintiffs filed their action on or about July 28, 2006. They procured issuance of the attachment order that same day, and attachments proceeded promptly thereafter. Plaintiffs failed to comply with Local Admiralty Rule B.2, and the attachment should be vacated for failure to comply with the procedural requirements for a valid attachment. See *Maersk, Inc. v. Neewra, Inc.,* 2006 U.S. LEXIS 53395, *20 (S.D.N.Y.); *International Ocean Way Corporation of Monrovia v. Hyde Park Navigation, Ltd.,* 555 F. Supp. 1047, 1049 (S.D.N.Y. 1983).[3]

> **3.    Both Delaware and Ohio Law Limit the Liability of the Company's Advisory Directors.**

The Delaware Limited Liability Company Act, at § 18-303, expressly limits the liability of LLC members and managers to third parties:

> **§ 18-303.  Liability to 3rd parties**
>
> (a) Except as otherwise provided by this chapter, the debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no manager or member of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company.
>
> (b) Notwithstanding the provisions of subsection (a) of this section, under a limited liability company agreement or under another agreement, a member or manager may agree to be obligated personally for any or all of the debts, obligations and liabilities of the limited liability company.

Delaware law has long recognized that corporations protect the stockholders and officers

---

[3] Plaintiffs correctly note that Rule B attachments have roots in long-standing maritime practice and procedure. Those roots were called into question during the 1970s and 1980s with a series of decisions clarifying the due process deficiencies in prejudgment attachments. See Advisory Committee Notes to Supplemental Rule B, 1985 Amendment. *See also Sniadach v. Family Finance Corp.,* 395 U.S. 337 (1969); *Fuentes v. Shevin,* 407 U.S. 67 (1972). *See generally* R. Robol, *Admiralty's Adjudicatory Jurisdiction Over Alien Defendants: A Functional Analysis* 11 J. MAR L & COM 395 (1980) *and cases cited therein.* As noted above, the amendments to Supplemental Rules B and E, including the adoption of Local Rule B.2, reflected those concerns—and the procedures believed needed to avoid constitutional deficiencies in the administration of Rule B attachments.

4

against individual liability.  An officer may not be held liable for breach of a corporate contract, unless the officer has signed the contract in her own capacity and not just as an agent for the corporation.[4]  Consequently, a plaintiff who seeks to sue an officer of a corporation must pierce the corporate veil to do so.[5]  The same principles apply to an LLC.

A limited liability company, a relatively new entity, was created to allow tax benefits similar to a partnership, while still providing limited liability protection, much like a corporation.[6]  As with a corporation, a member or manager of a limited liability company may not be held liable for the debts, obligations and liabilities of the company.[7]

The leading case under Ohio law on this issue is *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Companies, Inc.*, 67 Ohio St.3d 274 (1993).  In that case, the Ohio Supreme Court observed that "a fundamental rule of corporate law is that, normally, shareholders, officers and directors are not liable for the debts of a corporation."[8]

> An exception to this rule was developed in equity to protect creditors of a corporation from shareholders who use the corporate entity for criminal or fraudulent purposes.  **** Under this exception, the "veil" of the corporation can be "pierced" and individual shareholders held liable for corporate misdeeds when it would be unjust to allow the shareholders to hide behind the fiction of the corporate entity.[9]

A party seeking to pierce the corporate veil must prove three essential elements: (1) Control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own; (2) Control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity; and (3) Injury or unjust loss resulted to the plaintiff from such control and wrong.[10]

Here, there is simply no evidentiary basis to support Plaintiffs' claims against the Defendant

---

[4] See, e.g., *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P., v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999).
[5] See, e.g., *Sonne v. Sacks*, 314 A.2d 194, 197 (Del. 1973).
[6] *Elf Atochem North am., Inc. v. Jaffari*, 727 A.2d 286, 287 (Del. 1999).
[7] *Id.* (citing *6 Del. C. § 18-303*).
[8] *Belvedere, supra*, 67 Ohio St.3d at 287.
[9] *Id.* (Emphasis added.)
[10] *Id.* at syllabus paragraph 3.

5

directors. Plaintiffs say that the non-disclosure agreements were executed with the full blessing of

the Defendant directors. Pl Mem Opp 10-23-06 at 18. This is impossible, since no Defendant

company had a board of directors when the non-disclosure agreements were executed in 1986, and

the board of directors was not even created until 12 years later after Columbus Exploration, LLC was

formed!

### 4. *Kirby* Did Not Overrule Precedents on the Contractual Freedom of Parties to Choose the Substantive Law Governing Their Disputes.

Contrary to Plaintiffs' assumption, the U.S. Supreme Court's decision in *Norfolk Southern*

*Railway Co. v. James N. Kirby Pty Ltd.*, 543 U.S. 14 (2004) did not overrule existing precedents on

the contractual freedom of the parties to choose the substantive law governing their contractual

relations. In fact, *Kirby* is devoid of even a bare sentence suggesting that those precedents have been

overruled.

To the contrary, *Kirby* makes clear the fundamental inconsistency between maritime

contracts, governed by uniform federal law, and state law contracts governed by non-uniform state

law. The Court recognized that the uniform federal common law undergirding maritime contracts

was inconsistent with state law:

> Here, our touchstone is a concern for the uniform meaning of maritime contracts like
> the ICC and Hamburg Sud bills. We have explained that Article III's grant of
> admiralty jurisdiction "'must have referred to a system of law coextensive with, and
> operating uniformly in, the whole country. It certainly could not have been the
> intention to place the rules and limits of maritime law under the disposal and
> regulation of the several States, as that would have defeated the uniformity and
> consistency at which the Constitution aimed on all subjects of a commercial character
> affecting the intercourse of the States with each other or with foreign
> states.'"*American Dredging Co.* v. *Miller*, 510 U.S. 443, 451, 127 L. Ed. 2d 285, 114
> S. Ct. 981 (1994) (quoting *The Lottawanna*, 88 U.S. 558, 21 Wall. 558, 575, 22 L.
> Ed. 654 (1875)).... Applying state law to cases like this one would undermine the
> uniformity of general maritime law.... In protecting the uniformity of federal
> maritime law, we also reinforce the liability regime Congress established in COGSA.
> By its terms, COGSA governs bills of lading for the carriage of goods "from the time
> when the goods are loaded on to the time when they are discharged from the ship."
> 46 U.S.C. app. § 1301(e).

543 US at 25, 27, 28, 29.

The High Court therefore recognized that while state law might sometimes fill in the

interstices of federal common law, maritime contracts must be governed by the uniform body of

federal common law. The determination of whether a contract is maritime, therefore, looks not simply to geography, but instead to the underlying functional issue of whether the United States' interests in having a uniform body of federal common law govern a transaction outweighs the federalism interests of applying state law:

> Indeed, for federal common law to apply in these circumstances, this suit *must* also be sustainable under the admiralty jurisdiction. See *Stewart Organization, Inc.* v. *Ricoh Corp.*, 487 U.S. 22, 28, 101 L. Ed. 2d 22, 108 S. Ct. 2239 (1988). Because the grant of admiralty jurisdiction and the power to make admiralty law are mutually dependent, the two are often intertwined in our cases.... *The ICC and Hamburg Sud bills are maritime contracts because their primary objective is to accomplish the transportation of goods by sea from Australia to the eastern coast of the United States.* See *G. Gilmore & C. Black*, Law of Admiralty 31 (2d ed. 1975) ("Ideally, the [admiralty] jurisdiction [over contracts ought] to include those and only those things principally connected with maritime transportation"....In *Kossick*, for example, we held that a shipowner's promise to assume responsibility for any improper treatment his seaman might receive at a New York hospital was a maritime contract. The seaman had asked the shipowner to pay for treatment by a private physician, but the shipowner, preferring the cheaper public hospital, offered to cover the costs of any complications that might arise from treatment there. We characterized his promise as a "fringe benefit" to a shipowner's duty in maritime law to provide "'maintenance and cure.'"365 U.S., at 736-737, 6 L. Ed. 2d 56, 81 S. Ct. 886. Because the promise was in furtherance of a "peculiarly maritime concer[n]," *id.*, at 738, 6 L. Ed. 2d 56, 81 S. Ct. 886, it folded into federal maritime law.

543 US at 23, 24-25.

Neither *McNamara v. Tug DIANA L. MORAN*, No. 87 Civ. 3096, 1989 WL 106522 (S.D.N.Y. Sept. 6, 1989) nor *U.S. Fire Ins. Co. v. S.S. LIONS GATE BRIDGE*, No. 88 Civ. 9188, 1997 WL 10923 (S.D.N.Y. 1997) is to the contrary. In each of those cases, the Court determined that it did not matter whether state law or maritime law was applied, since the outcome would be the same. In doing so, the Court rested on the established choice-of-law principle that in determining the governing law, the court will look to whether applying one jurisdiction's law or another will be outcome determinative: if the end result would be the same no matter, there is no "conflict of law' issue, and the court is not required to resolve which body of law applies. In McNamara, the Courts subject matter jurisdiction was based on a maritime tort that had occurred when the Plaintiff, McNamara, had stepped off a barge operated by Defendant Moran. 1989 U.S. DIST. LEXIS *1. In the context of claims for indemnity among two of the Defendants, the Court noted that "the general rule is that the interpretation of a maritime contract is 'governed by fed maritime law and not state law.'" *Id.* *4. The Court noted that the issue of the applicable law did not matter because (a) both

7

parties agreed to admiralty jurisdiction and that the contract in question (for transportation by sea of a shipment of oil pursuant to a bareboat charter) was a maritime contract, and (b) there was no divergence between maritime law and state law on the issue before the Court. *Id.* *4-5. In *U.S. Fire Insurance*, there was again no issue as to maritime jurisdiction or whether the contract was a maritime contract; the case again involved a claim for damage to cargo under a Stevedoring Agreement providing for limitation of liability to the carrier under the Carriage of Goods by Sea Act (COGSA). 1997 U.S. DIST. LEXIS *8. The Court again noted that there was no dispute among the parties that the agreement was a maritime contract, and pointed out that "admiralty indemnity agreements are ordinarily governed by federal maritime law, not state law." *Id.* *13. The Court therefore held that, since there was no dispute that the contract was a maritime contract, the Court should apply admiralty law since it was not different from federal law on the subject. Id. *14. *McNamara* and *U.S. Fire* thus do not demonstrate that the Southern District of New York has rejected precedents from the U.S. Supreme Court and the lower courts upholding the contractual freedom of parties to choose the law governing their contractual relations; instead, they simply reflect the principle that federal courts do not issue advisory opinions on issues that do not need to be decided to resolve the issue before them.   See U.S. Const., art. III (case or controversy requirement).

Still, Plaintiffs repeat Defendants observation that Defendants' removed Plaintiffs' suit in Ohio from state court to federal court on grounds that Plaintiffs had stated a maritime claim for salvage.  What Defendants' stated in their original filing in support of their Motion to Vacate was true and continues to be true: Defendants removed the case to federal court on grounds that Plaintiffs' Complaint appeared to allege a claim for salvage; Defendants' promptly moved that the case be transferred from the Southern District of Ohio to the U.S. District Court for the Eastern District of Virginia, because the Eastern District of Virginia has taken continuing jurisdiction over claims for salvage to the SS *Central America*. See Def Mem Supp Mot to Vacate, 10-16-06.[11]

---

[11] Contrary to Plaintiffs representation to the Court, Defendants have specifically called the Southern District of Ohio's attention to the filing in this forum, including the numerous inconsistencies between Plaintiffs' representations to the Southern District of Ohio, on the one

In their most recent filing, Plaintiffs have, once again, stated that they are not making a claim for salvage.[12] Instead, Plaintiffs concede that their sole claims in this proceeding are upon the non-disclosure agreements. And each of those agreements chooses Ohio state law as the governing law.[13]

Plaintiffs also suggest that the parties intended to recognize that maritime jurisdiction would attach, even though the choice-of-law clauses in their contracts expressly chose Ohio state law, because the forum selection clause in one of the contracts provides for jurisdiction in the U.S. District Court for the Southern District of Ohio. (The other contracts unmentioned by Plaintiffs provided for jurisdiction in the Franklin County Ohio.) Given that the Plaintiff in question had diverse citizenship, the federal court was the appropriate forum based on diversity jurisdiction, not based on admiralty.

**5.    Plaintiffs Other Arguments Are Without Merit.**

Plaintiffs contend that the exclusionary language of 46 USC § 10501(b) does not apply to

---

hand, and to the Southern District of New York, on the other. In contrast, Plaintiffs neither disclosed nor mentioned this proceeding to the Southern District of Ohio.

[12] Presumably, they have done so because of the bar order entered by the U.S. District Court for the Eastern District of Virginia in 1990 barring any further claims for salvage.

[13] It is unnecessary, at this stage of the proceeding, to address the utter lack of merit in Plaintiffs claims, other than to note that Plaintiffs are well aware that they are frivolosu. While Plaintiffs assert that Defendants have admitted that the company earned "tens of millions" of dollars from sales revenues, see Pl Memo 10-23-06 at 22, they are well aware that there has never been any net recovery, and that the investors have not even been repaid any of their capital investment, to the tune of millions of dollars. See Rebuttal Declaration of Gilman D. Kirk, Jr.  Plaintiffs were paid far above and beyond the value of their services in 1986. They repeatedly made one error after another that caused delays and cost money. Under the terms of their contracts, they are entitled only to a tiny percentage of the "net recovery." And they are entitled to such a percentage if the ship is ed in 1986. See e.g. McGinnis contract, page 3 ("...recovery profits, provided the target shipwreck site is located in June-July of 1986.").

The SS *Central America* was not located at all in 1986. And it was ultimately located two years later, in 1988, in spite of, not due to, the Plaintiffs. During the summer of 1986, Plaintiff Williamson was eager to end work on the project so that he could work on a job for EXXON oil company. While still on the job ostensibly to locate the SS *Central America*, Mr. Williamson was found to be spending time and Columbus-America funds to negotiate a contract with EXXON. It is true that during the summer of 1986, the sonar crew located an anamoly that they were sure was the SS *Central America*. It was not.  Defendant Thompson, relying on the Plaintiffs' alleged expertise, announced that the shipwreck appeared to have been located. When the site was re-visited in 1987 (this time, without the Plaintiffs' participation), it was determined that the site could not possibly be the SS *Central America*. The ship was not located until over a year later, ultimately by coming to the realization that Plaintiffs were completely wrong on all counts, including in their statement that the SS *Central America* was "geology", not a shipwreck.

9

the penalty wage section of the very same statute.   Based on this contention, Plaintiffs assert that

the Estate of Don Craft is not barred from its penalty wage claim.   profit sharing agreement

between Plaintiff Craft and Columbus-America Discovery Group.

      The statute is clear: the *entire chapter* of the statute—including the penalty wage

provision-- has no application to voyages where the seaman is entitled to a share of the profits:

"*This chapter* does not apply to a vessel on which the seamen are entitled by custom or

agreement to share in the profit or result of the voyage." 46 USC §10501(b). (emphasis added).

It is difficult to imagine how the Congress could have drafted clearer language, making it

apparent that the exclusion applies to the entire chapter-- including the penalty wage provision.[14]

### 6.    **Request for Attorneys' Fees, Costs and Damages**

      The law and evidence establish beyond doubt that Plaintiffs improperly procured an *ex parte*

writ of attachment in this case and failed to give prompt written notice of the attachment.  Plaintiffs

had no colorable claim that Defendant board members are or may be personally liable for the alleged

obligations of any Defendant company.  Plaintiffs' allegations were based on hearsay, speculation

and innuendo rather than competent admissible evidence.  Worse, Plaintiffs filed a patently false

verified complaint and affidavit in support of their allegations.[15]

---

[14] Even if the statute lacked this clear language, Plaintiffs' argument would fail.  Plaintiffs propose that the only types of voyages excluded by § 10501(b) are those listed in §10504(d).  No language in the statute supports Plaintiffs' claim; nor do Plaintiffs cite any authority to support their claim. Plaintiffs' Mem Opp. 13. This is because there are none. Rather then limiting the general exclusionary language of § 10501(b), it is clear the language the language of 10504(d) identifies types of voyages not covered under the penalty wage statute, but that may still be covered under the other provisions of Chapter 105.
   The clear error of Plaintiffs contention is further illustrated by examining 46 U.S.C. § 10601-3 (dealing with the wages of seamen on fishing vessels specifically). The exclusionary language of 46 USC § 10504(d) was not meant to be used to define the meaning of § 10501(b). Again, plaintiffs have cited no authorities. The language of the statute is clear; when referring specifically to fishing vessels, such exclusions are used to identify a specific type of voyage that is covered under an entirely separate chapter of the United States Code, not to counteract the clear language of 46 USC § 10501(b).

[15] The extent to which Plaintiffs improperly attached assets is reflected in the attached Declaration of James F. Turner, which shows that Plaintiffs attached an estate over which Mr. Turner merely serves as Executor; in the attached Declaration of former Director Arthur Cullman, which shows that Plaintiffs attached accounts owned jointly by Mr. Cullman's wife as well as IRA & Roth IRA accounts; and in the attached Declaration of Gil Kirk, which shows that Plaintiffs persuaded the Court to attach property that did not even belong to Mr. Kirk based on a

For these reasons and the additional reasons cited by Defendants, the attachment should be vacated and Defendants should recover their reasonable attorneys' fees, costs and damages from Plaintiffs pursuant to Rule 11 of the Federal Rules of Civil Procedure and/or *Rashi Textiles, U.S.A., Inc. v. Rhomberg Textil Gesellschaft M.B.H. of Austria*, 857 F.Supp. 1051 (S.D.N.Y. 1994) (a defendant is entitled to fees and costs where a New York court would find the underlying attachment to have been wrongful). Defendants respectfully request a briefing schedule and subsequent hearing on this request for an award of attorneys' fees, costs and damages.

Dated: New York, New York
      October 24, 2006

                                     Respectfully Submitted,
                                     LANDMAN CORSI BALLAINE & FORD P.C.

_____    By:   _____
William M. Mattes, Esq.                       Daniel S. Moretti (DSM 6630)
DINSMORE & SHOHL LLP                 Local Counsel for Defendants
Attorneys for Defendants              Thomas G. Thompson, Gilman D. Kirk,
Thomas G. Thompson, Gilman D. Kirk,   James F. Turner, Michael J. Ford, Jr., and
James F. Turner, Michael J. Ford, Jr., and W.  W. Arthur Cullman, Jr.
Arthur Cullman, Jr.                  120 Broadway, 27th Floor
175 South Third Street                New York, New York 10271
Columbus, Ohio 43215                (212) 238-4800
(614) 628-6880.

                                       Richard T. Robol
                                       ROBOL LAW OFFICE, LPA
                                       Attorneys for Defendants
                                       555 City Park Avenue
                                       Columbus, Ohio 43125

TO:    James T. Shirley, Esq.
        HOLLAND & KNIGHT
        Attorneys for Plaintiffs
        195 Broadway
        New York, New York 10007-3189
        (212) 513-3200

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL WILLIAMSON, ET AL. | |
| **Plaintiffs,** | Case No. 06 CV 5724 |
| v. | **DECLARATION OF** |
| RECOVERY LIMITED PARTNERSHIP, ET AL. | **GILMAN D. KIRK, JR.** |
| **Defendants.** | |

I, Gilman D. Kirk, Jr., make the following Declaration pursuant to 28

U.S.C.§1746:

1.    I am a resident of Ohio.

2.    Although I have not been served with a copy of the verified Complaint, upon information and belief, I am a named Defendant in the above-captioned case.

3.    I have reviewed Plaintiffs' Verified Complaint and Plaintiffs' response to Defendants' show cause Motion.

4.    In both the Verified Complaint and the Affidavit of Michael Frevola, it is alleged that I owned the R/V Arctic Discoverer ("Vessel") at the time the wages were earned by the deceased Plaintiff, Donald Craft.

5.    Attached hereto as Exhibit 1 is a true and accurate copy of the Sale Agreement and Bill of Sale that the deceased Plaintiff, Donald Craft, signed accepting the Vessel on behalf of Economic Zone Resource Associates, Inc. ("EZRA, Inc.")

6.    I did not own the Vessel at the time wages were earned by the deceased Plaintiff, Donald Craft.

7.    Mr. Frevola's sworn affidavit, which relied on hearsay to say I owned the Vessel at the time wages were earned by the deceased Plaintiff, Donald Craft, is false.

8.    I believe that the Plaintiffs and their attorneys have submitted both a Verified Complaint and a sworn Affidavit without any legally sufficient evidence to prove their allegations. Plaintiffs' attorneys claim to be admiralty lawyers, but failed to produce the chain of title to the Vessel in question, and made reckless allegations in both the Verified Complaint and in an Affidavit that I am, or was at the time services were rendered, the owner of the Vessel, something that is false.

# Exhibit A

9.   The Plaintiffs are not entitled to any recovery from any of the Defendants in this case. There has never been any net recovery from sale of the treasure of the SS *Central America*. In fact, the investors in the project (the limited partners in Recovery Limited Partnership) have not received a return of their original capital investment.

10.  The Plaintiffs did not give prompt written notice of the attachment to the Defendants. The first notice of the attachment was obtained by EZRA, Inc. when it became aware nearly a month after the attachment, that the company's payroll was being returned for "unavailable funds".

11.  A true and accurate copy of the letter from ADP through which the Defendants learned that an attachment had occurred, is attached as Exhibit 2.

12.  I am not aware of any excuse for why the Plaintiffs did not provide prompt written notice of the attachment.

13.  From the beginning of this suit, the counsel for the Plaintiffs knew how to reach the corporate and individual Defendants and provide notice of the attachment. Counsel for the Plaintiffs have had the names, addresses, phone numbers and full contact information for all of Defendants' attorneys since at least March, 2006.

14.  In addition to the harm caused to the individual Defendants from the attachments, the Plaintiffs' attachment has caused severe damage to the company and its investors.

I declare under penalty of perjury that the foregoing is true and correct.


Dated this 24th day of October, 2006, in Columbus, Ohio.

_____
Gilman D. Kirk, Jr.

02/25/1998  17:00    RADISSON PLAZA HOTEL STJ.              709 739 4154   P.02

THIS AGREEMENT made at St. John's, in the Province of Newfoundland
this            day of February, 1988

BETWEEN:                          CENTRAL FUEL & BUILDING SUPPLIES
                                  LIMITED, a body corporate, of
                                  Glovertown, in the Province of
                                  Newfoundland

                                  (hereinafter referred to as the
                                  "Seller")

                                  Of the one part

AND:                              ECONOMIC ZONE RESOURCE ASSOCIATES
                                  INC., a body corporate, of Columbus,
                                  Ohio, United States of America

                                  (hereinafter referred to as the
                                  "Buyer")

                                  Of the other part

FOR AND IN CONSIDERATION of the sum of $165,000.00 (U.S. Funds)
paid in accordance with terms and conditions herein, the Seller
agrees to sell and the Buyer agrees to buy the Canadian registered
vessel "M.V. Arctic Ranger" (ex "A. T. Cameron"), Official Number
310137, registered in the Port of Ottawa, Ontario (hereinafter
referred to as "the Vessel"), on the following terms and
conditions, namely:

1.   Buyer to deposit $15,000.00 (U.S. Funds) in the Seller's
account by bank transfer or other guaranteed form of payment within
forty-eight hours (Saturdays and Sundays only excepted) of the

**Exhibit 1**

02/25/1988  17:00    RADISSON PLAZA HOTEL STJ.         709 739 4154  P.03

- 2 -

signing of this Agreement by both parties.  Failure by the Buyer to
deposit this amount will render this Agreement null and void except
were the Seller may grant an extention of time for such deposit.

2.   Seller to deliver Vessel from present berth in Glovertown, to
St. John's, in the Province of Newfoundland, and have vessel
drydocked at that port.  The deposit made pursuant to Clause 1 to
be entirely earned by the Seller by the delivery of the vessel to
St. John's, unless Seller defaults in its obligations under this
agreement.

3.  Buyer to deposit an additional sum of $9,750.00 (U. S. Funds)
in the Seller's account by bank transfer or other guaranteed form
of payment within forty-eight hours (Saturdays and Sundays only
excepted) after the Vessel is safely drydocked.  Failure on the
part of the Buyer to deposit this amount will render this Agreement
null and void, all monies previously deposited in the Sellers
account will be considered earned by the Seller.  This twenty-four
period may be extended by the Seller at its option.

4.   Seller to complete all underwater repairs and replacements
required by Steamship Inspection Branch of Canadian Coast Guard
(hereinafter referred to as "C.S.I."), such underwater work

02/25/1989  17:01    RADISSON PLAZA HOTEL STJ.          709 739 4154  P.04

- 3 -

to include the drawing and inspection of tailshaft and opening of sea valves.    The Seller to provide Buyer with Inspection Certificate for Vessel's underwater.  This Certificate to be issued by C.S.I. and valid for a minimum period of two years.

5.  Seller to replace all zinc anodes which require replacement as determined by C.S.I.;

6.  Seller to high pressure wash underwater hull, and paint with one coat of red oxide primer and one coat of customary bottom paint.  Any specialized paints to be provided by the Buyer at the Buyer's cost.

7.  Seller to return Vessel to water and secure alongside pier in St. John's Harbour for Buyer to accept delivery.  All Port charges, including pilotage, dockage, wharfage, etc. to be for the Seller's account up to and including day of deliver.  All such costs from date of delivery are for Buyer's account.

8.  Seller to deliver Vessel to Buyer with all electronic navagational and communication equipment belonging to the vessel and placed on board. The following equipment is to be in good working order on delivery:

02/25/1999  17:01   RADISSON PLAZA HOTEL STJ.              900 739 4154  P.06

– 4 –

Gyro Compass

V.H.F. Radio

S.S.B. Radio

Loran C

2 Radars (one 40 mile and one 50 mile)

1 Echo Sounder

9.  Seller to complete inclining experiment as required by C.S.I.
as the result of Seller's removing Ballast from vessel.

10. Seller to install all new running lights to C.S.I. satisfaction
and current requirements.

11. Seller to reline (cement wash) all fresh water tanks on board
vessel.

12. Seller to have on board at time of delivery all galley cooking
equipment (pots, pans, etc.) presently belonging to the Vessel,
including, silverware, dishes, linens, bedding and the like.

13. Seller to have on board at time of delivery all spares
presently belonging to the Vessel, including, engine spares,
propellors, shaft, liferafts, rings, jackets and the like.

- 5 -

14. Seller to have on board at time of delivery all deck equipment previously on board and now stored ashore, including all rigging blocks, cables, mooring lines and one large drum winch. (Large drum winch not to be installed by Seller, cost and responsibility for ~~installation~~ to Buyer's account)

*N2 for LOADING*

15. Seller to have all galley equipment including range and refrigeration units aft in good working order at time of delivery.

16. Seller will use best efforts to have Vessel available for delivery to Buyer by 12:01 a.m., March 25, 1988.  Buyer agrees to extend delivery date if delay is due to no fault of the Seller, including but not limited to delays due to sea ice conditions, labour unrest at dockyard, acts of God, delays in receiving parts, force majeure and the like.

17. Buyer to purchase at additional cost from Seller at then current Newfoundland prices, all provisions, fuel, lube oil and hydraulic oils on board the Vessel at time of delivery.

18. Notwithstanding anything to the contrary contained herein, if on drydocking vessel Seller determines that major additional and presently unforseen repairs are required, the Seller will have the

02/25/1988  17:02   RADISSON PLAZA HOTEL STJ.                709 739 4154   P.07

- 6 -

option to cancel this agreement and refund all monies advanced by the Buyer up to that time.

19. On delivery, the balance of the purchase price, $140,250.00 (U.S. Funds) to be deposited in the Seller's account by bank transfer or other guarenteed form of payment.

20. Seller will delivery customtenary documentation required for a "clean" sale, including Bill of Sale necessary for registration in Buyer's name, which is the responsibility of the Buyer and at the Buyer's cost.

21. When Vessel is accepted by the Buyer at place of delivery it is understood and agreed that the acceptance of the Vessel will then be on a "as is where is" basis.

SIGNED, SEALED AND DELIVERED
By the Seller in the presence
of:

_____

_____
JAMES BURRY, President

02-25-1998  17:02  RADISSON PLAZA HOTEL STS.    TO 702 717 4171  P.05

- 7 -

SIGNED, SEALED AND DELIVERED
by the Buyer in the presence
of:

_____        DONALD CRAFT, Representative

Approved by Thomas A. Thompson, President Economic Zone Resource
Associates Inc.

_____

# BILL OF SALE (Body Corporate)

CANADA
Registry of Shipping
Form No. 10A.

Issued by the
DEPARTMENT OF TRANSPORT

| Official No. | Name of Ship | No., Date and Port of Registry | Whether a Sailing, Steam or Motor Ship | Horse Power of Engines, if any |
|---|---|---|---|---|
| 310137 | ARCTIC RANGER | 11 in 1958, Ottawa ON | Motor Ship | 1000 B.H.P. |

|  | FEET | TENTHS |  |
|---|---|---|---|
| Length from forepart of stem to the aft side of the head of the _____ fore rudder stock | 167 | 5 |  |
| Main breadth to outside of plank | 32 | 1 | Gross : : : : 753.19. |
| Depth from top of deck at side amidships to bottom of keel | 16 | 7 | Number of Tons Registered : : : 330.13. |

and as described in more detail in the Certificate of the Surveyor and the Register Book.

We, (a) _____ Central Fuel & Building Supplies Ltd. _____

_____ in consideration of the sum of one hundred sixty five thousand US _____ paid to us by _____ E.Z.R.A. Inc. _____

Sixty four (one hundred percent) _____ of (b) 867 Neil Street, Columbus Ohio USA _____ shares in the ship above particularly described, and in her boats, guns, ammunition, small arms, and appurtenances, to the said _____ E.Z.R.A. Inc. _____ the receipt whereof is hereby acknowledged, transfer, _____

Further, we, the said _____ Central Fuel & Building Supplies Ltd. _____

E.Z.R.A. Inc. _____ their _____ for ourselves and our successors covenant with the said _____ assigns, that we have power to transfer in manner aforesaid the premises hereinbefore expressed to be transferred, and that the same are free from incumbrances (d) _____

In witness whereof we have hereto affixed our common seal this _____ 25th _____ day of _____ March _____ one thousand nine hundred and eighty eight

The Common Seal of the _____ Central Fuel and Building Supplies Limited _____ was affixed hereunto in the presence of (e)

NOTE.—
(1) A Purchaser of a Registered British Vessel does not obtain a complete title until the Bill of Sale has been recorded at the Port of Registry of the ship; and neglect of this precaution may entail serious consequences.
(2) Registered Owners or Mortgagees are reminded of the importance of keeping the Registrar of Shipping informed of any change of residence on their part.

84-0017 (4-41)

(a) Here insert title in full of the Body Corporate.  (b) Here insert address in full and description of transferee or transferees.  (c) "Sixty" "four" or "third".  (d) If there be any subsisting Mortgage, or outstanding Certificate of Mortgage or Sale, add "save as appears by the Registry of the said Ship."  (e) Description of Witnesses, Directors, Secretary, &c. (as the case may be).  "Space for signature and seal."



9/5/2006



EZRA INC

Company Code: ▇▇▇▇▇

Dear ▇▇▇▇▇▇

Your 8/25/2006 Tax Filing/FSDD/ADP Check impound for $8,181.82 was returned by your bank due to "non-sufficient funds" (NSF).

In the signed ADP Client Account Agreement, you agreed to fund this account one-day before check date. We at ADP do not want to jeopardize our business relationship with your company so it is imperative that the funds be available, in their entirety, on a timely basis. Failure to do so can cause a NSF status and prevent ADP from providing our services such as making deposits to Tax Agencies or funding your payroll.

ADP's policy is to charge a $75.00 returned item fee for every NSF occurrence. Your account will be billed accordingly. ADP will also terminate all Tax Filing, FSDD, ADPCheck, TotalPay or 401K services after a second occurrence.

ADP is confident that by bringing this matter to your attention, you will be able to avoid future NSF occurrences by following the funding guidelines set forth in the Client Account Agreement.

Sincerely,

Esther Dominguez
Returned Items Collector
877/370-9608

**PLEASE BE ADVISED THAT YOU ARE RESPONSIBLE FOR ANY PENALTY OR INTEREST CHARGES INCURRED DUE TO THIS NSF.**

NSF1T&M

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **MICHAEL WILLIAMSON, ET AL.** | |
| **Plaintiffs,** | Case No. 06 CV 5724 |
| **v.** | **DECLARATION OF** |
| **RECOVERY LIMITED PARTNERSHIP, ET AL.** | **JAMES F. TURNER** |
| **Defendants.** | |

I, James F. Turner, make the following Declaration pursuant to 28 U.S.C.§1746:

1. I am a resident of Ohio.

2. Although I have not been served with a copy of the verified Complaint, upon information and belief, I am a named Defendant in the above-captioned case.

3. I am submitting this Declaration in support of Defendants' show cause Motion.

4. On October 11th I was notified via an overnight mail letter that the Estate of Margaret Graham Armour - for which I am the Executor - was frozen by UBS Financial Services, Inc.

5. The proceeds of this estate do not belong to me, but rather to the beneficiary, Robert G. Armour, the nephew of Margaret Graham Armour.

6. I have been advised by UBS that this account is considered frozen and no funds will be released until further notice is received from this Court.

7. The Plaintiffs' garnishment of an account over which I am executor has caused, and will continue to cause, damage to the estate of Margaret Graham Armour and will prevent the timely and proper management of the Estate and distribution of funds to the beneficiary.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 24th day of October, 2006, in Columbus, Ohio.

_____
James F. Turner

81349v1
33982-2

# Exhibit B

## AFFIDAVIT OF PERSONAL SERVICE

STATE OF NEW YORK    )
                             ) ss.:
COUNTY OF NEW YORK   )

      **RYAN NEW**, being duly sworn, deposes and says, that deponent is not a party to the action, is over 18 years of age and resides at NEW YORK, NEW YORK.

      That on the 24th day of October, 2006, deponent served the within **DEFENDANTS' REPLY IN SUPPORT OF MOTION BY ORDER TO SHOW CAUSE TO VACATE MARITIME ATTACHMENT** upon:

> James T. Shirley, Esq.
> HOLLAND & KNIGHT, LLP
> 195 Broadway, 24th Floor
> New York, New York 10007-3189

attorneys in this action, at the addresses designated by said attorneys for that purpose by personally delivering a copy of the same and leaving it with a person at that office authorized to receive service of legal papers.

                                              _____
                                              Ryan New

Sworn to before me this
24th day of October, 2006

_____
      Notary

DAWN PINKSTON
NOTARY PUBLIC, State of New York
No. 02PI6130040
Qualified in New York County
Commission Expires July 5, 2009