James T. Shirley, Jr. (JTS 6114)
Michael J. Frevola (MJF 8359)
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200
Attorneys for Plaintiffs Michael Williamson, The Estate of Don C. Craft, Kirk O'Donnell, John
Lettow, Timothy McGinnis, Fred Newton, William Watson, Chris Hancock, Dale Schoeneman,
and International Deep Sea Survey, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL WILLIAMSON, THE ESTATE OF DON C. CRAFT, KIRK O'DONNELL, JOHN LETTOW, TIMOTHY MCGINNIS, FRED NEWTON, WILLIAM WATSON, CHRIS HANCOCK, DALE SCHOENEMAN, and INTERNATIONAL DEEP SEA SURVEY, INC., <br><br> Plaintiffs, <br><br> v. <br><br> RECOVERY LIMITED PARTNERSHIP, COLUMBUS EXPLORATION, LLC, COLUMBUS-AMERICA DISCOVERY GROUP, INC. COLUMBUS EXPLORATION LIMITED PARTNERSHIP, OMNI ENGINEERING, INC., OMNI ENGINEERING OF OHIO, INC., ECONOMIC ZONE RESOURCE ASSOCIATES, ECONOMIC ZONE RESOURCE ASSOCIATES, LTD., EZRA, INC., EZRA OF OHIO, INC., ECON ENGINEERING ASSOCIATES, INC., DOE.E, INC., THOMAS G. THOMPSON, GILMAN D. KIRK, JAMES F. TURNER, MICHAEL J. FORD, and W. ARTHUR CULLMAN, JR., <br><br> Defendants. | 06 Civ. 5724 (LTS) <br><br> **DECLARATION OF MICHAEL E. WILLIAMSON** |



I, MICHAEL E. WILLIAMSON, under penalty of perjury pursuant to the laws of the United States, declare as follows:

1.     I am one of the Plaintiffs in this action, and I am currently the person in our group of Plaintiffs (the "Williamson Plaintiffs") who is responsible to give instruction to our legal counsel, to relay information on this matter from our legal counsel to the remaining members of our group, and to coordinate the funding of the litigation.

2.     To the best of my recollection and belief, all of the Plaintiffs in this action have been involved from the very beginning, going back to 1990, when we were known as the "Craft Group" because Don C. Craft was then the person who had the responsibilities with respect to the group that I now have. Mr. Craft continued in that position until December 2002 when, because of his failing health, he and the rest of the group decided I should take over. Mr. Craft died on April 2 of this year, just two days after our lawsuit was filed in Ohio.

3.     I am submitting this declaration to address issues I understand have been raised in the Defendants' motion to vacate attachments and to dismiss the attachment proceedings we have begun in New York. The statements made in this Declaration are based on my personal knowledge except where I state them to be based on information and belief and in those cases I believe them to be true.

4.     I have not yet seen a transcript of the October 26, 2006 hearing, but I have been asked about some of the things that I was told were said. I have been told that Mr. Robol said to the Court that side scan sonar is used on land for geological survey as it is used at sea. That statement is false. I have been involved with side scan sonar for 32 years, and have never heard of such a thing. In fact, it would be extremely difficult if not impossible to use side scan sonar technology in that fashion, and the results would be so limited as to be useless. Indeed, you would at best obtain an imaging of the topography that would not be nearly as good as a simple

1

photograph. Moreover, there is equipment which is designed specifically to provide geological information from beneath the surface on land, but that equipment is based on either radar or seismic technology rather than sonar technology. Certainly the type of equipment we use, including the Sea MARC IA we deployed in the *SS Central America* search, is only useful at sea and in this case it was only used at sea.

5.      I have been told Mr. Robol said to the Court that some portion of the work done under the IDSS contract was performed at Battelle Memorial Institute in Ohio. That statement is false. The work of our technicians employing the side scan sonar and interpreting the data it provided was done on site at sea on board the Defendants' vessels. As with any maritime adventure, there was support and back up ashore in our Seattle, Washington office, but almost all of the work, and certainly the most important work under the contract, was performed at sea. IDSS had no contract with Battelle, and none of the Williamson Plaintiffs did any work at Battelle.

6.      Fred Newton is the only one of the Williamson Plaintiffs who did not go to sea on either of the Defendants' vessels to participate in the search. He nonetheless provided very valuable services that were wholly maritime in nature and contributed greatly to the success of this maritime adventure by working out the search grid to be followed to expeditiously locate the wreck of the *SS Central America* and/or other wrecks in the area we were directed by Tommy Thompson to search.

7.      I also strongly refute the statements made about the value and timing of the results of our services in footnote 13 on page 9 of the Defendants' Reply Brief. I refute this on the basis of personal knowledge, something none of the three lawyers who signed that brief can possibly have. However, Mr. Robol knows enough about what happened at sea to also know the statements in that footnote are false. In fact, when those or similar allegations were raised in the

2

Norfolk legal action, Mr. Robol argued just the opposite of what he is saying in that footnote, and he proved to Judge Kellam the statements made in that footnote were wrong. Indeed, this is the first time I have seen the value of our services questioned. In *America's Lost Treasure,* a "picture book" written by Tommy Thompson about this search and recovery operation, Thompson described the contribution of our SeaMARC equipment, which would be useless without our operators. Please see Exhibit A, hereto. I should advise the Court, however, that the sonar image Thompson chose to use in the picture in Exhibit A is not the image of the *SS Central America*, but rather one of the other 7 or 8 images we named and decided to come back to by order of preference.

8.      Moreover, the Defendants have applauded our services and have repeatedly assured us over the years that our percentages have been well-earned. I attach as Exhibit B an April 28, 1990 letter Thompson sent to me confirming the value of our service. An identical letter was sent to every NDA holder on our team. As recently as April 7, 2006 (a week after we filed our law suit in Ohio) in a 1 hour and 15 minute phone call from Thompson, he praised our work several times and told me he had "dedicated his life to honoring obligations and protecting our interests", and that he had been able to do so "without dilution of our interests". Please see Exhibit C (my April 7, 2006 email to Jim Shirley reporting on that conversation). The lawyers who signed that brief are trying to revise history, and since Mr. Robol is one of them and is making false statements that directly conflict with what he argued and proved in the Norfolk Court, and with what he and the Defendants have been reporting to us for the past fifteen years, the lawyers' motives are suspicious.

9.      As a further point, I have been told that at of the October 26, 2006 hearing there was discussion of whether our promised percentages in the IDSS contract and the Non Disclosure Agreements (NDAs) were to come from the gross proceeds of the recovery, the net

3

proceeds of the recovery (net of search and recovery costs), or the net profits of the company. Right up to the time of his death, Don Craft was adamant that Thompson promised it would be from the gross proceeds, despite the language in the NDAs. Others in the group remain adamant on the same point. This issue arose because early versions of the NDA's issued in 1983 stated the percentages were "of anything salvaged during the SC Venture provided that the recovery begins prior to September 15, 1985". There was never any doubt about this being percentages of the gross recovery, so when the language was changed in the new agreements (made necessary because the treasure had not been recovered by September 15, 1985) the NDA holders sought and obtained from Thompson his assurances their percentages would be paid based on gross value. This is also supported by Thompson's statement on April 6, 2006 about how he has fought to keep our interests from being diluted. I may be an exception to that "deal", however, for the reasons set forth in ¶14 below.

10. Our group has no control whatsoever over the incurrence of "expenses" by the Defendants. It would be patently unfair to penalize us by having our payments realized only from a contrived profit figure. That is especially so since we now know from the results of the proceedings in Los Angeles that profits were very likely maxed out in mid-2001, and yet the Defendants have continued to spend enormous amounts of money supporting the international endeavors and frolics of Tommy Thompson (who I understand is the chairman of the board of directors of Columbus Explorations LLC), supporting a large number of corporate entities for undisclosed purposes, hiring lawyers to fend off legitimate creditors to whom they owe money and information, and all the while refusing to provide any financial accounting to anyone, including their own investors according to documents I have seen which were filed in the Courts of Ohio.

4

11.    Press reports of the initial sale of the treasure in late 1999/early 2000, which we know now was based on a document referred to as the "Asset Purchase Agreement", stated that the Defendants received $100 million in that transaction. That agreement provides additional amounts to be paid to the Defendants based upon "retail" sales of the treasure by the California Gold Marketing Group (CGMG). We do not know how much the Defendants received pursuant to that term of the Asset Purchase Agreement, but we know it must be many more millions of dollars because during the one and one-half years from the date of that Agreement to the date that provision was extinguished by an amendment, the Defendants and their counsel repeatedly reported "robust sales" and "expectations of early distributions". We also know there was an additional payment, referred to as the "acquisition price", to the Defendants pursuant to a June 25, 2001 Amendment to the Asset Purchase Agreement in exchange for extinguishment of the Defendants' continuing interests in the sales of whatever treasure had not been sold by CGMG by that time.

12.    To be clear, we did not learn of this sale until the week of October 16, 2006, i.e. more than five years after the sale of all the valuable treasure had been completed and all the proceeds received by the Defendants. We, like the investors who sued their board of directors in Ohio, were misled by reports from the Defendants and their legal counsel into believing sales were still ongoing, right up through Thompson's phone call to me on April 6 of this year. At one time, they even pointed to the sale of the "Eureka bar" for many times its value as one of the successes of their skillful marketing, despite that sale apparently having been made some six months after (we now know) their interest in the Eureka bar had been extinguished.

13.    In the 1 hour 15 minute phone conversation with Thompson on April 7 of this year, see Exhibit B, he was still talking about the success of the ongoing marketing efforts, which he said were right on target to meet the 7 year estimate of Judge Kellam, and those efforts

5

were close to enabling distributions to our group. Mr. Thompson's reference to "protecting our interests" and "doing so without dilution of our interests" strongly suggested a continued commitment to pay what he had promised, i.e. percentages based on gross proceeds, as well as to mislead us into believing marketing was ongoing.

14.     I understand that one of the Ohio lawyers for the Defendants, Mr. Rex Elliott, in papers submitted to the Honorable Robert W. Sweet, a U.S. District Court Judge in New York, said that the expense of locating and recovering the treasure was approximately $14 million. If that is shown to be correct and supported with a proper accounting, I would not object to that $14 million being deducted from the gross proceeds of the sale, and my percentage then being based on the balance. That is because I understood when my 1986 NDA was issued that net recovery for me meant netting out the costs incurred locating and recovering the treasure. My concession of going from "gross proceeds" to "net recovery" was justified because I received a boost in my percentage in connection with the change, [Exhibit D, hereto ¶7] which the other members of our group, or at least most of them, did not receive. I did not agree to also net out legal, marketing, and administrative expenses, and no reasonable argument could ever be made by the Defendants for netting out expenses of any sort incurred after all the treasure was sold and all interests of the Defendants in the treasure were extinguished in 2001.

15.     I have seen in Mr. Robol's declaration given in the Los Angeles proceeding where he said all the remarks he and the Defendants have made to us over the years about marketing, and to various courts more recently about protecting the secrecy of their marketing techniques, was meant to apply to treasure that has not yet been recovered from the shipwreck. I am told he testified in Los Angeles that we just misunderstood that over these many years, or at least the last five years. As shown by Mr. Thompson's remarks to me in our April 7, 2006 phone conversation, they were talking only about marketing the recovered treasure, despite having no

6

further interests to be marketing since June 2001! Mr. Robol's statements to the Los Angeles

Court were also false!

_____
Michael E. Williamson

# 4147141_v1

**Exhibit A**

# AMERICA'S LOST TREASURE



A Pictorial Chronicle of the Sinking and
Recovery of the United States Mail
Steamship *Central America*
THE SHIP OF GOLD

## TOMMY THOMPSON

$39.95

AMERICA'S LOST TREASURE is a pictorial account of the sinking and recovery of the United States Mail Steamship *Central America*, a story that was the subject of *The New York Times* bestseller, *Ship of Gold in the Deep Blue Sea*.

The sinking of the *Central America* in a hurricane in 1857, was America's worst peacetime sea disaster; in addition to many tons of gold, 425 men were lost. The ship was recovered in 1989, in an operation that developed the most groundbreaking marine-recovery technology in existence, a dramatic triumph that made new law and opened the planet's last frontier to mankind. Now, in more than 250 stunning illustrations and photographs, most of them never before seen, *America's Lost Treasure* tells the amazing story of the tragic voyage and discovery.

Tommy Thompson has been described by *People* magazine as "the kind of guy who could fix a rocket ship with two paper clips and a piece of twine... [a] briny Chuck Yeager, a genuine American hero." Now, he tells how the basic paradigms of marine search were rethought to recover America's greatest lost treasure. Superior-quality photographs taken eight thousand feet below the surface—a feat that was never before technically possible—depict life on the ocean floor, including the many new species Thompson's team discovered, the site where the *Central America* rests, and the extraordinary historical treasures they brought back—from stacks of coins and gold bars to trunks filled with clothing, newspapers, and journals still readable after 131 years beneath the sea. Combining contemporary drawings, paintings, photographs, and maps from both the era of the *Central America's* voyage and the contemporary high-tech recovery, *America's*

(continued on back flap)

*Overleaf: The lights of the submersible robot* Nemo
*illuminate the biological and historical mysteries of the deep.*

Copyright © 1998 by Tommy Thompson, with
Columbus-America Discovery Group

Director of Photography: Milt Butterworth, Jr.

A ROUNDTABLE PRESS BOOK
Directors: Marsha Melnick, Susan E. Meyer, Julie Merberg
Project Editor: Rachel D. Carley
Art Director: Richard J. Berenson, Berenson Design & Books, Ltd.
Production Coordinator: John Glenn
Cartography: Bette Duke
Photo Research: Picture Research Consultants, Inc.
Production: Bill Rose

All rights reserved. No part of this book may be reproduced in any form or
by any electronic or mechanical means, including information storage and
retrieval systems, without permission in writing from the publisher, except
by a reviewer, who may quote brief passages in a review.

Published simultaneously in Canada
Printed in the United States of America

First Edition

Library of Congress Cataloging-in-Publication Data
Thompson, Tommy, 1952–
     America's lost treasure : a pictorial chronicle of the sinking and
recovery of the United States mail steamship Central America : the
ship of gold / Tommy Thompson.
        p.    cm.
     Includes index.
     ISBN 0-87113-732-1
     1. Central America (Ship)—Pictorial works.  2. Shipwrecks—North
Atlantic Ocean—Pictorial works.  3. Treasure-trove—Pictorial
works.  4. Survival after airplane accidents, shipwrecks, etc.—
Pictorial works.  I. Title.
G530.C4T48  1998
910′ .91631—dc21                           98–38902
                                                    CIP



THE ATLANTIC MONTHLY PRESS
841 BROADWAY
NEW YORK, NY 10003

98 99 00 01  10 9 8 7 6 5 4 3 2 1

*Gold coins, ingots, and dust
are scattered across the
degraded timbers.*

# Sea MARC Sonar

The Sea MARC sonar used by the Columbus-America Discovery Group to locate the *Central America* is a side-scanning device that is towed behind the surface vessel in swaths while sending out a strong pulse of sound waves to detect objects on the ocean floor. A computer aboard the research vessel interprets the returning signals and "paints" an image of the seabed. After one sweep, the vessel turns 180 degrees and maps a band parallel to the previous one, overlapping the passes to eliminate any possible gaps in the record. This systematic process is known as "mowing the lawn."

When the sonar passes over an anomaly, the image registers in changing tones and colors. A shipwreck stands out prominently in such a side-scan sonar image. The hard hull of the ship returns a strong signal shown in oranges and reds. The greens and blues are background colors. The dark "shadow" indicates a very weak or absent signal, caused when the wreck obscures the sea floor behind it.



**Exhibit B**



**EZRA**

Economic Zone Resource Associates

433 West Sixth Avenue, Columbus, Ohio 43201
(614) 299-6008

April 28, 1990

Mr. Mike Williamson
731 N. Northlake Way
Suite 104
Seattle, WA  98103

Dear Mike:

Thank you for your participation and prior support in the project. I hope you have enjoyed the many positive articles on our project in the media. Even before we had brought in a little over a ton of gold into Norfolk last October 5th, approximately 3000 stories about us as a result of our discoveries. We are planning on this amount of positive press to be very helpful when it comes time to market the gold. In the meantime, as you may have read in the newspapers, the extent of ownership interest which our project will have in the recoveries made to date, will be determined by the United States District Court for the Eastern District of Virginia in an admiralty proceeding which is currently pending before that court.

Should the Court decide in our favor, we will implement a marketing program for our recoveries. I expect that the earliest by which we will be able to convert some of our recoveries to cash will be late 1991 or 1992. Because of its nature as rare gold, it will be difficult to effectively market until the entire treasure is recovered. Once recovered, there will be only one *Central America* treasure - a potentially very exclusive item. Of course, if the Court rejects our ownership claim and we are required to await a salvage award, the disposition of recoveries could be delayed a year or more. In either case, it is possible that the claimants could appeal the judgment of the District Court and obtain an injunction against our disposition of any recoveries pending the appeal. This event might delay the disposition of any recoveries by a a year or more.

Jack Grimm, Harry John and Columbia University intervening claims, which first appeared at outset of the insurance company trial, were viewed by most observers as a circus rather than a trial. We do not expect these claims to amount to much.

As noted, if things go our way, we hope to begin making cash distributions to our investors, perhaps as early as 1991. Any cash distributions to which you are entitled by virtue of your Non-Disclosure agreement will be made at the same time as distributions to investors and me, on a pro rata basis. In other words, we plan for you to be paid at the same time, and following the same procedures, as other participants in this project.

I appreciate everyone's support for our project. I'll try to keep you posted of significant developments as time and circumstances permit.

Very truly yours,

Thomas G. Thompson

TGT:jv

**Exhibit C**

**Shirley, Jim (NYC - X73561)**

| | |
|---|---|
| **From:** | Mike Williamson [mikew@wassoc.com] |
| **Sent:** | Friday, April 07, 2006 7:56 PM |
| **To:** | Jim Shirley |
| **Cc:** | mike frevola; mike szolosi; Art Wright |
| **Subject:** | April 7 telecon with thompson |

Jim,

"Harvey" (Tommy Thompson) requested I call him upon return from europe.
I left messages at both his office and on his cell and at 2:30 pm PDT he called me at my
office.  The conversation lasted until 3:45 pm -- highlights follow.


We talked a bit about Don Craft and how vital he was to the Central America operation,
then he expressed surprise that we had filed the complaint.  I suggested lack of
communication on his part and he insisted that they were continuously filling information
requests from Jim Shirley.  When I questioned that he said he knew that must be the case
because he had stacks of bills from his lawyer indicating many contacts with Shirley.

He then proceeded to lecture me on the legal history of the case, the denial of the
abandonment condition and retrial under salvage law, leaving a cloud on the treasure
ownership and making it impossible to raise capital etc.

He then said he had not known I was involved in the Jim Shirley stuff -- thought that was
just Don.  Told me how he had dedicated his life to honoring obligations and protecting
our interests and those of the investors.  He had been successful in doing so without
dilution of our interests and that had been a primary goal.  When I told him I had stacks
of memos/letters in my file documenting communication from Jim outlining membership of our
group and percentages he then stated that he hasn't been specifically involved.  Said he
has been very busy, continuously working late every night, no girl friend just fighting
all the attacks on the venture with no end in sight.

I suggested that better communication may lessen the number of challenges, and that
secrecy without oversight often leads to abuse, inefficiency and losing sight of the
mission.  He said that he is under the constant scrutiny of his Board, so lots of
oversight.  He hoped that we were not siding with the small group of disgruntled investors
(said he didn't think their share position was as large as ours -- implied they were very
minor players and this was an internal issue that got out of hand), as he and his Board
had serious concerns about their motivation, that their interests could be detrimental to
the larger group..  "Friend to friend" he cautioned me about this group, as their actions
could lessen the value of everyone's share.

When asked about the justification of continuos secrecy he said the marketing effort was
very complicated and required continuing confidentiality.  Judge Kellam had estimated that
it may require 7 years to market the gold without destroying its value, and that seems to
have been about right.  He says they have just made it over a critical hurdle and were
close to being able to start distributions.

Harvey said that he had no idea we had problems with his orgaization(s).  When I
referenced again the thick stack of correspondence sent by Jim, he said he didn't know how
seriously to take Shirley, as he was writing articles in the salvage community claiming to
be involved with the Central America case (implying this helped Jim get published).

I repeatedly asked Harvey if he had actually read our complaint, and he said he'd seen a
summary.  He said he would think about what we had discussed (he had done at least 70% of
the talking) and would try to do better at keeping us informed.

Best regards,
Mike Williamson

--

Mike Williamson, President

Williamson & Associates
1124 Northwest 53rd Street, Seattle, WA 98107
(206) 285-8273
(206) 285-8291 FAX

**Exhibit D**

**Economic
Zone
Resource
Associates**      1046 Neil Ave. Columbus, Ohio 43201 (614) 299-6000

## NON-DISCLOSURE AGREEMENT

THIS AGREEMENT is entered into this **29th** day of **June**                    ,
1986, by and between Thomas G. (Harvey) Thompson, a research scientist in
the field of ocean engineering with principal offices in Columbus, Ohio
(herein called "Thompson"), who represents interests, in addition to his
own, of certain other science professionals and individuals, including one
or more entities, and **Michael E. Williamson**      (herein called
"Confidant").

## RECITALS

A.      Thompson is engaged in the costly implementation and testing of
various theories and innovations resulting from years of extensive
research, which was undertaken at considerable out-of-pocket expense and
investment of time by Thompson and others. Thompson is currently engaged in
the development of procedures and applications for high technology
equipment to be used in locating, verifying, surveying and recovering
certain lost deep-ocean cultural sites (defined as shipwrecks and other
man-made sites being neither natural nor mineral) of significant historical
importance. In the course of this undertaking, Thompson's projects have
fostered valuable cooperative relationships among professional colleagues
and unique multi-disciplinary innovations with regard to research and
exploration of deep-ocean cultural sites. Thompson and his colleagues
recognize that strict secrecy is essential with regard to the research
data, its development, and the proprietary nature of their projects if they
are to realize success in their cooperative efforts.

B.      Confidant is being paid to perform work in one of the following
areas in connection with the search operations effort: operations, data
interpretation, equipment repair and maintenance, image processing, and
logistics.

C.      Thompson, through one of his agents, has accepted Confidant to
work as a member of the search operations team involved in locating and
verifying the remains of a certain historic Shipwreck(s). Thompson desires
that Confidant, as a member of the search operations team, share in the
proceeds of the net recovery, provided that the target Shipwreck(s) is
found as a result of Confidant having lent his best efforts to the search
operations effort and providing that subsequent recovery operations are
successful.

D.      While Confidant does not intend to pursue the search and recovery
of historic shipwrecks as a line of business, his tasks involve the actual
search operations and may also require that he review certain highly
confidential and proprietary information developed by Thompson. In
addition, they may require that Confidant consult with certain other search
operations personnel for the purpose of carrying out his assigned tasks.

(Page 1 of 4 pages)

E.    Thompson desires Confidant to participate in the search operations, but only to the extent that Thompson is sure that the information developed by Thompson, including the existence of the Project being directed by Thompson and the location(s) of any Shipwreck target(s) found, remains confidential between Thompson and Confidant.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises hereinafter set forth, Thompson and Confidant agree as follows:

1. (a)    For the purposes of this Agreement, "Confidential Information" shall mean all information concerning the deep-water cultural site(s) and/or object(s) of search, including the location, the procedures and applications to be used to confirm the location(s) of or to engage in archaeological work on the site(s), and all other information or material proprietary to Thompson or designated as Confidential Information by Thompson, of or to which Confidant may obtain knowledge or access through or as a result of Confidant's relationship with Thompson.

(b)    Confidential Information includes, but is not limited to, the following types of information and other information of a similar nature (whether or not reduced to writing): discoveries, ideas, concepts, computer programs, designs, drawings, specifications, techniques, models, data, documentation, diagrams, research, development, processes, procedures, expertise ("know-how"), marketing and development plans, names and other information related to sources of funding and supplies, and financial information.

(c)    Confidential Information also includes any information described above which Thompson treats as proprietary or designates as Confidential Information, whether or not owned or developed by Thompson individually or by other individuals, colleagues, or entities to whom Thompson may be confidentially obligated.

(d)    Confidential Information also includes knowledge of the existence of the Project being directed by Thompson, including, but not limited to, the names of any ship or shipwreck associated with the Project.

2.    Confidant agrees that the recitals above are true and that the Confidential Information, as defined in paragraphs 1. (a), (b), (c), and (d), above are in the nature of trade secrets and that they are owned by and/or under Thompson's fiduciary protection. Confidant further agrees that the Confidential Information is not readily available and cannot be easily obtained. Confidant acknowledges that but for his executing this Agreement, Thompson would not permit Confidant to review the Confidential Information developed by Thompson.

3.    Confidant agrees that he will not remove, copy, or make any notes

(Page 2 of 4 pages)

concerning any Confidential Information provided him, either directly or indirectly, through Thompson without obtaining Thompson's prior consent. Further, Confidant agrees to hold in confidence and not directly or indirectly reveal, report, publish, disclose or transfer any Confidential Information to any person or entity. For the purpose of performing his assigned tasks, Confidant may consult as necessary with other operations personnel on the basis of the "need-to-know" criteria.

4.    Confidant agrees that he will not at any time for a period of ten (10) years after the execution of this Agreement become involved in any effort regarding search, verification, survey and/or recovery of the target Shipwreck site(s) that is the object of the Project's search operations, unless such efforts are being sponsored by Thompson.

5.    Because of the unique nature of the Confidential Information, Confidant understands and agrees that Thompson will suffer irreparable harm in the event that Confidant fails to comply with any of his obligations under this Agreement, and that monetary damages will be inadequate to compensate Thompson for such breach. Accordingly, Confidant agrees that Thompson will, in addition to any other remedies available to him at law or in equity, be entitled to injunctive relief to enforce the terms of this Agreement.

6.    Confidant acknowledges that the damages suffered by Thompson as a result of Confidant's breach of this Agreement will be incapable of exact measurement and therefore agrees that in the event he breaches this Agreement in any manner whatsoever, or sponsors or participates in a venture to recover the target Shipwreck site(s), in addition to the remedies available to Thompson under paragraph 5 above, or otherwise, Thompson will be entitled to liquidated damages equal to the greater of: (a) Fifty percent (50%) of any interest of Confidant in a competing venture, or of any sums that Confidant might receive as a result of participating in such a venture; or (b) One Hundred Fifty Thousand Dollars ($150,000). .45 $\left(\frac{45}{100}\right)$ 6/29/86

7.    Thompson agrees to give Confidant ~~One Twentieth (1/20)~~ of One Percent (1%) of the net recovery, provided the target Shipwreck site(s) is found as a result of Confidant having participated in the search operations effort and providing that subsequent recovery operations are successful, regardless of when the recovery operation is performed and provided that Confidant employs his best efforts to complete his assigned tasks in connection with the search operations.

7.a. This Agreement supercedes all previous non-disclosure agreements between Confidant and Thompson.

8.    The limitations and obligations imposed on Confidant by this Agreement shall extend to any corporation, partnership, joint venture, association or other entity in which Confidant is a shareholder, partner, or member.

9.    Confidant may not assign or transfer his obligations under this Agreement, without the prior written consent of Thompson, but Thompson may assign this Agreement to Economic Zone Resource Associates or others who

(Page 3 of 4 pages)

may be beneficiaries of this Agreement and therefore entitled to enforce its terms.

10.    Thompson and Confidant agree that if any term, paragraph or section of this Agreement is unenforceable, a court of competent jurisdiction may construe this Agreement without including the specific term, paragraph, or section found to be unenforceable.

11.    This Agreement shall be governed by Ohio law applicable to contracts between residents of Ohio wholly executed and performed in Ohio. Further, this Agreement contains the full and complete understanding of the parties with respect to the subject matter hereof and supersedes all prior representations and understandings, whether oral or written. This Agreement may be modified only in a writing signed by both parties.

12.    In the event that disputes, differences, or controversies arise in connection with this Agreement, Confidant agrees that the United States District Court for the Southern District of Ohio, Eastern Division, shall have exclusive jurisidiction. Accordingly, Confidant irrevocably submits his person to the jurisdiction of such court for purposes of such litigation.


IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year written above.

THOMPSON:                                    CONFIDANT:


_____                      _____
Thomas G. (Harvey) Thompson                  Confidant's Signature

                                             M.E. Williamson
                                             _____
                                             Print Name

Date:    6-28-86

                                             Date:    29 JUN 86


(Page 4 of 4 pages)