James T. Shirley, Jr. (JTS 6114)
Michael J. Frevola (MJF 8359)
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY  10007-3189
(212) 513-3200
Attorneys for Plaintiffs Michael Williamson, The Estate of Don C. Craft, Kirk O'Donnell, John Lettow, Timothy McGinnis, Fred Newton, William Watson, Chris Hancock, Dale Schoeneman, and International Deep Sea Survey, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MICHAEL WILLIAMSON, THE ESTATE OF
DON C. CRAFT, KIRK O'DONNELL,
JOHN LETTOW, TIMOTHY MCGINNIS,
FRED NEWTON, WILLIAM WATSON, CHRIS
HANCOCK, DALE SCHOENEMAN, and
INTERNATIONAL DEEP SEA SURVEY, INC.,

        Plaintiffs,

    v.

RECOVERY LIMITED PARTNERSHIP,
COLUMBUS EXPLORATION, LLC,
COLUMBUS-AMERICA DISCOVERY GROUP, INC.
COLUMBUS EXPLORATION LIMITED
PARTNERSHIP, OMNI ENGINEERING, INC.,
OMNI ENGINEERING OF OHIO, INC.,
ECONOMIC ZONE RESOURCE ASSOCIATES,
ECONOMIC ZONE RESOURCE ASSOCIATES, LTD.,
EZRA, INC., EZRA OF OHIO, INC., ECON
ENGINEERING ASSOCIATES, INC., DOE.E, INC.,
THOMAS G. THOMPSON, GILMAN D. KIRK,
JAMES F. TURNER, MICHAEL J. FORD, and
W. ARTHUR CULLMAN, JR.,

        Defendants.

06 Civ. 5724 (LTS)

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION BY ORDER TO SHOW CAUSE TO VACATE MARITIME ATTACHMENT**

To meet their burden under Rule B and maintain their attachment, Plaintiffs need only show that: (1) the Defendants cannot be found within the district, and (2) that Plaintiffs have a valid *prima facie* admiralty claim against Defendants. *Aqua Stoli Shipping Ltd. v. Gardener Smith Pty Ltd.*, 460 F.3d 434, 444-45 (2d Cir. 2006). Only element (2) is at issue. As discussed below, Plaintiffs have shown – at the very least – reasonable grounds to support their claims against all Defendants, and Defendants have not met their burden of proving the limited *Aqua Stoli Shipping* exceptions to continuing the attachments.

## ARGUMENT

**Maritime Claims.** Plaintiffs' first brief reviews maritime contract law at length. Under well-settled principles, a state choice-of-law clause does not divest a federal court of admiralty jurisdiction over a maritime contract. *See, e.g., CTI-Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F.2d 377, 382 (2d Cir. 1982). In *CTI*, discussed during oral argument, the contract concerned acquisition of cargo containers which could be used either in overland or sea transport and included a New York law clause. *Id.* In holding this to be a maritime contract, the Second Circuit noted that "agreements for the acquisition of ship equipment have been viewed as maritime contracts," *id.* at 380-81, and observed that "we need not reach the question whether a choice of law provision in a maritime contract must be given effect by the courts." *Id.* at 382 n.8. This footnote is significant, in that the question was not whether the contract was maritime, but whether the state choice of law provision would be considered ***at all because the contract was maritime***! *See also Ocean Science & Eng'g Inc. v. Int'l Geomarine Corp.*, 312 F. Supp. 825, 828-29 (D. Del. 1970) (rejecting argument that contract was not maritime because of California choice-of-law clause, because "***[o]nce the contract is found to be maritime and within admiralty jurisdiction, an agreement amounting to a private repeal of 28 U.S.C. § 1333 would***

1

*be a nullity*"). The IDSS Agreement, like the *CTI* contract, was for marine equipment. The NDAs were for ship's personnel. In both cases, *CTI* is controlling and the sole authority cited by Defendants, the Sixth Circuit's *National Enterprises* case, should be distinguished on its facts.

Plaintiffs also have filed the Declaration of Michael E. Williamson. It refutes Defendants' counsel's representations made at oral argument (including contentions that side-scan sonar can be used on land and that Plaintiffs worked at Battelle), and further discusses the term "recovery," including Plaintiffs' basis for interpreting the term differently than Defendants. *See id.* ¶¶ 4-15. Defendants admit that the gold sold for tens of millions of dollars. Plaintiffs claim the amount was much more. The Los Angeles documents support this. While Mr. Kirk avers there has been no "net recovery," the Investor Plaintiffs in Ohio have moved to compel Defendants **_based on their refusal to comply with a court order directing the auditing of Defendants' books_**. Supplemental Affidavit of James T. Shirley, Jr. dated October 30, 2006 ("Shirley 10/30 Aff."), Ex. M. Defendants' refusal to produce such books belies their contentions as to their returns on the sale of the gold. In any case, as a Rule E(4)(f) inquiry only reviews whether Plaintiffs state a valid basis for attachment, a merits-based decision should not be made now.[1]

Plaintiffs respectfully submit that the penalty wage claim by the Estate of Don Craft is similar to that found to be within the penalty wage statute in *Williams v. Great Lakes Dredge & Dock Co.*, 726 F.2d 278 (6th Cir. 1984). In *Williams*, the court affirmed the district court's award of nearly $125,000 each to plaintiffs who had been promised payment both in the form of regular wages and a "completion bonus." *Id.* at 280-81. That bonus was for a defined sum but based on the employee's completion of work. Nevertheless, the court held that it fell within the penalty wage statute. Don Craft's original wage agreement called for him to be paid $150 more per day

---

[1] Indeed, deciding the merits of Plaintiffs' claim on Mr. Kirk's Declaration without cross-examination would be tantamount to rendering summary judgment without giving Plaintiffs opportunity for discovery.

than he received. He exchanged consideration to be paid to him by redefining it based on the recovered treasure. As he has not been paid the alternative consideration, he is entitled to penalties on the known, defined amount. In contrast, lay shares earned on fishing and whaling vessels are excluded because the crew are joint-venturers. Thus, as the entirety of the fishermen's earnings is a lay share based on voyage profits (as opposed to Mr. Craft, who received wages and exchanged a portion of those wages for alternative consideration), the fisherman cannot sue for wages. *Marshall v. S&S Marine Supply, Inc.*, 654 F. Supp. 160, 162 (E.D. Va. 1987) (citations omitted). Indeed, all of the annotations to the penalty wage statutes on this issue refer solely to fishing or whaling voyages.

**Veil-piercing.** Federal common law governs the issue of piercing the corporate veil in admiralty actions and, thus, whether Plaintiffs have stated a claim against the Director Defendants. *See, e.g., Dow Chem. Pac. Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 342 (2d Cir. 1986) (citations omitted). Under federal common law, piercing the corporate veil is appropriate in two circumstances:

> The individual [or corporate parent] must have used the corporate entity to "perpetuate a fraud or have so dominated and disregarded" the corporate entity's form that the entity "primarily transacted [the individual's or parent's] business rather than its own corporate business."

*Id.* (quoting district court decision) (citations omitted).[2]

Accordingly, proving fraud is not essential to piercing the corporate veil. *Northern Tankers (Cyprus) Ltd. v. Adam Backstrom*, 967 F. Supp. 1391, 1399-1401 (D. Conn. 1997).

---

[2] Defendants likely will claim that Delaware law governs their liability because CXLLC is a Delaware entity. Federal maritime law does not look to the law of the state for veil-piercing claims derivative of maritime claims. In anticipation of their new arguments, however, the Court should be aware that the Director Defendants previously argued Delaware law in Ohio state court and also that the claims against them must be rejected as plaintiffs have not shown a "deliberate intent to cause injury" to CXLLC or that they acted with "reckless disregard for the best interests" of CXLLC, and the Ohio rejected those arguments. Shirley 10/30 Aff., Ex. B. They further argued that this must be proven by clear and convincing evidence and that not all Directors have been sued causing a lack of all necessary parties. For the Court's information, Judge Sheeran of the Ohio state court rejected these arguments and noted that the Investor Plaintiffs' Complaint contained allegations of intentional wrongdoing that overcomes the Operating Agreement language that the Director Defendants relied upon. *See id.*

Fraud or wrongdoing with respect to the use of the corporation's <u>alter ego</u>, however, provides an additional basis for piercing the corporate veil. Aside from fraud/inequity, a plaintiff can pierce a corporate veil by showing that a person or corporation exercises dominion and control over its <u>alter ego</u>. *Northern Tankers* sets forth fifteen relevant factors under federal maritime law used to assess whether a veil-piercing is appropriate. Courts in admiralty are clear that these factors "are not a substitute for" the federal maritime law's two tests for piercing the corporate veil, namely (1) fraud <u>or</u> (2) dominion and control, but rather factors that should be used as "an aid" in analyzing a specific situation:

> (1) common or overlapping stock ownership between parent and subsidiary; (2) common or overlapping directors and officers; (3) use of same corporate office; (4) inadequate capitalization of subsidiary; (5) financing of subsidiary by parent; (6) parent exists solely as holding company of subsidiaries; (7) parent's use of subsidiaries' property and assets as its own; (8) informal intercorporate loan transactions; (9) incorporation of subsidiary caused by parent; (10) parent and subsidiary's filing of consolidated income tax returns; (11) decision-making for subsidiary by parent and principals; (12) subsidiary's directors do not act independently in interest of subsidiary but in interest of parent; (13) contracts between parent and subsidiary that are more favorable to parent; (14) non-observance of formal legal requirements; (15) existence of fraud, wrongdoing or injustice to third parties.

*Id.* (citing *Bergensen d.y. A/S v. Magnus Lindholm*, 760 F. Supp. 976, 987 (D. Conn. 1991)).

Defendants' initial two companies were Recovery Limited Partnership ("RLP") and Economic Zone Resource Associates, Inc. RLP filed its partnership papers in October 1985. Shirley 10/30 Aff., Ex. G. From indicia thus far seen, RLP dominated EZRA. Defendant Thompson was the General Partner of RLP and the President of Economic Zone Resource Associates, Inc. *See id.* In Thompson's correspondence with Mr. Craft, Thompson used both RLP's and Economic Zone Resource Associates, Inc.'s names in connection with his retention. *Id.* ¶ 11 & Exs. H & I. Although Mr. Craft's NDA is printed on Economic Zone Resource Associates, Inc., Thompson used RLP letterhead to instruct Mr. Craft to disregard the Economic

4

Zone Resource Associates, Inc. NDAs while performing some of his services. *Id.* As the companies' letterheads also reveal, both had the same street address in the 1980s. *Id.* They also had the same telephone number. *Id.* These practices continued until recently, when Economic Zone Resource Associates, Inc. was dissolved administratively. *See id.* Ex. G.

Defendants claim that Economic Zone Resource Associates, Inc. was the "owner" of the *Artic Discoverer*, but questions exist as to its capitalization and its existence. *Ship of Gold* states that Mr. Kirk funded the vessel purchase.[3] Mr. Kirk attests to Economic Zone Resource Associates, Inc.'s funds being attached and it not having employees paid as result. *See* Kirk 10/24 Declaration, ¶¶ 10-11. **_This is curious, as Economic Zone Resource Associates, Inc. has been dissolved since 2003!_** Indeed, Mr. Kirk deftly refers to Economic Zone Resource Associates, Inc. as EZRA, Inc., **_but the two are separate identities_**. *See* Shirley 10/30 Aff., Ex. G. Kirk's sleight of hand is intended to mislead the Court – if Economic Zone Resource Associates, Inc. was the owner of the ship, that company has been dissolved and the principals – such as Mr. Kirk – are liable for its debts. The same goes for the obligations owed under the NDAs. These facts support veil-piercing and buttress *Ship of Gold*'s citing him as the *Artic Discoverer*'s owner.

Another question pertaining to Economic Zone Resource Associates, Inc. is – how was it capitalized (if it was capitalized at all)? *Ship of Gold* catalogues in great detail how Thompson, a man of little means – assembled investors for RLP, but no information exists as to Economic Zone Resource Associates, Inc.'s capitalization. Although discovery will show more, two likely scenarios exist: (1) the two companies are one and the same, as all capitalization came from the investors' contributions to RLP, or (2) Economic Zone Resource Associates, Inc. was capitalized

---

[3] *See* Gary Kinder, *Ship of Gold in the Deep Blue Sea*, p. 413 (Atlantic Monthly Press 1998) (hereinafter "*Ship of Gold*"). Defendants have cited liberally to *Ship of Gold* in the Ohio Proceedings, and Defendant Thompson had editorial review privileges over *Ship of Gold*. *See id.* at xii (acknowledgements describing Thompson's right of review of the manuscript before publication). *Ship of Gold* was not written by an outsider – it was written by an author with inside access granted only on condition that Defendant Thompson excise anything that he chose to omit.

5

by Mr. Kirk. If Economic Zone Resource Associates, Inc. was capitalized by Mr. Kirk's funds while the company remained insolvent on the books, this is a classic indicator for veil-piercing.

If the capitalization instead came from RLP, the same inference can be drawn between Economic Zone Resource Associates, Inc. and RLP. The exhibits submitted here show that the two had, among other things, the same address, the same telephone number, the same corporate head (Mr. Thompson), and the apparently the same Non Disclosure Agreements.

The dissolution of Economic Zone Resource Associates, Inc. means the penalty wage claim of Mr. Craft and the NDAs likewise are the principals' liabilities directly. Similarly, if the preliminary indicators that Economic Zone Resource Associates, Inc. and RLP being alter egos are borne out, then RLP's obligation to IDSS and the IDSS Agreement likewise can be attributed directly to Mr. Kirk. The documents and little information presently known – due to Defendants' stonewalling discovery in Ohio – nevertheless raise questions relating to twelve of the alter ego elements: (1)-(5), (7)-(9), and (11)-(14).

The Director Defendants' later actions also show grounds for veil-piercing, and relate both to corporate domination ***and*** fraud. Although the Defendants fail to advise the Court of this fact, the agreements between RLP and Columbus Exploration, LLC ("CXLLC") (the Management Agreement and the Operations Agreement) essentially merged RLP into CXLLC. RLP partners all gained proportionate rights in CXLLC. Shirley 10/30 Aff., ¶ 6, Exs. C & D. All of RLP's functions were assumed by CXLLC. *Id.* All of RLP's liabilities were assumed by CXLLC. *Id.* RLP's assets likely have been transferred to CXLLC, leaving RLP judgment-proof, although the Management Agreement is so heavily redacted it is impossible to tell. *Id.*

CXLLC is a Delaware corporation with a Florida address, which is a dockyard at the end of a street in Fernandina Beach, Florida. *Id.* ¶ 7, Ex. E. CXLLC's office address is the same as

the present address of virtually all of the other corporate Defendants – 433 West Sixth Avenue, Columbus, Ohio.[4] Just as with all of the other Defendant companies, the person heading CXLLC is Thompson. *Id.* ¶ 7. Turning to the RLP-CXLLC agreements, the Court will note that large portions of the Management Agreement are redacted, which is how it was filed in the Ohio Proceedings. What can be seen from the visible terms is that CXLLC has taken control of RLP, and its members are RLP's partners. With the exception of an identity change and a convenient extra corporate shell, CXLLC merely is continuing RLP's business. What happened next, unfortunately, is the following evidence of domination and fraud:

- **Domination**: The Director Defendants were nominated or elected for an initial 2-year term (running from 1998 to 2000). Since then, *they never have stood for re-election*. Shirley 10/30 Aff., Ex. J (Investors' Opp. Memo to Defendants' Joint Motion to Seal), at 9.

- **Domination and Fraud**: The Director Defendants met from 2002-2005 and *unanimously voted to preclude investors from having access to books and records; and concealed this decision in violation of their fiduciary obligations*. *Id.*, Ex. A (Investors' Complaint), ¶ 24.

- **Domination and Fraud**: The Directors refused to disclose financial information so as to conceal mismanagement. *Id.*, Ex. A (Investors' Complaint,) ¶ 37.

- **Fraud**: Furthermore, from the papers filed by the Investor Plaintiffs in the Ohio Proceedings, the investors have no idea that the Treasure fully was sold by June 2001 and that their rights were extinguished in that sale. *See* Shirley 10/23 Aff., Ex. D (Amendment to Asset Purchase Agreement dated June 25, 2001). According to the Investor Plaintiffs, the investors thought that the gold may have been sold by late 2003 with no information having been provided to the investors. Shirley 10/30 Aff., Ex. A (Investors' Complaint), ¶ 21.

- **Domination and Fraud**: As stated by the Investor Plaintiffs: "*But for five years now, since 2001, when Defendants started to sell the gold and other treasure that has been reported to*

---

[4] Every one of the Defendants has a corporate address at 433 West Sixth Avenue in Columbus, Ohio or at the end of 14th Street in the dockyard in Fernandina Beach, Florida. All office addresses are 433 West Sixth Avenue. Furthermore, of all corporate filings for these Defendants reviewed by Plaintiffs, the officers all are the same, Mr. Thompson, Mr. Robol, Robert Evans, Debra Burley, and Curtis Loveland. Shirley 10/30 Aff., ¶ 8 & Exs. E, F & G.

*be worth more than $100 million, **<u>Defendants have refused to provide any financial reports, they have refused to provide annual financial statements, they have refused to hold annual meetings or stand for reelection, and they have actually misled their investors with falsehoods about these matters</u>**.*" Shirley 10/30 Aff., Ex. K (Investors' Opp. Memo. to Defendants' Motion to Transfer Venue), at 4.

- **Domination**: Indeed, despite the Operating Agreements specifically providing the investors with the right to examine CXLLC's books and review records, on December 16, 2005 the four Director Defendants issued the following ultimatum: (1) the Investor Plaintiffs must forego their rights under existing Operating Agreements with Defendants; (2) Investor Plaintiffs must sign a new non-disclosure agreement; and (3) Investor Plaintiffs must agree to pay liquidated damages to Defendant Directors. *Id.*, Ex. L, at 1.

- **Domination**: Mr. Robol, a corporate officer of some defendants, has appeared as legal counsel for all of the Defendants in New York and/or Ohio without regard to any conflicts.

Despite our lack of opportunity for discovery, Defendants' actions since CXLLC began to manage RLP raise questions under fourteen of the <u>alter ego</u> elements: (1)-(9), (11)-(15).

Plaintiffs' direct claims are against Thompson (and whomever else he acted for as agent in executing the NDAs), EZRA, and RLP. EZRA has classic markers of being RLP's <u>alter ego</u>. Now, RLP has been folded into CXLLC, likely leaving RLP an asset-less shell which is managed and contractually dominated by CXLLC. The Director Defendants assumed control of CXLLC at or about the time of its taking control of RLP. All but one are still in place. Notably, Defendant Cullman, after years as a holdover director, resigned last year after the Investor Plaintiffs sued. His liability, however, stems from his actions before his resignation.

The corporate fiction is generally upheld, but equity does not allow an <u>alter ego</u> to disregard the laws and rules by which a company is established, then seek to hide behind the corporate protection of that very same company. *Northern Tankers*, 967 F. Supp. at 1408, 1413. As stated in *Bergesen*, after a showing of sufficient indicia to order pre-judgment attachment,

8

> To adhere to the fiction of separate corporate identities in these circumstances would unjustly allow the individual defendants, and their labyrinthine enterprise, to escape from liability that has arisen out of an activity that was conducted for their benefit.

*Bergesen*, 760 F. Supp. at 989. Plaintiffs' initial brief recites at pp. 16-17 their burden in response to Defendants' motion is to show "reasonable grounds" to support the attachment of the Directors assets. In *Ullises Shipping Corp. v. Fal Shipping Co.*, 415 F. Supp. 2d 318 (S.D.N.Y. 2006), Plaintiff sustained its burden merely by showing that the <u>alter ego</u> had paid a debt of the primary defendant. In *A. Coker & Co. v. Nat'l Shipping Agency*, No. 99-1440, 1999 WL 371941 (E.D.La. May 17, 1999), it was met by showing insufficient capitalization, the <u>alter ego's</u> guarantee of the primary defendant, and that the two companies *may* have shared offices. Plaintiffs submit their showing here far outstrips the foregoing cases and the attachment should be upheld.

In *Bergesen*, the court ordered pre-judgment attachment after examining the defendants' complex web of corporations. The court specifically refused to impose untangling defendants' corporate structure on plaintiffs, stating that it "rejects the suggestion that the availability of a prejudgment remedy depends on whether the plaintiff is able to untie the corporate Gordian Knot which the defendants have created." *Bergesen*, 760 F. Supp. at 981 n.8. This principle should especially govern in the present case, where Defendants have made multiple motions to seal documents, for protective orders, have refused to produce financial documents under court order, and have filed redacted documents to hinder Plaintiffs' ability to litigate on an even footing.

CXLLC's (and the Defendant Directors') veil-piercing liability not only arises from the RLP/EZRA relationship, but also – as stated at oral argument – on equitable grounds against CXLLC and, by veil-piercing, the Directors. In *Zim Israel Navigation Co. v. 3-D Imports, Inc.*, 29 F. Supp. 2d 186 (S.D.N.Y. 1998), the defendant was held liable due to its breach of its duty to disburse funds equitably to all interests entitled to a general average distribution:

9

> [Plaintiff] also argues that [defendant] breached its fiduciary duties to [plaintiff] when it paid all of the other beneficiaries of the Fund 100% of their claims and only offered [plaintiff] 70%. This Court agrees. ***Since [defendant] was responsible for collecting the General Average contributions and disbursing the money, it acted as trustee for the General Average Fund***. . . . 1 Scott on Trusts § 12.2 (Fratcher 4th ed. 1987) ("When a person collects money for another, he ordinarily has no right to use the money as his own and is a trustee of the money and not a debtor."). *[Defendant], therefore, owed a fiduciary duty to [plaintiff] and all other cargo owners*.

*Id.* at 191-92 (emphasis added). CXLLC was to collect the gold sales proceeds and distribute them, like the defendant in *Zim Israel*. While Defendants' interest in the gold was ended years ago, no distribution has occurred. Defendants say that no distributions have been made to the investors. This is a red herring – the CXLLC Agreements provide that CXLLC has discretion as to investor distributions. The wisdom of the investors' agreeing to this provision is questionable, but CXLLC might be entitled to withhold investor distributions. Plaintiffs are not investors. They are creditors involved only in the *Central America* operation, which obligated payment when the gold was sold. CXLLC's breach of its duty to distribute funds to Plaintiffs is attributable to the Directors, and thus forms another grounds for the Directors' liability.

As in *Bergesen*, the Defendants have constructed a "Gordian Knot." Discovery will help to untangle it. Defendants cannot hide portions of agreements and avoid discovery, then make declarations to this Court when other evidence would more properly prove the matters asserted. What shines through even now is the domination of Defendants' corporate group by CXLLC and, in particular, the domination of CXLLC by the Director Defendants who have usurped CXLLC's corporate governance and have abused their positions to both insiders' and outsiders' detriment.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully submit that they have sustained their burden and that this Court should maintain the Plaintiffs' attachments of the Defendants' assets.

Dated: New York, New York
       October 30, 2006

HOLLAND & KNIGHT LLP

By: /s/ *[signature]*

James T. Shirley, Jr. (JTS 6114)
Michael J. Frevola (MJF 8359)
195 Broadway
New York, NY 10007-3189
Tel:  (212) 513-3200
Fax:  (212) 385-9010

*Attorneys for Plaintiffs*

TO:  **Via E-Mail**
Landman Corsi Ballian & Ford P.C.
Attorneys for Defendants
120 Broadway, 27th Floor
New York, New York 10271
Attn: David S. Moretti, Esq.
Tel: (212) 238-4835
Fax: (212) 238-4848

**Via E-Mail**
Robol Law Office, LPA
555 City Park Avenue
Columbus, Ohio 43215
Att: Richard T. Robol, Esq.
Tel: (614) 737-3739
Fax: (614) 737-3756

**Via E-Mail**
Dinsmore & Shohl LLP
175 South Third Street, 10th Floor
Columbus, Ohio 43215-5134
Att: William M. Mattes, Esq.
Tel: (614) 628-6901
Fax: (614) 628-8901

# 4149869_v1

11