James T. Shirley, Jr. (JS 6114)
Michael J. Frevola (MJF 8359)
HOLLAND & KNIGHT LLP
195 Broadway
New York, NY 10007-3189
(212) 513-3200

Attorneys for Plaintiffs Michael Williamson, The Estate of Don C. Craft, Kirk O'Donnell, John
Lettow, Timothy McGinnis, Fred Newton, William Watson, Chris Hancock, Dale Schoeneman,
and International Deep Sea Survey, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL WILLIAMSON, THE ESTATE OF DON C. CRAFT, KIRK O'DONNELL, JOHN LETTOW, TIMOTHY MCGINNIS, FRED NEWTON, WILLIAM WATSON, CHRIS HANCOCK, DALE SCHOENEMAN, and INTERNATIONAL DEEP SEA SURVEY, INC., <br><br> Plaintiffs, <br><br> v. <br><br> RECOVERY LIMITED PARTNERSHIP, COLUMBUS EXPLORATION, LLC, COLUMBUS-AMERICA DISCOVERY GROUP, INC. COLUMBUS EXPLORATION LIMITED PARTNERSHIP, OMNI ENGINEERING, INC., OMNI ENGINEERING OF OHIO, INC., ECONOMIC ZONE RESOURCE ASSOCIATES, ECONOMIC ZONE RESOURCE ASSOCIATES, LTD., EZRA, INC., EZRA OF OHIO, INC., ECON ENGINEERING ASSOCIATES, INC., DOE.E, INC., THOMAS G. THOMPSON, GILMAN D. KIRK, JAMES F. TURNER, MICHAEL J. FORD, and W. ARTHUR CULLMAN, JR., <br><br> Defendants. | 06 Civ. 5724 (LTS) <br><br><br> **SUPPLEMENTAL AFFIDAVIT OF JAMES T. SHIRLEY, JR. IN OPPOSITION TO DEFENDANTS' MOTION TO VACATE RULE B ATTACHMENT** |

STATE OF NEW YORK          )
                          ) ss:
COUNTY OF NEW YORK         )

     JAMES T. SHIRLEY, JR., being duly sworn, deposes and says:

     1.    I am a member of the law firm Holland & Knight LLP, attorneys for Plaintiffs, and I am fully familiar with the facts in this case.

     2.    This Affidavit is made in support of Plaintiffs' Supplemental Memorandum of Law in Opposition to Defendants' Motion By Order to Show Cause to Vacate Rule B Attachments in this district. The statements made in this affidavit are based upon my personal knowledge except where I state them to be based upon information and belief and in those cases I believe them to be true.

     3.    This affidavit largely is to sponsor documents filed in other proceedings or exhibits obtained from other sources.

     4.    Plaintiffs and many of the Defendants in this proceeding are likewise involved in proceedings in the United States District Court for the Southern District of Ohio (the "Ohio Proceedings"). The Ohio Proceedings were commenced by investors in Defendant Recovery Limited Partnership (RLP) and members of Defendant Columbus Explorations LLC (CXLLC) (the "Investor Plaintiffs") suing certain of the Defendants herein in the Court of Common Pleas, Franklin County, Ohio. A true copy of the Investor Plaintiffs' Complaint is annexed as Exhibit A.

     5.    The Director Defendants previously argued that the Investor Plaintiffs' claims were barred by Delaware law and also that the claims against them must be rejected as plaintiffs

have not shown a "deliberate intent to cause injury" to CXLLC or that they acted with "reckless disregard for the best interests" of CXLLC. They further argued that this must be proven by clear and convincing evidence and that not all Directors have been sued causing a lack of all necessary parties. For the Court's information, Judge Sheeran of the Ohio state court rejected these arguments and noted that the Investor Plaintiffs' Complaint contained allegations of intentional wrongdoing that overcomes the Operating Agreement language that the Director Defendants relied upon. True copies of Judge Sheeran's decisions rejecting Defendants' arguments are annexed as Exhibit B.

6.     Although the Defendants fail to advise the Court of this fact, the agreements between RLP and CXLLC (the Management Agreement and the Operations Agreement) essentially merged RLP into CXLLC. RLP partners all gained proportionate rights in CXLLC. All of RLP's functions were assumed by CXLLC. All of RLP's liabilities were assumed by CXLLC. RLP's assets likely have been transferred to CXLLC, leaving RLP judgment-proof, although the Management Agreement is so heavily redacted it is impossible to tell. Copies of the redacted Management Agreement (filed as redacted in the Ohio Proceedings) and the Operations Agreement are annexed as Exhibits C & D, respectively.

7.     CXLLC is a Delaware limited liability company with a Florida address, which is a dockyard at the end of a street in Fernandina Beach, Florida (the Fernandina Beach address formerly was "End of 14th Street," which now – although the same physical location – has been changed to "1200 Pogy Place"). CXLLC originally was formed as a limited partnership entitled Columbus Exploration Limited Partnership, which it then converted to CXLLC on or about July 6, 1998. A copy of CXLLC's company information filed with the Delaware Department of State showing this history is annexed as Exhibit E. Although CXLLC's on-line company filing in

3

Delaware does not provide office address information, Columbus Exploration Limited Partnership's filings (which have been made at least through June 2004) does provide that information. Columbus Exploration Limited Partnership's company filings in Florida with the Florida Department of State, Division of Corporations states that the mailing is the same as the present address of virtually all of the other corporate Defendants – 433 West Sixth Avenue, Columbus, Ohio. A true copy of Columbus Exploration Limited Partnership's corporate information reported by it to the Florida Department of State, Division of Corporations from 1997 through 2004 is annexed as Exhibit F. Just as with the other Defendant companies, the person heading CXLLC is Thomas G. Thompson.

8. Every one of the corporate Defendants has an address either at 433 West Sixth Avenue in Columbus, Ohio or at the end of 14th Street in the dockyard in Fernandina Beach, Florida (now known as 1200 Pogy Place, Fernandina Beach, Florida). With the exception of Defendant DOE.E, Inc., which has the 1200 Pogy Place mailing address, all of the other corporate Defendants' mailing addresses are 433 West Sixth Avenue. Furthermore, of all corporate filings for these Defendants reviewed by Plaintiffs, the officers all are the same, Mr. Thompson, Mr. Robol, Robert Evans, Debra Burley, and Curtis Loveland. *See* Exhibits E & F for CXLLC/Columbus Exploration Limited Partnership, and true copies of the corporate filings for all other Defendant companies except for Econ Engineering Associates, Inc. are annexed as Exhibit G.

9. Two of the Defendants' early companies were Recovery Limited Partnership ("RLP") and Economic Zone Resource Associates, Inc. RLP was formed in October 1985 (*see* Exhibit G). RLP dominated Economic Zone Resource Associates, Inc. According to records

4

we have seen, *see* Exhibit G, Defendant Thompson was the General Partner of RLP and the President of Economic Zone Resource Associates, Inc.

10.     The Non-Disclosure Agreements ("NDAs") in this case were printed both on Economic Zone Resource Associates, Inc. letterhead and on non-letterhead paper.  True copies of sample NDAs of each type are annexed as Exhibit H.

11.     In Thompson's correspondence with Mr. Craft, Thompson used both RLP's and Economic Zone Resource Associates, Inc.'s names in connection with Mr. Craft's retention. Although Mr. Craft's NDA is printed on Economic Zone Resource Associates, Inc. letterhead, Thompson used RLP letterhead to instruct Mr. Craft to disregard his NDA while performing some of his services.  A true copy of Thompson's letter to Mr. Craft on RLP letterhead is annexed as Exhibit I.

12.     Turning back to the filings in the Ohio Proceedings, the following allegations have been made by the Investor Plaintiffs – corporate insiders – regarding the Defendants' conduct in running their businesses:

a.     The Director Defendants (Messrs. Kirk, Ford, Turner and Cullman) were nominated or elected for an initial 2-year term (running from 1998 to 2000).  Since then, they never have stood for re-election, but have nonetheless continued their domination of CXLLC as its directors.  A true copy of the Investor Plaintiffs' Memorandum in Opposition to Defendants' Joint Motion to Seal, in which this is stated, is annexed as Exhibit J.

b.     As stated by the Investor Plaintiffs in another filing in the Ohio Proceedings: "But for five years now, since 2001, when Defendants started to sell the gold and other treasure that has been reported to be worth more than $100 million, Defendants have refused to provide any financial reports, they have refused to provide annual financial statements, they have refused to hold annual meetings or stand for reelection, and they have actually misled their investors with falsehoods about these matters."     A true copy of the Investor Plaintiffs' Memorandum in Opposition to Defendants' Motion to Transfer Venue, in which the foregoing is stated, is annexed as Exhibit K.

c.     Despite the Operating Agreement specifically providing the investors with the right to examine CXLLC's books and review records, on December 16, 2005 the four Director Defendants issued the following ultimatum: (1) the Investor Plaintiffs must forego their rights under existing Operating Agreements with Defendants; (2) Investor Plaintiffs must sign a new non-disclosure agreement; and (3) Investor Plaintiffs must agree to pay liquidated damages to Defendant Directors.     A true copy of the Investor Plaintiffs' Application for Preliminary and Permanent Injunction filed in the Ohio Proceedings, in which the December 16, 2005 communication is described, is annexed as Exhibit L.

13.     While Mr. Kirk avers there has been no "net recovery," the Investor Plaintiffs in Ohio have had to move to compel Defendants based on their refusal to comply with a court order directing the auditing of Defendants' books.     Copies of the Consent Order in the Ohio Proceedings and the Investor Plaintiffs' Motion to Compel are annexed as Exhibit M (the Consent Order is an exhibit to the Investor Plaintiffs' Memorandum).

14.     I also wish to address allegations of wrongful attachment and failure to give notice.  I attach as Exhibit N our first notice from UBS Financial Services, Inc. of the attachments made of Cullman assets, which notice we received today.  We shall provide separate notice to Mr. Cullman's lawyers, also reminding them he may obtain release of these assets by posting a bond or other suitable substitute security in like amount.

15.     The Court will also note from Exhibit N that UBS has released the attachment made of the estate account over which Mr. Turner is only the executor, just as we directed UBS to do when we learned of that attachment.

WHEREFORE, it is respectfully requested that this Court deny the Defendants' motion to vacate the Rule B attachments herein, and grant such other and further relief to the Plaintiffs as may be appropriate.

James T. Shirley, Jr. (JTS 6114)

Sworn to before me this
30th day of October, 2006

_____
           Notary Public

Elvin Ramos
Notary Public, State of New York
NO. 01RA4870243
Qualified in Queens County
Certificate filed in New York County
Commission Expires September 2, 2010

# 4152592_v1

**Exhibit A**



IN THE COURT OF COMMON PLEAS OF FRANKLIN COUNTY, OHIO

THE DISPATCH PRINTING COMPANY    :
34 South Third Street
Columbus, Ohio 43215    :

    :    **05CVH 04 4220**

DONALD C. FANTA    :
726 City Park Avenue
Columbus, Ohio 43206    :

    :

        Plaintiffs,    :

    :

    -vs-    :

    :

RECOVERY LIMITED PARTNERSHIP    :
433 West Sixth Avenue
Columbus, Ohio 43201    :

    :

COLUMBUS EXPLORATION, LLC    :
5282 Olentangy Boulevard
Columbus, Ohio 43214    :

    :

THOMAS G. THOMPSON    :
5282 Olentangy Boulevard
Columbus, Oho 43214    :

    :

ECON ENGINEERING    :
ASSOCIATES, INC.    :
433 West Sixth Avenue
Columbus, Ohio 43201    :

    :

        Defendants.    :

<u>COMPLAINT</u>

1.    Plaintiffs The Dispatch Printing Company and Donald C. Fanta are investors in

Recovery Limited Partnership and Columbus Exploration, LLC, two entities managed by

Defendant Thomas G. Thompson and formed to finance and facilitate the search, recovery,

marketing and sale of gold, silver and valuable artifacts from the shipwreck of the *S.S. Central*

*America*, a United States Mail Steamship that sank off the coast of South Carolina in 1857.

Thompson's team discovered the *S.S. Central America* in 1988 and since then Thompson has been successful in recovering, marketing and selling gold, silver and other artifacts from the sunken ship. Thompson, however, refuses to provide Plaintiffs with any information as to what happened to Plaintiffs' investments or the proceeds from the treasure, the costs to recover and sell the treasure, revenue earned from the sale, or whether there is any treasure left to be recovered and sold. Thompson's failure to provide this information constitutes a breach of contract, breach of fiduciary duty, and violates Ohio statutory law. Plaintiffs, through this action, request injunctive relief compelling Thompson to provide Plaintiffs with records and information regarding the finances and operations of the *S.S. Central America* project, a full accounting for Recovery Limited Partnership and Columbus Exploration, LLC, and an award of appropriate damages.

The Parties

2.    Plaintiff The Dispatch Printing Company ("The Dispatch") is an Ohio corporation with its principal place of business in Columbus, Ohio. The Dispatch is a limited partner of Recovery Limited Partnership and a member of Columbus Exploration, LLC.

3.    Plaintiff Donald C. Fanta ("Mr. Fanta") is an individual who resides in Columbus, Ohio. Mr. Fanta is a limited partner of Recovery Limited Partnership and a member of Columbus Exploration, LLC.

4.    Defendant Recovery Limited Partnership ("RLP") is a limited partnership organized under the laws of the State of Ohio, with its principal place of business in Columbus, Ohio.

5.    Defendant Columbus Exploration, LLC ("Columbus Exploration") is a limited liability company organized under the laws of the State of Delaware, with its principal place of

2

business in Fernandina Beach, Florida. Columbus Exploration also maintains an office in Ohio, owns property in Ohio, and conducts business activities in Ohio. In addition, many of its members and directors reside in Ohio, including W. Arthur Cullman, Jr., Michael J. Ford, Charles F. Freiburger, Gilman D. Kirk, James F. Turner, and John B. Patton.

6.    Defendant Econ Engineering Associates, Inc. ("Econ") is a corporation organized under the laws of the State of Ohio, with its principal place of business in Columbus, Ohio. Econ is the current general partner of RLP. Econ owes fiduciary duties to Plaintiffs.

7.    Defendant Thomas G. Thompson ("Mr. Thompson" or "Thompson") is the president of Econ. He also is a member of Columbus Exploration and serves as the chairman of the company's board of directors ("Chairman"). Thompson also was formerly the general partner of RLP. Thompson owes fiduciary duties to Plaintiffs.

Background Facts

8.    In 1977, Thompson began researching deep-ocean shipwrecks and the methods and technologies for locating them. Thompson became particularly interested in the United States Mail Steamship *Central America* ("*S.S. Central America*"), which sank off the coast of South Carolina during a hurricane on September 12, 1857. The *S.S. Central America* was carrying several tons of gold when it sank.

9.    Thompson put together a team to conduct a search-and-recovery project for the *S.S. Central America*, and in 1985 he organized RLP as an Ohio limited partnership to finance the project. Thompson then began soliciting leaders from the Central Ohio business community to invest in RLP.

10.   The Dispatch and Mr. Fanta each invested in RLP and acquired limited partnership interests.

3

11.    In May 1985, the limited partnership agreement for RLP was executed. Under the terms of the agreement, Thompson was to act as general partner of RLP. The limited partnership agreement, as amended, states that "[t]he management and control of the Partnership and its business and affairs shall rest exclusively with the General Partner, who shall have all the rights and powers that may be possessed by general partners pursuant to the [Ohio Limited Partnership] Act, and such additional rights and powers as are otherwise conferred by law or are necessary, advisable or convenient to the discharge of its duties under this Agreement." A copy of RLP's limited partnership agreement, as amended, is attached at Exhibit 1.

12.    Thompson has directly or indirectly managed the finances and operations of RLP since its inception.

13.    Thompson's team went to sea in the summer of 1986 to begin their search for the *S.S. Central America*.

14.    In September 1988, during the third year of the search effort, Thompson and his team discovered the wreck of the *S.S. Central America* approximately 160 miles off the coast of South Carolina, in approximately 8,000 feet of water. Thompson and his team were successful in recovering *SS Central America's* bronze bell, a gold bar, and certain artifacts before they had to come ashore for the winter. Ultimately, Thompson and his team were able to recover more than a ton of gold and silver as well as numerous artifacts from the *S.S. Central America*.

15.    Upon discovering the *S.S. Central America*, Thompson initiated an admiralty action in federal court in the Eastern District of Virginia to establish ownership of the shipwreck and all of its contents (the "Admiralty Litigation"). After more than a decade of litigation, the Admiralty Litigation was finally resolved, with the district court ruling that Columbus-America Discovery Group (an affiliate of RLP) owned 92.5% of the salvage rights to the *S.S. Central*

4

*America.* The court awarded the remaining 7.5% of the salvage rights to a group of insurance companies that proved they or their predecessors had insured portions of the gold that were lost when the *S.S. Central America* sank in 1857.

16.    In November 1998, Thompson organized Columbus Exploration, LLC ("Columbus Exploration") to take over from RLP the recovery, marketing and sale efforts regarding the *S.S. Central America.* RLP's partners were granted ownership interests in Columbus Exploration based on their respective ownership interests in RLP. Thus, RLP's partners became members of Columbus Exploration. The members of Columbus Exploration entered into an Operating Agreement, under which Thompson was named Chairman of Columbus Exploration's board of directors. As Chairman, Thompson has "general authority to manage the business of the Company" and is granted "all the rights and powers of a manager under the [Delaware Limited Liability Company] Act." A copy of Columbus Exploration's Operating Agreement is attached as Exhibit 2.

17.    Columbus Exploration entered into a Management and Recovery Services Agreement ("Management Agreement") with RLP, whereby RLP transferred its salvage rights to the treasure that already had been recovered from the *S.S. Central America* (the "Up Treasure") as well as the treasure from the shipwreck that Thompson believed was still on the ocean floor (the "Down Treasure") in exchange for an additional ownership interest in Columbus Exploration for RLP and its partners and certain other consideration. Also, under the Management Agreement, Columbus Exploration took over from RLP the management of operations to market the Up Treasure and also the financing, recovery and marketing efforts regarding the Down Treasure.

18.    In May 2004, RLP amended its limited partnership agreement to name Econ as its new general partner to replace Mr. Thompson. This change did not affect the management of RLP, inasmuch as Thompson is the president of Econ.

19.    After recovering the Up Treasure from the *S.S. Central America*, Thompson initially engaged Christie's auction house to market and sell the treasure. However, while the Up Treasure was tied up in the Admiralty Litigation, disputes arose between Thompson and Christie's, causing Thompson to engage another company, California Gold Marketing Group, LLC ("California Gold"), to market and sell the Up Treasure.

20.    California Gold was retained in or about December 1998 and began marketing the gold for sale in 2000. According to media reports, as of November 2003, California Gold had sold virtually all of the Up Treasure. However, to date, Thompson has not made any cash distributions to the limited partners of RLP or the members of Columbus Exploration, or otherwise provided them with any return on their investment.

21.    Moreover, since at least 2000, Thompson has refused to provide the partners of RLP and the members of Columbus Exploration with any meaningful information regarding the finances and operations of those entities. The Dispatch and Mr. Fanta have been provided no information regarding RLP's or Columbus Exploration's business expenses or revenues from the sale of the Up Treasure. Additionally, The Dispatch and Mr. Fanta have no idea whether there is any remaining Down Treasure, and if so, what efforts have been made to recover it.

22.    Upon information and belief, Columbus Exploration and RLP own gold located in Columbus, Ohio.

23.    The Dispatch and Mr. Fanta sent letters to Thompson and Econ on September 22, 2004, December 1, 2004, December 28, 2004, and March 18, 2005, requesting records and

6

information regarding RLP's and Columbus Exploration's finances and operations. Although

some of the letters were returned as unclaimed, Plaintiffs accomplished service of at least two of

the letters. Plaintiffs have received no responses from Thompson or any other representatives of

RLP or Columbus Exploration regarding Plaintiffs' letters. Thompson simply refuses to provide

The Dispatch and Mr. Fanta with any information as to the status of their investments.

<u>Count I</u>

(Breach of Limited Partnership Agreement – Econ and Thompson)

24.    Plaintiffs incorporate by reference Paragraphs 1 through 23 above.

25.    On or about May 13, 2004, Thompson, acting as the authorized representative of

RLP, filed a certificate of amendment with the Ohio Secretary of State's office naming Econ as

the new general partner for RLP. The amendment states that it "reflects changes made January

25, 1999 and is filed nunc pro tunc." Prior to this amendment, Thompson had served as RLP's

general partner.

26.    The limited partnership agreement for RLP, as amended, provides that the general

partner shall maintain the books and records of the partnership and provide access to the limited

partners at all reasonable times:

> 15.1 *Books of Account*:   The Partnership's books and records
> (including a current list of the names and addresses of all Limited
> Partners) and an executed copy of this Agreement, as currently in
> effect, shall be maintained at the principal office of the General
> Partner, and each Partner shall have access thereto at all reasonable
> times. The books and records shall be kept by the General Partner
> using the tax basis of accounting consistently applied and shall
> reflect all Partnership transactions and be appropriate and adequate
> for the Partnership's business.

27.    RLP's limited partnership agreement also requires the general partner to provide

each partner, annually, with a copy of the partnership's financial statements, copies of any

7

amendments to the limited partnership agreement enacted during the year and, upon request, a copy of the partnership tax returns:

> 15.2 *Financial Reports.* As soon as reasonably practicable after the end of each fiscal year, but not later than March 15, each Partner shall be furnished with a copy of a balance sheet of the Partnership of the last day of such fiscal year and statements of income or loss and changes of financial position of the Partnership for such year accompanied by a review report with respect to such financial statements. . . . In addition, the General Partner shall send on or before March 15 of each year to each Partner a copy of any amendment to the Partnership Agreement executed pursuant to a general power of attorney from the Limited Partners . . . and, upon request from any Partner. . . a copy of the Partnership return for the year and any state or local income tax returns filed by the Partnership.

28.      The general partner of RLP also is required by the limited partnership agreement to provide each partner with an annual report describing in detail the activities of RLP during the past year:

> 15.3 *Annual Reports.* The annual financial statements provided for in Section 15.2 of this Agreement shall be accompanied by an annual report describing in reasonable detail the activities of the Partnership during such year. Such report shall set forth the distributions to the General Partners and the Limited Partners during such year and shall separately identify distributions from (a) cash flow from operations during the year, (b) cash flow from prior periods and (c) proceeds from any disposition of the Partnership's assets. Such report shall also separately identify funds retained by the Partnership at the end of such year. In addition, such annual report shall contain a complete statement of all compensation and fees paid or accrued by the Partnership to the General Partner.

29.      Plaintiffs are limited partners of RLP, and thus, are entitled to the information set forth in Paragraph 26 through 28 above.

30.      Since at least 2000, neither Thompson nor Econ have provided Plaintiffs with any of the reports or financial information as required under the terms of the limited partnership agreement.

31. By failing to provide Plaintiffs with the reports and financial information required under RLP's limited partnership agreement, Econ and Thompson breached the agreement.

32. Plaintiffs hereby request injunctive relief in the form of an Order for specific performance requiring Econ and Mr. Thompson, on behalf of RLP, to immediately provide Plaintiffs with copies of all of the records, reports and financial information required under RLP's limited partnership agreement for the years 2000, 2001, 2002, 2003, and 2004.

33. Without injunctive relief, Plaintiffs will suffer irreparable harm for which there is no adequate remedy at law.

Count II

(Breach of Operating Agreement – Thompson)

34. Plaintiffs incorporate by reference Paragraphs 1 through 33 above.

35. Mr. Thompson is a member and director of Columbus Exploration. He also is the Chairman of the company's board of directors. As Chairman, Thompson controls the management of Columbus Exploration's operations and affairs. The other directors of Columbus Exploration are W. Arthur Cullman, Jr., Michael J. Ford, Charles F. Freiburger, Gilman D. Kirk, James F. Turner, and John B. Patton.

36. Under Columbus Exploration's Operating Agreement, the directors are required to provide the company's members with access to various records, including financial records and tax returns:

> 9.02. Books and Records.
>
> (a) The Directors shall direct the officers to keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The records shall include, but not be limited to, financial statements of the Company for the three most recent fiscal years, a copy of the Certificate and Operating

9

Agreement, together with any relevant powers of attorney, information regarding the amount of cash or agreed value of property or services contributed or agreed to be contributed in the future by each Member, the respective rights of the Company and each Member regarding the return of contributions, and the Company's federal, state or local tax returns.

(b) The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member at any and all reasonable times during normal business hours. Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

37.    The directors of Columbus Exploration also are required under the Operating

Agreement to provide each member with the company's certified year-end financial statements:

9.04.    Reports.    Within ninety (90) days after the end of each taxable year of the Company, the Directors shall cause to be sent to each Person who was a Member at any time during such year the financial statements of the Company for such year, accompanied by a certificate of the chief financial officer of the Company that such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows for the Company at year end and for the year then ended, in conformity with generally accepted accounting principles. In lieu of such certification, if the financial statements have been reported upon by the Company's independent auditors, a copy of such auditors' report shall be furnished to the Members. . . .

38.    As a director and Chairman of Columbus Exploration, Thompson had an

obligation to provide the members of Columbus Exploration with the company's annual financial

statements and to provide access to the company's books and records.

39.    Plaintiffs are members of Columbus Exploration.

40.    On September 22, 2004, December 1, 2004, and March 18, 2005, Plaintiffs sent

letters via certified mail to Mr. Thompson, asking that he provide Plaintiffs with copies of the

company's financial records for the past four years as well as other information contained in the

company's books and records. The September 22 letter was returned as unclaimed, despite the fact that it was sent to Columbus Exploration's principal place of business. The December 1 and March 18 letters were served on Columbus Exploration's statutory agent in Delaware.

41.     In addition, on March 18, 2005, Plaintiffs left another letter requesting the same information at 5282 Olentangy Boulevard in Columbus Ohio, which is a residence owned by Columbus Exploration, LLC.   A copy of these letters are attached as Exhibit 3(A) through 3(D).

42.     To date, Mr. Thompson has not provided Plaintiffs with copies of the records they requested or otherwise responded to their December 1 and March 18 letters, which were served on Columbus Exploration's statutory agent.  In addition, Thompson has not provided Plaintiffs with copies of Columbus Exploration's financial statements as required by Section 9.04 of the company's Operating Agreement.

43.     By failing to provide Plaintiffs with copies of Columbus Exploration's annual financial statements and failing to provide copies of the records and information requested in their December 1 and March 18 letters, Mr. Thompson breached Columbus Exploration's Operating Agreement.

44.     Section 11.09 of the Operating Agreement provides that any party to the agreement is entitled to specific performance in the event of a breach:

> Specific Performance.  The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any remedies that may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act that would constitute a breach, or (ii) compelling the performance of any obligation that, if not performed, would constitute a breach.

11

45.    Plaintiffs hereby request injunctive relief in the form of an Order for specific performance requiring Mr. Thompson, on behalf of Columbus Exploration, to immediately provide Plaintiffs with copies of all of the company's records, reports and financial information requested by Plaintiffs in their September 22, 2004, December 1, 2004, and March 18, 2005 letters to Mr. Thompson, including the company's financial reports as required under Section 9.04 of the Operating Agreement.

46.    Without injunctive relief, Plaintiffs will suffer irreparable harm for which there is no adequate remedy at law.

Count III

(Violation of R.C. 1782.21 – Econ and Thompson)

47.    Plaintiffs incorporate by reference Paragraphs 1 through 46 above.

48.    Section 1782.21 of the Ohio Revised Code provides that each limited partner of an Ohio limited partnership has the right to obtain from the general partner (1) true and full information regarding the status of the business and the financial condition of the limited partnership; (2) a copy of the limited partnership's tax returns for each year; (3) a current list of the partners; and (4) a copy of the limited partnership agreement and all amendments.

49.    On September 22, 2004, Plaintiffs sent a letter via certified mail to Econ at its principal place of business requesting that Econ, as general partner of RLP, provide Plaintiffs with copies of records relating to the finances and operations of RLP, to which Plaintiffs are entitled under R.C. 1782.21. The letter was returned as unclaimed. Plaintiffs then attempted to serve the letter via certified mail directly on Mr. Thompson, who is the president and statutory agent of Econ. Again, the letter was returned as unclaimed. Plaintiffs made a third attempt to deliver the letter via personal service to Econ (as general partner) at its principal place of

business and to Mr. Thompson (as statutory agent for Econ) at the address on file with the Ohio

Secretary of State. Both attempts at personal service were unsuccessful. Finally, Plaintiffs

attempted to deliver the letter via personal service to Mr. Thompson at 5282 Olentangy

Boulevard, Columbus, Ohio, which is a residence previously owned by Mr. Thompson and

currently owned by Columbus Exploration. Copies of these letters are attached hereto as Exhibit

4(A) through 4(E).

50.    As explained in the letters to Econ and Mr. Thompson, Plaintiffs have requested

copies of RLP's financial and operational records because they, as limited partners of RLP,

would like to know the status of their investments, including information as to how Thompson

has spent RLP's capital, what revenues RLP received for its sale of the Up Treasure of the *S.S.*

*Central America*, and why Plaintiffs have not received any return on their investment despite the

fact that the vast majority of the Up Treasure apparently has been sold.

51.    Econ and Mr. Thompson violated R.C. 1782.21 by failing to provide Plaintiffs

with copies of or access to the financial and operational records of RLP that they requested in

their letters.

52.    Plaintiffs hereby request injunctive relief in the form of an Order for specific

performance requiring Econ, as the current general partner of RLP, to immediately provide

Plaintiffs with copies of RLP's financial and operational documents as requested in their letters

to Econ and Mr. Thompson.

53.    Without injunctive relief, Plaintiffs will suffer irreparable harm for which there is

no adequate remedy at law.

13

<u>Count IV</u>

(Breach of Fiduciary Duty – Thompson)

54.    Plaintiffs incorporate by reference Paragraphs 1 through 53 above.

55.    As a member, director and Chairman of Columbus Exploration, Mr. Thompson owes a fiduciary duty to each of the other members, which includes a duty to provide the members with timely and accurate reporting regarding the operations and finances of the company.

56.    Mr. Thompson has breached his fiduciary duties to Plaintiffs by failing to provide them with the information and reports required by the company's Operating Agreement and by engaging in a pattern and practice of non-disclosure regarding material matters affecting Columbus Exploration and Plaintiffs' investments.

57.    As a result of Mr. Thompson's breaches of his fiduciary duty, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $25,000.

<u>Count V</u>

(Breach of Fiduciary Duty – Thompson and Econ)

58.    Plaintiffs incorporate by reference Paragraphs 1 through 57 above.

59.    As the general partner of RLP, Econ owes a fiduciary duty to each limited partner of RLP, which includes a duty to provide the limited partners with timely and accurate reporting and disclosures regarding the operations and finances of the company.  During the time Mr. Thompson served as RLP's general partner, he too owed the limited partners the same fiduciary duty.

60.    Mr. Thompson and Econ breached their respective fiduciary duties to Plaintiffs by failing to provide them with the information and reports required by RLP's limited partnership

14

agreement and by engaging in a pattern and practice of non-disclosure regarding material matters affecting RLP and Plaintiffs' investments.

61.    As a result of Mr. Thompson's and Econ's breaches of their fiduciary duties, Plaintiffs have suffered damages in an amount to be determined at trial, but not less than $25,000.

Count VI

(Accounting for RLP)

62.    Plaintiffs incorporate by reference Paragraphs 1 through 61 above.

63.    As the general partners of RLP, Mr. Thompson and Econ owed fiduciary duties to each limited partner to maintain accurate books and records of RLP's operations and financial affairs and to provide timely and accurate information to the limited partners regarding those subjects.

64.    Under RLP's limited partnership agreement, Plaintiffs are entitled to receive cash distributions from RLP under certain circumstances. To date, Plaintiffs have never received any cash distributions from RLP, and they would like to know why.

65.    As the general partners of RLP, Mr. Thompson and Econ have superior knowledge of RLP's operations and financial condition.

66.    Mr. Thompson and Econ have failed to provide Plaintiffs with true and accurate disclosures regarding the finances of RLP and the status of Plaintiffs' investments. Instead, for several years Econ and Mr. Thompson have adopted a policy of non-disclosure regarding RLP's financial condition.

67.     In order to determine the true and accurate status of RLP's financial condition and Plaintiffs' investments, and to determine why Plaintiffs have not received any cash distributions, it is necessary that Econ and Mr. Thompson provide a full accounting of RLP's finances.

Count VII

(Accounting for Columbus Exploration)

68.     Plaintiffs incorporate by reference Paragraphs 1 through 67 above.

69.     As the member in charge of the management of Columbus Exploration, Mr. Thompson owes fiduciary duties to each member of the company to maintain accurate books and records of Columbus Exploration's operations and financial affairs and to provide timely and accurate information to the members regarding these matters.

70.     Under Columbus Exploration's Operating Agreement, Plaintiffs are entitled to receive cash distributions from the company under certain circumstances.  To date, Plaintiffs have never received any cash distributions from Columbus Exploration, and they would like to know why.

71.     As the member with management responsibility for Columbus Exploration, Mr. Thompson has superior knowledge of Columbus Exploration's operations and financial condition.

72.     Mr. Thompson has failed to provide Plaintiffs with true and accurate disclosures regarding the finances of Columbus Exploration and the status of Plaintiffs' investments. Instead, for several years Mr. Thompson has adopted a policy of non-disclosure regarding Columbus Exploration's finances and affairs.

73.     In order to determine the true and accurate status of Columbus Exploration's financial condition and Plaintiffs' investments, and to determine why Plaintiffs have not received

16

any cash distributions, it is necessary that Mr. Thompson provide a full accounting of Columbus Exploration's finances.

WHEREFORE, Plaintiffs The Dispatch Printing Company and Donald C. Fanta request judgment as follows:

(A)    A complete accounting of the finances of Recovery Limited Partnership;

(B)    A complete accounting of the finances of Columbus Exploration, LLC;

(C)    An injunction compelling Defendants Thomas G. Thompson and Econ Engineering Associates, Inc. to immediately provide Plaintiffs with all records and information relating to Recovery Limited Partnership that Plaintiffs have requested in writing as well as all records and information to which Plaintiffs are entitled under Recovery's limited partnership agreement and Ohio statutory law;

(D)    An injunction compelling Defendant Thomas G. Thompson to immediately provide Plaintiffs will all records and information relating to Columbus Exploration, LLC that Plaintiffs have requested in writing as well as all records and information to which Plaintiffs are entitled under Columbus Exploration's Operating Agreement;

(E)    An award of money damages in an amount to be determined at trial, but not less than $25,000;

(F)    An award of costs, expenses, attorney fees, and any other relief the Court deems appropriate.

John W. Zeiger (0010707)
Steven W. Tigges (0019288)
Bradley T. Ferrell (0070965)
ZEIGER, TIGGES, LITTLE & LINDSMITH LLP
3500 Huntington Center
41 South High Street
Columbus, Ohio 43215
Telephone: (614) 365-9900
Facsimile: (614) 365-7900

Attorneys for Plaintiffs.

159821v2

**Exhibit B**

IN THE COURT OF COMMON PLEAS
FRANKLIN COUNTY, OHIO
GENERAL DIVISION

| | |
|---|---|
| THE DISPATCH PRINTING CO., et al., : | |
| : | |
| Plaintiffs, : | **CASE NO. 05 CVH 04 4220** |
| : | |
| vs. : | **JUDGE PATRICK E. SHEERAN** |
| : | |
| RECOVERY LIMITED : | |
| PARTNERSHIP, et al., : | |
| : | |
| : | |
| Defendants. : | |

---

| | |
|---|---|
| THE DISPATCH PRINTING CO., et al., : | |
| : | |
| Plaintiffs, : | **CASE NO. 05 CVH 10 11795** |
| : | |
| vs. : | **JUDGE PATRICK E. SHEERAN** |
| : | |
| : | |
| GILMAN D. KIRK, et al, : | |
| : | |
| Defendants. : | |

## DECISION AND ENTRY SUSTAINING IN PART STEPHEN ALEXANDER'S MOTION TO QUASH (FILED JANUARY 6, 2006)

### AND

## OVERRULING PLAINTIFF'S MOTION FOR SANCTIONS (CONTAINED IN MEMORANDUM CONTRA FILED JANUARY 20, 2006)

### AND

## OVERRULING DEFENDANTS GILMAN D. KIRK, JAMES F. TURNER, MICHAEL J. FORD, AND ARTHUR CULLMAN, JR.'S MOTION TO DISMISS (FILED JANUARY ____, 2006)

Rendered this 20th day of February, 2006

1

Sheeran, J.

The parties have filed various motions with this Court. They are addressed as follows.

**Motion to Quash**

On January 6, 2006, Stephen Alexander, a non-party witness, filed a Motion to Quash Subpoena in Case No. 05-CV-11795. Plaintiffs subpoenaed Mr. Alexander to appear at a hearing on their Preliminary Injunction. At the conference of January 6, 2006 regarding the Motion to Consolidate the two cases, the Parties agreed to go forward with this hearing on February 24, 2006.

Mr. Alexander is the accountant for Columbus Exploration. In Case No. 05-CV-4220, Mr. Alexander was served with a subpoena *duces tecum* on April 19, 2005. This Court overruled Mr. Alexander's objections to this subpoena and granted Plaintiffs' Motion to Compel, ordering production of the documents, on June 17, 2005. This ruling is currently on appeal before the 10th District Court of Appeals. The Court's ruling regarding consolidation and its intent to hold a hearing on February 24, 2006 were based on a desire, agreed to by the parties, to expedite the case if that could be done without disturbing the jurisdictional rights of a higher court, in this case, the Tenth District Court of Appeals. The Court feels that this issue (i.e. Mr. Alexander's testimony and its relation to the issues before the 10th District) should have been discussed at the consolidation hearing held on January 6, 2006 but, unfortunately, it was not.

Plaintiffs argue that Mr. Alexander's Motion should be denied because, "The subpoena in Case No. 05-CV-4220 was a discovery subpoena for documents only" while "the subpoena at issue in [Case No. 05-CV-11795] directs Alexander to testify at the

2

Case 2:06-cv-05724-LTS    Document 25-3    Filed 10/30/2006    Page 4 of 12

02/20/2006  14:38  FAX  614 462 3868    FR CO COMMONPLEAS    ☐ 004/006
Case 2:06-cv-00292-EAS-TPK    Document 38    Filed 06/06/2006    Page 3 of 5

upcoming preliminary injunction hearing." (Emphasis in original) Id. at 5. They further argue that they are not trying to circumvent the appeal process by requesting Mr. Alexander's testimony at a preliminary injunction hearing.

Whether Plaintiffs are attempting to circumvent the appeal process is not the issue before this Court. The issue is one of jurisdiction. Plaintiffs recognize, by means of an example they give in their Memorandum in Opposition concerning Mr. Alexander's expected testimony, that a significant amount of that testimony will relate to his "knowledge regarding the types of financial records and reports that he has prepared on behalf of Columbus Exploration and the location of those records." (Memo. in Op. p. 3). Based on the foregoing, this Court finds that Mr. Alexander's testimony is very likely to include facts relating to (and possibly included in) the documents subpoenaed in Case No. 05-CV-4220 and, therefore, could reveal information that the 10th District may find to be protected and not subject to discovery. Whether the Tenth District will reverse this Court and find the information to be subject to a protective order is up to the Tenth District, but in any event, proceeding with Mr. Alexander's testimony would likely encroach on the issues, and hence the jurisdictional prerogatives, of that part of a case currently before the Court of Appeals. This is not an action permitted this Court. See, e.g. *Buckles v. Buckles* (Tenth App. Dist. 1988), 46 Ohio App. 3d 118, 120, citing *Daloia v. Franciscan Health Sys.*, (1996), 79 Ohio St. 3d 98, at fn. 5, which cites *In re Kurtzhalz* (1943), 141 Ohio St. 432, paragraph two of the syllabus.

Though Plaintiffs' correctly point out that the Court found "that the issues presented by the second action [Case No. 05-CV-11795] are separate and distinct from those being addressed by the Court of Appeals," the Court also found, "there are several

3

questions of law and fact that are common to both actions." Mr. Alexander's testimony is common to both actions and the facts likely to be revealed in his testimony are simply too closely related to issues pending before the 10th District Court of Appeals.

Based on the foregoing, the Court SUSTAINS IN PART Mr. Alexander's Motion to Quash. Given the above ruling, the Court will not address the other arguments related to the Motion to Quash.

Further, Plaintiffs ask for sanctions related to opposing Mr. Alexander's Motion. Given this decision, this Motion is OVERRULED.

**Motion to Dismiss**

Defendants Gilman D. Kirk, James F. Turner, Michael J. Ford, and Arthur Cullman, Jr. ("Defendants") filed their Motion to Dismiss in Case No. 11795 on January 13, 2006. Plaintiffs' Memorandum in Opposition was filed on January 30, 2006 and Defendants' Reply was filed on February 9, 2006. The Court has considered this Motion, and will place its reasons in a Decision to be filed later this week, but at this point, will simply note that it OVERRULES the Motion. In essence, the Court finds that the averments in the Complaint are sufficient to overcome the Motion to Dismiss. This Court gives its Decision in this (temporarily) abbreviated manner, given the fact that the hearing is scheduled for this Friday, February 24, 2006. The parties deserve the courtesy of knowing the Court's Decision in as timely a manner as possible. This Court is currently engaged in a criminal trial, which should last through Wednesday, February 22. Nevertheless, a more complete Decision explaining the Court's rationale on the Motion to Dismiss will be filed later this week.

4

The hearing on the preliminary injunction remains set for February 24, 2006. However, given the above, if the parties desire a Status Conference (by telephone or in person), this Court is available to discuss this matter with the parties on Tuesday, Wednesday, or Thursday morning of this week at 8:30 a.m. The parties are invited to let the Court know their thoughts at their earliest convenience.

A copy of this Decision will be faxed to each counsel, and will be filed with the Clerk of Courts when the courthouse opens on Tuesday, February 21, 2006.

_Patrick E. Sheeran_ 2/20/06

**Patrick E. Sheeran, Judge**

Copies to:

John W. Zeiger, Esq.
Steven W. Tigges, Esq.
Bradley T. Ferrell, Esq.
**Zeiger, Tigges & Little LLP**
Counsel for Plaintiffs

William M. Mattes, Esq.
**Dinsmore & Shohl LLP**
Counsel for Defendants Kirk, Turner, Ford
And Cullman

Richard T. Robol, Esq.
**Robol Law Office, LPA**
Counsel for Defendants Recovery Limited Partnership and
Columbus Exploration LLC

Rex H. Elliott, Esq.
Charles H. Cooper, Jr.
**Cooper & Elliott, LLC**
Counsel for Defendants Thomas G. Thompson
And ECON Engineering Associates, Inc.

5

# IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO
### GENERAL DIVISION

|  |  |  |
|---|---|---|
| THE DISPATCH PRINTING CO., et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | **CASE NO. 05 CVH 04 4220** |
| v. | : | |
| | : | **JUDGE PATRICK E. SHEERAN** |
| RECOVERY LIMITED PARTNERSHIP, et al., | : | |
| | : | |
| | : | |
| Defendants. | : | |

|  |  |  |
|---|---|---|
| THE DISPACH PRINTING CO. et al., | : | |
| Plaintiffs, | : | |
| | : | **CASE NO. 05 CVH 10 11795** |
| v. | : | |
| | : | **JUDGE PATRICK E. SHEERAN.** |
| | : | |
| GILMAN D. KIRK, et al, | : | |
| | : | |
| Defendants. | : | |

## DECISION AND ENTRY REGARDING SCOPE OF FEBRUARY 24, 2006 HEARING

Rendered this 23rd day of February, 2006.

Sheeran, J.

This Court invited counsel for the parties to be present to discuss the scope of the hearing set for tomorrow, February 24, 2006. Counsel for all parties appeared.

In determining the scope of the hearing, it is important to note the relief requested by the Plaintiffs. Specifically, Plaintiffs request an Order that this Court:

1

    (1)    Order Defendants immediately to provide Plaintiffs with all financial reports and other information regarding Columbus Exploration, LLC to which Plaintiffs are entitled under their existing Operating Agreement with Defendants.

    (2)    Enjoin Defendants' unlawful demand that, before Defendants will provide Plaintiffs with any reports regarding the financial affairs of Columbus Exploration, LLC, Plaintiffs must first agree to (i) forgo (sic) their existing right to receive these financial reports under their existing Operating Agreement with Defendants, (ii) sign a new agreement, and (iii) agree to pay "liquidated damages" to Defendants.

Plaintiffs state they are investors in a limited liability company known as Columbus Exploration, LLC. Plaintiffs state they have invested over one million dollars in that LLC, and that they have been denied for five years the annual financial statement(s) guaranteed them by virtue of Section 9.04 of the Operating Agreement.

Defendants have moved to dismiss this case based on a number of grounds. First, they claim this action violates the jurisdictional priority rule. This Court disagrees with that contention, first, for the reason that this rule does not apply where causes of action are pending before the same court, as the Tenth District Court of Appeals pointed out in *Fenner v. Kinney* (10th Dist. 2003), 2003 Ohio 989, and second, because, unlike the situations noted in Defendants' Reply, the causes of action are now before the same judge.

Defendants also base their motion on the claim that the Delaware Chancery Court has exclusive jurisdiction over this case. That claim is likewise without merit. Plaintiffs state that their claim is based on the contractual right to examine the books and records of Defendant Company, and not on claim based on the Delaware Code Annotated. That right is stated in the Operating Agreement, in Section 9.

2

Defendants contend that this right is no broader than the right of inspection that exists under Delaware law (Reply, at 10). At this point, this Court will not make a finding on the merits of that issue, since some factual issues may need to be addressed on that point. At this point, that contention is debatable.

At this point, therefore, the Motion to Dismiss is OVERRULED.

This leads to the issue of the scope of the hearing for February 24, 2006. This Court has reviewed *Redman v. Ohio Department of Industrial Relations* (10th Dist. 1994), Nos. 93APE12-1670 and 1671, unreported. The first assignment of error in that case concerned the effect of consolidation on the ability of a court to make determinations affecting one case or the other. Key in the discussion is the statement by the Appeals Court that "[T]he individual character of each of the consolidated actions was not extinguished by the consolidation [Citation omitted]...'consolidation is permitted as a matter of convenience and economy in administration, *but does not merge the suits into a single cause,* or change the rights of the parties, or make those who are parties in one suit parties in another." (Emphasis in original). *Id* , at *4.

This Court's consideration of the matter pending on appeal in the Tenth District noted that this Court is not permitted to "disturb the jurisdictional rights of a higher court" (Decision, at 2). That, of course, remains true. In making that statement, this Court was following the general rule of jurisdiction, as noted in the cases it cited, that a trial court retains ancillary jurisdiction while *that same case* is on appeal for whatever reason. Thus, a trial court may, for example, consider contempt proceedings against a party while an appeal is pending.

3

Case 2:06-cv-05724-LTS    Document 25-3    Filed 10/30/2006    Page 10 of 12

02/23/2006 15:03 FAX 614 462 7465    HR CO COMMON PLEAS    Filed 06/06/2006    Page 4 of 6    005/007
Case 2:06-cv-00292-EAS-TPK    Document 38

However, the import of the *Redman* case must be considered, where there are, in fact, *two* cases, one of which is pending before this Court, and the other which is pending before another (in this case, higher) Court. The Court of Appeals has made it clear that the original identity of each case remains intact.

As such, while the issues involving Mr. Alexander and the right to proceed with discovery concerning him remain at the Court of Appeals, the ability of this Court to hold a preliminary injunction hearing also remains, insofar as that hearing does not interfere with the determination of whether Mr. Alexander's records, and his records alone, are subject to discovery, that issue being squarely before the Court of Appeals.

Based on the foregoing, the preliminary injunction may proceed, with the caveat given that Mr. Alexander is not a witness to the hearing.

The next issue concerns standing. In this regard, *Redman* is also instructive. In the course of its holding, the Court of Appeals noted that the parties in one case are not made parties in the second case. *Id.*, at *4, quoted *supra*, at 3. Strictly speaking, therefore, neither Columbus Exploration, LLC nor Recovery Limited Partnership are parties to the second case. As such, neither has standing here. However, it is also apparent to this Court that pursuant to Civ.R. 24, either or both of those entities would be permitted to intervene, either as of right under subsection (A), or by permission, based on (B)(2) Given the proximity of this Decision to the hearing, this Court believes it would be a waste of valuable time to require that Columbus Exploration, LLC or Recovery Limited Partnership file for Intervention. An oral motion on February 24, prior to the start of the hearing, will be sufficient[1].

---

[1] This would also apply to Thomas G. Thompson and Econ Engineering Associates, Inc.

4

Regarding the Motions in Limine, this Court will first address the Motion filed by Columbus Exploration, LLC and Recovery Limited Partnership. That Motion asks this Court to (1) limit the issues and evidence to those facts and issues "that are not intertwined with, and will not impinge upon any issue pending in the Court of Appeals"; (2) exclude any evidence relating to any such facts and issues; and (3) granting the Defendants a continuing objection to any evidence pertaining to any facts or issues before the Court of Appeals.

Motions in Limine are, in effect, advance requests by a party to exclude evidence that would violate a privilege (statutory or constitutional), a rule of evidence, or other limitation that would otherwise prejudice the proceedings. The ruling of the court involved is an advisory ruling, and the matter is subject to reconsideration during the proceeding itself.

This Court, earlier in this Decision, has refined the scope of evidence that it considers "intertwined" with the matter currently pending before the Court of Appeals; that is, the discovery concerning Mr. Alexander and his records. Because the consolidated case retains its own identity, and because the issues before the Court of Appeals have been clarified, this Court does, under *Redman*, retain jurisdiction to otherwise proceed.

As such, this Court will address each objection made by Defendants as they arise at the hearing. A blanket advance ruling could, unnecessarily and perhaps incorrectly, restrict this Court in its consideration of the case. As such, the first two prongs of the Motion in Limine are overruled. The third prong is unnecessary: said Defendants may,

5

at any time during the hearing, raise an objection (or a continuing objection) to a question or area being addressed. The Court will deal with the objection at that time.

2/23/06

Patrick E. Sheeran, Judge

Copies to:

All Counsel

**Exhibit C**

# MANAGEMENT AND RECOVERY SERVICES AGREEMENT

This Management and Recovery Services Agreement ("Agreement") is entered as of December 18, 1998, by and between Recovery Limited Partnership, an Ohio limited partnership ("RLP") and Columbus Exploration, LLC, a Delaware limited liability company ("CX").

### Background and Recitals

Whereas, RLP was organized in 1985 for, and has engaged in the business of, locating, verifying and recovering the contents of the shipwreck of the ███████████ S.S. *Central America*, which sank in 1857 (the "Shipwreck");

Whereas, RLP has conducted successful recovery operations at the Shipwreck site, having recovered substantial amounts of gold coins, gold bars, and other artifacts;

Whereas, CX was organized in 1990 for, and has engaged in the business of, developing certain technology, equipment and methods to locate, verify and recover the contents of deep ocean historic shipwrecks, and providing deep ocean technology products and services ███

Whereas, RLP has various rights, including the rights of first salvor with respect to the Shipwreck, which rights have been recognized by the United States District Court for the Eastern District of Virginia;



Whereas, the parties believe that CX has, or is in a better position to obtain, the necessary resources to accomplish this task, as well as to complete the marketing and other activities related to RLP's realization of its rights with respect to recoveries from the Shipwreck;

Whereas, the parties have agreed that it is the best interests of both for CX to assume the responsibility for management, financing ███████████████ and marketing activities with respect to the Shipwreck.

1

## Statement of Agreement

Now therefore, in consideration of the foregoing recitals, which the parties agree to be true to the best of their knowledge and belief, and of their mutual promises contained herein, the parties agree as follows:

1.   *Definitions.*   As used in this Agreement, the following terms will have the meanings ascribed to them in this Section:

"Admiralty Litigation" means the proceedings before the United States District Court for the Eastern District of Virginia known as *Columbus America Discovery Group, Inc. v. the Unidentified, Wrecked and Abandoned Sailing Vessel, etc., (believed to be the S.S. CENTRAL AMERICA),* Civil Action No. 87-363-N, including any related judicial proceedings, and appeals from judgments and orders entered in such proceedings.





2.    *Engagement and Appointment of Managing Agent.* On the terms and subject to the conditions set forth in this Agreement, RLP, by and through its General Partner, hereby engages CX, and CX hereby accepts such engagement, to manage and supervise the business of RLP as provided in this Agreement. RLP retains and irrevocably appoints CX as its agent with full power and authority to manage the business, assets and liabilities of RLP, and hereby ratifies all acts of CX taken pursuant to such appointment. The term of this appointment shall commence on the date of this Agreement and terminate upon the completion of the dissolution and winding up of RLP.

3.    *Management Authority and Duties of CX.* Without limiting the generality of the foregoing appointment, CX shall have the authority to:

(a)    evaluate and make recommendations regarding arrangements for the marketing and sale of the ▇▇▇▇▇▇▇▇▇▇ Treasure, including any agreements relating thereto, collect any proceeds of such marketing and sales activities, pay any costs and expenses incurred in the course of such activities, and apply the Net Proceeds as provided in this Agreement;

(b)    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

(c)    cause the Obligations of RLP to be paid and discharged as they become due;

(d)    commence, prosecute and settle any litigation (including the Admiralty Litigation) in the name and on behalf of RLP;

(e)    establish and maintain management and business systems, books, contracts, computer systems, forms and administration procedures;

(f)    select and retain consultants and technical advisors (including, without limitation, accountants, attorneys, banks, contractors custodians, depositories, agents for collection, and insurers) or persons acting in any other capacity, in connection with the business of RLP, and determine the terms of engagement of such persons, including, without limitation, compensation, expense reimbursement and waiver of conflicts of interest, actual and potential;

(g)    advise the General Partner of RLP with regard to management and direction of the business of RLP and as to any further actions as may be necessary or desirable to further the interests of RLP;

(h)    provide for the maintenance of the books and records of RLP, and the preparation of tax returns and schedules on behalf of RLP and its partners;

(i)    compile and provide information for reports to the partners of RLP, and appropriate governmental authorities, with respect to the business, operations, and financial condition of RLP; and

(j)    perform such other services for RLP as in the best judgment of CX and the General Partner of RLP are necessary or advisable in the best interests of RLP.

3



4



5

CX agrees that such compensation shall be the only compensation to which it is entitled for performing the recovery services, and waives any right to assert a claim against RLP for a salvage award or claim of ownership



12.    *Force Majeure; Consequential Damages.* Neither party will be responsible for failure to meet its obligations under this Agreement if the failure arises from causes beyond the control and without the fault or negligence of the non-performing party. Examples of causes beyond a party's control include (i) acts of God or of the public enemy, (ii) acts of the Government in either its sovereign or contractual capacity, (iii) fires, (iv) floods, (v) epidemics, (vi) quarantine restrictions, (vii) strikes, (viii) freight embargoes, and (ix) unusually severe weather. In no event will either party be liable to the other for any consequential damages (including lost profits or anticipated savings), even if the party has been advised of the possibility of such damages or loss.





14.    *No Conflict Statement.*  The parties to this Agreement acknowledge that, in addition to his position as CEO for CX, the current Chairman of CX has also served as the general partner for RLP and was the president of the general partner for CX Limited Partnership. Similarly, members of the Board of Directors of CX may hold positions not only as members of the Board, but also as partners in RLP or the successor to CX, or in other capacities.  To avoid any claim of conflict, the parties agree that the Chairman, members of the Board of Directors of CX, and counsel selected by the Chairman must be able to act freely and unhindered by any such claim of conflict that may be made.  This may involve an interplay of their own personal interests as well as the potential interest of both CX and RLP as they participate in the Joint Management and Recovery Services Agreement.  The Chairman and/or members of the Board may also be placed in a position where operations may be enhanced by the use of their life rights or other type of personal endorsements, resulting in additional compensation to them.  The parties hereby agree that Chairman's and Directors' holding of these positions and actions resulting from these positions do not create a conflict of interest.  The parties further agree that under no circumstances shall the Chairman or Directors be liable for any claim of conflict by any limited partner of CX or RLP, or any member of CX as it relates to Chairman's or Directors' holding of multiple positions in CX, RLP, and CX.  Inasmuch as the Chairman's retention of legal counsel creates similar potential conflicts, the parties further agree that this "no conflict" paragraph applies to counsel as well as the Chairman and Directors.  Chairman shall have the right to employ counsel of his choosing.  CX agrees to pay reasonable attorneys fees to said counsel related to CX matters.

15.    *Counsel.*  The parties acknowledge that for efficiency it is important that the Chairman have the benefit of timely advice of counsel.  Inasmuch as the Chairman's retention of legal counsel creates potential conflicts similar to those identified in Paragraph 15 of this Agreement, the parties further agree that the "no conflict" statement in Paragraph 15 applies to

8

counsel as well as the Chairman. The parties hereto agree that counsel may be employed by the Chairman to represent CX, RLP, CX and/or the Chairman in any capacity designated by the Chairman, and the parties waive any potential or actual conflict of interest or other such claim that that may arise from such representation. The parties further agree that the Chairman may (i) direct counsel as to the goals, methods and interests of the entities, and (ii) waive any potential or actual conflict on behalf of the partnerships and all partners of RLP, CX, and the members of CX, and counsel shall be entitled to accept and rely upon such waivers and such instruction and direction of the Chairman as to any legal or business matter, without requiring or seeking further authorization or taking any further action, with respect to any of the foregoing. It is the intent of the parties that such counsel be third party beneficiaries of this Paragraph.

16.    *Term and Termination.*  The Term of this Agreement shall continue until the recovery and marketing of the ▓▓▓▓▓▓ Treasure are completed  and the net proceeds, if any therefrom, are distributed according to this Agreement.



9



21.    *Severability.*  The intention of the Parties is to comply fully with all laws and public policies, and this agreement shall be construed consistently with all laws and public policies to the extent possible.  If any court of competent jurisdiction determines it is impossible to construe any provision of this agreement consistently with any law or public policy and consequently holds that provision to be invalid, such holding shall in no way affect the validity of the other provisions of this agreement, which shall remain in full force and effect, provided that such result would not frustrate the intent of the Parties in entering into this agreement.

22.    *Governing Law, Jurisdiction and Venue.*  All questions concerning the validity or meaning of this agreement or relating to the rights and obligations of the parties with respect to performance under this agreement shall be construed and resolved under the laws of Ohio.  The parties to this agreement hereby designate the U.S. District Court for the Northern District of Florida, Jacksonville Division as the court of proper jurisdiction and venue for any actions or proceedings relating to this agreement; hereby irrevocably consent to such designation, jurisdiction or venue with respect to any action or proceeding initiated in such court; and hereby waive all defenses to jurisdiction and venue.



25.    *Complete Agreement.*  This document contains the entire agreement between the Parties and supersedes all prior or contemporaneous discussions, negotiations, representations or

10

agreements relating to the subject matter of this agreement. No changes to this agreement shall
be made or be binding on either Party unless made in writing and signed by each Party.

11

**Exhibit D**

# COLUMBUS EXPLORATION, LLC
## OPERATING AGREEMENT

**THIS OPERATING AGREEMENT** is entered into as of November 19, 1998, among the undersigned members of Columbus Exploration, LLC, a Delaware limited liability company (the "Company").

### Recitals

The parties hereto, formerly the partners of Columbus Exploration, Ltd., a Delaware limited partnership (the "Partnership"), have agreed to convert the Partnership into a limited liability company under the laws of the State of Delaware in accordance with the terms and subject to the conditions set forth in this Agreement.

### Statement of Agreement

In consideration of their mutual promises herein, the parties, intending legally to be bound, agree as follows:

## ARTICLE I
## DEFINED TERMS

The following capitalized terms shall have the meanings specified in this Article I. Other terms are defined in the text of this Agreement, and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

"Act" means the Delaware Limited Liability Company Act, title 6, Sections 18-101 through 18-1109 of the Delaware Code Annotated, as amended from time to time during the term of the Company.

"Adjusted Capital Account Deficit" means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

    (i)  the deficit shall be decreased by the amounts which the Interest Holder is deemed obligated to restore pursuant to Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

    (ii)  the deficit shall be increased by the items described in Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"Adjusted Capital Balance" means, as of any day, an Interest Holder's total Capital Contributions less all amounts actually distributed to the Interest Holder pursuant to Sections 7.02(c)(iv)(A) and 7.04 hereof. If any Interest is transferred in accordance with

1

# COLUMBUS EXPLORATION, LLC
## OPERATING AGREEMENT

THIS OPERATING AGREEMENT is entered into as of November __, 1998, among the undersigned members of Columbus Exploration, LLC, a Delaware limited liability company (the "Company").

### Recitals

The parties hereto, formerly the partners of Columbus Exploration, Ltd., a Delaware limited partnership (the "Partnership"), have agreed to convert the Partnership into a limited liability company under the laws of the State of Delaware in accordance with the terms and subject to the conditions set forth in this Agreement.

### Statement of Agreement

In consideration of their mutual promises herein, the parties, intending legally to be bound, agree as follows:

## ARTICLE I
## DEFINED TERMS

The following capitalized terms shall have the meanings specified in this Article I. Other terms are defined in the text of this Agreement, and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

"Act" means the Delaware Limited Liability Company Act, title 6, Sections 18-101 through 18-1109 of the Delaware Code Annotated, as amended from time to time during the term of the Company.

"Adjusted Capital Account Deficit" means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

    (i)   the deficit shall be decreased by the amounts which the Interest Holder is deemed obligated to restore pursuant to Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

    (ii)  the deficit shall be increased by the items described in Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"Adjusted Capital Balance" means, as of any day, an Interest Holder's total Capital Contributions less all amounts actually distributed to the Interest Holder pursuant to Sections 7.02(c)(iv)(A) and 7.04 hereof. If any Interest is transferred in accordance with

1

the terms of this Agreement, the transferee shall succeed to the Adjusted Capital Balance of the transferor. to the extent the Adjusted Capital Balance relates to the Interest transferred.

"Affiliate" means, with respect to any Member, any Person: (i) which owns more than 10% of the voting interests in the Member; or (ii) in which the Member owns more than 10% of the voting interests; or (iii) in which more than 10% of the voting interests are owned by a Person who has a relationship with the Member described in clause (i) or (ii) above.

"Agreement" means this Operating Agreement, as amended from time to time.

"Board" means the Board of Directors of the Company elected or appointed pursuant to Article IV.

"Capital Account" means the capital account of any Interest Holder as determined in accordance with this Agreement and Regulation Section 1.704-1(b)(2)(iv).

"Capital Contribution" means the total amount of capital contributed in the past, or agreed to be contributed in the future, as the context requires, to the Partnership or the Company by each Member. Any reference to the Capital Contribution of a Member shall include the Capital Contribution made by a predecessor holder of the Interest of such Member.

"Capital Proceeds" means the gross receipts received by the Company from a Capital Transaction.

"Capital Transaction" means any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards and insurance proceeds.

"Cash Flow" means the amount of cash received by the Company from net operating income, exclusive of Capital Proceeds, (i) after the payment of all expenses including taxes, administrative fees, and debt service of the Company, and (ii) before the establishment of such reserves as the Board reasonably deems necessary to meet anticipated liabilities and obligations of the Company.

"Certificate" means the certificate of formation of the Company under Section 18-201 of the Act, as the Certificate may be amended from time to time.

"Class B Conversion Date" means that date on which the Class B Interest is automatically converted into a Class A interest consisting of 352 Class A Units in the manner provided in Section 5.06 of this Agreement.

2

"Class A Interest" or "Class A Membership Interest" means a Class A Member's share of the Profits and Losses of, and the right to receive distributions from, the Company; which interest, expressed as a number of Class A Units and as a Class A Percentage Interest, shall absent proof to the contrary be as set forth in the membership records of the Company.

"Class B Interest Holder" means Thomas G. Thompson (hereinafter referred to as "Mr. Thompson").

"Class B Member" means Mr. Thompson.

"Class A Percentage Interest" means, as to a Class A Member, the result obtained, rounded to the one hundredth or second decimal place, when the number of Class A Units owned by a Class A Member is divided by the total number of Class A Units owned by all Class A Members, and that result is multiplied by (i) 64.80% prior to the Class B Conversion Date and (ii) 100% after the Class B Conversion Date.

"Class A Unit" means a Class A Unit of Class A Interest in the Company.

"Class B Interest" or "Class B Membership Interest" means a Class B Member's share of the Profits and Losses of, and the right to receive distributions from, the Company, which interest is 35.2%.

"Class A Interest Holder" means any Person who holds a Class A Membership Interest, whether as a Class A Member or an unadmitted assignee of a Class A Member.

"Class A Member" means any person shown as a Class A Member on the membership records of the Company, as the same may be amended from time to time to reflect the withdrawal of a Class A Member and/or the admission of a new Class A Member.

"Class B Percentage Interest" means 35.2% prior to the Class B Conversion Date and 0.00% after the Class B Conversion Date.

"Code" means the Internal Revenue Code of 1986, as amended, and any corresponding provisions of succeeding law.

"Company" means the limited liability company known as Columbus Exploration, LLC formed by this Agreement.

"Consent" means either the written consent of a Person, or the affirmative vote of such Person at a meeting called and held pursuant to Article IX, as the case may be, to do the act or thing for which the consent is solicited, or the act of granting such consent, as the context may require. Reference to the Consent of a stated percentage of interest of the

Members means the Consent of so many of the Members whose combined Interests represent such stated percentage of the total Interests of the Members.

"Conversion" means the conversion of the Partnership into a limited liability company under the Act.

"Director" means a Director of the Company elected or appointed pursuant to Article IV.

"Distributable Cash Flow" means Cash Flow available for distribution to Members, after the establishment of reasonable reserves.

"Interest" or "Membership Interest" means a Class A Member Interest and/or a Class B Member Interest, as the case may be, or a Class A Membership Interest and/or a Class B Membership Interest, as the case may be.

"Interest Holder" means a Class A Interest Holder and/or a Class B Interest Holder, as the case may be.

"Life Rights" means the right to use an individual's life story in any form of media presentation; the right to endorse for personal compensation any type of service or product; name or image and any other personal attributes whether developed before, during or after the formation of the company.

"Member" means a Class A Member and/or a Class B Member, as the case may be.

"Negative Capital Account" means a Capital Account with a balance of less than zero.

"Nonrecourse Deductions" has the meaning set forth in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Regulation Section 1.704-2(c).

"Notice" means a writing containing the information required by this Agreement to be communicated to a Person and sent by registered or certified mail, postage prepaid, to such Person at the last known address of such Person, the date of registry thereof or the date of the certified receipt therefor being deemed the date of such Notice; provided, however, that any written communication containing such information sent to such Person actually received by such Person shall constitute Notice for all purposes of this Agreement.

"Officers" means those persons appointed by the Board as officers pursuant to Section 4.03.

"Partnership" means Columbus Exploration Limited Partnership, a Delaware limited partnership, the predecessor of the Company.

4

"Person" means any individual, partnership, corporation, trust or other entity.

"Positive Capital Account" means a Capital Account with a balance greater than zero.

"Profit" and "Loss" means, for each taxable year of the Company (or other period for which Profit or Loss must be computed) the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

(i)   all items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss; and

(ii)  any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss; and

(iii) any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704-1(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss; and

(iv)  gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes; and

(v)   in lieu of the depreciation, amortization or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi)  notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 7.03 hereof shall not be taken into account in computing Profit or Loss.

"Regulations" means the regulations promulgated by the Department of the Treasury under the provisions of the Code.

"Substitute Member" means any Person admitted to the Company pursuant to Section 5.02.

5

## ARTICLE II
## FORMATION OF THE COMPANY

2.01.  Conversion.  The partners of the Partnership having approved the Conversion, the Partnership is converted into and will continue the business of the Partnership as a limited liability company under the Act.

2.02.  Name.  The name of the Company is Columbus Exploration, LLC.

2.03.  Registered Office and Agent; Places of Business.  The registered office of the Company in the State of Delaware shall be c/o CT Corporation, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801 and the registered agent for service of process on the Company shall be CT Corporation.  The principal place of business of the Company shall be End of 14th Street, P.O. Box 767, Fernandina Beach, Florida 32034, or at such other place as shall from time to time be so designated by the Board.

2.04.  Purpose of the Company.  The purposes for which the Company is formed are to design and manufacture a side scan sonar system and a generic deep sea robotic recovery system; to finance and conduct future ventures to locate, verify and recover the contents of deep sea historic shipwrecks; to provide deep sea technology products and services to governmental and private sector customers; and to carry on such activities as may be necessary and proper in connection therewith, or such other activities as may be permitted under the Act.

2.05.  Term.  The term of the Company shall continue perpetually, unless the Company is sooner dissolved in accordance with the provisions of this Agreement or by operation of law.

2.06.  Filing of Certificate of Formation.  If the Certificate has not already been filed with the Delaware Secretary of State, the appropriate Officers shall file the Certificate and a certificate of conversion as soon as practicable after the partners of the Partnership have approved the Conversion.  The Board and Officers shall do all other acts and things that may now or hereafter be required (including the filing of any forms or certificates) for the perfection and continuing maintenance of the Company as a limited liability company under the laws of the State of Delaware or necessary in order to protect the limited liability of the Members as members under the laws of the State of Delaware or elsewhere.  Copies of any such filings shall be mailed to any Member upon request; provided, however, that absent such request the Directors shall not be obligated to send copies of any such filings to the Members.

6

## ARTICLE III
## MEMBERS, MEMBERSHIP RIGHTS AND
## MEMBERSHIP INTERESTS

3.01. Members, Membership Rights, Interests, and Capital Contributions.

(a) A list of Members shall be maintained as part of the books and records of the Company. The membership records of the Company shall reflect the capital contribution of each Member, indicating the amount of cash contributed, the value of property contributed and/or the value of services contributed, or the face value of any note or other binding written obligation to contribute cash or property or to perform services, the number of Class A Units owned by each Class A Member, each Class A Member's Percentage Interest, and the Class B Member's Class B Percentage Interest. Attached as Exhibit 1 to this Agreement is a list of all Class A Members as of the date of this Agreement, as well as the following information regarding each Class Member: (I) the total Capital Contribution of each Class A Member; (ii) the current Capital Account balance of each Class A Member; (iii) the number of Class A Units owned by each Class A Member; and (iv) the Class A Percentage Interest of each Class A Member.

(b) Except as otherwise specifically provided in this Agreement to the contrary, no Member shall have the right:

   (i)   To take part in the control of the Company business or to sign for or to bind the Company, such power being vested in the Directors and designated Officers;

   (ii)  To have his Capital Contribution repaid except to the extent provided in this Agreement;

   (iii) To require partition of the Company's property or to compel any sale or appraisal of the Company's assets;

   (iv)  To sell or assign his Interest in the Company or to constitute the vendee or assignee a Member of the Company, except as provided in this Agreement; or

   (v)   To voluntarily withdraw or resign as a Member from the Company.

(c). The total authorized number of Class A Units in the Company shall be 1000. As of the date of this Agreement, 202 Class A Units are issued and outstanding. Pursuant to Section 5.06, the Board is authorized to sell up to 446 additional Class A Units without the consent of the Members.

(d) Until the Class B Conversion Date, for all purposes under this Agreement, including without limitation any required consents or votes and any allocations or distributions of Profit, Loss, deduction, credit, Cash Flow, and Capital Proceeds, the aggregate Class A Percentage Interest for all Class A Membership Interests shall be

7

64.8% and the aggregate Class B Percentage Interest for all Class B Membership Interests shall be 35.2%. After the Class B Conversion Date, for all purposes under this Agreement, including without limitation any required consents or votes and any allocations or distributions of Profit, Loss, deduction, credit, Cash Flow, and Capital Proceeds, the aggregate Class A Percentage Interest for all Class A Membership Interests (including the converted Class B Membership Interest) shall be 100% and there will be no Class B Percentage Interest or Class B Membership Interest.

## ARTICLE IV
## MANAGEMENT RIGHTS, POWERS, AND DUTIES

4.01. Management.

(a)  Except where the law, the Certificate or this Agreement otherwise provide, all authority of the Company shall be exercised by or under the direction of the Board acting by or through the Chairman of the Board. Directors need not be Members of the Company.

(b) The number of Directors may be determined from time to time by the Directors or as otherwise provided in this Operating Agreement, but the number of Directors shall not be reduced so as to abolish the office of a Director during his term. The number of Directors may also be determined at any meeting of the Members called for the purpose of electing Directors, at which a quorum is present, by the affirmative vote of a two-thirds majority of the Interests that are represented at the meeting and entitled to vote on the proposal.

(c) The Directors shall be classified in respect of the time for which they severally hold office by dividing them into three (3) classes, each class consisting of one-third of the whole number of the Board with any number not evenly divisible by three (3) assigned to such class as the Board may direct. The terms of the initial Directors shall be staggered, so that Directors of the first class shall serve for a term of one (1) year, Directors of the second class shall serve for a term of two (2) years, and the Directors of the third class shall serve for a term of three (3) years. At each annual meeting, a class of Directors shall be elected to serve a term of three years to succeed the class of Directors whose term expired in that year so that the term of office of only one class of Directors shall expire in each such year; provided, however, that each Director elected at any time shall hold office until his successor is duly elected and qualified or until his earlier resignation, removal from office, or death. The selection, nomination and election of Directors shall be as set forth in Paragraph 4.01(e), below.

8

(d)  The number of Directors of the Company shall initially be fixed at seven (7), divided into three classes, and the initial Directors shall be:

| Class | Name | Term Ending at Annual Meeting in |
|---|---|---|
| Class I | W. Arthur Cullman, Jr. | 1999 |
| | Michael J. Ford | |
| Class II | A. Kenneth Pierce, Jr. (if unable to serve then Charles F. Freiburger) | 2000 |
| | Gilman D. Kirk | |
| | James F. Turner | |
| Class III | John B. Patton | 2001 |
| | Thomas G. Thompson | |

(e)  At each annual meeting of Members for the election of Directors, the successors to the Directors shall be elected, but if the annual meeting is not held or if one or more of such Directors is not elected thereat, they may be elected at a special meeting called for that purpose.  For purposes of this election, in consultation with members of the Board, the Chairman of the Board may provide a list of prospective Directors to the Board no less than 30 days before such annual or special meeting.  From the list provided by the Chairman of the Board, the Directors may by majority vote, nominate directors for election by the Members.  Other nominations may also be considered.

Except as provided in Article 4.03 of this Operating Agreement, all the Directors or any individual Director, including the Chairman of the Board, may be removed from office by the vote of the Members holding a majority of the Interests.  In case of any such removal the vacancy created shall be filled as provided Paragraph 4.01(g), below.

(g)  A vacancy in the Director positions shall exist in the event (i) a Director dies or resigns, (ii) a Director is removed by the Members, (iii) the Members fail at any time to elect the whole authorized number of Directors, or (iv) the Directors increase the number of Directors.  The remaining Directors, though less than a majority of the whole authorized number of Directors, may, by a vote of the majority of their number, fill any vacancy in the Director positions for the unexpired term.  The remaining Directors shall fill the vacancy from a list provided by the Chairman of the Board in consultation with members of the Board.  Other nominations may also be considered.

(h)  The Directors shall hold such meetings as may from time to time be called by the Chairman of the Board or by any two Directors.  Meetings of Directors shall be held at

9

the principal office of the Company or at such other place within or without the State of Delaware as the Directors may from time to time determine. Meetings of the Directors may be held through any communications equipment if all persons participating can hear each other and participation in a meeting pursuant to this provision shall constitute presence at such meeting.

(i) Notice of the time and place of each meeting of Directors shall be given to each of the Directors by any of the following methods:

    (i)   In a writing mailed not less than three (3) days before such meeting and addressed to the residence or usual place of business of a Director, as such address appears on the records of the Company; or

    (ii)  By telegram, electronic facsimile, or other writing sent or delivered to the residence or usual place of business of a Director as the same appears on the records of the Company, not later than two days before the date on which such meeting is to be held; or

    (iii) Personally or by telephone not later than the day before the date on which such meeting is to be held.

The method of giving notice to all Directors need not be uniform. Notice of any meeting of Directors may be given only by the Chairman of the Board, the President or the Secretary of the Company. No such notice need specify the purpose or purposes of the meeting. Notice of adjournment of a meeting of Directors need not be given if the time and place to which it is adjourned are fixed and announced at such meeting.

(j) Notice of any meeting of Directors may be waived in writing, either before or after the holding of such meeting, by any Director, which writing shall be filed with or entered upon the records of the meeting. The attendance of any Director at any meeting of Directors without protesting, prior to or at the commencement of the meeting, the lack of proper notice, shall be deemed to be a waiver by him of notice of such meeting. The Directors may take any action by unanimous written consent in lieu of any meeting.

(k) A majority of the whole authorized number of Directors shall be necessary to constitute a quorum for a meeting of Directors, except that a majority of the Directors in office shall constitute a quorum for filling a vacancy. The act of a majority of the Directors present at a meeting at which a quorum is present is the act of all the Directors for any purpose, except as otherwise specifically provided by law, the Certificate or this Agreement.

(l) The Directors, by the affirmative vote of a majority in office and irrespective of any personal interest of any of them, shall have authority to establish reasonable compensation for the Chairman of the Board and any Director for services rendered or to be rendered to the Company, including, but not limited to the following types of

programs: short-term incentives, equity-related long-term incentives, performance-related long-term incentives, deferred compensation plans, severance package, disability benefits, death benefits, insurance and other fringe benefits, and the Chairman of the Board shall have such authority with respect to any Officer, employee or contractor with the Company.

4.02. General Powers.

Except as otherwise provided in this Agreement, the Directors, on behalf of the Company and in furtherance of the business of the Company, shall have the authority to perform all acts which the Company is authorized to perform, including the rights and powers of a manager as provided in the Act and as otherwise provided by law. Any action taken by the Directors shall constitute the act of and shall bind the Company.

4.03. Officers.

(a) The Chairman of the Board may appoint officers of the Company, including a President, a Secretary, a Treasurer and such other officers and assistant officers as the Directors may from time to time elect. Officers of the Company may be paid such compensation as the Chairman of the Board may determine. Any two or more offices may be held by the same person, but no officer shall execute, acknowledge or verify any instrument in more than one capacity if such instrument is required by law, the Certificate, or this Agreement to be executed, acknowledged or verified by two or more Officers. The Company shall have a Chairman of the Board, who shall be a member of the Board, and shall be from time to time designated by the Board. The Chairman of the Board shall preside at all meetings of the Members and the Board and shall perform all duties incident to the office. He may sign and execute, in the name of the Company, all authorized deeds, mortgages, bonds, contracts, licenses and other instruments of every description. The Chairman of the Board shall be the chief executive officer of the Company, and, except as otherwise provided in this Agreement, shall have general authority to manage the business of the Company.

The initial Chairman of the Board shall be Mr. Thompson, who shall be initially retained for a term of 3 years, during which time he may not be removed from office. The Board shall have responsibility to negotiate and enter into a Services Agreement with Mr. Thompson within 60 days of the filing of the Certificate, on terms no less favorable than his total present compensation from both entities and preexisting rights, and providing for executive severance and other benefits consistent with industry standards. Such Services Agreement will provide for executive severance consisting of a lump sum payment of $500,000 in the event that Mr. Thompson's employment with the Company is terminated for any reason, whether by way of removal, resignation or otherwise, and one half such amount will be funded by the Company by a deposit in a trust account in a financial institution designated by the Board, to be held in trust for Thompson for no less than five years, unless paid to Mr. Thompson prior to that time. Following the five years, the trust may terminate and the corpus of the trust will be distributed consistent with the terms of

11

Mr. Thompson's Services Agreement. Mr. Thompson agrees to license for no additional fee any intellectual property that he owns with regard to the technology for exploration and recovery in the deep ocean to be used by the Company in its exploration and recovery efforts so long as the Company is in business. The Company cannot assign this intellectual property to any third party. The Chairman of the Board shall devote such time and commitment as is necessary to carry out the objectives of the Company. If the Board and Mr. Thompson are for any reason unable to enter into a Services Agreement, then prior to the end of such 60-day period, (i) the Directors shall name another person as Chairman of the Board, and (ii) Mr. Thompson shall have the right to resign as Chairman of the Board, to terminate his employment and to receive a severance payment of $500,000.

(b) Notwithstanding any other provision of this Article 4 to the contrary, until the earliest to occur of the following: (i) the aggregate amount of Capital Contributions that the Members have made to the Company from the date of filing of the Certificate equals or is greater than $40,000,000 (ii) 5 years from the date of such filing, or (iii) Mr. Thompson is no longer the Chairman of the Board, all authority granted to the Board under this Article 4 (except for the authority granted to the Board under Sections 4.01(b), (e), (g), (h), (i), (j), (k), and (l)) may be exercised by the Chairman of the Board in his sole discretion, without any further action or approval of the Board, and the Chairman of the Board shall have all the powers of a manager under the Act; provided, however, that the Chairman shall have no authority to take any of the following actions without the prior approval of a majority of the whole authorized number of Directors:

(i)   To initiate any litigation, including, without limitation, litigation against insurance companies, marketing partners or other business entities dealing with CXLLC (provided that the Chairman may authorize a request for a temporary restraining order or other emergency relief and request Board approval as soon as practical thereafter)

(ii)  To incur indebtedness on the part of the Company in excess of $500,000 in the accomplishment of its business objectives.

(iii) To purchase and sell assets of the Company representing a substantial portion of its net worth, or to lease space or equipment necessary for the conduct of the business of the Company.

(iv)  To designate a person to act as the "Tax Matters Member" of the Company within the meaning of the Internal Revenue Code of 1986.

(v)   To admit Additional Members in the manner permitted by this Agreement (see Section 5.06).

(vi)  To cause CXLC to be a party to any merger, exchange, acquisition or similar transaction.

12

(vii) Prior to each fiscal year, to prepare and approve an annual budget for each year's operation.

(viii) To engage the services of an auditor to perform an independent audit of CXLLC's financial statement.

(c) Other Officers. The Chairman of the Board may appoint such additional officers as he deems necessary, after advice and consultation with the Board. Such officers may include a Vice President or Vice Presidents, a Secretary and a Treasurer. Such officers shall have such duties, powers and responsibilities as directed by the Chairman of the Board.

(d) The officers of the Company shall hold office at the pleasure of the Chairman of the Board. Any officer of the Company may be removed, either with or without cause, at any time, by the Chairman Board, after advice and consultation with the Board; such removal, however, shall be without prejudice to the contract rights, if any, of the person so removed.

(e) Officers shall have such authority and shall perform such duties as are determined by the Chairman of the Board.

4.04. Directors Dealing with Company. In addition to services elsewhere set forth in this Agreement, a Director or any Affiliate of a Director shall have the right to contract or otherwise deal with the Company for the sale of goods or services if (a) compensation paid or promised for such goods or services is reasonable and is paid only for goods or services actually furnished to the Company, (b) the goods or services to be furnished are reasonable for and necessary to the Company, and (c) the terms for the furnishing of such goods or services are at least as favorable to the Company as would be obtainable in an arm's-length transaction.

4.05. Other Activities. The Directors may engage in or possess interests in other business ventures of every kind and description for their own account, including, without limitation, serving as a manager of other entities which engage, either directly or through interests in other entities, in business ventures similar to those of the Company. Each Director shall retain his Life Rights whenever acquired or developed; however, each Director may agree to allow the Company to use such Life Rights to further the interests of the Company, so long as the individual Director is still serving in that capacity.

Neither the Company nor any of the Members shall have any rights by virtue of this Agreement in or to such other business ventures of any of the Directors or to the income or profits derived therefrom or to the income or profits derived from the use of any Director's Life Rights.

4.06. Liability and Indemnification of Directors and Officers.

13

(a) Neither the Directors nor any officer of the Company, shall be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any action taken or failure to act on behalf of the Company unless it is proved, by clear and convincing evidence, in a court with jurisdiction that the a the action or failure to act involved an act or omission undertaken with deliberate intent to cause injury to the Company or undertaken with reckless disregard for the best interests of the Company.

(b) The Company (i) shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or by reason of the fact that such person is or was a Director or the Chairman of the Company, or while a Director or the Chairman of the Company is or was serving at the request of the Company as a director, trustee, fiduciary, officer, employee, partner, joint venturer or agent of a corporation, domestic or foreign, nonprofit or for profit, partnership, joint venture, limited liability company, trust, employee benefit plan or other enterprise, and (ii) may indemnify or agree to indemnify any person who is or was a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative by reason of the fact that he is or was an officer, employee or agent of the Company, or while an officer, employee or agent of the Company is or was serving at the request of the Company as a director, trustee, fiduciary, officer, employee, partner, joint venturer or agent of a corporation, domestic or foreign, nonprofit or for profit, partnership, joint venture, trust, employee benefit plan or other enterprise, against expenses (including attorney's fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement or conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Company, and with respect to any criminal action or proceeding, he had reasonable cause to believe that his conduct was unlawful.

(c) To the extent that a Director, trustee, fiduciary, officer, employee, partner, joint venturer or agent has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Section 4.06(b), or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorney's fees) actually and reasonably incurred by him in connection with the action, suit or proceeding.

(d) Any indemnification under Section 4.06(b) shall be made by the Company only as authorized in the specific case upon a determination that the indemnification of the Director, trustee, fiduciary, officer, employee, partner, joint venturer or agent is proper in the circumstances because he has met the applicable standard of conduct set forth in

14

Section 4.06(b). Such determination shall be made (i) by the Board by a majority vote of a quorum consisting of members who were not and are not parties to, or threatened with, such action, suit or proceeding; (ii) if such a quorum is not obtainable or if a majority of a quorum of disinterested Directors so directs, in a written opinion by independent legal counsel other than an attorney, or a firm having associated with it an attorney, who has been retained by or who has performed services for the Company or any person to be indemnified within the past five years; (iii) by the Members; or (iv) by the court of common pleas or the court in which the action, suit or proceeding was brought.

(e) Expenses (including attorney's fees) incurred by a Director or the Chairman in defending any civil or criminal action, suit or proceeding referred to in Section 4.06(b) shall be paid by the Company as they are incurred, in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such person in which he agrees to (i) repay such amount if it is proved by clear and convincing evidence in a court of competent jurisdiction that his action or failure to act involved an act or omission undertaken with deliberate intent to cause injury to the Company or undertaken with reckless disregard for the best interests of the Company; and (ii) reasonably cooperate with the Company concerning the action, suit, or proceeding.

(f) Expenses (including attorney's fees) incurred by a trustee, fiduciary, officer, employee, partner, joint venturer or agent in defending any action, suit, or proceeding referred to in Section 4.06(b) may be paid by the Company as they are incurred in advance of the final disposition of the action, suit or proceeding as authorized by the Directors in the specific case upon receipt of an undertaking by or on behalf of the trustee, fiduciary, officer, employee, partner, joint venturer or agent to repay such amount, if it is ultimately determined that he is not entitled to be indemnified by the Company.

(g) The indemnification authorized by this Section 4.06 shall not be deemed exclusive of, and shall be in addition to, any other rights granted to persons seeking indemnification under the Certificate, common law, the Act, or any agreement, vote of Members or disinterested Directors, or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a Director, trustee, fiduciary, officer, employee, partner, joint venturer or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

(h) The Company may purchase and maintain insurance or furnish similar protection, including but not limited to trust funds, letters of credit or self-insurance, on behalf of or for any person who is or was a Director, officer, employee, or agent of the Company, or is or was serving at the request of the Company as a director, trustee, fiduciary, officer, employee, partner, joint venturer or agent of a corporation, domestic or foreign, nonprofit or for profit, partnership, joint venture, trust, employee benefit plan or other enterprise, against any liability asserted against such person and incurred by such person in any such capacity, or arising out of the person's status as such, whether or not the Company would

15

have the power to indemnify such person against such liability under the provisions of this Section 4.06. Insurance may be purchased from or maintained with a person in which the Company or a Member has a financial interest.

(i)  The authority of the Company to indemnify persons pursuant to Section 4.06(b) does not limit the payment of expenses as they are incurred, indemnification, insurance or other protection that may be provided pursuant to any other provision of this Agreement or the provisions of any other agreement.  Section 4.06(b) does not create any obligation to repay or return payments made by the Company under any other section of this Agreement.

(j)  As used in this Section 4.06, references to "the Company" include all constituent entities in a consolidation or merger and the new or surviving entity, so that any person who is or was a manager, director, officer, employee, or agent of such a constituent entity, or is or was serving at the request of such constituent entity as a director, trustee, fiduciary, officer, employee, partner, joint venturer or agent of a corporation, domestic or foreign, nonprofit or for profit, partnership, joint venture, trust, employee benefit plan or other enterprise, shall stand in the same position under the provisions of this Section 4.06 with respect to the new or surviving entity as he would if he had served the new or surviving entity in the same capacity.

4.08.  Power of Attorney.

(a)  Each Member constitutes and appoints the Chairman as the Member's true and lawful attorney-in-fact ("Attorney-in-Fact"), and in the Member's name, place and stead, to make, execute, sign, acknowledge, and file:

(i)  the Certificate and any amendments thereto, provided any amendment is approved by the Consent of a majority in Interest of the Members;

(ii)  all documents which the Attorney-in-Fact deems appropriate to reflect any amendment, change, or modification of this Agreement;

(iii)  any and all other certificates or other instruments required to be filed by the Company under the laws of the State of Delaware or of any other state or jurisdiction, including, without limitation, any certificate or other instruments necessary in order for the Company to continue to qualify as a limited liability company under the laws of the State of Delaware; and

(iv)  all documents which may be required to dissolve and terminate the Company and to cancel its Certificate.

(b)  The foregoing power of attorney is irrevocable and is coupled with an interest, and, to the extent permitted by applicable law, shall survive the death or disability of a Member. It also shall survive the transfer of an Interest, except that if the transferee is approved for

16

admission as a Member, this power of attorney shall survive the delivery of the assignment for the sole purpose of enabling the Attorney-in-Fact to execute, acknowledge and file any documents needed to effectuate the substitution. Each Member shall be bound by any representations made by the Attorney-in-Fact acting in good faith pursuant to this power of attorney, and each Member hereby waives any and all defenses which may be available to contest, negate or disaffirm the action of the Attorney-in-Fact taken in good faith under this power of attorney.

## ARTICLE V
## PURCHASE, TRANSFER, AND RESTRICTIONS ON TRANSFER OF MEMBERSHIP INTERESTS

5.01. Purchase for Investment.

(a) Each Member hereby represents and warrants that his acquisition of his Membership Interest is made as principal for his account for investment purposes only and not with a view to the resale or distribution of the Membership Interest.

(b)  Each Member agrees that he will not sell, assign or otherwise transfer his Membership Interest or any fraction thereof to any Person who does not similarly represent, warrant and agree to the same restriction on the transfer of the Membership Interest.

5.02. Restrictions on Transfers of Interests.

(a) No Interest Holder may assign or transfer all or any portion of or any interest or rights in such person's Membership Interest without first having obtained the Consent of the Board, and then only upon the satisfaction of all of the following conditions ("Conditions of Transfer"):

   (i)   The transfer will not require registration of Membership Interests under any federal or state securities laws, and the transferor delivers to the Company an opinion of counsel reasonably acceptable to the Company to that effect;

   (ii)  The transferee delivers to the Company a written instrument agreeing to be bound by the terms of this Agreement;

   (iii) The transfer will not result in the termination of the Company pursuant to Code Section 708;

   (iv)  The transfer will not result in the Company being subject to the Investment Company Act of 1940. as amended;

17

(v) The transferor or the transferee delivers the following information to the Company: (A) the transferee's taxpayer identification number; and (B) the transferee's initial tax basis in the transferred Interest; and

(vii) The Company has waived or failed to exercise any right of first refusal provided in Section 5.03.

(b)  If the Conditions of Transfer and the other requirements of Section 5.02(a) are satisfied, then a Member may transfer all or any portion of that Person's Membership Interest.

(c)  Each Member hereby acknowledges the reasonableness of the prohibition contained in this Section 5.02 in view of the purposes of the Company and the relationship of the Members. The transfer of any Membership Interests in violation of the prohibition contained in this Section 5.02 shall be deemed invalid, null and void, and of no force or effect. Any Person to whom Membership Interests are attempted to be transferred in violation of this Section shall not be entitled to vote on matters coming before the Members, including the election of Directors, act as an agent of the Company, receive distributions from the Company or have any other rights in or with respect to the Membership Interests. If, for any reason, the Company is required to recognize a transfer of Membership Interests which is not permitted under the provisions of this Agreement, then the transferee of such Membership Interests shall have the right to receive the allocations and distributions attributable to that Membership Interest, as described in this Agreement, but shall have no other rights otherwise attributable to such Membeship Interest hereunder and shall not become a Member of the Company except as provided above..

5.03  Right of First Refusal.

(a) The Company shall have a limited right of first refusal on any Membership Interest that a Member wishes to sell, assign or otherwise transfer as provided in this Section 5.03.

(b)  Except as provided in Section 5.03(c), a Member (the "Assigning Member") may sell, assign or otherwise transfer any Membership Interest only after offering the Company the option to purchase such Membership Interest by notice to the Board, which notice shall constitute an offer and shall contain the name and address of the proposed transferee and the price and terms of the proposed sale, transfer or assignment (the "Offer Notice"). For a period of 30 days after receipt of the Offer Notice, the Board may accept the offer to purchase the Assigning Member's Membership Interest on the terms contained in the Offer Notice. If the Board does not accept the offer, the Assigning Member may sell the Membership Interest, but only to the proposed transferee and only at the price and on the terms contained in the Offer Notice. Any purchaser of the Membership Interest of an Assigning Member may become a Member only upon the terms and conditions set forth in Section 5.02 of this Agreement.

18

(c) Notwithstanding the foregoing, and subject to Section 5.02 of this Agreement, a Member may, upon notice to the Board, sell, assign or otherwise transfer any Membership Interest to any child of such Member over the age of 18 years, to the Member's parent or parents, to the Member's spouse, to any trust for the benefit of the Member, any spouse, child or parent of such Member, or to any charitable organization exempt from federal taxation, provided that no such assignment shall be made to any minor or incompetent.

5.04. Sale of Class A Additional Interests. The Board may, without the Consent of the Members, sell up to 400 additional Class A Units and admit the purchasers as additional Class A Members of the Company, on such terms and conditions as the Board deems appropriate. In addition, without the Consent of the Members, the Board may sell up to 46 Class A Units to Recovery Limited Partnership in exchange for certain of its assets, and admit Recovery Limited Partnership (or any partner thereof to whom such Class A Units may be distributed) as a Class A Member. Immediately prior to the admission of additional Class A Members pursuant to this Section, the Directors shall make an allocation to the then-current Members of all items of Profit and Loss realized to date, and may make a distribution of Cash Flow as of such date, if any, in the proportions provided in Article VII hereof. As a condition of admission, each such additional Class A Member shall have executed and delivered to the Company a written agreement to be bound by the terms of this Agreement.

5.05 No Sale of Additional Class B Interests. Under no circumstances shall the Company, or its Directors or Members, sell or otherwise issue any additional Class B Interests.

5.06. Conversion of Class B Interest to a Class A Interest. At such time as the Company has received $40 million from the sale of additional Class A Units (excluding any Class A Units sold to Recovery Limited Partnership pursuant to the second sentence of Section 5.04), the Class B Interest shall automatically be converted into a Class A Interest consisting of 352 Class A Units. The Company's membership records shall be appropriately updated to reflect such conversion.

## ARTICLE VI
## RIGHTS AND OBLIGATIONS OF MEMBERS

6.01. Limitation on Liability of Members. The liability of each Member shall be limited to his Capital Contribution. No Member shall have any other liability to contribute money to, or in respect of the debts, obligations, or liabilities of the Company, nor shall any Member be personally liable for any debts, obligations or liabilities of the Company.

6.02. Other Activities. The Members may engage in or possess interests in other business ventures of every kind and description for their own accounts, including without limitation, either directly or through interests in other entities, in business ventures similar to those of the Company. Neither the Company nor any of the Members shall

19

have any rights by virtue of this Agreement in or to such business ventures or to the income or profits derived therefrom.

### ARTICLE VII
### MEMBER ALLOCATIONS

7.01. Distributions of Cash Flow and Allocations of Profit or Loss Other than Capital Transactions.

(a)     After giving effect to the special allocations set forth in Section 7.03, for any taxable year of the Company, Profit or Loss (other than Profit or Loss resulting from a Capital Transaction, which Profit or Loss shall be allocated in accordance with the provisions of Sections 7.02(a) and 7.02(b)) shall be allocated as follows: (i) prior to the Class B Conversion Date, 64.8% to the Class A Interest Holders in proportion to their Class A Percentage Interests and 35.2% to the Class B Interest Holder; and (ii) after the Class B Conversion Date, 100% to the Class A Interest Holders in proportion to their Class A Percentage Interests..

(b)     The Directors shall use their best efforts to cause the distribution of available Cash Flow to Members at such times and in such amounts as are sufficient to meet the Members' estimated state and federal income tax obligations attributable to net Profits allocable to them for the current taxable year, assuming an average combined tax rate of 40%.

(c)     Cash Flow for each taxable year of the Company shall be distributed as follows: (i) prior to the Class B Conversion Date, 64.8% to the Class A Interest Holders in proportion to their Class A Percentage Interests and 35.2% to the Class B Interest Holder; and (ii) after the Class B Conversion Date, 100% to the Class A Interest Holders in proportion to their Class A Percentage Interests. Such distributions shall be made no later than seventy-five (75) days after the end of the taxable year.

7.02. Distribution of Capital Proceeds and Allocation of Profit or Loss from Capital Transactions.

(a)     After giving effect to the special allocations set forth in Section 7.03, Profit from a Capital Transaction shall be allocated as follows:

(i)   If one or more Interest Holders has a Negative Capital Account, to those Interest Holders, in proportion to their Negative Capital Accounts, until all of those Negative Capital Accounts have been reduced to zero.

(ii)  Any Profit not allocated pursuant to Section 7.02(a)(i) shall be allocated to the Interest Holders in proportion to, and to the extent of, the amounts distributable to them first pursuant to Section 7.02(c)(iv)(A) and then 7.02(c)(iv)(C)

20

(b) After giving effect to the special allocations set forth in Section 7.03, Loss from a Capital Transaction shall be allocated as follows:

    (i)   If one or more Interest Holders has a Positive Capital Account, to those Interest Holders, in proportion to their Positive Capital Accounts, until all Positive Capital Accounts have been reduced to zero.

    (ii)  Any Loss not allocated to reduce Positive Capital Accounts to zero pursuant to Section 7.02(b)(i) shall be allocated as follows: (i) prior to the Class B Conversion Date, 64.8% to the Class A Interest Holders in proportion to their Class A Percentage Interests and 35.2% to the Class B Interest Holder; and (ii) after the Class B Conversion Date, 100% to the Class A Interest Holders in proportion to their Class A Percentage Interests.

(c)   Capital Proceeds shall be distributed and applied by the Company in the following order and priority:

    (i)   to the payment of all expenses of the Company incident to the Capital Transaction; then

    (ii)  to the payment of debts and liabilities of the Company then due and outstanding (including all debts due to any Interest Holder); then

    (iii) to the establishment of any reserves which the Directors deem necessary to meet anticipated liabilities or obligations of the Company; then

    (iv) the balance shall be distributed as follows:

        (A) to the Interest Holders in proportion to their Adjusted Capital Balances, until their remaining Adjusted Capital Balances have been paid in full;

        (B) if any Interest Holder has a Positive Capital Account after the distributions made pursuant to Section 7.02(c)(iv)(A), to those Interest Holders in proportion to their Positive Capital Accounts; then

        (C) the balance, as follows: (i) prior to the Class B Conversion Date, 64.8% to the Class A Interest Holders in proportion to their Class A Percentage Interests and 35.2% to the Class B Interest Holder: and (ii) after the Class B Conversion Date, 100% to the Class A Interest Holders in proportion to their Class A Percentage Interests..

7.03. Regulatory and Special Allocations

(a) Qualified Income Offset. No Interest Holder shall be allocated Losses or deductions if the allocation causes an Interest Holder to have an Adjusted Capital Account Deficit. If

an Interest Holder unexpectedly receives any adjustments, allocations, or distributions described in Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), which causes the Interest Holder to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Interest Holder, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Interest Holder, as quickly as possible. This Section 7.03(a) is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

(b) Minimum Gain Chargeback. Except as set forth in Regulation Section 1.704-2(f), if, during any taxable year, there is a net decrease in Minimum Gain, each Interest Holder, prior to any other allocation pursuant to this Article VII, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Interest Holder's share of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g). Allocations of gross income and gain pursuant to this Section 7.03(b) shall be made in accordance with Regulation Sections 1.704-2(f)(6) and 1.704-2(j)(2). It is the intent of the parties hereto that any allocation pursuant to this Section 7.03(b) shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(f).

(c) Contributed Property and Book-ups. In accordance with Code Section 704(c) and the Regulations thereunder, as well as Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Interest Holders so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder.

(d) Code Section 754 Adjustment. To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the Interest Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

22

(e) Nonrecourse Deductions. Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Interest Holders in proportion to their Percentage Interests.

(f) Member Loan Nonrecourse Deductions and Minimum Gain Chargeback. Any Nonrecourse Deduction attributable to a loan to the Company from an Interest Holder for any taxable year or other period shall be specially allocated to the Interest Holder who bears the risk of loss with respect to the loan to which the Nonrecourse Deduction is attributable in accordance with Regulation Section 1.704-2(i)(1). Except as set forth in Regulation Section 1.704-2(i)(4), if during any taxable year, there is a net decrease in Member nonrecourse debt minimum gain as defined in Regulation Section 1.704-2(i)(2), each Member who is allocated a portion of such Member nonrecourse debt minimum gain pursuant to Regulation Section 1.704-2(i)(5), prior to any other allocation pursuant to this Article VII, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Interest Holder's share of the net decrease of Member nonrecourse debt minimum gain, computed in accordance with Regulation Section 1.704-2(i)(4). Allocations of gross income and gain pursuant to this Section 7.03(f) shall be made in accordance with Regulation Sections 1.704-2(i)(4) and 1.704-2(j)(2). It is the intent of the parties hereto that any allocation pursuant to this Section 7.03(f) shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(i)(4).

(g) Guaranteed Payments. To the extent any compensation paid to any Member by the Company is determined by the Internal Revenue Service not to be a guaranteed payment under Code Section 707(c) or is not paid to the Member other than in the Person's capacity as a Member within the meaning of Code Section 707(a), the Member shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and the Member's Capital Account shall be adjusted to reflect the payment of that compensation.

(h) Unrealized Receivables. If an Interest Holder's Interest is reduced (provided the reduction does not result in a complete termination of the Interest Holder's Interest), the Interest Holder's share of the Company's "unrealized receivables" and "substantially appreciated inventory" (within the meaning of Code Section 751) shall not be reduced, so that, notwithstanding any other provision of this Agreement to the contrary, that portion of the Profit otherwise allocable upon a liquidation or dissolution of the Company pursuant to Section 7.04 hereof which is taxable as ordinary income (recaptured) for federal income tax purposes shall, to the extent possible without increasing the total gain to the Company or to any Interest Holder, be specially allocated among the Interest Holders in proportion to the deductions (or basis reductions treated as deductions) giving rise to such recapture. Any questions as to the aforesaid allocation of ordinary income (recapture), to the extent such questions cannot be resolved in the manner specified above, shall be resolved by the Directors.

23

(i)  Withholding.  All amounts required to be withheld pursuant to Code Section 1446 or any other provision of federal, state or local tax law shall be treated as amounts actually distributed to the affected Interest Holders for all purposes under this Agreement.

7.04.    Liquidation and Dissolution

(a)    If the Company is liquidated, the assets of the Company shall be distributed to the Interest Holders in accordance with the balances in their respective Capital Accounts, after taking into account the allocations of Profit or Loss and distributions of Cash Flow and Capital Proceeds pursuant to Sections 7.01 through 7.03.

(b)    No Interest Holder shall be obligated to restore a Negative Capital Account.

7.05.    General

(a)    Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the Directors.

(b)    If any assets of the Company are distributed in kind to the Interest Holders, those assets shall be valued on the basis of their fair market value, and any Interest Holder entitled to any interest in those assets shall receive that interest as a tenant-in-common with all other Interest Holders so entitled. Unless the Directors otherwise agree, the fair market value of the assets shall be determined by an independent appraiser who shall be selected by the Directors. The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 7.02 and shall be properly credited or charged to the Capital Accounts of the Interest Holders prior to the distribution of the assets in liquidation pursuant to Section 7.04.

(c)    All Profit and Loss shall be allocated, and all distributions shall be made to the Persons shown on the records of the Company to have been Interest Holders as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the foregoing, unless the Company's taxable year is separated into segments, if there is a transfer or an involuntary withdrawal during the taxable year, the Profit and Loss shall be allocated between the original Interest Holder and the successor on the basis of the number of days each was an Interest Holder during the taxable year; provided, however, the Company's taxable year shall be segregated into two or more segments in order to account for Profit, Loss or proceeds attributable to a Capital Transaction or to any other extraordinary non-recurring items of the Company.

(d)    The Directors are hereby authorized, upon the advice of the Company's tax counsel, to amend this Article VII to comply with the Code and the Regulations promulgated under Code Section 704(b); provided, however, that no amendment shall materially affect distributions to an Interest Holder without the Interest Holder's prior written consent.

24

## ARTICLE VIII
### SALE, DISSOLUTION AND LIQUIDATION

8.01. Dissolution of the Company.

(a) The Company shall be dissolved upon the happening of any of the following events:

(i) the Directors sell or transfer substantially all of the assets of the Company;

(ii) the Company ceases its business operations; or

(iii) upon the Consent of a majority in Interest of the Members.

(b) If the Company is dissolved, the business and affairs of the Company shall continue to be governed by this Agreement during the winding up of the Company's business and affairs, and the Directors shall proceed to wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Interest Holders who are creditors, in satisfaction of the liabilities of the Company, and then to the Interest Holders in accordance with Section 7.04 of this Agreement.

(c) If the Company is dissolved, the Directors shall promptly file a Certificate of Dissolution with the Delaware Secretary of State. If there are no Directors, then the Certificate of Dissolution shall be filed by the remaining Members; if there are no remaining Members, the Certificate shall be filed by the last Person to be a Member; if there is neither a Director, remaining Members, or a Person who last was a Member, the Certificate shall be filed by the legal or personal representatives of the Person who last was a Member.

## ARTICLE IX
### BOOKS AND RECORDS, ACCOUNTING, TAX ELECTIONS

9.01. Accounts. All funds of the Company shall be deposited in a bank account or accounts maintained in the Company's name. The Directors shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

9.02. Books and Records.

(a) The Directors shall direct the officers to keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The records shall include, but not be limited to, financial statements of the Company for the three most

25

recent fiscal years, a copy of the Certificate and Operating Agreement, together with any relevant powers of attorney, information regarding the amount of cash or agreed value of property or services contributed or agreed to be contributed in the future by each Member, the respective rights of the Company and each Member regarding the return of contributions, and the Company's federal, state or local tax returns.

(b) The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member at any and all reasonable times during normal business hours. Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

9.03 Annual Accounting Period. The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Directors, subject to the requirements and limitations of the Code.

9.04. Reports. Within ninety (90) days after the end of each taxable year of the Company, the Directors shall cause to be sent to each Person who was a Member at any time during such year the financial statements of the Company for such year, accompanied by a certificate of the chief financial officer of the Company that such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows for the Company at year end and for the year then ended, in conformity with generally accepted accounting principles. In lieu of such certification, if the financial statements have been reported upon by the Company's independent auditors, a copy of such auditors' report shall be furnished to the Members. In addition, the Directors shall use their best efforts to cause to be sent to each Person who was an Interest Holder at any time during any taxable year of the Company, within ninety (90) days after the end of such taxable year, a Schedule K-1 and other tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year.

9.05. Tax Matters Member. The Chairman or such other Director as is designated by the Directors shall be the Company's tax matters Member ("Tax Matters Member"). The Tax Matters Member shall have all powers and responsibilities provided in Code Section 6221, et seq. The Tax Matters Member shall keep all Directors informed of all notices from government taxing authorities which may come to the attention of the Tax Matters Member. The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Tax Matters Member in performing those duties. A Member shall be responsible for any costs incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Company. The Tax Matters Member may not compromise any dispute with the Internal Revenue Service without the approval of the Directors.

26

9.06. Tax Elections. The Directors shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754. The decision to make or not make an election shall be at the Directors' sole and absolute discretion.

## ARTICLE X
## CONSENTS, VOTING AND MEETINGS

10.01. Method of Giving Consent. Any Consent required by this Agreement may be given as follows:

(a) by a written Consent given by the consenting Member and received by the Directors at or prior to the doing of the act or thing for which the Consent is solicited, provided that such Consent shall not have been nullified by:

   (i) notice to the Directors of such nullification by the consenting Member prior to the doing of any act or thing the doing of which is not subject to approval at a meeting called pursuant to Section 10.02;

   (ii) notice to the Director of such nullification by the consenting Member prior to the time of any meeting called pursuant to Section 10.02 to consider the doing of such act or thing;

   (iii) the negative vote by such consenting Member at any meeting called pursuant to Section 10.02 to consider the doing of such act or thing; or

(b) by the affirmative vote by the consenting Member to the doing of the act or thing for which the Consent is solicited at any meeting called pursuant to Section 10.02 to consider the doing of such act or thing.

10.02. Meetings of Members.

(a) The annual meeting of the Members for the election of Directors, for the consideration of reports to be laid before such meeting and for the transaction of such other business as may properly come before such meeting, shall be held on such day and at such hour as may be fixed from time to time by the Directors.

(b) Special meetings of the Members may be held on any date. Calls for Special Meetings shall specify the time, place and object or objects thereof, and no business other than that specified in the call therefor shall be considered at any such meetings. Meetings of the Members may be called only by the Chairman, by the Directors in action at a meeting, by a majority of the Directors acting without a meeting, or the holders of a majority of the Membership Interests. All meetings of Members shall be held at the principal office of the Company, unless otherwise provided by action of the Directors. Meetings of Members may be held at any place within or without the State of Delaware.

(c) Written notice stating the time, place and purpose of a meeting of the Members shall be given by or at the direction of the Chairman or Secretary, either by personal delivery or by mail not less than three nor more than sixty days before the date of the meeting, to each Member of record entitled to notice of the meeting. If mailed, such notice shall be addressed to the Member at his address as it appears on the records of the Company. Notice of adjournment of a meeting need not be given if the time and place to which it is adjourned are fixed and announced at such meeting. In the event of a transfer of Interests after the record date for determining the Members who are entitled to receive notice of a meeting, it shall not be necessary to give notice to the transferee. Nothing herein contained shall prevent the Directors from setting a record date for the determination of Members who are entitled to receive notice of or to vote at any meeting of Members or for any purpose required or permitted by law.

(d) Notice of the time, place and purpose or purposes of any meeting of Members may be waived in writing, either before or after the holding of such meeting, by any Member, which writing shall be filed with or entered upon the records of such meeting. The attendance of any Member, in person or by proxy, at any such meeting without protesting the lack of proper notice prior to or at the commencement of the meeting shall be deemed to be a waiver by such Member of notice of such meeting.

(e) At any meeting of Members, the holders of a majority of the Membership Interests then outstanding and entitled to vote thereat, present in person or by proxy, shall constitute a quorum for such meeting. The holders of a majority of the Membership Interests represented at a meeting, whether or not a quorum is present, or the Chairman, the President or the officer of the Company acting as Chairman of the meeting, may adjourn such meeting from time to time and, if a quorum is present at such adjourned meeting, any business may be transacted as if the meeting had been held as originally called.

(f) At all elections of Directors, the candidates receiving the greatest number of votes shall be elected. Any other matter submitted to the Members for their vote shall be decided by the vote of the holders of a majority of the Membership Interests present in person or by proxy entitled to vote upon such matter or such other proportion as is required by law, the Certificate or this Agreement. No Member shall have the right to cumulate votes in the election of Directors or for any other purpose.

(g) The Directors may fix a record date for any lawful purpose, including without limitation, the determination of Members entitled to (i) receive notice of or to vote at any meeting, (ii) receive payment of any dividend or distribution, (iii) receive or exercise rights of purchase of or subscription for, or exchange or conversion of, shares or other securities, subject to any contract right with respect thereto, or (iv) participate in the execution of written consents, waivers or releases. Said record date shall not be a date earlier than the date on which it is fixed, and shall not be more than sixty days preceding

28

the date of such meeting, the date fixed for payment of any distribution, or the date fixed for the receipt or exercise of rights, as the case may be.

(h)  Any action that may be taken at a meeting of the Members may, in the discretion of the Board of Directors, be taken in writing with the written Consent of the holders of a majority of the Membership Interests. The Chairman or Secretary shall submit to the Members a verbatim statement of any proposed action and may include in any such submission the recommendation of the Board.   For purposes of obtaining a written Consent, the Board may require a response within a specified time, but not less than 15 days, and failure to respond in such time shall constitute a Consent which is consistent with the Board's recommendation with respect to the proposed action.

## ARTICLE XI
## GENERAL PROVISIONS

11.01.  Burden and Benefit.  The covenants and agreements contained herein shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors and assigns of the respective parties hereto.

11.02.  Applicable Law; Jurisdiction and Venue.  This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware.  Any suit involving any dispute of or matter arising under this Agreement may only be brought in the Chancery Court of the State of Delaware, or in any state or federal court located in Franklin County, Ohio.  All members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding, and waive any objection to venue in any such court.

11.03.  Pronouns and Plurals.  All pronouns used herein shall be deemed to refer to masculine, feminine, neuter, singular or plural as the identity of the Person or Persons may require in the context, and the singular form of nouns, pronouns, and verbs shall include the plural, and vice versa, whichever the context may require.

11.04.  Counterparts.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original copy, and all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties shall not have signed the same counterpart.

11.05.  Separability of Provisions.  Each provision of this Agreement shall be considered separable and if for any reason any provision which is not essential to the effectuation of the basic purposes of the Agreement is determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those provisions of this Agreement that are valid.

11.06  Amendments.  Amendments to this Agreement may be made in the following manner.

29

(a) Amendments to this Agreement may be proposed by the Directors or by Members whose combined Interests represent at least 25% of the Interests of all Members. Following such proposal, the Chairman or Secretary shall submit to the Members a verbatim statement of any proposed amendment and may include in any such submission the recommendation of the Board as to the proposed amendment. The Board may seek the written Consent of the Members on the proposed amendment pursuant to Section 10.02(h) or may call a special meeting of the Members pursuant to Section 10.02(b) to vote thereon and to transact any other business permitted by the Act to be transacted by the Members that they may deem appropriate. Except as provided below, a proposed amendment shall be adopted and effective as an amendment to this Agreement if it receives the affirmative vote of Members whose combined Interests represent at least 51% of the Interests of all Members. Notwithstanding any other provision of this Article XI to the contrary, until the earliest to occur of the following: (i) the aggregate amount of Capital Contributions that the Members have made to the Company from the date of filing of the Certificate equals or is greater than $40,000,000, (ii) 5 years from the date of such filing, or (iii) Mr. Thompson is no longer the Chairman of the Board, Article 4.03 of this Operating Agreement may not be amended.

(b) In addition to any amendments otherwise authorized herein, the Board may, without obtaining the consent of the Members, amend this Agreement from time to time to cure any ambiguity, to correct or supplement any provision herein or therein which may be inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Agreement which will not be inconsistent with the provisions of this Agreement, provided that in any such case, the Company receives a written opinion of independent counsel that such amendment does not adversely affect the interests of the Members.

(c) Notwithstanding anything in this Agreement to the contrary, no amendment may be adopted which would reduce the amount of any allocation of income or loss or cash distribution without the written consent (to be evidenced on the fact of the amendment) of all Members adversely affected by such amendment.

11.07 Confidentiality. No Member shall, without the prior written consent of the Board of Directors or a duly authorized Officer, divulge to any third party, or use for his own benefit or for any purpose other than the exclusive benefit of the Company, any confidential information concerning its business and affairs, it being the intent hereof that no Member shall divulge or use any such information which is unpublished or not readily available to the general public. Nothing contained in this paragraph shall restrict any Member's ability to make such disclosures as may be necessary or appropriate in furtherance of the business of the Company, or to obtain legal, accounting, or investment advice concerning such Member's Interest in the Company.

11.08 Integrated Agreement. This Agreement constitutes the entire understanding and agreement among the parties hereto with respect to the subject matter hereof, and there

30

are no agreements, understandings, restrictions, representations or warranties among the parties other than those set forth herein or herein provided for.  This Agreement supersedes all prior agreements among the parties, written or oral, concerning the subject matter hereof, including but not limited to the Amended and Restated Agreement of Limited Partnership of the Partnership.

11.09  Specific Performance.  The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury.  Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any remedies that may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act that would constitute a breach, or (ii) compelling the performance of any obligation that, if not performed, would constitute a breach.

IN WITNESS WHEREOF, the Members have entered into this Agreement as of the effective date first written above.

31